**Carroll v. Allstate**    **Gary Fye**    **April 2, 2013**

---

**1**

```
            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
                         -oOo-


RICHARD CARROLL and          )
SHARON CARROLL,              )
                             )
          Plaintiffs,        )
                             )
vs.                          )  Case No.
                             )  12-cv-00007-WJM-KLM
ALLSTATE FIRE AND CASUALTY   )
INSURANCE COMPANY,           )
                             )
          Defendants.        )
                             )



          VIDEO DEPOSITION OF GARY T. FYE

              Tuesday, April 2, 2013

                  Reno, Nevada







REPORTED BY:          SUSAN E. BELINGHERI, CCR #655
```

---

**2**

```
 1   APPEARANCES:
 2
 3
 4   For the Plaintiff:     THE KAUDY LAW FIRM
                            Attorneys at Law
 5                          By:  RICHARD M. KAUDY, ESQ.
                            333 W. Hampden Avenue,
 6                            Suite 850
                            Englewood, CO 80110
 7
 8
 9   For the Defendant:     WHEELER TRIGG O'DONNELL LLP
                            Attorneys at Law
10                          By:  TERENCE M. RIDLEY, ESQ.
                            370 Seventeenth Street,
11                            Suite 4500
                            Denver, CO 80202
12
13
14
15   The Videographer:      A CORRAO VIDEO
                            By:  DAVID CORRAO
16                          5375 Kietzke Lane
                            Reno, NV
17
18
19
20
21
22
23
24
25
```

---

**3**

```
 1                    I N D E X
 2
 3   EXAMINATION:                             PAGE
 4   By Mr. Ridley:                             6
 5
 6
 7   EXHIBITS:        DESCRIPTION:            PAGE
 8   Exhibit 57    Fye CV.......................  7
     Exhibit 58    Assorted Documents............ 38
 9   Exhibit 59    E-mails, Subpoena to Produce... 40
     Exhibit 60    Fye 9/28/12 Expert Report...... 45
10   Exhibit 61    Fye 11/20/12 Expert Report..... 45
     Exhibit 62    Sierra Legal Duplicating
11                   Invoice..................... 51
     Exhibit 63    1998 Acclaim Article.......... 115
12   Exhibit 64    1995 CCPR Implementation
                     Training Manual.............. 115
13
14
15   MARKED PORTIONS BY MR. RIDLEY:
16
     PAGE   LINE         PAGE   LINE
17    43     18          107     9
      51      5          113    24
      55     22          123    15
18    62      9          130     6
      71     11          149     2
19    77     23          157     7
      79     17          169     5
20    80     18          174    18
      81     17          175    21
21    85     11          204    18
      86      9          205    17
22    87      9          206     4
     105      6          216     2
23
24
25
```

---

**4**

```
 1        ATTORNEYS NOTES/CORRECTIONS
 2
 3   PAGE  LINE
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Exhibit H**

**5**

1        PURSUANT TO NOTICE, and on Tuesday, the 2nd
2 day of April, 2013, at the hour of 9:00 a.m. of said
3 day, at the offices of Bonanza Reporting, 1111 Forest
4 Street, Reno, Nevada, before me, Susan E. Belingheri, a
5 notary public, personally appeared GARY T. FYE.
6           -oOo-
7
8        THE VIDEOGRAPHER: We're on record. The
9 date is Tuesday, April 2nd, 2013, and the monitor time
10 is approximately 9:00 a.m. This is the video deposition
11 of Gary T. Fye in the matter of Richard Carroll and
12 Sharon Carroll, plaintiffs, versus Allstate Fire and
13 Casualty Insurance Company, defendant. The case number
14 is 12-cv-0007-WJM-KLM, as filed in the United States
15 District Court, for the District of Colorado.
16        This deposition is being held at Bonanza
17 Reporting, 1111 Forest Street, Reno, Nevada. The court
18 reporter is Susan Belingheri of Bonanza Reporting. I am
19 a certified court videographer. My name is David Corrao
20 of A Corrao Video. My address 5375 Kietzke Lane, Reno,
21 Nevada.
22        Counsel will now introduce themselves, the
23 name of their firm and who they represent, counsel for
24 the plaintiff first, please.
25        MR. KAUDY: Yes, thank you. Good morning.

**6**

1 Richard Kaudy, representing Richard and Sharon Carroll.
2 My Colorado registration number is 12345.
3        MR. RIDLEY: Terence Ridley, appearing on
4 behalf of Allstate Fire and Casualty Insurance Company.
5 I'm with the law firm of Wheeler Trigg O'Donnell.
6        THE VIDEOGRAPHER: Will the court reporter
7 now please swear in the witness.
8
9          GARY T. FYE,
10       having been duly sworn,
11      was examined and testified as follows:
12
13         EXAMINATION
14 BY MR. RIDLEY:
15      **Q. Good morning, Mr. Fye. Will you please state**
16 **your full name for the record.**
17     A. It's Gary, G-a-r-y, Tipton, T-i-p-t-o-n, and the
18 last name is Fye, F-y-e.
19      **Q. Do you have a business address?**
20     A. I do.
21      **Q. Is that the same as your home address? I'm**
22 **sorry, is that the same as your home address?**
23     A. It is.
24      **Q. Okay. What is that address?**
25     A. 6815 Windy Hill Way, Reno, Nevada, 89511.

**7**

1      **Q. All right. I'd like to mark your CV as our first**
2 **exhibit, and I think by agreement of counsel we've**
3 **agreed to mark this as Fye Exhibit 57.**
4       (Exhibit 57 marked at this time.)
5 BY MR. RIDLEY:
6      **Q. All right. Mr. Fye, as I understand it,**
7 **Exhibit 57 is a copy of your resume?**
8     A. It's my curriculum vitae.
9      **Q. All right. And is the information on this CV**
10 **accurate?**
11     A. Yes.
12      **Q. Since 1999 have you done any professional work**
13 **other than claims practice, I'm sorry, claim practices**
14 **analyst for Gary T. Fye Company?**
15     A. I guess I don't understand the question.
16      **Q. Sure. Professionally, what have you done since**
17 **1999? Generally speaking. In other words, have you**
18 **done anything other than claims practices analysis,**
19 **consulting and expert work.**
20     A. I have.
21      **Q. Can you tell me about that, please.**
22     A. Not really much. I invest.
23      **Q. I see. All right. Do you work full-time in the**
24 **claim practices analysis arena?**
25     A. Yes.

**8**

1      **Q. Do you have, maintain an office in Austin, Texas?**
2     A. No.
3      **Q. Is that just a second home?**
4     A. No. I don't have any presence in Austin. If
5 you're not able to follow my CV, let me help you with
6 that. What I have done from the beginning is listed the
7 cities where I've done work, in order. For instance, I
8 started in Fresno, moved to Redding, moved to
9 Susanville, moved to Everett, Washington. Then with
10 Fireman's Fund I worked in Seattle, and then Portland.
11      As an independent, I started my office in
12 McMinnville, Oregon, moved it to Anchorage, Alaska, and
13 then to Austin, Texas. When I retired from claims
14 adjusting at the end of 1998, I started doing solely
15 claim practices analysis in Austin, and then in 2000
16 moved to Reno. So basically these are the sequences of
17 the locations where I have pursued these activities.
18      **Q. I see. Okay. Thank you for that. So did you,**
19 **did you grow up in Fresno, California?**
20     A. No.
21      **Q. Did you go to high school there?**
22     A. No.
23      **Q. Where did you go to high school?**
24     A. In Lake Arrowhead, California.
25      **Q. What year did you graduate?**

**9**

1    A. I think 1959.
2    Q. All right. And then turning your attention to
3  the bottom of your CV, as I understand it, your degree,
4  or you obtained a degree from LaSalle Extension
5  University --
6    A. Yes.
7    Q. -- in law? What type of -- that was a bachelor's
8  degree, is that right?
9    A. Yes. It's called a Bachelor of Laws. It, it was
10 called an LLB in those days before lawyers switched to
11 the JD. And it was a correspondence course.
12   Q. Are you an attorney?
13   A. No.
14   Q. What year did you obtain that Bachelor of Laws
15 from LaSalle Extension University?
16   A. I don't know, but I think it was 1973.
17   Q. Okay. Mr. Fye, can you tell me what you did, if
18 anything, to prepare for today's deposition.
19   A. Read several boxes of materials associated with
20 the case, including the depositions and correspondence,
21 pleadings and claim activity materials, assembled
22 materials for copying on short notice on Friday, met
23 with Mr. Kaudy yesterday afternoon, and loaded up the
24 materials and brought them to the deposition before the
25 9:00 o'clock starting time this morning. I can't think

**10**

1  of anything else.
2    Q. For how long did you meet with Mr. Kaudy?
3    A. Associated with this case, an hour and a half or
4  so.
5    Q. What did you talk about?
6    A. The materials that had been furnished. As he
7  came to Reno, some last minute medical information.
8  Some, I asked him about an entry from a supervisor named
9  Hernandez, and we talked about that briefly. We talked
10 about the difficulty of dealing with the issue when an
11 insurance company basically puts up a hand and says talk
12 to the hand and, and recasts an insurance coverage,
13 morphs it into something that it isn't, and then
14 basically how they pursue kind of a tail-chasing
15 exercise that goes on endlessly rather than provide the
16 coverages that are actually written in the policy. I, I
17 probably discussed why some of that behavior happens and
18 where it came from and things, things of that nature.
19     We talked about, I asked him if there was a trial
20 date, and he said no. He mentioned to me that somehow
21 there, there was complaining about the way the documents
22 were produced. I forget exactly what it was. But I
23 told him not to worry, that that was a tactic that
24 Allstate had been teaching its lawyers, to be more
25 aggressive and to complain and go after the people

**11**

1  involved aggressively, that Ron Getchey's firm in San
2  Diego had published an aggressor program, when people
3  sued for insurance benefits, that it was smart tactics
4  for the insurance company to go after them and try to
5  make them the villain to deflect attention from the
6  company.
7      I can't think of anything else. That pretty much
8  encompasses what I can remember.
9    Q. You mentioned some medical information. What did
10 that medical information relate to?
11   A. Richard and Sharon Carroll.
12   Q. Do you recall specifically what the medical
13 information related to?
14   A. Their injuries.
15   Q. Do you recall which injuries?
16   A. No.
17   Q. Do you recall which doctors?
18   A. No. I have the material. It didn't get copied
19 Friday, so I have it with me today if you'd like to see
20 it.
21   Q. Okay. I probably will in a little bit. Thank
22 you for that. All right. You said, I believe, that you
23 had a question about Ms. Hernandez?
24   A. Me?
25   Q. Yes. About an entry.

**12**

1    A. (No audible response.)
2    Q. What was the nature of your concern concerning
3  Ms. Hernandez?
4    A. Well, there was an entry basically saying, you
5  know, kind of putting some bad faith insurance in the
6  file, I call it. Making an entry saying, well, at
7  least -- let's make an offer. At least we can say that
8  we made an offer. And the file was being postured for
9  later. Because the conclusion was that, that Allstate
10 would have to, would have to reply in some form, if not
11 substance. It's an improper, it's an improper entry in
12 a claim file, it basically is posturing, and I found it
13 to be a disturbing entry in a claim file.
14   Q. Did you mention that entry anywhere in either one
15 of your reports?
16   A. Indirectly, yes.
17   Q. Directly did you mention it?
18   A. No.
19   Q. This is an entry that was in, if I understand
20 your testimony, the claim history report?
21   A. What's the claim history report?
22   Q. The claim diary?
23   A. The activity logs?
24   Q. Right.
25   A. Yes.

Carroll v. Allstate                     Gary Fye                     April 2, 2013

---

13

1    Q. Okay. Do you recall the date of that entry?
2    A. Don't hold me to this, but I think it was
3  February 25th, 19 -- or 2011.
4    Q. Have you ever spoken with Ms. Hernandez?
5    A. No, not to my knowledge.
6    Q. Has she been deposed in this case?
7    A. Not to my knowledge. But, but you'll, you have
8  the answer to that, I don't.
9    Q. Do you have any --
10   A. I don't have her deposition in this case.
11   Q. Okay. Do you have any specific knowledge of what
12 Ms. Hernandez' motivation was in making the entry?
13       THE WITNESS: Could you read that back?
14       (Whereupon the reporter read the record.)
15       THE WITNESS: That's an unanswerable
16 question in the form it's in.
17 BY MR. RIDLEY:
18   Q. At --
19   A. I have a lot of specific knowledge about what
20 could be her motivation. But if you are asking me am I
21 able to read her mind, of course not. And that's an
22 interesting way to ask for Allstate to pose that question.
23   Q. Do you know whether when Ms. Hernandez --
24   A. It's almost like the entry in the activity log,
25 actually.

---

14

1    Q. Do you know whether the Carrolls were demanding
2  policy limits at the time Ms. Hernandez made that entry?
3    A. At the moment I don't. I may have at some point.
4    Q. Do you know if the Carrolls were demanding
5  payment of UIM benefits at the time she made that entry?
6    A. Well, are you using the word demand other than as
7  a term of art? Because I would -- you know, this is
8  first-party bodily injury coverage. You don't need to
9  demand, it's not a demand offer settlement situation,
10 it's making a claim. My understanding was they were
11 making a claim, and all of these activity notes were
12 responsive to the claims that were being made. They
13 don't have to make a demand.
14   Q. Okay. I understand that, that testimony, but my
15 question was --
16   A. You what, now?
17   Q. I understand what you're saying with that, but my
18 question was do you know whether the Carrolls were
19 demanding UIM benefits at the time Ms. Hernandez made
20 that entry?
21   A. Same answer. I don't know what you're after.
22   Q. Sure. All I'm after is --
23   A. If you could recast the question.
24   Q. Sure. Were the Carrolls --
25   A. They had reported an accident, and when you

---

15

1  report an accident, you're making a claim for every
2  benefit under the policy at that point. Whether or not
3  they're demanding something, it's not really that
4  relevant, because it's the insurer's obligation to
5  investigate the accident and make the benefits
6  available. The purpose of this policy is to soften the
7  financial consequences of the accident.
8    Q. All right.
9    A. So I, I guess what I'm trying to say is you need
10 to clarify, if you want to try to draw me into this
11 demand offer world that you're trying to create with
12 this case. Because that's the heart of my report --
13   Q. Sure.
14   A. -- that that's improper. Are you doing that --
15   Q. Well --
16   A. -- to be, to further that plan?
17   Q. No. I have no idea what you're talking about.
18   A. Well, did you read my report?
19   Q. Do you know whether the Carrolls made a specific
20 written demand for payments as of February when Ms.
21 Hernandez made that entry in the claim diary?
22   A. So this is a memory test.
23   Q. I'm just asking if you know.
24       MR. KAUDY: Object to the form.
25       THE WITNESS: So it's a memory test.

---

16

1  BY MR. RIDLEY:
2    Q. It's just a question.
3    A. It's a memory test.
4    Q. It's a question.
5    A. Well, let me refresh my memory.
6        MR. RIDLEY: Let the record reflect that I
7  have not asked the witness to look through any of his
8  five boxes of documents, I'm just asking him a question.
9  Please note the time on the record.
10       (Time is 9:17 a.m.)
11       THE WITNESS: What was that question again?
12       MR. RIDLEY: Can you read it back, please?
13       (Whereupon the reporter read the record.)
14       THE WITNESS: No.
15 BY MR. RIDLEY:
16   Q. Okay. Mr. Fye, this is what I'm going to do.
17 I'm going to, I'm just trying to get through my
18 questions. All right? I didn't ask you to look at
19 documents. So what I'm going to do is try to get some
20 direction from our magistrate right now in order to
21 figure out how we can get through this deposition today.
22 Because at this rate, it's not going to happen.
23       So let's get the phone, I'm going to try to get
24 the magistrate on the phone so we can discuss this up
25 front. Because if what you're doing is correct, I need

---

Carroll v. Allstate                **Gary Fye**                April 2, 2013

17

1    to know about it, and if not, I think you need to know
2    about it.
3        A.  Discuss what?
4        Q.  Discuss the deposition conduct so far.  So --
5        A.  The deposition conduct?
6            THE VIDEOGRAPHER:  Do you want to go off
7    record?
8            MR. RIDLEY:  No, I want to keep it on the
9    record.
10           THE VIDEOGRAPHER:  Okay.
11           MR. RIDLEY:  But I tell you what, why don't
12   you keep, we can go off record until we get the
13   magistrate on the phone.  Okay?
14           THE VIDEOGRAPHER:  We're going off record.
15   The monitor time is approximately 9:21 a.m.
16       (A short break was taken at this time.)
17           THE VIDEOGRAPHER:  We're going back on
18   record.  The monitor time is approximately 9:25 a.m.
19           THE COURT:  Good morning.  This is
20   Magistrate Judge Mix.
21           MR. RIDLEY:  Good morning, Judge Mix.  This
22   is Terence Ridley calling on 12-cv-07, and with me is
23   Richard Kaudy, who represents the Carrolls.
24           And I'm attempting to take the deposition of
25   Plaintiff's bad faith expert, Gary Fye.  And Your Honor,

18

1    yesterday when we spoke I, I alerted the Court to the
2    issue of not just the $500 video issue, but also the
3    issue of documents that would be produced pursuant to a
4    subpoena.
5            This is what has happened in the meantime.
6    After our call of yesterday, I went up to the offices of
7    Snell & Wilmer, encountered over 12,000 pages of
8    documents, many of which dated back to 1995.  I have not
9    yet gotten to that part of the deposition, but many
10   dated back 15, 16 years, have absolutely nothing do with
11   this claim.
12           Today at the start of the deposition,
13   Mr. Fye appeared with five boxes of documents.  One box
14   I have no idea what's in it yet.  But here's the
15   specific issue:  I'm trying to get through the
16   deposition, and I start off by asking a basic question,
17   which was what did you do to get ready for the
18   deposition.  Part of that answer, in part of that answer
19   Mr. Fye expressed a criticism of a supervisor at
20   Allstate, Ms., about Ms. Estrella Hernandez in an entry
21   she made in the claim file in February, 2011.
22           I asked, at that point I asked Mr. Fye a
23   simple question.  I just said do you know whether the
24   Carrolls were demanding UIM benefits at the time Ms.
25   Hernandez made that entry.

19

1            Now, at that point Mr. Fye accused me of
2    engaging him in a memory contest rather than just giving
3    me a yes or no answer.  When I persisted, he
4    unilaterally got up, walked down to his five boxes,
5    started rummaging through them.  I told him he didn't
6    need to do that, it was a simple question, but he
7    persisted.  Took about five minutes, came back and asked
8    the court reporter to repeat the question.
9            Now, Your Honor, I've got a bunch of issues
10   with the deposition, and a lot of issues to cover in
11   this complex case, but issue number one is I cannot
12   have, because I don't have time, I cannot have Mr. Fye
13   standing up to rummage through over 12,000, now it's
14   maybe over 13,000 pages of documents, many of which are
15   completely unrelated to this case, in order to answer a
16   simple question, do you know.
17           So I'm hoping for some instruction on this
18   issue so that I don't have to go through this throughout
19   the day, because if I do, I'm going to make hardly any
20   progress at all.  Because I'm not asking him about all
21   those documents at this point.  I'm just at the
22   background, one of the very first questions, what did
23   you do to get ready for the deposition, some related
24   questions, and now I've got Mr. Fye going through boxes
25   of documents to answer a question where I have not asked

20

1    him to go through the boxes of documents.
2            So there is a long, contentious history with
3    Mr. Fye.  I don't want to get into that now, but I do
4    want guidance from the Court so I can make this as
5    productive as possible today.
6            THE COURT:  All right.  Thank you.
7    Mr. Kaudy?
8            MR. KAUDY:  Thank you, Judge.  I was in Reno
9    yesterday when there was the hearing on the Stanton
10   matter.  I was unaware that Mr. Ridley was going to
11   involve the Carroll case, or I would have been available
12   to Your Honor.  I apologize for my absence from the
13   hearing yesterday.  I had no idea that this would even
14   be raised.
15           Several months ago we provided, on CD, to
16   both Mr. Scott and Mr. Ridley, a complete copy of all of
17   the attachments that Mr. Fye had referenced in his
18   report.  In addition to that, several weeks ago we
19   provided Mr. Ridley's office with the procedure for how
20   his office, at his expense, could obtain the entire file
21   of Mr. Fye, that Mr. Fye relied upon, reviewed, and
22   referenced in his report.
23           Mr. Ridley's office did not welcome that
24   invitation.  In fact, ignored it until last week, when
25   on either Maundy Thursday or Good Friday the urgency

5 (Pages 17 to 20)

21

1    came through that Mr. Ridley's office suddenly needed a
2    copy of Mr. Fye's entire file that had been available to
3    him for months before.
4          So we arranged that even on Good Friday
5    Mr. Fye would bring his file to Sierra Document
6    Production and have it photocopied and provided to the
7    Reno offices of Snell & Wilmer for the convenience of
8    Mr. Ridley.
9          What Mr. Fye brought today was a voluntary
10   production of his entire file that Mr. Ridley didn't
11   serve a subpoena for, we just volunteered to provide it
12   for him in advance, as we had done previously. That is
13   the file production kerfuffle, I guess is the best word
14   for it. It seems to me the objection usually is you
15   don't produce enough, not what you produced. Since
16   Mr. Fye has relied and reviewed upon institutional
17   records in his opinion, and believed it would be helpful
18   to explain his position, not knowing what the questions
19   would be, he brought the entire five boxes of materials.
20         Mr. Ridley made reference to incomplete
21   production. What he neglected to tell you was we
22   provided Mr. Fye with additional disclosures that had
23   been made in the last two weeks that are provided to him
24   simply to complete his file, but which had no bearing on
25   his opinion. Mr. Ridley just didn't ask about that and

22

1    so he didn't understand that Mr. Fye volunteered simply
2    to bring whatever he had.
3          So if I could fast forward, then, to this
4    morning. Mr. Ridley repeatedly asked Mr. Fye a
5    knowledge question, do you know this fact at the time
6    the Carrolls were seeking coverage benefits. Mr. Fye
7    recognized this as a memory, or recollection issue, not
8    a knowledge issue. There was an exchange between
9    counsel and the witness, three or four times, and the
10   record will reflect it. So you're asking if this is a
11   memory question? Mr. Ridley: Knowledge. Memory?
12   Knowledge. Memory? Knowledge.
13         Then Mr. Fye, to resolve the dispute, simply
14   said I will go find the information for you. Walked to
15   the box, about five feet away, reviewed some materials,
16   came back and asked for the question to be asked again.
17   Question was no, I do not remember.
18         So that's the exchange. It's a little
19   puzzling that we're even on the record, when it appears
20   to be more of an emotional reaction by Mr. Ridley of not
21   getting the answer he wanted. Mr. Fye has not refused,
22   I've never objected in the deposition. We're simply
23   here to provide helpful testimony and not engage in any
24   argument or provocations. And so I'm kind of, I don't
25   understand why we're troubling Your Honor at this

23

1    moment. But I'll be willing to answer any questions
2    Your Honor may have.
3          THE COURT: All right. Thank you. Let me
4    just comment for your benefit, Mr. Kaudy, about the
5    brief hearing yesterday that related to this case. Mr.
6    Ridley and Mr. Eddington were on the phone with respect
7    to another case. At that time Mr. Ridley mentioned that
8    there would be depositions in the Carroll case today,
9    and I confirmed with counsel, Mr. Eddington, that he was
10   counsel for the plaintiffs in the Carroll case as well.
11         So I was operating under the assumption, of
12   course, that I had all attorneys on the phone at the
13   hearing yesterday with respect to Carroll, which was in
14   fact quite brief and related only to an issue about an
15   additional deposition fee relating to a video, and also
16   about issues, potential issues relating to documents,
17   just as a heads up to the Court, without any ruling
18   requested.
19         So that was the nature of the hearing
20   yesterday. And to the extent that you feel you should
21   have been involved in that, I apologize. It was my
22   understanding that I had all counsel on the call.
23         With respect to this issue today, I think
24   the best way to handle this would be for the question to
25   be framed as follows: Without checking your documents,

24

1    do you know, et cetera. I think that's the best way to
2    put the witness in a position where he can answer
3    without checking the documents. If the witness has an
4    answer without checking the documents, he can say yes
5    and provide the answer. If the witness does not know
6    without checking the documents, he can say no. Then the
7    record is clear that the witness would need to check the
8    documents in order to provide a knowledgeable answer.
9          I think, otherwise I cannot prevent the
10   witness from checking documents to refresh his
11   recollection with respect to what he knew at any given
12   time. So if an open-ended question is asked about the
13   witness' knowledge, he may take a reasonable amount of
14   time to check his documents to respond. If the question
15   is asked, without checking your documents do you know
16   whether the Carrolls were asking for UIM benefits at
17   that time, then the witness must answer based on his
18   best recollection. And if the answer is no, he just
19   doesn't know without checking his documents, that's just his
20   answer.
21         All right. Anything further we need to
22   address, Mr. Ridley?
23         MR. RIDLEY: No, Your Honor. I appreciate
24   you taking the call. I mean, just to, just so the Court
25   knows, this request for documents went out on March

6 (Pages 21 to 24)

Carroll v. Allstate                    Gary Fye                    April 2, 2013

---

25

1   20th, and Mr. Fye refused to accept the subpoena.  So it
2   has been out there.  And just so the Court knows,
3   Mr. Kaudy and I had e-mail exchanges, both on the $500
4   issue and the document issue.  And because I know that
5   Mr. Fye has a lot of documents.  I did ask him
6   specifically to produce the documents that you
7   specifically relied on in forming your opinions.  And
8   this issue that came up this morning was a new issue.
9   It was based on what he discussed with Mr. Kaudy
10  yesterday.
11       So I will, I will attempt to ask those
12  questions in that way.  I think that makes a lot of
13  sense.  I did think I made it clear to Mr. Fye that I
14  didn't want him to look at the documents, but he
15  insisted on getting up anyways and rummage through.  And
16  like I said, basically five minutes went by, he came
17  back and there was, even then there was just no answer
18  to the question.  When all he had to say was I can't
19  answer that sitting here without reviewing my documents.
20  So --
21       THE COURT:  Well, I think, I mean, I think
22  the one thing that we should establish from this point
23  forward in the deposition is that to the extent that the
24  question asks for an answer without a review of the
25  documents, then the witness at that point should not

---

26

1   take the time to review the documents.  And of course
2   this is the because there's a limited amount of time
3   that's allotted for the deposition.  And so both the
4   taker of the deposition and the deponent has to be
5   careful about using time wisely and in accordance with
6   the rules.
7        So if the question specifically is asked in
8   a way that asks the witness to respond without reviewing
9   documents, that's what the witness should do.  All
10  right?
11       MR. RIDLEY:  All right.  And Your Honor,
12  just one other thing.  Again, I'm just trying to speed
13  this up so I make it productive.  Already there have
14  been several instances where I've just tried to ask a
15  simple question, and the response is a rhetorical
16  question back from Mr. Fye.  Such as what Mr. Kaudy just
17  said.  I asked a simple question, the response is:  Is
18  this a memory test?  No, it's, it is just answer the
19  question.  So if Mr. Fye would just answer the question
20  asked, I think this deposition would be much more
21  productive.
22       THE COURT:  Right.  I mean, let me say this,
23  counsel.  I understand that there is some history here
24  with respect to this particular expert witness, and, you
25  know, and his review of cases involving this insurance

---

27

1   company, and perhaps other insurance companies as well.
2   I understand that over time certain animosities can
3   develop, and they can make depositions more caustic and
4   less productive than they need to be.
5        I'm not blaming the witness by any means.  I
6   think that, unfortunately, occasionally that kind of a
7   caustic deposition is caused by counsel as well.  I
8   don't want to pass any judgment on what's happened in
9   this deposition today, but I want to tell you I am aware
10  of the history, and I encourage you to try to put any
11  history aside and focus on questions and answers in
12  order to get through the deposition as efficiently as
13  possible without unnecessary animosity, without wasting
14  unnecessary time, and without eventually causing counsel
15  to have to come back to the Court and ask for more time
16  for the deposition because time is wasted on exchanges
17  of the nature that Mr. Ridley just brought to my
18  attention.
19       So please do your very best to be as
20  professional as you can and get through the deposition.
21  I know it's not always a pleasant process, but I know
22  that we have two fine professionals here, in terms of
23  both lawyers, and we also have a fine professional in
24  terms of the expert.  And I know that if you do your
25  best, you'll be able to get through it efficiently.  So

---

28

1   I encourage you to do that.
2        MR. KAUDY:  Well, thank you, Judge.  This is
3   Rich Kaudy again.  I think you've got an advantage on
4   me.  To my knowledge, this is the first time Mr. Fye has
5   been on a case with this law firm, Wheeler Trigg &
6   O'Donnell.  To my knowledge, Mr. Fye has never been the
7   subject of any proceeding in front of Your Honor in this
8   case.
9        Though I wasn't present at the hearing
10  yesterday, I have no idea what Mr. Ridley has
11  represented to the Court, but it's astonishing to me
12  that Mr. Fye would somehow have a history with this
13  court when there's been nothing other than Mr. Ridley's
14  call this morning, or perhaps Mr. Ridley's peevishness
15  at a $500 video fee that Mr. Fye had asked for.  And
16  that issue has not even been addressed here.  Mr. Fye
17  has been paid for his deposition.  That's a non-issue.
18       I'm a little perplexed at exactly what has
19  been discussed about Mr. Fye in my absence and --
20       THE COURT:  Well, let me clear it up.
21       MR. KAUDY:  -- that there's some caustic
22  response.
23       THE COURT:  I wasn't implying that Mr. Fye
24  had been before this Court in the past.  He has not.
25  I'm not, I don't believe I've met you, Mr. Fye.  I, if I

---

Bonanza Reporting          (775) 786-7655          1111 Forest Street

Carroll v. Allstate                    Gary Fye                         April 2, 2013

---

29

1   have, I apologize, but I don't think I have.  I don't
2   think I've had any involvement with Mr. Fye.
3           What was suggested to me yesterday was that
4   Mr. Fye was a frequent expert witness in cases against
5   Allstate Insurance Company, and that was all that was
6   suggested to me.  And if that's incorrect, I apologize
7   for that as well.  That was all I was referring to.
8           MR. KAUDY:  Well, I understand.  I'm sorry,
9   Your Honor.  I felt like I'm going in the third reel of
10  a four-reel movie, and I was unaware.  So I'll, I'll
11  move on.  I think we have your guidance today, and I'll
12  just be quiet.
13          THE COURT:  All right.  Thank you.  Anything
14  else, Mr. Ridley?
15          MR. RIDLEY:  No.  Thank you, Your Honor.  I
16  appreciate you taking the call.
17          THE COURT:  All right.  Thank you.
18          MR. RIDLEY:  Okay.  Bye now.
19          Okay.  Are, are we on the record?
20          THE VIDEOGRAPHER:  (No audible response.)
21  BY MR. RIDLEY:
22      **Q.  Okay.  Mr. Fye, with respect to the specific**
23  **medical condition discussed with Mr. Kaudy yesterday,**
24  **did this condition relate to either Mr. Carroll or**
25  **Ms. Carroll?**

---

30

1       A.  Yes.
2       **Q.  Did it relate, were there issues related to both?**
3       A.  Yes.
4       **Q.  What was the medical issue discussed concerning**
5   **Mr. Fye?**
6       A.  I'm Mr. Fye.
7       **Q.  I'm sorry.  Mr. Carroll.  Excuse me.**
8       A.  One was balance and the wisdom of him climbing
9   ladders, or being on roofs, and how that limited his
10  occupation.  He's apparently a, a property loss
11  adjuster.
12          And with Mrs. Carroll, we briefly discussed the
13  idea that she's had ongoing difficulties, and I'm not
14  sure which side, but her lower extremities had secondary
15  issues that, that were related to the accident by gait
16  and carriage issues, apparently.  And that's what I can
17  remember of our conversation.
18      **Q.  And you said related to the accident.  Is that**
19  **Mr. Kaudy telling you that the lower extremity issues**
20  **experienced by Ms. Carroll was related to the accident?**
21      A.  No, not in, not the way you've expressed it.  I
22  think more just a discussion of how, how patients
23  recover and react to accident injuries in a general
24  sense, and some of the difficulties the Carrolls had,
25  are still undergoing treatment for.

---

31

1       **Q.  Do you know who Greg Taylor is?**
2       A.  Not as I sit here.  I, I know that name very
3   well, but I can't --
4       **Q.  Do you know -- I'm sorry.**
5       A.  I can't remember who that is.
6       **Q.  Do you know who Jeff Opp is?**
7       A.  Yes.
8       **Q.  Who's Jeff Opp?**
9       A.  I hesitate to say an economist, but basically an
10  occupational expert that calculates the effect of
11  accidents on earning capacity and issues like that.
12      **Q.  Have you ever spoken with Jeff Opp?**
13      A.  Not to my knowledge.  I may have, but I don't
14  recall it.
15      **Q.  Did Mr. Kaudy show you any documents yesterday?**
16      A.  Yes.  He brought a group of medical reports and
17  disclosures to bring me up to date.
18      **Q.  Now, as I understand it, though, based on**
19  **comments that Mr. Kaudy made when we were speaking to**
20  **the Court, those medical records don't bear on your**
21  **opinions; is that correct?**
22      A.  Yes.
23      **Q.  Did he show you anything else yesterday?**
24      A.  He didn't show me, but he, but I, I asked him
25  about the claim manual, and he said that the claim

---

32

1   manual was under protective order and that he couldn't
2   furnish it to me.  So I gave him a claim manual that was
3   unprotected, and brought it with me today to show you.
4   And in that claim manual he showed me a couple of pages,
5   and I put flags on them.  And those would be part of my
6   deposition today.
7       **Q.  Did he show you any other documents?**
8       A.  I don't recall any.
9       **Q.  Other than the time you're spending with me**
10  **today, are you charging for the time you spend in, on**
11  **this case?  The time you spent preparing your reports,**
12  **for example.**
13      A.  Yes.
14      **Q.  How do you charge for that time?**
15      A.  By the hour.
16      **Q.  What's the hourly rate?**
17      A.  $175.
18      **Q.  Can you give me an estimate of how much you have**
19  **charged so far on this case, excluding today's**
20  **deposition?**
21      A.  $2,500.
22      **Q.  And have you sent an invoice out on that to**
23  **Mr. Kaudy or to the Carrolls?**
24      A.  I should have.
25      **Q.  Without getting up to look at your documents, do**

---

8 (Pages 29 to 32)

Carroll v. Allstate                    **Gary Fye**                    April 2, 2013

---

33

1   you know if you brought that invoice?
2      A. If I sent it, it's here, yes.
3      **Q. Have you written any time off with respect to**
4   **your billings on this case?**
5      A. What do you mean, written off?
6      **Q. In other words, you've performed work for**
7   **Mr. Kaudy and/or the Carrolls, but you haven't charged**
8   **for that time.**
9      A. No. And I need to explain my form of billing --
10     **Q. Sure, go ahead.**
11     A. -- so you'll understand why that question doesn't
12  relate to the way I charge. Many years ago I stopped
13  keeping billing records, and what I do is work on the
14  case -- and I charge for everything. But what I do is
15  when the case is closed I go back through the file and
16  basically put increments of time on the materials.
17     For instance, in boxes of documents I can tell
18  you whether they're a rapid review or dense material
19  that's, that's difficult to review. And basically I
20  don't bill by the hour until the case is closed, and
21  then I simply send a bill for the hours that I've spent
22  on the case.
23     So when you say written off, I don't write any
24  time off, it's just that they don't get a bill for it
25  until the end of the case. What I do is get a deposit,

---

34

1   or a retainer, of $2,500. And during the pendency of
2   the case, I'll frequently send another interim billing
3   for another $2,500, or some figure, that represents some
4   of the work I've done. But I don't necessarily do that.
5      **Q. All right. So with respect to the invoice that**
6   **you mentioned, the $2,500, was that just your retainer**
7   **invoice?**
8      A. Yes.
9      **Q. Do you know if you have spent more than $2,500**
10  **worth of time on this matter thus far?**
11     A. Yes.
12     **Q. Do you know by how much?**
13     A. I don't. I don't. But normally by the time I
14  appear for a deposition, my charges are somewhere
15  between four and seven thousand dollars, depending on
16  the materials in the case.
17     **Q. And do you know how much it is in this case?**
18     A. I don't. I haven't thought about it.
19     **Q. Is there a written document which would show what**
20  **that amount is?**
21     A. What amount?
22     **Q. The four -- whatever the amount is today that,**
23  **the amount of time you've spent and the charges you've**
24  **incurred as of today.**
25     A. You apparently didn't listen to my last answer.

---

35

1      **Q. I just want to know if there's a written, written**
2   **document showing your time.**
3      A. Well, if you would remember my last answer, there
4   isn't.
5      **Q. So how do you keep track of your, your time and**
6   **the amounts owed by the Carrolls and/or Mr. Kaudy?**
7      THE WITNESS: Do you want to read the answer
8   back to him? Should we --
9      MR. KAUDY: Object to the form, asked and
10  answered. If you want to supplement, feel free.
11     THE WITNESS: I don't have any supplement.
12  BY MR. RIDLEY:
13     **Q. Yeah. And I haven't asked a specific question,**
14  **so just, I'm trying to make a record here too, Mr. Fye.**
15  **So --**
16     A. You're trying to make a record? Okay.
17     **Q. Sure.**
18     A. Well, what's your question?
19     **Q. The question is: Specifically, how do you keep**
20  **track of exactly how much is going to be charged?**
21     A. You've got your fingers up like this.
22     **Q. I'm trying to be precise. That's all.**
23     A. You're trying to be precise. Okay. Good, good
24  for you. What is it you want me to tell you?
25     **Q. Sure. How do you keep track of how much the**

---

36

1   **Carrolls and/or Mr. Kaudy owe you for your services on**
2   **this case?**
3      A. As I --
4      **Q. And the question goes to documentation.**
5      A. I have to answer your question. If you start
6   talking the minute I start answering, you're
7   over-talking me. What is it you want?
8      MR. RIDLEY: Could you read the last
9   question back?
10     (Whereupon the reporter read the record.)
11     THE WITNESS: I keep careful documentation
12  of my time spent by accumulating documents in my file in
13  the form of pieces of paper with highlighting and tabs
14  and consideration, reports from that material, and other
15  activities that, that consume the time that I spend.
16  When I close files, I reconstruct the number of hours
17  from the materials that I've retained in the boxes of
18  documents.
19     I don't keep time records. So if you're
20  asking me for precision, there, there is a relatively
21  imprecise way of dealing with time, in that I don't take
22  the time to write individual notes and keep time
23  records, realizing that it's much more efficient for me
24  to use that time reviewing materials and keeping a
25  record by putting the documents in boxes. Then I'm able

---

9 (Pages 33 to 36)

Carroll v. Allstate                          Gary Fye                          April 2, 2013

---

37

1   to look at a box, determine whether it's rapid review
2   material or dense material that takes a longer time to
3   review, and I can reconstruct the time and send an
4   hourly billing when the case is closed.
5           I don't send hourly billings, usually, until
6   the case is closed, unless there's a specific instance
7   where someone asked me to do a specific operation or
8   review and bill me for that specific time, or bill, bill
9   them for that specific time.  Then, then I will do that.
10  But that's not the, the normal situation.  In fact,
11  that's relatively rare.
12          And if your, if your question requires, if
13  I'm missing the point of your question and you're,
14  you're asking me do I have a precise method or document
15  showing my precise method, no.
16  BY MR. RIDLEY:
17      **Q.  So I'm not asking you to do this now, but if I
18  were to ask you to look at your documents and tell me
19  how much time you've spent on this matter, would you be
20  able to do that?**
21      A.  I already did.  For the second time, generally by
22  the time I get to the deposition phase, my billing would
23  run somewhere between four and seven thousand dollars,
24  depending on the type of case and the amount of the
25  materials.

---

38

1       **Q.  So in this case, the Carroll case, do you believe
2   that the amounts owed by the Carrolls or Mr. Kaudy is in
3   that range, $4,000 to $7,000?**
4       A.  I don't have any thoughts about that.  I would
5   presume so.  I'd appreciate it if you wouldn't use the
6   word believe.
7       **Q.  Do you know?**
8       A.  I don't know.
9       **Q.  How long would it tell you, how long would it
10  take you to make that determination of how much is owed
11  as of today, by the Carrolls?**
12      A.  I don't know.  But not, not long.
13          MR. RIDLEY:  This would be 58, Fye 58.
14          (Exhibit 58 marked at this time.)
15  BY MR. RIDLEY:
16      **Q.  Mr. Fye, I've handed you what's been marked as
17  Fye deposition Exhibit 58.  Have you seen these
18  documents before?**
19      A.  I've seen originals of some of these, but not
20  these copies.
21      **Q.  With respect to the originals that you saw, do
22  you recall when you first saw them?**
23      A.  I got the, the top page, I think, last Friday.
24      **Q.  Meaning the e-mail page?**
25      A.  Yes.  I think it's the same one.  I saw something

---

39

1   like this.  And I, it said I would receive a check
2   yesterday with, with a letter, and I did.  So I think
3   this e-mail was sent to me last Friday.  It will be in
4   my correspondence file.
5       **Q.  All right.  And with respect to -- and you
6   brought that with you today?**
7       A.  Yes.
8       **Q.  All right.  With respect to the subpoena to
9   produce documents --**
10      A.  Hang on.
11      **Q.  This is the second to the last page, is what my
12  questions go to.**
13      A.  The subpoena to produce documents is the last
14  one --
15      **Q.  Right.**
16      A.  -- two, three, four, five pages?
17      **Q.  Okay.**
18      A.  The second, second to the last page is the list?
19      **Q.  Right.**
20      A.  Yes.
21      **Q.  All right.  Now, have you complied fully with the
22  items listed in that list?**
23      A.  I believe so.  The only thing that is not
24  discussed here, I had the copy service talk to your
25  office in Denver about books, and copying the books

---

40

1   would be a horrendous expense, so your office in Denver
2   instructed the copy service to tell me, don't worry
3   about the books.
4       **Q.  All right.**
5       A.  So when he returned the documents, he said they
6   don't want a copy of the books, or something to that
7   effect.
8       **Q.  All right.  And did you bring those books with
9   you today?**
10      A.  No.  I was told you weren't interested in them.
11      **Q.  These are the, the books that are listed on your
12  report?**
13      A.  Yes.
14      **Q.  Were those books specifically relied upon by you
15  in forming your opinions in this case?**
16      A.  No, they were generally relied upon.  Much like
17  your law school text books.
18          MR. KAUDY:  Object to the foundation.
19          (Exhibit 59 marked at this time.)
20  BY MR. RIDLEY:
21      **Q.  Okay.  Mr. Fye, I've handed you what's been
22  marked as Fye Exhibit 59, the first page of which is
23  some e-mails, and then there's a subpoena to produce,
24  which is dated -- well, actually, this is an unsigned
25  one.  And my question goes to your e-mail at the bottom**

---

**Bonanza Reporting**                   **(775) 786-7655**                   **1111 Forest Street**

Carroll v. Allstate                     Gary Fye                          April 2, 2013

41

1    of page one.
2    A. Yes.
3    Q. All right. This is an e-mail that you sent to
4    Rich Kaudy on March 21, 2013; is that correct?
5    A. Yes.
6    Q. Now, towards the bottom you say -- and you
7    understood that we were, we being counsel for Allstate,
8    were seeking a waiver signed by you with respect to the
9    service of the subpoenas, correct?
10   A. I don't know what you were trying to do.
11   Q. All right.
12   A. But that's my general understanding of it, that I
13   was given two waivers to sign, one for my appearance and
14   one for document production.
15   Q. All right. You see, it's the second line from
16   the bottom on page one of Fye Exhibit 59, you say:
17       The waiver documents you enclose are not factual,
18   so I can't sign them.
19       What did you mean by that?
20   A. The waiver had language to the effect that I
21   acknowledge receipt of a subpoena and a duces tecum
22   list -- that's d-u-c-e-s, space, t-e-c-u-m, and I had
23   not been furnished those documents, I had not seen those
24   documents, so I couldn't sign a fact that was not
25   correct. It was not possible for me to sign something

42

1    that wasn't factual. If I had, if I had them in my
2    possession, I would have signed those documents, but I
3    didn't have them in my possession.
4    Q. You didn't have the subpoena --
5    A. And the, I didn't have a list of documents.
6    Q. Okay.
7    A. And all, and yes, all I had was a, as I recall, I
8    had a notice of deposition, but not a subpoena. In
9    other words, I considered it factually incorrect, and I
10   don't sign things that are not factually correct.
11   Q. All right. Now --
12   A. So what I did, if you'll look at this notice, I
13   said I agree to appear for the deposition with my entire
14   file in this matter. There's no need to use a subpoena.
15   And you chose to ignore that and subpoena me anyway.
16   Q. All right.
17   A. Your, your call.
18   Q. Well, you were provided, if you look at the last
19   page of the exhibit, the list of documents, you did have
20   that list --
21   A. I didn't have that list.
22   Q. Mr. Kaudy had that list, didn't he?
23   A. I don't know.
24   Q. Do you know whether my office sent this, this
25   Exhibit A to the subpoena, to produce to Mr. Kaudy?

43

1    A. How would I know that? I don't know what your
2    office does.
3    Q. Okay. Well, the point is simply this: If you --
4    A. I, I can tell you that judging from, if I can
5    reconstruct your capacity for dealing with a simple
6    deposition, it wouldn't surprise me if it didn't get
7    sent. Let's put it that way.
8        I just, I'm sorry to be so judgmental, but come
9    on now. You have a witness who's willing to appear with
10   everything, a copy service that I use constantly to copy
11   documents for not only Allstate, but any carrier who
12   wants them, and you chose not to do any of that stuff.
13   And I can't figure out what you're doing and not doing.
14   So it's pretty frustrating to be in a deposition and
15   have you ask me what your office is doing. I don't
16   know.
17       MR. RIDLEY: Could you please mark the
18   transcript there. /(
19       THE WITNESS: Sorry, I kind of went off on
20   it, too.
21   BY MR. RIDLEY:
22   Q. Mr. Fye, my understanding is that Mr. Kaudy did
23   have this Exhibit A, this list of documents. My
24   understanding is that you had the list of documents.
25   But even if you didn't --

44

1    A. Well --
2    Q. -- you could have just asked for the list, right?
3        MR. KAUDY: Is there a need to waste time on
4    this? Obviously we sent everything electronically. If
5    it got sent, it did. If it didn't, it didn't. But why
6    are we wasting time here? Let's get to something
7    substantive. He's not evading anything. Just, Terence,
8    can't we get to something substantively here?
9        THE WITNESS: Well, I understand the
10   question. I suppose that is an alternative that was
11   available to me. I could have said send me the factual
12   basis for these waivers and I'll consider them.
13   BY MR. RIDLEY:
14   Q. Now, Mr. Kaudy just mentioned documents that were
15   sent electronically. Do you know what he's referring
16   to?
17   A. E-mails.
18   Q. Just e-mails?
19   A. Yes.
20   Q. Because --
21   A. Do you know of some other --
22   Q. Well, I --
23   A. If you're talking about telephone calls, that's
24   electronic, but I don't get any paper from that.
25   Q. Well, let me tell you what my understanding is.

11 (Pages 41 to 44)

Carroll v. Allstate                     Gary Fye                          April 2, 2013

---

45

1        MR. RIDLEY:  Let me, we'll mark this as
2    Exhibit 60.
3        (Exhibit 60 marked at this time.)
4    BY MR. RIDLEY:
5        Q.  All right.  Mr. Fye, you do recognize Exhibit 60;
6    is that right?
7        A.  Yes.
8        Q.  What is Exhibit 60?
9        A.  It appears to be a copy of a report, of one of my
10   reports in this case.
11       Q.  Was this the first report you did?
12       A.  It looks like it, yes.
13       Q.  And you have done, you did the supplement to this
14   report in November; is that right?
15       A.  I don't know the date.
16
17       (Exhibit 61 marked at this time.)
18   BY MR. RIDLEY:
19       Q.  All right.  Is the date of your second report
20   November 20, 2012?
21       A.  Probably.  This isn't a copy of it, but it's,
22   it's probably close enough that I can say yes.
23       Q.  I'm sorry, did you say this, that was not a copy
24   of it?
25       A.  Correct.

---

46

1        Q.  Okay.  What do you mean by that?
2        A.  This has a fax line up at the top.
3        Q.  All right.  Other than the fax line, is this a
4    copy of your November 20, 2012, report?
5        A.  Yes.
6        Q.  And these are the, the only two reports that you
7    have signed pursuant to FRCP 26(a)(2)?
8        A.  I don't know what you mean by those numbers.  If
9    you are suggesting that this is my attempt to make a
10   disclosure under Rule 26, whatever the paragraphs are,
11   yes, it is.  But I don't, I don't know Rule 26 by its
12   subparagraphs and subcategories.
13       Q.  Okay.
14       A.  So I can't answer your question the way it's
15   posed.
16       Q.  The only two reports that you have signed in this
17   case are your reports dated September 28th, 2012, and
18   November 20th, 2012; is that correct?
19       A.  To my knowledge, I, I don't -- I can remember
20   looking for them yesterday, and I think I only found two
21   files with reports.  If there's another one, I don't
22   know what it is.
23       Q.  Neither do I.  That's why I asked the question.
24   All right.  Now, if you look at Exhibit 60, attached to
25   exhibit is Exhibit F, which is a list of documents.

---

47

1        A.  Yes.
2        Q.  All right.  Now, I asked you a minute ago about
3    the, the electronic documents referenced by Mr. Kaudy.
4    I did receive a disc containing the items listed in
5    Exhibit F, which is comprised of a variety of things,
6    and certainly not just e-mails.  Do you know that, when
7    Mr. Kaudy mentioned the electronic files, whether he was
8    referring to this list of documents in Exhibit F?
9        A.  Do I know what Mr. Kaudy was referring to?
10       Q.  Yes.
11       A.  When?
12       Q.  When he told the judge, or when he mentioned, I'm
13   sorry, during his last objection about electronic files
14   sent to me.  Is this what he was referring to?
15       A.  He's right there.  Just ask him.
16       MR. RIDLEY:  Rich, is this what you were
17   referring to?
18       MR. KAUDY:  No.  I referred to the
19   forwarding to Mr. Fye from your office the subpoena and
20   subpoena duces tecum, so Mr. Fye would have it and see
21   what it was.  So it's simply a shortcut method of trying
22   to expedite service of the subpoena and the waiver you
23   sent.  And so --
24       MR. RIDLEY:  All right.
25       MR. KAUDY:  -- my presumption was everything

---

48

1    was forwarded along through e-mail.  And if it didn't
2    make it to the target, I was unaware of that.  So we
3    didn't withhold anything from what you'd asked, we just
4    wanted to expedite production of the documents to help
5    your firm.
6    BY MR. RIDLEY:
7        Q.  Mr. Fye, the documents listed in Exhibit F, are
8    those documents that you've produced for copying on last
9    Friday?
10       A.  Yes, and any updated documents that is added to
11   that collection.
12       Q.  All right.  The documents listed in Exhibit F,
13   then, would be a subset of the documents that were
14   copied and the documents that you brought with you
15   today?
16       A.  I don't understand that question.  What do you
17   mean, subset?
18       Q.  Well, in other words, you brought more with you
19   today than what's listed in Exhibit F to your report.
20       A.  I don't know that, but I presume that.  That's a
21   dynamic file that keeps, I keep adding to that.  But I
22   don't know if anything got added to it.  I haven't
23   checked that.
24       Q.  When you selected documents for copying, what was
25   your method of this, in selecting those documents?

---

Bonanza Reporting              (775) 786-7655              1111 Forest Street

**Carroll v. Allstate**                    **Gary Fye**                    **April 2, 2013**

---

49

1       A.  There wasn't much method used.  I had taken some
2   depositions for reading while I was traveling, and so
3   the, the file was out of the boxes and sitting in
4   disarray on my, on a table, on my conference table, and
5   I got a call on Good Friday, or the day before, that
6   there was some urgency in getting you the documents.  I
7   put them in boxes the way they were stacked, they
8   weren't in order, to help Sierra Document Management
9   pick them up and get them copied.
10      I sent them, the main body of my working file and
11  told them that I had to have it back to prepare for the
12  deposition.  And then I prepared another box with
13  Exhibit F, and any other files that weren't contained
14  in, in those boxes.  And there were a few materials
15  that, a couple of extra files that I found on the
16  conference table that didn't get put in the original
17  box, one of was my correspondence file.  And so I knew
18  you'd need that.  So that got sent to Sierra Document
19  Management when the first group got returned.  So it was
20  done in two stages.
21      Now, what my methodology was, was just to get
22  that stuff to the copy service as soon as possible,
23  based on a sense of urgency that you were apparently
24  communicating to Mr. Kaudy.
25      Q.  Do you know that we had requested documents as

50

1   early as March 20, 2012?
2       A.  Yes, I can remember telling Mr. Kaudy, furnishing
3   him with the telephone number of Sierra Document
4   Management and saying that Allstate and its attorneys
5   could call Sierra Document Management and have these
6   picked up any time.
7       Q.  When did that call occur?
8       A.  I have no idea.  I just knew that you had asked
9   about the documents earlier.  Did you say March 20th?
10      Q.  March 20th.
11      A.  Oh, I recall this being much earlier.
12      Q.  Earlier than March 20th?
13      A.  Oh, yeah.  Allstate may be just tormenting you,
14  but I've had other depositions, and copying my documents
15  is a very simple process.  Maybe you just weren't in on
16  it.
17      Q.  On prior copying projects?
18      A.  On how easy it is to copy my documents.  Because
19  you've made a big deal out of it, and it's not a big
20  deal.  It's something that -- you know, I've been
21  cooperating with courts in this context since the 1970s,
22  and you're making me out to be someone who doesn't
23  cooperate.  That's simply not true.  And I know you're
24  probably not a liar, so I don't know why you're going
25  down that road.  I'm completely cooperative with

51

1   documents, and Sierra Document Management has always
2   been able to come over and get my documents and have
3   them copied.
4       MR. RIDLEY:  Would you mark the transcript,
5   please. /(
6       (Exhibit 62 marked at this time.)
7   BY MR. RIDLEY:
8       Q.  Mr. Fye, speaking of Sierra Legal Duplicating,
9   the copy service, I've handed you Deposition Exhibit 62.
10  This was the bill that I received yesterday.  It's dated
11  April 1st, 2013.  It shows, under quantity, 11,725 pages
12  for medium grade copy work and 634 pages for color
13  copies.  So it reflects over 12,000 pages copied.
14  Do you have any reason to doubt that Sierra copied over
15  12,000 pages of documents delivered by you?
16      A.  No.
17      Q.  Were all of the documents --
18      A.  Well, well, wait a minute.  Let's go back.  Give
19  me a do-over on that question.  Say it again.
20      MR. RIDLEY:  Why don't you read it back.
21      (Whereupon the reporter read the record.)
22      THE WITNESS:  Yes and no.  Their bills are
23  very accurate.  They're, they're an exceptionally good
24  service.  And the total here is more than 12,000.  My
25  only question would be did the straight run copying get

52

1   done and was the total document count 11,725, and then
2   they identified highlighting or colors that had to be
3   then retrieved and copied separately.  So the 634 might
4   be within that.
5       And then thirdly, I have no doubt that
6   Sierra Document Management has copied hundreds of
7   thousands of documents for me, or for my, of my records,
8   let's say, over the years, but I'm assuming that you
9   meant your question to be with regard to this invoice
10  alone.
11  BY MR. RIDLEY:
12      Q.  For the Carroll case.
13      A.  Yes.  You didn't limit it, but --
14      Q.  Of course.  Yeah.  No.  And I can rephrase it.
15  Let me just put it this way:  Do you have any reason to
16  doubt the number of documents copied by Sierra that you
17  delivered related, in some form or fashion, apparently
18  to the Carroll case?
19      A.  I don't.  And another thing I'll refer you to is
20  that that five boxes over there, generally you're
21  looking at between three and four thousand pages per
22  box, so just the box count supports this.
23      Q.  All right.  With respect to the documents that
24  you did produce to Sierra on this case, is it your
25  testimony that all of those documents specifically

---

Carroll v. Allstate                          Gary Fye                          April 2, 2013

---

53

1   relate to the Carroll case?
2       A.  No.  I've specifically noted documents that
3   appear to be from another file in the Allstate
4   documents, in Allstate's disclosure.  I've also enclosed
5   my collection of Allstate testimony exhibits, and that
6   collection of testimony exhibits is simply for
7   convenience and historical purposes to bring forward the
8   claim practices history of a company.  It doesn't always
9   relate in specific terms to a case, unless you -- well,
10  you can say that, that the history of these documents is
11  specifically related in one sense, because it reflects
12  kind of an anecdotal history of the way a company got to
13  where it is in terms of its claims philosophy.  But I
14  consider it more generally related.
15      And for instance, when I refer to the data
16  considered in my text books, category number seven in my
17  most recent report refers to generally available
18  literature on insurance.  That both relates generally,
19  but in some cases specifically to a given case.  If that
20  helps you.
21      Q.  Let's look at your two reports.
22      A.  All right.  Are we done with this invoice?
23      Q.  Yes.  Generally speaking, what's the difference
24  between your November 20, 2012 report and your
25  September 28th, 2012 report?

---

54

1       A.  Bold additions.
2       Q.  All right.  So let's take a look, then, at
3   Exhibit 61, which is the November 20, 2012 report.  Now,
4   it appears to me, Mr. Fye, that in terms of your
5   opinions, your November 20 report has expanded a bit on
6   the opinions set forth in your September 28th, 2012
7   report.  Is that correct?
8       A.  Yes.
9       Q.  And that's, and that's what is put in bold.
10      A.  Yes.
11      Q.  And just so I'm clear, the November 20, 2012
12  report has, has not included your qualifications, for
13  example, as it appears on your September 28th, 2012
14  report.  Is that correct?
15      A.  Probably I would, I probably would have included
16  only categories where there were additions.
17      Q.  Okay.  All right.  Now, there were some additions
18  under data and information considered, is that correct,
19  on page one of your November 20th, 2012 report?
20      A.  Yes.
21      Q.  All right.  With respect to data and information
22  considered that is specifically related to the Carrolls,
23  it appears to be items two, four and five.  Is that
24  correct?
25      A.  No.

---

55

1       Q.  All right.  How is that incorrect?
2       A.  I know you're not trying to be disingenuous with
3   the Court --
4       Q.  Of course not.
5       A.  -- and --
6       Q.  You do not even need to suggest that.  You don't.
7       A.  When you start talking in the middle of my
8   answer, I can't give you an answer to your question.
9       THE WITNESS:  Could we have the question
10  back?
11          (Whereupon the reporter read the record.)
12      THE WITNESS:  I know you're not trying to be
13  disingenuous with the Court.
14      MR. RIDLEY:  And I object to that and move
15  to strike it.  So go ahead.
16      THE WITNESS:  Well, I'm going to get some
17  more coffee.  You can decide when you resume.
18      MR. KAUDY:  May I just take a bathroom
19  break?
20      MR. RIDLEY:  By all means.
21      THE VIDEOGRAPHER:  We're going off record.
22  The monitor time is approximately 10:28 a.m. /(
23      (A short break was taken at this time.)
24      THE VIDEOGRAPHER:  We're back on record.
25  The monitor time is approximately 10:37 a.m.

---

56

1   BY MR. RIDLEY:
2       Q.  Mr. Fye, I'm going to try this line of
3   questioning a little bit differently.  I'll try to break
4   it down a little bit.  We're talking about your original
5   report dated September 28th, 2012, page two, data and
6   information considered.  Item one simply says
7   correspondence, correct?
8       A.  Yes.
9       Q.  There is no specific correspondence specifically
10  related to the Carrolls listed under item one, correct?
11      A.  Yes.
12      Q.  Item two says disclosures by the parties,
13  correct?
14      A.  Yes.
15      Q.  There is no specific disclosure by the Carrolls
16  or Allstate listed in item two, correct?
17      A.  Yes.
18      Q.  Item three says pleadings, correct?
19      A.  Yes.
20      Q.  And there is no specific pleading related to the
21  Carrolls listed in item three.
22      A.  There's no question there.
23      Q.  Is that correct?
24      A.  Yes.
25      Q.  Item four lists generally available literature

---

Bonanza Reporting              (775) 786-7655              1111 Forest Street

**Carroll v. Allstate**                    **Gary Fye**                    **April 2, 2013**

---

57

1   and management, articles, tapes and ads from general
2   available sources.  And then you give examples A through
3   O, and none of those items specifically relate to the
4   Carrolls, correct?
5     A.  No, not correct.
6     Q.  All right.  Which, which of these items
7   specifically relate to the Carrolls?
8     A.  My entire file specifically relates to the
9   Carrolls.  You have to realize that I have probably
10  somewhere between three and five million pages, I don't
11  know what the document count is, but the page count is
12  probably three to five million pages of foundational
13  claim practices documents in my archives and library.
14     And so out of that universe of information, I've
15  taken the specific documents from that bigger universe
16  of documents and related the specific documents to this
17  case that, that -- while you could argue disingenuously
18  that they were not specific to this case because they're
19  general background, the problem with that is that
20  generally speaking no document becomes specific unless
21  it is in a specific context.
22     So as an example of that, it appears that
23  Allstate produced in its disclosures some documents from
24  another case.  They didn't relate to the Carroll case,
25  but they have become specifically involved in this

58

1   deposition, so they are now specifically related to this
2   case, where before they were generally unrelated.
3     In the universe of knowledge, general information
4   becomes specific as needed.  So what I've tried to do is
5   produce a much smaller universe of documents
6   specifically related to the Carroll case.  But of course
7   if you're being disingenuous you can say:  Oh no, that's
8   not specific enough, that would be a general case.  But
9   I trust you're not trying to do that.
10     You understand that I have pared down the
11  production to make it efficient, and that many of my
12  cases are forty or fifty boxes of documents -- not many,
13  but some of them are -- and we're only talking about
14  four and a half boxes here.
15     So I, I don't want to go through 1,200 pages and
16  make the case for the specific relationship to the case.
17  All I can say is that in, in my judgment, the fact
18  finder in this case needs the case documents, it needs
19  some background documents on how insurance works, that
20  would be specifically related, and that's in the, that's
21  in item seven, and then they would need information
22  about the evolution of Allstate to explain the company's
23  culture and practices, and that would be in the material
24  produced for this deposition in response to a subpoena
25  for specific information.

59

1     Now, using the term specific is reframing the
2  issue of document production, and trying to put a
3  witness in the position of making judgment calls on
4  material, as if unless a specific relationship can be
5  established, then the document can't be produced.  But
6  actually, the subpoena is much broader than that.  It
7  basically says your file and the basis for your
8  comments.
9     So the documents produced are specific to the
10  reporting and commentary that I've engaged in here.  It
11  is a miniscule portion of what I could produce.  For
12  instance, if I produced all of the documents in number
13  seven, there would be many more pages, probably, than
14  these four boxes.
15    Q.  I'm sorry, what item seven are you referring to?
16    A.  Well, item seven in my report --
17    Q.  Which report?
18    A.  -- that you were questioning me about.
19    Q.  All right.  We're on a different -- I'm on
20  first report now.
21    A.  What's item seven in the first report?
22    Q.  There is no item seven in the first report.
23    A.  Okay.  Item four.
24    Q.  All right.  Mr. Fye, in your first report, item
25  four, sub A says:  Best's Key Rating Guide.

60

1    A.  Yes.
2    Q.  Best's Key Rating Guide does not mention Richard
3  or Sharon Carroll, does it?
4    A.  No.
5    Q.  What year is this Best's Key Rating Guide?
6    A.  It's published annually, and it would be for any
7  years that financial information is needed about the
8  defendant.
9    Q.  Do you know who the claims representative or the
10  adjuster for Allstate was on the Carroll claim?
11    A.  Mr. Palmer.
12    Q.  Do you know whether Mr. Palmer has ever reviewed
13  or seen Best's Key Rating Guide?
14    A.  No.
15    Q.  Item B says Aggressive Good Faith, and then it
16  says Rokes.  Is Rokes the author of Aggressive Good
17  Faith?
18    A.  Yes, those are authors listed.
19    Q.  Does Aggressive Good Faith address this Carroll
20  claim?
21    A.  Yes.
22    Q.  Specifically?
23    A.  No.
24    Q.  In what year was Aggressive Good Faith published
25  by Rokes?

**Bonanza Reporting**          **(775) 786-7655**          **1111 Forest Street**

**Carroll v. Allstate**               **Gary Fye**               **April 2, 2013**

---

**61**

1    A. I don't know.  Many years ago.
2    Q. Prior to the Carroll claim arising?
3    A. Yes.
4    Q. Item C -- well, let me go back.  Item B,
5  Aggressive Good Faith.  Do you know whether Mr. Palmer
6  ever read Aggressive Good Faith?
7    A. No.
8    Q. Do you know whether Ms. Hernandez ever read
9  Aggressive Good Faith?
10    A. No.
11    Q. Do you know whether Ms. Hernandez ever read
12  Best's Key Rating Guide?
13    A. No.
14    Q. With respect to item C, it says Human Relations
15  in Handling Insurance Claims, again by Rokes.  Is that a
16  book?
17    A. Yes.
18    Q. Do you know when it was published?
19    A. No.  In general terms I do, but no, not the
20  specific year.
21    Q. Was that published before Mr. Palmer adjusted the
22  Carroll claim?
23    A. Yes, it was.
24    Q. Do you know whether Mr. Palmer ever read Human
25  Relations in Handling Insurance Claims by Rokes?

**62**

1    A. I don't.
2    Q. Do you know if any of his supervisors ever did?
3    A. No.
4    Q. Item D says Recovery of Damages for Bad Faith,
5  McCarthy.  Is McCarthy the author of that publication?
6    A. Do I get to point out the record of this complete
7  waste of time that you're engaging in?
8    Q. Let the judge decide that.
9       MR. RIDLEY:  Mark the record. /(
10       THE WITNESS:  Yeah, we will.  And I take
11  back on what I said about I'm sure you're not trying to
12  be disingenuous.  Actually, insurance was invented
13  before this claim occurred too.  But go ahead.
14       MR. RIDLEY:  Is that marked?  All right.
15  Thank you.  Can you read back the last question?
16       (Whereupon the reporter read the record.)
17       THE WITNESS:  Oh, excuse me.  I thought you
18  were trying to get to your place.
19  BY MR. RIDLEY:
20    Q. No, I was just, the question was simply whether,
21  is McCarthy the author of Recovery of Damages for Bad
22  Faith?
23    A. Yes, he is.
24    Q. Do you know when -- is that a book?
25    A. Yes, it's a, it's an updated book.  There's

**63**

1  several versions of it.
2    Q. Do you know when the last version was published?
3    A. I don't, but it started in the late '70s and
4  early '80s.
5    Q. Do you know if the last version of that book was
6  published prior to the Carrolls' claim?
7    A. Probably.
8    Q. Do you know whether Mr. Jerry Palmer ever read
9  that book?
10    A. No.
11    Q. Do you know whether any of his supervisors ever
12  read that book?
13    A. No.
14    Q. The next item is Organizational Behavior in
15  Insurance.  That's by White, is that correct?
16    A. Yes, and other authors.
17    Q. All right.  Do you know when that was published?
18    A. No.
19    Q. Do you know whether Mr. Palmer ever read that
20  publication?
21    A. No.
22    Q. Does that publication make any specific reference
23  to Richard or Sharon Carroll?
24    A. No.
25    Q. The next item is The Claims Environment.  That's

**64**

1  by Markham, first edition.  Is that right?
2    A. Yes.
3    Q. Does that book specifically mention Richard or
4  Sharon Carroll?
5    A. No.
6    Q. Do you know whether Mr. Palmer ever read that
7  book?
8    A. No.
9    Q. Do you know whether any of his supervisors ever
10  read that book?
11    A. No.
12    Q. Do you consider that book authoritative in the,
13  in the area of insurance law?
14    A. Somewhat, yes.
15    Q. Next --
16    A. Wait.  Insurance law, did you say?  I --
17    Q. Well --
18    A. I don't have any testimony about insurance law.
19    Q. Insurance matters.
20    A. Claim practices, yes.
21    Q. Claims practices, okay.  Do you know Mr. Markham?
22    A. No.  I do know one of the authors, in a general
23  sort of way, by telephone conversation, but not very
24  well.
25    Q. Have you read that book?

16 (Pages 61 to 64)

Carroll v. Allstate                  Gary Fye                  April 2, 2013

---

65

1    A. Yes.
2    Q. Item G says The Claims Environment.
3    A. If your question was has he read that book, he
4  claimed not to have in his last deposition, but that's
5  another story.
6    Q. Okay.
7    A. I have read the book.
8    Q. All right. Do you know whether any of
9  Mr. Palmer's supervisors read that book?
10   A. No.
11   Q. Item G says The Claims Environment by Hoopes,
12  second edition. Have you read that book?
13   A. Yes.
14   Q. All right. Do you consider that authoritative in
15  the field of insurance?
16   A. Not very, but I guess if you use the pork chop
17  method, some of it's okay.
18   Q. Are you saying that the, the first edition is, to
19  your mind, more authoritative than the second edition of
20  The Claims Environment?
21   A. Yes. Those authors were much more devoted to
22  claim handling rather than authorship, I think.
23   Q. Item H, The Legal Environment of Insurance by
24  Lorimer. Well, let me step back. Do you know when the,
25  the second edition of The Claims Environment was

---

66

1  published?
2    A. I don't know the precise date, but I think it was
3  around 2005.
4    Q. So both the first and second edition were
5  published prior to the Carrolls' claim arising with
6  Allstate?
7    A. Yes. I don't think there's any book on here that
8  was not published after the Carroll accident.
9    Q. Okay. Thank you for that.
10   A. You're welcome.
11   Q. With respect -- and maybe we can short-circuit
12  this with respect to items -- well, let me just read
13  these off. The Legal Environment of Insurance by
14  Lorimer; Insurance Claims and Disputes by Windt;
15  Barron's Dictionary of Insurance Terms, Rubin;
16  Litigation Road, The Story of Campbell v. State Farm,
17  Stempel; Delay, Deny, Defend, Feinman; From Good Hands
18  to Boxing Gloves, Berardinelli.
19   A. Berardinelli.
20   Q. Berardinelli.
21   A. B-e-r-a-r-d-i-n-e-l-l-i.
22   Q. All right. With respect to those items, as I
23  understand your testimony, all of those predated the
24  Carroll claim with Allstate?
25   A. I believe so.

---

67

1    Q. All right. You testified in the Campbell v.
2  State Farm case?
3    A. I did.
4    Q. And you've testified for Mr. Berardinelli; is
5  that correct?
6    A. Yes. Well --
7    Q. In connection --
8    A. -- he presented, he presented me as a witness in
9  at least two cases, the last one being the Martinez, et
10  al. case in Santa Fe.
11   Q. Mr. Feinman, is he professor Feinman?
12   A. Yes, he is. At Rutgers. R-u-t-g-e-r-s.
13   Q. Does he still teach, do you know?
14   A. F-e-i-n-m-a-n. I don't know precisely, but I
15  believe he does.
16   Q. Have you spoken with him?
17   A. Of course.
18   Q. In what context?
19   A. Several. He's attended workshops that I've given
20  where I've spoken, he's visited my office for consulting
21  purposes, and I've spoken with him and corresponded with
22  him.
23   Q. With --
24   A. And the context is listed in his book.
25   Q. With respect to The Legal Environment of

---

68

1  Insurance by Lorimer, do you consider that an
2  authoritative text in the area of insurance claims
3  practices?
4    A. The Legal Environment of Insurance?
5    Q. Yes.
6    A. There are portions of that book that I would
7  consider accurate recitations of claim practices
8  truisms. Standing alone, I don't recommend it as a sole
9  source authority on insurance.
10   Q. How about Insurance Claims and Disputes by Windt,
11  do you consider that an authoritative text in the area
12  of insurance claims practices?
13   A. At the, at the times the editions are written,
14  yes, because that's its intent, to be summarizing
15  insurance law for practitioners. And Mr. Windt has done
16  a, a very good job of accumulating material. There are
17  some presumptions that I don't always agree with, but I
18  don't doubt his scholarship and his work ethic.
19   Q. Delay, Deny, Defend by Feinman. Do you consider
20  that an authoritative text in the area of insurance
21  claims practices?
22   A. It's, it's not a text, per se, but it has case
23  studies that illustrate principles that I consider
24  authoritative, and I consider that Dr. Feinman is a very
25  capable teacher and expositor and writer about insurance

---

Bonanza Reporting              (775) 786-7655              1111 Forest Street

Carroll v. Allstate                    Gary Fye                    April 2, 2013

---

69

1    subjects.  So I know that I was amazed at its breadth
2    and scope when I read it.
3        Q.  From --
4        A.  And of course I was interested in it because it
5    uses case studies of cases that I know quite a bit
6    about.  So I was interested in the book for that purpose
7    as well.
8        Q.  Does it mention any Allstate cases?
9        A.  Almost certainly, but I'm not sure which.
10       Q.  From Good Hands to Boxing Gloves, do you consider
11   that an authoritative text in the area of insurance
12   claims practices?
13       A.  Yes.  It's the only, the only outline of the
14   effect of McKinsey & Company redesign that's available
15   to a practitioner, someone representing the insuring
16   public, for instance.  It's, it, it may not be
17   completely authoritative, but it contains a great deal
18   of practical information and discusses a very difficult
19   subject, and that is the redesign of an entire insurance
20   company to create lower claim outcomes institutionally.
21   It's a very interesting book.
22       Q.  Do you know how many times Mr. Berardinelli has
23   sued Allstate?
24       A.  No.
25       Q.  How many times have you worked on his cases as an

---

70

1    expert or consultant?
2        A.  Probably four or five times.  Maybe more than
3    that, but I don't, I don't remember more than that.
4        Q.  That book does not contain the complete McKinsey
5    report, does it?
6        A.  Of course not, for obvious purpose, for obvious
7    reasons.  And I'm sure you're not trying to be
8    deliberately disingenuous again.
9        Q.  No.  And move to strike that.  I'm just asking
10   you a simple question.
11       A.  Well, it would be disingenuous for you to ask
12   that question knowing that at the time the book was
13   written Allstate was claiming that the McKinsey
14   documents were confidential and privileged and it had
15   not released them on its website like it did
16   subsequently.  So the Court is not misled.
17       Q.  Well, and I don't want you to mislead the Court
18   or the jury.  I asked you a simple question, which was
19   whether --
20       A.  Good.  We're in the same boat.
21       Q.  Okay.
22       A.  I don't want you to mislead them --
23       Q.  Right.
24       A.  -- and you don't want me to mislead them.
25       Q.  So we can dispense --

---

71

1        A.  So you stop it, and I will stop talking about it.
2        Q.  No, I, I'm just asking simple questions.  I'm not
3    trying to be disingenuous.
4        A.  That's simply not true.  You're not asking simple
5    questions, you're asking very broad questions with broad
6    implications.  And that's another way that you could
7    deceive the jury and the Court, by suggesting that these
8    are simple questions.  They're not.
9        Q.  Are you done?  I don't want to interrupt.
10       MR. RIDLEY:  Okay.  Please go ahead and mark
11   the transcript there.  /(
12       THE WITNESS:  Mark it for what?  Excuse me,
13   but what's going on here?  Why are these transcripts
14   being marked?
15       MR. RIDLEY:  You don't need to know that.
16       THE WITNESS:  I'm sorry, I'm -- Mr. Kaudy,
17   could you please find out what's going on here for me?
18       MR. KAUDY:  Well --
19       THE WITNESS:  Trying to threaten me somehow
20   by saying that to the court reporter, and I don't know
21   what in the world he's talking about.
22       MR. KAUDY:  I don't either.
23       THE WITNESS:  Madam court reporter, do you
24   have a way of marking transcripts in some way that I
25   don't know about?

---

72

1        MR. RIDLEY:  I object.  You don't have to
2    answer the question.
3        THE WITNESS:  Can we go off the record so I
4    can ask the court reporter service whether, whether
5    they're doing something, something for Allstate that's
6    not a disclosed reporting method?
7        MR. KAUDY:  That's inappropriate?
8        THE WITNESS:  I don't know.  I don't know
9    what they're talking about.  They won't explain it.
10       MR. RIDLEY:  Mr. Fye, I will tell you this,
11   by marking the transcript, it simply makes it easy for
12   me to find certain portions of your testimony.
13       THE WITNESS:  How is my transcript going to
14   be marked?
15       MR. RIDLEY:  It's just a simple mark on the,
16   on the side of the, on the, on the margin.  That's all.
17       THE WITNESS:  Let's go off the record and
18   let me find out exactly what's going to be done.  I
19   don't want compromised transcripts.
20       MR. RIDLEY:  It's not a, this is not a
21   compromised transcript.  I object to you speaking to the
22   court reporter about this.  There's no reason to.
23       THE WITNESS:  Your --
24       MR. RIDLEY:  It's just a simple mark.
25       THE WITNESS:  Your explanation --

---

**Bonanza Reporting**          **(775) 786-7655**          **1111 Forest Street**

Carroll v. Allstate                         Gary Fye                          April 2, 2013

73

1       MR. RIDLEY:  It's just a simple mark.
2       THE WITNESS:  Your explanation does not
3   satisfy my question.  So if we can go off the record.
4       MR. RIDLEY:  I'll accommodate that.  We'll,
5   you know --
6       THE WITNESS:  Thank you.
7       MR. RIDLEY:  -- delay further and we'll go
8   off the record for a bit, and the court reporter can --
9       THE WITNESS:  Your line of questioning is
10  the purpose of the delay, not, not this.
11      THE VIDEOGRAPHER:  This --
12      MR. RIDLEY:  Not true.
13      THE VIDEOGRAPHER:  This is the end of video
14  disc number one in the video deposition of Gary T. Fye.
15  We're going off record.  The monitor time is
16  approximately 11:01 a.m.
17  (An off the record discussion was held at this time.)
18      THE VIDEOGRAPHER:  We're going back on
19  record.  The monitor time is approximately 11:05 a.m.
20  This marks the beginning of video disc number two in the
21  video deposition of Gary T. Fye in the matter of Richard
22  Carroll, et al. versus Allstate Fire and Casualty
23  Insurance Company.
24      This deposition is taking place at Bonanza
25  Reporting, 1111 Forest Street, Reno, Nevada.  My name is

74

1   David Corrao.  We're ready to proceed.
2       THE WITNESS:  I want to, I'm not represented
3   by counsel today, so I haven't been able to get a
4   satisfactory answer other than the court reporter has
5   been very helpful in telling me that you're creating a
6   separate mark on the transcript.  When I'm given the
7   document to read and sign, I will, I'm requesting, or
8   demanding that I be given a word index with my full page
9   copy of the deposition for reading and signing so that I
10  can look for your word mark to see those portions where
11  you've asked the transcript to be marked.
12      And I would ask you to try to avoid
13  developing a threatening manner, which I don't think
14  helps me deliver full, correct testimony in this
15  deposition.  So if you can proceed, go ahead.
16  BY MR. RIDLEY:
17      Q.  I don't think there's been any threatening manner
18  here.  There's nothing wrong with asking the court
19  reporter to mark a transcript.
20      A.  It's very unusual.  I do, I do this frequently,
21  and it doesn't happen.  And you're doing something that
22  we're all pretty much unfamiliar with.
23      Q.  Well, you may perceive, Mr. Fye, that my mere
24  asking the court reporter to mark a transcript is
25  threatening, but it has not been done in a threatening

75

1   manner.  So, and it's not intended to threaten, it's
2   intended to mark a transcript for future reference.
3   That is all.
4       A.  Well, I appreciate your calmer manner now.  Thank
5   you.
6       Q.  And I object to the implication that there has
7   not been a calm manner throughout this deposition.
8       Okay.  Mr. Fye, we were talking about
9   Mr. Berardinelli.  You know Mr. Berardinelli, you have
10  read his book.  Is it true that he has selected certain
11  portion, certain portions of the McKinsey documents for
12  inclusion in his book?
13      A.  I don't think so, but I may be incorrect about
14  that.  My recollection is that he didn't have the
15  McKinsey documents to put in the book.  Allstate had
16  produced them to him, and then had gotten them back
17  under the guise of authenticating them, and then would
18  not give them back to him.  So he wrote in his book
19  facsimiles of the McKinsey documents.  But I may be
20  incorrect about that.  I'm simply trying to give you
21  full, correct testimony.
22      Q.  With respect to the facsimiles of McKinsey
23  documents, what he included in his book was facsimiles
24  of certain McKinsey slides, correct?
25      A.  Generally that's correct.  And if, if the jury or

76

1   the Court would be thrown off by the use of the word
2   slide, let me just say that many times when we in the
3   consulting business make a mylar, a full-size mylar copy
4   of a page, and we put it on an overhead projector, we'll
5   call that a slide.  Technically it's not a slide, it's
6   a, it's a mylar copy, or an overlay.  But I think
7   what -- excuse me, I've forgotten your name.  I'm sorry.
8       Q.  Terence Ridley.
9       A.  Mr. Ridley.  What Mr. Ridley is suggesting is
10  correct.
11      Q.  Mr. Fye, do you know how voluminous the McKinsey
12  documents were?
13      A.  I don't.  No one has ever seen the McKinsey
14  documents other than the 150,000 or so pages that
15  Allstate published.  I have no idea what the actual
16  volume is.
17      Q.  But at least 150,000?
18      A.  Suffice to say it's probably multiples of that.
19      Q.  Now, this last item, O, Low Ball -- An Insider's
20  Look at How Some Insurers Can Manipulate Computerized
21  Systems to Broadly Underpay Injury Claims by Romano &
22  Hunter, have you read that publication?
23      A.  I have.
24      Q.  And do you understand that Mr. Romano regularly
25  testifies against Allstate?

77

1    A.  No.  And again, here we have this reframing
2    process going on in an attempt to mislead the Court and
3    the jury.
4         MR. RIDLEY:  Move to strike.
5         THE WITNESS:  People --
6         MR. RIDLEY:  Move to strike, and please mark
7    the transcript.
8         THE WITNESS:  People, people don't testify
9    against insurance companies.  In the claim practices
10   area, the subject is claim practices.  It's not against
11   an insurance company to suggest that claim practices
12   need to be improved.  And this is an attempt to
13   categorize Mr. Romano's work, or anyone's work, about
14   claim practices or insurance practices as to be against
15   an insurance company.
16        It's a bit paranoid and it's not really what
17   the purpose of litigation or what the purpose of
18   analysis is all about.  We should, we should see an
19   industry where Mr. Ridley, and people like him, should
20   be welcoming the public's attempts to achieve fair
21   insurance practices.
22        MR. RIDLEY:  Move to strike that answer and
23   please mark the transcript. /(
24   BY MR. RIDLEY:
25   Q.  Mr. Fye, do you know if Mr. Romano has been

78

1    retained to testify in cases on behalf of insureds
2    against Allstate?
3    A.  Same, same admonition.  He's not, I don't know of
4    any case where I or Mr. Romano have been engaged to
5    testify against an insurance company.  We're, we're
6    clearly retained by parties who are suing an insurance
7    company, but our work is specific to practices.
8    Q.  Mr. Romano has been retained by parties suing
9    Allstate in the past, correct?
10   A.  At least one that I know of.
11   Q.  Which one is that?
12   A.  Stanton.
13   Q.  Have you been retained in Stanton?
14   A.  Yes.
15   Q.  Have you submitted a report in Stanton?
16   A.  I don't recall.  And I apologize if I have
17   inadvertently violated Rule 11 on Mr. Kaudy's behalf.
18   He says no.  So if he had not disclosed me, he doesn't
19   have to, but I guess he has.
20        MR. RIDLEY:  Well, I'll tell you, I did see
21   some Stanton communication with you in the documents
22   produced yesterday.  So if that was inadvertent, Rich,
23   let me know.
24        MR. KAUDY:  No, it was not inadvertent.
25   Since my disqualification as trial counsel, I do not,

79

1    you know, retain experts.  But Mr. Fye had been
2    consulted before on analyzing the Stanton claim would
3    encompass.  And so I did not consider that a Rule 26
4    before violation. Just produced it.  You have
5    everything that he has.  We have not asked, at least I
6    never asked Mr. Fye for a report on Mr. Stanton, on the
7    Paula Stanton, Patrick Stanton matter.
8    BY MR. RIDLEY:
9    Q.  All right.  Now, Mr. Fye, what I'd like to do is
10   just move to Exhibit 61, your November 20, 2012, report.
11   Again, under data and information, under number one,
12   correspondence, there is no specific listing of any
13   particular e-mail or letter, correct?
14   A.  Correct.  And there never is.  And if you're
15   trying to suggest that that's a standard, then you're
16   trying to reframe this disingenuously.
17        MR. RIDLEY:  Please mark the transcript. /(
18   BY MR. RIDLEY:
19   Q.  In your -- well, without going to your five boxes
20   of documents, can you identify specifically what
21   correspondence you are referring to in item one --
22   A.  No.
23   Q.  -- on page one of your November 20 --
24   A.  No.
25   Q.  -- 2012 report?

80

1    A.  No.  The correspondence is all in the boxes, and
2    it's voluminous, and it's a question that is
3    unanswerable.
4    Q.  All right.
5    A.  No one could.
6         MR. RIDLEY:  All right.  Could you please
7    read that question back?
8         (Whereupon the reporter read the record.)
9    BY MR. RIDLEY:
10   Q.  Your answer to that question is no?
11   A.  Well, my answer to that question is what it is,
12   but an alternative answer would be it's the material in
13   the boxes.  If you think about your question, which one
14   of us has to do, the answer would be no, or yes, I don't
15   have to go to the boxes to tell you that it's the
16   material in the boxes.  But, see, that's the nature of
17   your questions.  They're just ill-conceived.
18        MR. RIDLEY:  Please mark the transcript. /(
19   BY MR. RIDLEY:
20   Q.  Mr. Fye, as you sit here, can you identify the
21   specific correspondence related to the Carrolls, if any,
22   that you are referring to when you list the word
23   correspondence under item one on page one of your
24   November 20th, 2012, report?
25        THE WITNESS:  Could you read that back,

Carroll v. Allstate **Gary Fye** April 2, 2013

---

81

1   please?
2        (Whereupon the reporter read the record.)
3        THE WITNESS:  Yes.
4   BY MR. RIDLEY:
5        Q.  What pieces of correspondence are you referring
6   to?
7        A.  The correspondence furnished to me, and it's
8   contained within these boxes, and it's referenced in
9   activity logs, claim files, depositions and other
10  proceedings in this case.
11       Q.  So you're referring to all of that
12  correspondence?
13       THE WITNESS:  Could you read him my answer?
14       (Whereupon the reporter read the record.)
15       THE WITNESS:  What about that didn't you
16  understand?
17       MR. RIDLEY:  Please mark the transcript. /(
18  BY MR. RIDLEY:
19       Q.  Mr. Fye, I'm simply trying to find out whether
20  you can --
21       A.  Simply?
22       Q.  Yes.  I am simply trying to find out whether you
23  can identify specific pieces of correspondence related
24  to the Carroll claim.
25       A.  Without looking at the boxes.

---

82

1        Q.  Without looking at the boxes.
2        A.  I understand that.  No.  It's, it's the document,
3   documentation that I've been furnished.
4        Q.  Without looking at your five boxes of documents,
5   are there any specific pieces of correspondence that you
6   can think of right now that support your opinions as set
7   forth in your two reports?
8        A.  Yes.
9        Q.  What are those pieces of correspondence?
10       A.  Mr. Carroll's letters, Mr. Kaudy's letters,
11  Allstate's very few letters, letters from physicians
12  outlining injuries.  And I think that pretty much
13  encompasses my recollection.
14       Q.  With respect to the Carrolls' letters, can you
15  think of any specific letters that you are relying upon
16  in forming your opinions?
17       A.  Yes.  The letters engaged in claim making and
18  asking for Allstate's responses and procedural matters,
19  evaluations and so forth.  And the Carrolls' expression
20  of frustration and the Carrolls turning the matter over
21  to Mr. Kaudy, who wrote additional letters explaining
22  the Carrolls did not want to engage in a give and take
23  negotiation session in response to the claim they were
24  making, that they wanted undisputed claim payments, or
25  payments to help them financially, and Allstate's rather

---

83

1   evasive responses not giving information and not
2   responding to the questions.
3        So when I think of the Carrolls' letters, I don't
4   think of those in a void absent Mr. Kaudy's letters and
5   the letters of Allstate, not, and Allstate's basic
6   nonresponse.
7        Q.  Can you identify the specific Kaudy letters that
8   you're referring to?
9        A.  Sure.  I'll go get them.
10       Q.  No.  Without looking at the documents.  Without
11  looking at the five boxes of documents.  You don't have
12  to give me a date, but in terms of specific content or
13  specific statements made by Mr. Kaudy.
14       A.  I, I don't think that's a very accurate way to
15  testify about these cases.  We've got the documents.
16  And if you're asking me to just engage in a memory test,
17  I have a good memory and I could probably come up with
18  things, but I don't want to be engaged in any more
19  inaccuracy.
20       For instance, this morning I gave you a date of a
21  letter in response to a question, guessing about that
22  date, speculating about that date.  You immediately
23  turned that into a specific statements that that is the
24  date.  I never implied that that was the actual date
25  from memory.  And I don't want you to do that.  So to

---

84

1   give accurate testimony, maybe you could rephrase.
2        MR. RIDLEY:  Can you read the last question
3   back, please?
4        (Whereupon the reporter read the record.)
5   BY MR. RIDLEY:
6        Q.  Mr. Fye, without looking at your five boxes of
7   documents, can you identify for me any specific
8   correspondence by Mr. Kaudy on which you based your
9   opinions?
10       A.  Yes.
11       Q.  Please identify those for me.
12       A.  The letters he wrote on behalf of the Carrolls to
13  elicit assistance from Allstate in acceptance and
14  payment of the Carrolls' claims, and his admonition to
15  Allstate that the Carrolls didn't want to engage in
16  circular negotiations that would involve a process of
17  delaying payment, delaying the claim while Allstate
18  sought more, more documentation or more rationale for a
19  delay in payment.
20       Q.  Mr. Kaudy did sue Allstate in this matter,
21  correct?
22       MR. KAUDY:  Object to the form and
23  foundation.
24  BY MR. RIDLEY:
25       Q.  Mr. Kaudy did sue, on behalf of the Carrolls, he

---

21 (Pages 81 to 84)

**Bonanza Reporting** (775) 786-7655 **1111 Forest Street**

Carroll v. Allstate                  Gary Fye                  April 2, 2013

85

1  sued Allstate in this case; is that right?
2      A. I guess that's my presumption.  I, I don't know
3  the history of the complaint filing.  And it's not
4  Mr. Kaudy's lawsuit, it's his clients' lawsuit.
5      Q. That's why, that's why I clarified the question.
6      A. You didn't clarify it.
7      Q. I did.
8      A. No, you just rephrased it in a way that tried to
9  cast blame on Mr. Kaudy for doing something that lawyers
10  are obligated to do.
11          MR. RIDLEY:  Please mark the record. /(
12          THE WITNESS:  Just trying to give you
13  complete testimony.
14  BY MR. RIDLEY:
15      Q. Let me show you what's previously been marked as
16  Exhibit 29, Deposition Exhibit 29.
17      A. So if you knew this, why didn't you ask it?
18          THE WITNESS:  And I should tell the Court
19  and the jury, he's now handed me --
20          MR. RIDLEY:  Objection.
21          THE WITNESS:  -- the complaint that says
22  Mr. Kaudy --
23          MR. RIDLEY:  You're being non-responsive.
24          THE WITNESS:  -- and Mr. Eddington filed
25  this lawsuit.  Why would you ask the question in such a

86

1  disingenuous way --
2          MR. RIDLEY:  Please mark --
3          THE WITNESS:  -- when you knew, before you
4  even asked the question, that there were two lawyers on
5  this complaint, not just one?  That's the kind of stuff
6  that I object to.  It's not Allstate, it's not claim
7  practices, it's just plain sloppy practice on your part,
8  and I don't like it.
9          MR. RIDLEY:  Mark the transcript, please. /(
10  BY MR. RIDLEY:
11      Q. Who signed the complaint, sir?
12      A. There's no signature on this complaint, but it
13  suggests that it's signed by Richard Kaudy.
14      Q. Who's on the signature line?
15      A. What I just said.
16      Q. It's an electronic signature; is that right?
17      A. It says slash, backslash S, Richard M. Kaudy.
18      Q. So Mr. Eddington did not file this complaint.
19      A. I'm sorry, but Mr. Eddington is counsel of record
20  on this complaint.
21      Q. His signature is not on it, is it?
22      A. Neither is Mr. Kaudy's.
23      Q. Well, it says what it says.
24      A. It says what it says.  That's exactly my point.
25  Thank you very much.

87

1      Q. What is the date on the complaint?  December 8,
2  2011, if you look at the last page, is that right?
3      A. Now you're answering my questions without even
4  giving me a chance to answer them.
5      Q. I'm just trying to move things along, sir.
6      A. You really aren't, but you're trying to -- you've
7  spent at least 30 minutes on a list of books that you
8  could have done with one question.  It has two dates --
9          MR. RIDLEY:  Mark the transcript, please. /(
10          THE WITNESS:  It has two dates on here,
11  January 3rd, 19 -- or 2012.  And it has another date,
12  December 8th, 2011.  And then a third date,
13  December 21st, 2012.  So there are three dates on this
14  complaint.
15  BY MR. RIDLEY:
16      Q. On the page where Mr. Kaudy's name appears, on
17  the last page of the complaint, is there a date there?
18      A. Yes, December 8th, 2011.  And above that,
19  January 3rd, 2012.
20      Q. You're referring to a filing number at the top of
21  the page?
22      A. Yes, it says filed January 3rd, 2012.
23      Q. All right.  Just so you know, that's, I believe
24  that refers to when the case was removed to the U.S.
25  District Court, as opposed to when it was originally

88

1  filed in state court.
2      A. Your questions were does this document contain
3  dates, and I'm trying to answer that, and you're trying
4  to treat me like I don't know what I'm doing here.
5      Q. Have you seen this complaint before?
6      A. I think so.
7      Q. Now, do you know what factual information
8  Mr. Kaudy provided to the Carrolls prior to filing the
9  complaint?
10      A. No.
11          MR. KAUDY:  Could you read the question
12  back, please?
13      (Whereupon the reporter read the record.)
14          MR. KAUDY:  Thank you.
15          MR. RIDLEY:  All right, let's take a break.
16          THE VIDEOGRAPHER:  We're going off record.
17  The monitor time is approximately 11:30 a.m.
18      (A lunch break was taken at this time.)
19          THE VIDEOGRAPHER:  We're back on record.
20  The monitor time is approximately 12:28 p.m.
21  BY MR. RIDLEY:
22      Q. Okay.  Mr. Fye, I have a few more questions about
23  your background.  Can you tell me, have you ever
24  adjusted a Colorado UIM claim?
25      A. Yes, I can.

22 (Pages 85 to 88)

89

1    Q. Okay. Have you ever adjusted a Colorado UIM
2  claim?
3    A. No.
4    Q. Have you ever been employed as an adjuster who
5  has adjusted any type of claim under Colorado law?
6    A. Undoubtedly. I wouldn't be able to cite
7  circumstances, but in connection with claims work
8  between 1962 and 1998, I undoubtedly was in and out of
9  Colorado on claims work of some sort or other. But in
10  the, in the sense that we used to talk about adjusting
11  claims, receiving an assignment, investigating,
12  evaluating and resolving, as a complete package, I've
13  never been licensed, never been domiciled and never done
14  that in Colorado. My work in Colorado has been largely
15  investigation and analysis work.
16    Q. Have you taken any courses or seminars on
17  Colorado UIM law?
18    A. Not, not specifically, but I've attended GAB's
19  courses in claims handling and claims management in
20  Denver in the past. It may have touched on that, but I,
21  I don't recall it.
22    Q. When was that?
23    A. During the years I was with General Adjustment
24  Bureau, and they established their educational center in
25  Denver.

90

1    Q. Are you familiar with the Colorado UM/UIM
2  statute, which is 10-4-609?
3    A. Pretty much. I have a copy of it, I think, in my
4  materials. I have read it, but my degree of familiarity
5  is situational.
6    Q. When was the last time you read that statute?
7    A. Probably in connection with this, or another case
8  within the last year. And I hope I'm remembering
9  correctly that I have it in, in this file. It may be
10  the Stanton case, or it may be something else. Seems to
11  me there was a case called Gardono pending.
12    And I'm not sure whether you're defending that
13  case, but in that case Allstate did avail themselves of
14  Sierra Document Management and got a copy of the file
15  well in advance with no, no fuss.
16    Q. Have you ever presented any seminars on Colorado
17  UM/UIM law?
18    A. Yes, but not on law. Excuse me. I don't present
19  seminars on law. I'm not a lawyer.
20    Q. Have you presented any seminars on the Colorado
21  UIM claims practices standards?
22    A. Yes, I've given several seminars in Colorado.
23    Q. When did you give a seminar on Colorado claims
24  practices?
25    A. April 17th and 18th of 2009, May 16th of 2012,

91

1  March 18th of 2005, December 19th of 2003. And I was
2  just in Colorado. Let me see if I listed that. Yes. I
3  was in Colorado last May, so I did, I did list that.
4    Q. That was May 16th?
5    A. Yes.
6    Q. All right. And you were just looking at, I
7  believe, Exhibit C to your September report?
8    A. Correct.
9    Q. All right. With respect to the April 2009, were
10  you -- which one are you referring to? Is this the
11  National Law Firms Coherence in Claims Practice
12  Litigation?
13    A. I don't understand your question. The April 2009
14  presentation said What Claims, What Claim Practices
15  Documents Reveal.
16    Q. Okay. I see. What is the mountain states law
17  firms? Is that who attended, or, or what?
18    A. Yeah, I try to list the scope of the attendants.
19    Q. Are those plaintiffs' firms or defense firms?
20    A. Yes.
21    Q. They're both?
22    A. Yes.
23    Q. And what --
24    A. When they attend my workshops, I make the
25  presumption that they are unfamiliar with insurance

92

1  claim practices because they're assisting policy holders
2  with either claim presentation or claims litigation. So
3  I don't give the seminar to the defense bar, the defense
4  bar seldom asks me to present to them except privately.
5    So these presentations are basically to help
6  defense lawyers who are in, who are wearing a different
7  hat. For instance, Mr. Kaudy, when I first met him, was
8  a defense lawyer -- well, in fact I guess he's still a
9  defense lawyer. Pardon me for making assumptions,
10  Mr. Kaudy. But in connection with his defense work, I
11  think it's safe to say that he did not need my
12  consulting ideas, but in connection with his work
13  representing consumers, he wanted these ideas.
14    Q. Other than Mr. Kaudy, can you identify any other
15  defense firms that you've presented to?
16    A. I, given time I could, probably.
17    Q. Okay. And I'm talking Colorado, defense firms
18  practicing in Colorado.
19    A. Well, I know that my first seminar was at White
20  and Steele, and there were several defense lawyers from
21  White and Steele at that presentation.
22    Q. Which one was that?
23    A. I don't remember which one it is.
24    Q. Do you know if it's listed on this sheet?
25    A. It should be. Yes, it's listed as December 19th,

Carroll v. Allstate                    Gary Fye                    April 2, 2013

---

93

1   2003.
2       Q.  I see.  All right.  Have you presented to any
3   defense firms since 2003?
4       A.  To defense firms solely?  No.
5       Q.  No.  Just seminars where defense --
6       A.  Sure.
7       Q.  -- Colorado defense firms were present.
8       A.  Well, I don't know.  Almost certainly, but I
9   don't know names as I sit here.  I'd have to think that
10  one through.  I, I do know that I've had a couple of
11  claim managers from insurance companies, but I, I don't
12  think they would want me to reveal their identity.
13      Q.  With respect to the seminar from May 16, 2012,
14  the audience, as I understand your chart here, was
15  Colorado firms, and the topic was Claim Practices
16  Trends?
17      A.  Yes.
18      Q.  Generally speaking, what were the claim practices
19  trends that you presented on?
20      A.  Redesign of claim practices to achieve lower
21  claim outcomes, and generally the practice of attacking
22  the insured's proof, attacking the insured's evidence at
23  every level to basically undermine the claim making for
24  the purpose of using the claim as a revenue stream by
25  essentially recapturing moneys from a more accurate

94

1   assessment of what the claim should, should cost.
2       Q.  What specific --
3       A.  Those are, those are general trends.  There are
4   other trends as well.
5       Q.  Do you know what specific --
6       A.  There are trends in fraud accusations for the
7   same purpose, but those are a lesser part of the
8   curriculum.
9       Q.  At the May 16, 2012 seminar, do you recall what
10  insurance companies you discussed?
11      A.  I don't.
12      Q.  Do you know if you discussed Allstate?
13      A.  Probably, but I don't know that for sure.  I
14  don't know.
15      Q.  Were there any defense lawyers present at that
16  seminar?
17      A.  I don't know.
18      Q.  Where did that seminar occur?
19      A.  I don't know that either.  It was in -- does it
20  say here?  Just a minute.
21      Q.  It says Denver, Colorado.
22      A.  Give me the date.
23      Q.  May 16, 2012.
24      A.  I remember going to the west side of Denver to a
25  park or a presentation hall of some sort, but I don't

95

1   know the name of the location.  I'm sorry.
2       Q.  That's all right.
3       A.  And, and I, there were a significant number of
4   regional lawyers there.
5       Q.  Including defense lawyers?
6       A.  That would be my assumption, but I'm not certain
7   of that.
8       Q.  Did you present any written materials at that
9   seminar?
10      A.  No.
11      Q.  Did you, do you have any PowerPoint or outline
12  related to that seminar?
13      A.  No.  What I normally do, there may have been
14  something like that, but what I normally do is use an
15  easel, a flip chart, and draw in front of my audience
16  and draw my exhibits as I'm discussing them.
17      Q.  Do you recall any attorney who attended that
18  seminar?  This is May 16, 2012.
19      A.  I do.
20      Q.  Who?
21      A.  I don't think my attendees are interested in
22  having me discuss their attendance.
23      Q.  Are you refusing to give those names?
24      A.  No.  If the Court wants me to give names of
25  people who attended my seminars, and if they're notified

96

1   to raise any objection, I see no reason.  It's not
2   secret to me.  But in fairness, they should be heard.
3       Q.  So today you refuse to answer that question.
4       A.  I didn't refuse to answer the question that I
5   recalled names.  I will answer it with one name, if that
6   will suffice.
7       Q.  Well, I'm looking for all the names you
8   remember --
9       A.  Okay.
10      Q.  -- of folks who attended --
11      A.  Okay.
12      Q.  -- that conference --
13      A.  Okay, I'll give you all the names I can remember.
14      Q.  Okay.
15      A.  Rich Kaudy.
16      Q.  That's the only name you can remember?
17      A.  Yes.
18      Q.  Who is Steve Strzelec?
19      A.  S-t-r-z-e-l-e-c.  It's pronounced Strzelec.
20      Q.  All right.
21      A.  Steve is a consultant in insurance claims
22  practices from the Seattle area and was formerly a
23  manager for State Farm.
24      Q.  And it appears that you've put on several
25  presentations with him.

24 (Pages 93 to 96)

Bonanza Reporting              (775) 786-7655              1111 Forest Street

Carroll v. Allstate                    Gary Fye                    April 2, 2013

97

1   A. Yes.
2   Q. Is he typically retained by plaintiffs counsel or
3   by insurance counsel?
4   A. I don't --
5   Q. If you know.
6   A. I don't know what his engagements look like on a
7   total scale, but I can tell you that when I work with
8   Steve on cases, the only context in the cases that I've
9   had exposure to him have been a half dozen cases or so
10  for consumer attorneys that are representing policy
11  holders with some kind of a claim practices problem, and
12  Steve and I have worked on the case together. Those are
13  really the only engagements I know about. But I know
14  he's active around the country in things that I, that
15  I'm not fully aware of.
16      And by the way, just so the record is clear, I
17  have really enjoyed presenting with Steve because he is
18  so insightful and thoughtful about claim transactions,
19  and it's been a real pleasure working with him.
20  Q. Let me direct your attention to your list of
21  cases, which is Exhibit E to your September 28, 2012
22  report. Now, on this list, which goes on for several
23  pages, in any of these cases do you, did you, were you
24  retained by an insurance company?
25  A. No.

98

1   Q. With respect to the first listing, Winters v.
2   Allstate, do you recall generally what that case was
3   about?
4   A. My recollection is -- yes. Yes, I do.
5   Q. And what was the, the general issue in that case?
6   A. An auto accident with injuries.
7   Q. Was that a UM/UIM case?
8   A. My recollection isn't that good.
9   Q. I see the attorney list. At the top there was
10  Ronald Getchey, and you mentioned him earlier in the
11  deposition. Do you know Mr. Getchey?
12  A. Do I know Mr. Getchey?
13  Q. Yes.
14  A. Yes. And his name is -- again, I know you're not
15  trying to be disingenuous, it's more reflexive, but the
16  idea is that Mr. Getchey's name is listed several times
17  here. He is Allstate's attorney, and he's the one I
18  mentioned this morning that I talked about the firm that
19  designed Allstate's turn the tables aggressive approach
20  to turn the deposition process into something other than
21  a discovery deposition.
22  Q. Directing your attention down on the bottom of
23  that page one of eight --
24  A. Correcting or directing?
25  Q. Directing.

99

1   A. Okay.
2   Q. There's an entry for March 23, 2009. Dodson, Jon
3   H. Dodson v. Allstate. This was in Little Rock,
4   Arkansas. Can you tell me generally what that case was
5   about?
6   A. I can.
7   Q. Generally, what was that about?
8   A. Allstate targeted a physician who established a
9   clinic to assist patients who were suffering from
10  injuries as a result of moderate or low impact auto
11  accidents, and for a series of circumstances, made
12  Allstate cast Dr. Dodson as a fraud and Allstate damaged
13  his practice and his reputation, and he sued them.
14  Q. So that was a, a libel or slander type lawsuit?
15  A. Well, it was styled several things over the
16  years. When it went to trial, I believe it was a
17  combination of defamation and interference. And that's
18  what the jury rendered its, I think, $21 million verdict
19  about.
20  Q. On the top of page two of eight -- well, that's
21  the, the trial in the Dodson matter.
22  A. Say that again.
23  Q. I just, I noticed another Allstate case, but
24  that's just the trial on March -- I'm sorry, May 27,
25  2009 in Little Rock.

100

1   A. Yes. I, I attended the trial and testified.
2   Q. All right. And then, and I'm assuming that all,
3   all of the depositions listed on this and all the trial
4   testimony that you testified --
5   A. By the way, it was all I could do to not put the
6   Dodson opinion in my records in this case, but I decided
7   not to do that. Just for your information, it wouldn't
8   hurt you to read that.
9   Q. That was not a UM/UIM case, was it?
10  A. No, but it was about Allstate attacking proof.
11  Attack, attack, attack.
12  Q. Martinez v. Allstate towards to bottom there,
13  Santa Fe, New Mexico, September 23, 2009. There is a
14  deposition listed, and I see the plaintiff's counsel is
15  David Berardinelli, who we have discussed. Can you tell
16  me generally what that lawsuit against Allstate was
17  about?
18  A. Well, it should be on here, there was a trial of
19  that case as well, but I don't see it on here. Just a
20  minute. Yeah, the, on the next page, on November 2nd
21  and 3rd of 2009 that case was tried and, in Santa Fe,
22  and I testified in the trial.
23      The case was about four New Mexico insureds who
24  had been subjected to the same treatment the Carrolls
25  got. Their claims were put in a category, or a segment,

25 (Pages 97 to 100)

Carroll v. Allstate                          Gary Fye                          April 2, 2013

---

101

1    that Allstate calls SFXOL, which means settle for X or
2    less.  And they wouldn't negotiate and wouldn't respond.
3    And so the practices of Allstate came into dispute.
4        And I testified much as I recorded in this
5    report, that Allstate had set up a reparation system
6    that operated independently of the New Mexico reparation
7    system, and Allstate was kind of a law unto itself.  In
8    the documents that you suggested were not specific to
9    this case, but which are, there is a -- let me give you
10   a page number.  Page 2038 through 2046 is the ruling by
11   Judge Vigil in the Martinez, et al. case saying that
12   Allstate's method, claim handling method, is an attempt
13   to extort and delay claim benefits.  And I mentioned
14   that in this case.
15       Q.  Was the Martinez case a UM/UIM case?
16       A.  There were four cases, and I don't remember the
17   specific coverages at this date.
18       Q.  Did that case involve any questions of Colorado
19   regulatory or case law?
20       A.  I don't know.  I don't think so, but I don't
21   know.  And I suppose you couldn't drive a golf ball from
22   Santa Fe to Colorado, but it's pretty close.
23       Q.  Please turn to page seven of eight.  The top
24   entry is Truong v. Allstate.
25       A.  Yes.  Truong, T-r-u-o-n-g.

---

102

1        Q.  What was that case about?
2        A.  It was a class action about undermining insureds'
3    claims through the use of fraudulent software and
4    assessment by Allstate.
5        Q.  What software?
6        A.  I, are you eliciting questions about that
7    software specifically for a reason, when I've been
8    admonished not to discuss it?
9            MR. KAUDY:  I told him we had a stipulation
10   that Colossus was irrelevant, inadmissible, and neither
11   party would attempt to elicit any testimony or evidence
12   concerning Colossus.
13           MR. RIDLEY:  Right.  And --
14           MR. KAUDY:  That's the ammunition --
15   admonition.  I'm sorry.
16           MR. RIDLEY:  Right.  Okay.  Right.  And I
17   did that as a trial stip.  I mean, his report mentions
18   Colossus, so we're going to have to talk about Colossus
19   at some point just to make sure that it's not part of
20   the case.  If there was some other software -- I don't,
21   I don't view this as a violation of the stipulation.
22           MR. KAUDY:  That's fine.  If you don't --
23           MR. RIDLEY:  This is a discovery deposition.
24           MR. KAUDY:  -- then that's okay with me.  I
25   just didn't want Mr. Fye --

---

103

1            MR. RIDLEY:  No, and I understand that.
2            THE WITNESS:  I'm abiding by the
3    stipulation, and I don't separate these.  I don't see
4    why you have to discuss it.  And as far as I'm
5    concerned, I'm not going to be discussing it a little,
6    tiny bit.
7            MR. RIDLEY:  All right.  Well --
8            THE WITNESS:  If you're going to elicit
9    questions about it, then I don't want this record to be
10   impaired at all by any confidentiality orders or
11   stipulations.
12           MR. RIDLEY:  And, and --
13           THE WITNESS:  This is my testimony that I
14   have to live with.
15           MR. RIDLEY:  Well, and I'll represent on the
16   record that, one, that's not my intent, and two, this is
17   a discovery deposition.  I do not intend to claim if
18   there's any violation of that stipulation, which I've
19   always viewed as a trial, evidentiary trial testimony
20   stipulation.
21           THE WITNESS:  Did you notice my answer when
22   the subject came up?  That's the way --
23           MR. RIDLEY:  That's fine.
24           THE WITNESS:  -- I'll answer questions about
25   it.

---

104

1            MR. RIDLEY:  Okay.
2            THE WITNESS:  If you don't mind.
3            MR. KAUDY:  I just don't want to waste time
4    in discovery on that either, knowing time is precious.
5            MR. RIDLEY:  And you understand I need to, I
6    need to pin this down, though, just to --
7            THE WITNESS:  You've pinned it down.
8            MR. KAUDY:  We're not going to elicit a
9    syllable regarding Colossus.
10   BY MR. RIDLEY:
11       Q.  Okay.  So those opinions expressed in your
12   September and November reports related to Colossus can
13   be deemed --
14       A.  Withdrawn.
15       Q.  -- retracted, or withdrawn.
16       A.  Absolutely not.  From my work?  No.  You can't
17   edit my reports.
18           MR. KAUDY:  We are considering them on
19   behalf of the Carrolls, but they don't mean to suggest
20   that you have withdrawn anything.
21           THE WITNESS:  These, these reports are
22   public record somewhere, and they're frequently part of
23   other discovery, and I can't have you editing my
24   reports.  Sorry.
25           MR. RIDLEY:  No, that's not, that's not the

---

26 (Pages 101 to 104)

Carroll v. Allstate                    Gary Fye                    April 2, 2013

---

105

1 intent of my question --
2       THE WITNESS:  You know, after this episode
3 about who filed this complaint, you don't need to
4 represent your intent as being sincere. I get it. I'm
5 not letting you edit my reports.
6       MR. RIDLEY: Mark the transcript, please. /(
7       MR. KAUDY: Anyway, that's our stipulation
8 on the record.  We just didn't see any need to pursue
9 Colossus, for a variety of reasons.  So I guess it's up
10 to you, if you wish to pursue it, we just don't think
11 it's going to be very --
12       MR. RIDLEY: No.
13       MR. KAUDY: -- productive.
14       MR. RIDLEY: And I don't --
15       MR. KAUDY: It's your time.
16       MR. RIDLEY: Rich, I don't intend to pursue
17 it.  All I want the witness to say is that he's not
18 presenting opinions at the trial of this particular
19 matter, Carroll, on Colossus.
20       MR. KAUDY: Well, I'm not going to elicit
21 those.  He'll have to, like your experts, answer
22 truthfully to your question.  But we are not going to
23 tiptoe around our stipulation, and by insinuation,
24 suggestion, innuendo, try to elicit out any computer
25 software program, because we have an understanding and

---

106

1 agreement.  And I told him that in preparation, don't
2 even think about Colossus, it's been withdrawn.
3       MR. RIDLEY: All right.
4       MR. KAUDY: Not by him, but by the Carrolls.
5       MR. RIDLEY: I, I understand that. So, and
6 I, you know, I can take your, your word for it that in
7 terms of what his report says in this case about
8 Colossus is not going to be presented at the trial in
9 this case.
10       MR. KAUDY: That's correct.
11       MR. RIDLEY: All right. That's all I'm
12 looking for.
13       MR. KAUDY:  That's fine.  He didn't, Mr. Fye
14 didn't know that, so I'm, he's just, with an abundance
15 of caution, making sure.  So it was my fault that I've
16 asked him to take that approach.  And please do not hold
17 it against him.  This is my request of him to be
18 aggressive and not volunteer anything about Colossus.
19       MR. RIDLEY: Okay.
20 BY MR. RIDLEY:
21 Q. Mr. Fye, moving along, December 21, 2011,
22 Allstate v. Total Rehab and Medical Centers appears to
23 be a Palm Beach, Florida case. Can you tell me
24 generally what that case was about?
25 A. I don't feel free to discuss that case on the

---

107

1 record, other than it deals with Total Rehab as a
2 defendant in an Allstate case about medical practice and
3 medical billing.  And there are lots of stipulations and
4 confidentiality agreements in place that I don't want to
5 even come close to violating.
6 Q. Does that case involve UM/UIM?
7 A. You know, I'm forced to ask that same question.
8 What is it about my answer that you didn't get?
9       MR. RIDLEY: Please mark the transcript. /(
10 BY MR. RIDLEY:
11 Q. Did it involve UM/UIM.  It's an easy answer,
12 right?  If it did, it's probably a matter --
13 A. You're trying to get me to violate a protective
14 order.  I get it.  Move on.  I'm not violating a
15 protective order.  And I would appreciate it if you'd
16 stop that.
17 Q. I'd appreciate if you'd stop with the verbal ad
18 hominems which have gone on this entire deposition.
19 A. Well, they're well deserved.  Just move on with
20 your so-called deposition, your aggressive deposition.
21 Q. So you refuse to answer the question whether your
22 prior testimony at deposition in this Allstate v. Total
23 Rehab case had to do with UM/UIM?
24 A. That's a different question, and I have not
25 refused to answer that question.  Probably it did.

---

108

1 Q. It did relate to UM/UIM?
2 A. My deposition?
3 Q. Yes.
4 A. Probably.  But not in the sense that you're
5 thinking.
6 Q. How do you know what I'm thinking?
7 A. Because you're thinking in terms of claim
8 practices.
9 Q. As opposed --
10 A. But undoubtedly people injured and whose medical
11 records are involved in that case carry those coverages.
12 And so it involved UM/UIM, but in a very indirect way.
13 But the deposition, I'm not talking about the case.
14 Q. All right.  That's fine.
15 A. I'm talking about my deposition only.
16 Q. All right.  Did the Truong case involve Colorado
17 claims practices?  And I can try to rephrase that --
18 A. And the answer is yes.  Well, of course you're
19 going to try to rephrase it, because, of course,
20 Allstate's practices are national, and anywhere in the
21 country that Allstate's practices are in question.  So of course
22 it involved Colorado and every other state.  So of course
23 it involved Colorado practices.  But in a direct sense,
24 no.  Not that I recall.
25 Q. And the Total Rehab and Medical Centers, did that

---

27 (Pages 105 to 108)

Carroll v. Allstate                    **Gary Fye**                    April 2, 2013

---

109

1   involve any questions of Colorado claims handling?
2   A. Say it again.
3   Q. Sure. The Florida case, the Total Rehab and
4   Medical, did that involve any questions of Colorado
5   claims practices?
6   A. If you rephrase, maybe I can answer it.
7   Q. Sure. Were any of the plaintiffs in the Total
8   Rehab, Medical Center's case, Colorado Allstate policy
9   holders?
10   A. And maybe if you rephrase, I can answer it. In
11   other words, did my deposition involve Colorado claim
12   practices.
13   Q. Yes.
14   A. Is that your new question?
15   Q. Yes. That's fine.
16   A. My deposition involved Colorado claim practices
17   because Allstate's practices are national in scope, and
18   the redesign was national in scope. So naturally, any
19   Allstate case involves Colorado practices, but not
20   directly, probably.
21   Q. All right. Directing your attention, Mr. Fye, to
22   your September 28 report, which is Fye Exhibit 60, page
23   three. The second paragraph, second line, talks about
24   variable-pay and performance-based compensation
25   programs. Do you see that?

110

1   A. Yes.
2   Q. Do you know whether Mr. Gerald Palmer received
3   any variable-pay or performance-based compensation?
4   A. Yes.
5   Q. And did he?
6   A. Yes.
7   Q. What was -- how did that work? What's your
8   understanding of that?
9   A. It's complicated, but I'll try to answer. Give
10   me a second to get a document.
11   There are, there are two fundamental ways that
12   someone in Mr. Palmer's position receives income and
13   promotional consideration for the way, for claims
14   outcomes. One is measurements within the company that
15   measure the actual claim results compared to EA, which
16   stands for evaluated amount. Records are kept at
17   Allstate through an evaluation process that it gets to a
18   number called evaluated amount, and then the company
19   operates off that amount.
20   And people who achieve resolutions of claims at
21   or below that amount, or at or near that amount, are
22   given promotional consideration and merit increases in
23   salary. It's a very interesting incentive program, but
24   it's, it is, nonetheless, an incentive program.
25   And then Mr. Cohen, in the 1998 Acclaim,

111

1   A-c-c-l-a-i-m, magazine, which is an Allstate
2   publication, described the profit sharing fund of
3   Allstate employees, where the company's bottom line
4   results increased contributions to the employee, the
5   employee's retirement account. It's an incentive
6   program that operates company-wide.
7   And I guess I would be remiss if I didn't say
8   that from what I've learned of the Allstate employment
9   culture and from what the documents in, in on page two,
10   Exhibit F, show, is that Allstate is bombarded with
11   verbal, oral and written goals to achieve lower
12   outcomes. The redesign documents reflect that
13   Allstate's management is to be relentless in pursuing
14   these goals.
15   And then lastly, in the SFXOL documents, which
16   I'll get in just a moment --
17   Q. I'm going to have a question for you on that
18   first document.
19   A. In the SFXOL documents, which I have labeled as
20   SFXOL-11, it basically refers to the PDS -- and that
21   stands for performance development summary. That's the
22   annual evaluations and goal setting for employees.
23   System to be modified to incorporate these measures
24   after 12 to 18 months. These measures are basically
25   percent of cases resolved at or below the evaluated

112

1   amount, and the average dollar deviation, percentage
2   deviation from the evaluated amount.
3   And I take from the documents I've read, that
4   Allstate is heavily managed in terms of outcomes. And
5   of course the documents from the Consumer Federation of
6   America and the documents about Mr. Romano and about the
7   use of judgment and experience in evaluating claims,
8   would bear out that Allstate's claim methods are all
9   about achieving lower outcomes, and that the behaviors
10   that achieve lower outcomes have a system of rewards.
11   It is prudent for me to say that Allstate
12   produces documents under protective order and, or don't,
13   don't, doesn't produce documents that may shed more
14   light on the subject, but those documents are available
15   to me, and I've produced here.
16   Q. All right. We're talking about variable-pay and
17   performance, and you've, you've looked at two documents.
18   I would just like to clarify for the record what you've
19   looked at. First of all, can I take a look at that
20   document?
21   A. Yes.
22   Q. All right. Thank you. You've just handed me a
23   two-page document entitled: Acclaim, Second Quarter
24   1998. And that's the cover page.
25   MR. RIDLEY: I don't know if you can get

---

28 (Pages 109 to 112)

Carroll v. Allstate                          Gary Fye                          April 2, 2013

---

113

1    that.
2             THE VIDEOGRAPHER:  One second.  Okay.
3             MR. RIDLEY:  All right.  And then the, the
4    second page is entitled:  Stretching our goals.
5             THE VIDEOGRAPHER:  Okay.
6             MR. RIDLEY:  All right?
7    BY MR. RIDLEY:
8        Q.  Mr. Fye, first of all, do you know if Mr. Palmer
9    himself received variable-pay and performance pay?
10       A.  You're, you're changing the question, as I
11   understood it, but my answer remains the same.  These
12   are generic comments about people working in claims at
13   Allstate, and I'm not singling Mr. Palmer out.
14       Q.  All right.  So since 1998, do you know whether
15   Allstate has changed its compensation system?
16       A.  Oh, I'm certain it has.
17       Q.  Okay.  So can you tell me how this two-page --
18       A.  That's, that's not its compensation system.
19   That's a different subject.
20       Q.  Okay.  So then I must have missed something.
21   This addresses --
22       A.  I'm not surprised.
23       Q.  -- what issue?
24             MR. RIDLEY:  Please mark the transcript.  /(
25

---

114

1    BY MR. RIDLEY:
2        Q.  Okay.  Because the question --
3        A.  It's confusing.  That's, that's a profit sharing
4    program for the retirement funds, and it's voluntary on
5    the employee's part.  But it's an incentive plan.
6        Q.  Does --
7        A.  It's not a variable-pay plan.  You're trying to
8    characterize these things into smaller categories, and
9    I, I appreciate that some of that may be not
10   intentional.  But basically this is a, a retirement type
11   of plan.  And it's simply telling the employees that if
12   you achieve better results on claims and improve our
13   bottom line, we're going to pay you more.
14       Q.  Do you know if that statement by management was
15   still in force in 2010?
16       A.  Not firsthand.  Only secondhand.
17       Q.  Secondhand from who or from what?
18       A.  Simply asking questions of that nature, that
19   there hadn't been significant changes or substantive
20   changes of the retirement program.  But I, I don't know
21   how much weight to place on those, because there could
22   be changes that I simply am not aware of.
23       Q.  All right.  Do you mind if we mark this as an
24   exhibit?
25       A.  Yes.

---

115

1        Q.  Okay.
2        A.  Why don't you hand it back and --
3        Q.  Yeah, sure.  Maybe we can --
4        A.  Do you want to get your copy of it and mark it?
5        Q.  Well, I don't know -- there's no Bates label on
6    it, so I'd have to look through four boxes to find it.
7    I don't want to --
8        A.  Did you have the documents put in folders, like
9    mine?
10       Q.  I saw the documents yesterday, so --
11       A.  Well, okay.  Why don't we just have a copy made
12   and you can mark the copy.
13       Q.  Okay.  And as long as we're doing that, we'll
14   take a short break.  I'd like to mark the other exhibit
15   you relied on in your answer concerning incentive pay
16   and variable --
17       A.  Very good.
18       Q.  -- pay.
19             THE VIDEOGRAPHER:  We're going off record.
20   The monitor time is approximately 1:17 p.m.
21             (A short break was taken at this time.)
22             (Exhibits 63 and 64 marked at this time.)
23             THE VIDEOGRAPHER:  We're back on record.
24   The monitor time is approximately 1:26 p.m.
25

---

116

1    BY MR. RIDLEY:
2        Q.  Mr. Fye, before the break we were talking about
3    the documentary support that you've located for me
4    related to your opinion that there was variable-pay and
5    performance-based compensation programs in effect at the
6    time of the Carroll claim.
7        A.  Well, you've used a specific article rather than
8    a general one, and there's more support than this is
9    what --
10       Q.  Okay.  And I'll --
11       A.  -- my answer said.
12       Q.  Okay.  I'll get to that.  Thus far, as I
13   understand it, the two documents that you've presented
14   to me to support your opinion on variable-pay and
15   performance --
16       A.  That it was available to someone like Mr. Palmer.
17       Q.  Right.  Okay.  That's fine.
18       A.  That's kind of what I was getting at.  There are
19   more documents that have not been produced, and they're
20   referred to.
21       Q.  All right.  So thus far what you have presented
22   to me in support of your opinion concerning variable-pay
23   and performance-based compensation programs are Exhibit
24   63 and Exhibit 64.
25       A.  And a report on September 28th, 2012, with

---

29 (Pages 113 to 116)

Carroll v. Allstate                        Gary Fye                        April 2, 2013

---

117

1     enclosure number F on page two of thirteen.
2          Q.  All right.  Let's get to that third item in a
3     minute.  Let me just finish up with these.
4          A.  All right.
5          Q.  So we've discussed Exhibit 63, which is the 1998
6     Acclaim article, right?
7          A.  Yes.  By the claims vice president about the
8     profit sharing retirement program.
9          Q.  All right.  Do you know if this article has ever
10    re-appeared in Acclaim or any Allstate publication since
11    1998?
12         A.  Say that again.
13         Q.  Sure.  Has, has this article ever again been
14    published, to your knowledge, since 1998 to Allstate
15    employees?
16         A.  I don't know.
17         Q.  Exhibit 64 --
18         A.  By the way, thank you for raising it here, but
19    there's another more indirect element here, but it's
20    direct as, as regarding people like Mr. Palmer.
21    Allstate's people are managed by bonus eligible people.
22    If you'll look on the second page of the exhibit, in the
23    right-hand column in the second paragraph it says
24    management bonus eligible employees are limited, and so
25    forth.

---

118

1          Do you understand that when a manager is bonus
2     eligible, that employees have incentives to qualify that
3     manager for a bonus, and that that's an incentive
4     program as well?
5          Q.  Do you know if Mr. Palmer was eligible for that
6     program in 2010 or 2011?
7          A.  I don't, but I doubt that he is bonus eligible.
8     I think the people that manage him are.
9          Q.  Okay.  Do you know whether Mr. Palmer's
10    supervisors were bonus eligible in 2010 or 2011?
11         A.  I don't have any specific information like that.
12         Q.  Do you know if any --
13         A.  Again, they work for someone who is bonus
14    eligible, and the same incentives apply.  If you want
15    the get ahead in a business, you do what pleases your
16    boss.  If your boss gets a bonus for lower claim
17    outcomes, then you have an incentive to produce lower
18    claim outcomes, which is the behavior that this claim
19    represents.
20         Q.  Do you have any direct proof that Mr. Palmer or
21    any of his supervisors were in fact motivated by any
22    sort of variable-pay or performance-based compensation
23    in the adjusting of the Carrolls' claims?
24         A.  Other than what I've said and other than what the
25    documents contain, no.

---

119

1          Q.  Now, with respect to Exhibit 64 -- just give me a
2     second, here.  Okay.  I'm sorry.  I seem to have -- is
3     this the first page of Exhibit 64?
4          A.  Yes, it is.
5          Q.  All right.  And is the second page -- what's the
6     number on the bottom of the second page of Exhibit 64?
7          A.  1A.  Don't ask me how that took place.  I don't
8     know.
9          Q.  All right.  Now, Exhibit 64, as I read this, it
10    says:
11             Source: CCPR Implementation Training Manual --
12    Tort States, July 1995.
13             Is that your understanding, that this is a, from
14    the 1995 CCPR Implementation Training Manual?
15         A.  This page is, for sure.
16         Q.  All right.  Do you know if Mr. Palmer ever saw
17    this page?
18         A.  I, I don't have specific knowledge like that, but
19    it would be -- well, I shouldn't speculate.  It would
20    be, if you look at the nature of the page, it would be
21    irresponsible of claim management not to show it to all
22    claim employees of his generation.
23         Q.  Do you know, though, whether Mr. Palmer --
24         A.  I just said so.
25         Q.  -- ever saw it?

---

120

1          A.  No, I don't.
2          Q.  Okay.
3          A.  You don't need to ask me twice.
4          Q.  Do you know whether any of Mr. Palmer's
5     supervisors ever saw this first page of --
6          A.  Same --
7          Q.  -- Exhibit 64?
8          A.  Same answer.
9          Q.  Which is no.
10         A.  Same answer is it would be irresponsible of
11    management not to share this document with such people,
12    but I have no specific knowledge of any one individual
13    seeing it or not seeing it, nor do I have any knowledge
14    of anyone who has seen it would even remember seeing it.
15         Q.  Do you know, then, whether this first page of
16    Exhibit 64 had any impact at all on how Mr. Palmer
17    adjusted the Carrolls' claim?
18         A.  It had significant impact on the way Allstate
19    conducts its claims business nationally, including every
20    claim handled by Mr. Palmer and his supervisors.  It is,
21    it is the one page that I would consider absolutely
22    crucial that the jury in this Carroll case to see and
23    have an explanation of.  It is the basis of the change
24    that Allstate underwent to create the new, what, what
25    Allstate is today.  And it is the one document that

---

30 (Pages 117 to 120)

| Carroll v. Allstate | Gary Fye | April 2, 2013 |

**121**

1  explains and ties together the behaviors that occurred
2  to the Carrolls.
3  **Q. What proof do you have that Mr. Palmer considered**
4  **page one of Exhibit 64 in adjusting the Carroll claim?**
5  A. It's a, it's an unanswerable question. The proof
6  of the pudding is in the eating. The proof I have is
7  the claim handling. The proof I have is the
8  segmentation. And the proof I have is the outcome and
9  the current status of the case, and Allstate continuing,
10  through you, to continue to be disloyal and undermine
11  its own insured's proof in a first-party claim context.
12  So I don't link this document like a necklace
13  around Mr. Palmer's neck. My comments are not about him
14  specifically, they're about Allstate claim methods. And
15  this document is, as you saw, if you looked at the
16  production of documents, I gave you the manual this is
17  from to emphasize its important in redesigning the
18  company.
19  Now, the implication is that I'm going to need
20  some form of direct proof that he had this in hand when
21  he went off and played hooky rather than responding to
22  the Carrolls. I don't have anything in the record like
23  that.
24  **Q. Do you know whether the statements made on page**
25  **one of Exhibit 64 were even in effect when Mr. Palmer**

**122**

1  **adjusted the Carrolls' claims?**
2  THE WITNESS: Could you repeat that? Or
3  read it back?
4  (Whereupon the reporter read the record.)
5  THE WITNESS: One more time.
6  (Whereupon the reporter read the record.)
7  THE WITNESS: Same answer. Yes, I do. I've
8  never seen a retraction, Allstate has never backed away
9  from these principles. The redesign manual was not
10  designed to be retracted, and I have seen nothing to
11  indicate that the redesign isn't still in place.
12  BY MR. RIDLEY:
13  **Q. Have you seen any amended versions of the CCPR**
14  **since 1995?**
15  A. Yes.
16  **Q. Which, from what years?**
17  A. I don't know.
18  **Q. Do you know what was in effect in terms of the**
19  **CCPR at the Colorado claims office at the time the**
20  **Carrolls made their claim?**
21  A. I don't even understand the question.
22  **Q. Do you know what version of the CCPR, if any, was**
23  **in effect at the time the Carrolls made their claim?**
24  A. No, I don't know what, what version of it was
25  being used in Colorado.

**123**

1  **Q. So you don't know what was in the CCPR or what**
2  **had been --**
3  A. It would be --
4  **Q. -- removed from --**
5  A. It would be interesting if we could trust --
6  **Q. Let me finish the question, please.**
7  A. -- if we could trust the production if you were
8  being candid with this question.
9  **Q. All right. Can you please --**
10  A. But you're being deliberately --
11  **Q. -- pay me the courtesy of allowing me to finish**
12  **my question?**
13  A. You don't deserve courtesy for that question.
14  MR. RIDLEY: Could you please mark the
15  transcript. /(
16  THE WITNESS: You're playing a game with the
17  court and the jury, and I don't appreciate it. You're
18  withholding documents, you won't produce them, and now
19  you're calling into question whether this fundamental
20  program that describes Allstate claim methods even
21  exists.
22  MR. RIDLEY: I'm sorry, Susan, but --
23  THE WITNESS: That's not, that's not
24  negotiating fairly, playing fairly, and I have to object
25  that this type of claim practice is, even when this

**124**

1  litigation is in process, Allstate has a continuing
2  responsibility to resolve the Carrolls' claims, and your
3  taking that tact is a deliberate refutation of all known
4  responsibilities of claim operations.
5  MR. RIDLEY: Wow. Susan, I'm sorry, but --
6  THE WITNESS: I can't hear what you're
7  saying.
8  MR. RIDLEY: -- could you please go back to
9  the start of my last question?
10  (Whereupon the reporter read the record.)
11  MR. RIDLEY: First I'm going to move to
12  strike his last answer.
13  BY MR. RIDLEY:
14  **Q. Mr. Fye, you don't know what was in the Allstate**
15  **CCPR at the time Mr. Palmer adjusted the Carroll claim,**
16  **correct?**
17  MR. KAUDY: Objection to form and
18  foundation, asked and answered. You can certainly
19  supplement.
20  THE WITNESS: Could you read that back?
21  BY MR. RIDLEY:
22  **Q. I'll tell you what it is. It's --**
23  A. No, please have her read it back.
24  MR. RIDLEY: Go ahead.
25  (Whereupon the reporter read the record.)

31 (Pages 121 to 124)

Carroll v. Allstate                          **Gary Fye**                          April 2, 2013

---

Page 125

```
1          THE WITNESS:  That's not totally correct and
2   not totally incorrect.
3   BY MR. RIDLEY:
4       Q.  What was in the Allstate CCPR at the time Mr.
5   Palmer adjusted the Carrolls' claims?
6          THE WITNESS:  Your Honor and members of the
7   jury, these volumes are the CCPR training manual, which
8   he's shortened to CCPR.  It means the Claim Core Process
9   Redesign training manual.  And this is the manual.  He's
10  trying to make the suggestion --
11         MR. RIDLEY:  Object.
12         THE WITNESS:  -- that this manual did not
13  exist, but I have it in my hand.
14         MR. RIDLEY:  Move to strike.
15         THE WITNESS:  -- that was in the manual was
16  this page, that has become page one.
17         Now, does that answer your question?
18  BY MR. RIDLEY:
19      Q.  No, it doesn't.
20      A.  Oh, good.
21      Q.  It does not answer the question.  But with
22  respect to those blue folders, have you ever produced
23  those before in this case?
24      A.  No.
25      Q.  Okay.  Can you tell me what the date on the
```

Page 126

```
1   documentation in those blue folders is?
2       A.  July, 1995.
3       Q.  So with respect to those blue folders that you
4   just flourished to the camera, do you know if those were
5   even in effect when Mr. Carroll, when Mr. Palmer
6   adjusted the Carrolls' claims?
7       A.  I do know that.
8       Q.  You do know what, that they were?
9       A.  Whether they were in effect.
10      Q.  You do know that they were?
11      A.  I do know whether they were in effect.  I'm
12  answering your question.
13      Q.  Were they in effect?  Those blue folders that you
14  just held up, were those in effect when Mr. Palmer
15  adjusted the Carrolls' claims?
16      A.  Listen carefully.
17      Q.  No, you listen carefully.  The question was were
18  those blue folders --
19      A.  Listen carefully to my answer --
20      Q.  -- in effect when --
21      A.  -- and stop lecturing me.
22         MR. KAUDY:  Can we take a little break here,
23  please?
24  BY MR. RIDLEY:
25      Q.  -- when Mr. Palmer adjusted the Carrolls' claim?
```

Page 127

```
1       A.  Listen to my question --
2       Q.  It's a simple question.
3       A.  -- and stop lecturing me.  And don't tell me it's
4   a simple question.
5          MR. KAUDY:  May we -- we just need to go off
6   the record.
7          THE WITNESS:  I'll answer the question right
8   now.
9          MR. RIDLEY:  I agree with Mr. Kaudy.  Thank
10  you.
11         MR. KAUDY:  Let's just take a break.
12         THE VIDEOGRAPHER:  We're going off record.
13  The monitor time is approximately 1:44 p.m.
14      (A short break was taken at this time.)
15         THE VIDEOGRAPHER:  We're back on record.
16  The monitor time is approximately 1:50 p.m.
17  BY MR. RIDLEY:
18      Q.  Mr. Fye, do you understand that Mr. Palmer made
19  offers to resolve the Carrolls' UM/UIM claims in May of
20  2011?
21      A.  I don't want to proceed with the deposition until
22  I give my answer that you interrupted.
23      Q.  I think you interrupted my question.
24      A.  You interrupted my answer.
25      Q.  What was the question?
```

Page 128

```
1       A.  Is it still in effect?
2       Q.  Is what still in effect?
3       A.  The CCPR.
4       Q.  The blue folders that you have in front of you?
5       A.  The CCPR.
6       Q.  All right.  My question went to whether these
7   blue folders from 1995 were in effect at the time the
8   Carrolls' claim was adjusted, which was generally in the
9   May, 2011 time frame.
10      A.  And I started to answer, and you jumped in the
11  middle of my answer and started lecturing me.
12      Q.  I disagree with your characterization.  But if
13  you can answer whether those blue folders were in effect
14  at the time of the Carrolls' claim, claims were
15  adjusted, I'd like to hear the answer.
16      A.  You're mischaracterizing it.  These are my blue
17  folders, not Allstate's blue folders.
18      Q.  These blue folders that you've just presented for
19  the first time, the stuff that's in them dated from
20  1995 -- I haven't seen it.  Presumably it's CCPR.  Was
21  that version of the CCPR in effect at the time Mr.
22  Palmer adjusted the Carrolls' claims?
23      A.  That's a different question, but I'll answer it
24  anyway.  Will you promise not interrupt me this time?
25      Q.  If you promise not to interrupt me.
```

32 (Pages 125 to 128)

Carroll v. Allstate                    Gary Fye                    April 2, 2013

---

129

1    A.  You won't be speaking, I'll be answering.
2         The language of this document is that it's the
3    Claim Core Process Redesign Implementation Training
4    Manual from July of 1995.  Exhibit 64 is page three of
5    that manual, that explains that Allstate completely
6    redefined the game of claims to question, improve and
7    radically alter our whole approach to the business of
8    claims.  Those are Allstate's words, not mine.
9         The reason I was so adamant when I was
10   interrupted by Allstate's lawyer is that Allstate
11   implements a program of redesign to achieve lower claim
12   outcomes that are explained by this one page eloquently.
13   There are more pages that explain it further, but that,
14   that page explains it pretty thoroughly.  And basically
15   it's about providing greater financial support to the
16   company.  Not, not the insured, not the insuring public,
17   but to the company.
18        So this redesign was put in place, it was
19   implemented at Allstate, at the cost of millions of
20   dollars, paid to McKinsey & Company -- that's
21   M-c-K-i-n-s-e-y -- the consultant that designed the
22   program.  This program was implemented nationally at
23   Allstate, and it became Allstate's claims culture.
24        Mr. Ridley is deceiving the Court and the jury by
25   suggesting --

---

130

1         MR. RIDLEY:  Objection, move to strike.
2         THE WITNESS:  -- that --
3         MR. RIDLEY:  Objection --
4         THE WITNESS:  Mr. Ridley --
5         MR. RIDLEY:  -- move to strike.  And mark
6    the transcript.  Thank you.  /(
7         THE WITNESS:  Mr. Ridley is deceiving the
8    Court and the jury by suggesting --
9         MR. RIDLEY:  Objection.
10        THE WITNESS:  -- that --
11        MR. RIDLEY:  And I would ask Your Honor shut
12   down this answer right now, because it is non-responsive
13   to the question.
14        THE WITNESS:  -- by --
15        MR. RIDLEY:  You are grandstanding, Mr. Fye,
16   and you know it.
17        THE WITNESS:  -- by suggesting that this
18   manual has to exist in any form at the time the
19   Carrolls' accident occurred.  Because it has been
20   implemented in various forms from the time it was
21   designed and put into place in July of 1995.  It's
22   important to look at claim practices and whether they
23   conform to the redesign program.
24        I know that the method of implementing these
25   programs and trying to protect, destroy and otherwise

---

131

1    obliterate the foundational documents that explain the
2    claim handling behaviors is a diligent attempt by
3    Allstate's counsel, Mr. Ridley.  But please don't be
4    deceived, this Claim Core Process Redesign is alive and
5    well in its general principles and in this explanation
6    as they apply to this claim.
7         This claim is a perfect example of the
8    segment called settle for X or less, which is another
9    way of saying settle for X or else, and it's the method
10   that was applied to the Carroll claim.  So yes, I know
11   that this was in place at the time of accident.
12        MR. RIDLEY:  Can I mark that as an exhibit?
13        MR. KAUDY:  Mark your own copy.
14        MR. RIDLEY:  Are you saying it was produced?
15        THE WITNESS:  I am saying that it was
16   produced.  I produced the documents, and you're saying
17   that you haven't even looked at them.
18   BY MR. RIDLEY:
19        Q.  You produced 12,000 pages yesterday.
20        A.  And you haven't looked at them?
21        Q.  The 12,000 plus pages?  I've look at some of
22   them?
23        THE VIDEOGRAPHER:  Microphone, Mr. Fye.
24        MR. RIDLEY:  Rich, do you know when those
25   were produced?

---

132

1         MR. KAUDY:  I do not.  But in an abundance
2    of caution, since we're dealing with so many, I will
3    take the --
4         THE WITNESS:  They were.  They were copied
5    by, they're in that copy order.
6         MR. KAUDY:  I will check, and if, provide
7    copies if they haven't been produced.  I don't know if
8    they haven't.  My presumption is they have been, but I
9    want to avoid any potential claim for prejudice.  We'll
10   make sure that --
11        THE WITNESS:  Well, he brought up CCPR.
12        MR. KAUDY:  I understand.  We just want to
13   make sure they've been produced.
14   BY MR. RIDLEY:
15        Q.  Mr. Fye, with respect to the blue folders that
16   you've just held up, was that version of the CCPR in
17   effect in 2011?
18        A.  In the sense that I testified about, absolutely.
19        Q.  How do you know that?
20        A.  By my continuing work in Allstate cases.
21        Q.  Do you know that Mr. Palmer ever considered the
22   1995 CCPR in adjusting the Carrolls' claims?
23        A.  It's an unanswerable question.  He certainly
24   learned the methods.  Whether, whether he -- well, I
25   don't know what you mean by that.  He certainly

---

Bonanza Reporting          (775) 786-7655          1111 Forest Street

133

1  considered the methods available to him, and that was
2  the method available to him.  That's what the claim
3  practices show.
4    **Q.  How do you know he considered the methods**
5  **available to him?**
6    A.  Because the claim file reflects that.
7    **Q.  Does the claim file say anything about CCPR?**
8    A.  Well, it says nothing but speaks volumes.  Let's
9  put it that way.
10   **Q.  Does the claim file say anything about McKinsey?**
11   A.  No.
12   **Q.  When was the first time you reviewed the claim**
13  **history report related to the Carrolls' claim?**
14   A.  I don't know.
15   **Q.  Do you know if it was before or after your**
16  **November report, November 2012?**
17   A.  My assumption was that it was part of the
18  disclosures listed on the November report.
19   **Q.  Do you know whether you did review the Allstate**
20  **claims history report related to the Carrolls' claims**
21  **prior to signing your November, 2012 report?**
22   A.  I don't recall.
23   **Q.  Did you review any handwritten notes of**
24  **Mr. Gerald Palmer related to the Carrolls' claims prior**
25  **to signing and submitting your November, 2012 report?**

134

1    A.  I don't know.  Handwritten reports?
2    **Q.  Yes.**
3    A.  Off the top of my head, I can't envision those.
4  Maybe you could refer those to me and I could refresh my
5  memory.
6    **Q.  Did you review any e-mails from any supervisor of**
7  **Mr. Palmer concerning the Carrolls' claims prior to your**
8  **completion of your November 12th -- I'm sorry -- your**
9  **November, 2012 report?**
10   A.  Again, I don't recall e-mails.  I don't know.
11   **Q.  Do you know what Mr. Palmer's compensation was in**
12  **2009?**
13   A.  No.
14   **Q.  Do you know what Mr. Palmer's compensation was in**
15  **2010?**
16   A.  No.
17   **Q.  Do you know what Mr. Palmer's compensation was in**
18  **2011?**
19   A.  No.
20   **Q.  Do you know what his compensation was in 2012?**
21   A.  No.
22   **Q.  Do you know what the -- do you know who -- well,**
23  **Ms. Hernandez, do you know what her compensation was in**
24  **any of those years, 2009 through 2012?**
25   A.  No, I don't.

135

1    **Q.  Do you know whether Ms. Hernandez received any**
2  **bonus from 2009 through 2012?**
3    A.  Bonus?
4    **Q.  Bonus.**
5    A.  No.  I -- are you limiting -- well, no, I don't.
6    **Q.  Did Mr. Palmer receive a bonus --**
7    A.  And please, don't be deceived by the suggestion
8  that incentive pay is paid in the form of a bonus.
9    **Q.  Did Mr. Palmer, to your knowledge, receive any**
10  **bonuses between 2009 and 2012?**
11       THE WITNESS:  Could you read that one back?
12    (Whereupon the reporter read the record.)
13       THE WITNESS:  If I heard that right, it is
14  did Mr. Palmer receive a bonus between 2009 and 2012.
15  Did I hear that right?
16  BY MR. RIDLEY:
17    **Q.  Yes.**
18    A.  I, I don't have any way of knowing that.
19    **Q.  Directing your attention back to Exhibit 64,**
20  **Exhibit 64 consists of 12 pages.  My question, Mr. Fye,**
21  **is are there any other specific pages in this exhibit**
22  **that you think bear specifically on the adjusting of the**
23  **Carrolls' claim.**
24    A.  Yes.
25    **Q.  All right.  What pages would those be?**

136

1    A.  If, I'm referring to the small numbers down at
2  the bottom of the page where it says SFXOL-1, and I'll
3  refer to those.  Number, number one is a crucial page to
4  explain the claim practices here.  Page 1A explains the
5  scope of CCPR, where it says:
6       A significant shift in mindset, in the way we
7  think about claim handling.  Newly designed roles.
8  Bundled activities with tailored support tools.
9  Complete redesign of our environment.
10       Number two, page two, says:  Consistently
11  achieving evaluated amount.  Impacting market value to
12  reduce loss payout.
13       Allstate's program intended to pay less for
14  claims and make the market, the general market for
15  claims, that is the insureds, accept lower payments.  By
16  maintaining a tight cost control, it would be necessary
17  to increase trials, like the type of behaviors that led
18  the Carroll case to lawsuit.
19       SFXOL-3 says that redesign will be about:
20  Segmenting cases according to the intended method of
21  resolution to result in significant financial benefits
22  for Allstate.
23       You have to follow the intent.  There will be
24  some risks in doing this, according to this document.
25  In other words, when Allstate put this program into

34 (Pages 133 to 136)

Carroll v. Allstate                    Gary Fye                    April 2, 2013

137

1    place, it calculated the risk that it would get sued
2    for, for possible wrongdoing.  And those risks were
3    already calculated as part of the arithmetic.
4          And the objectives of the new employee
5    performance management approach was to consistently
6    achieve better results and loss payout.  Better results,
7    of course, mean lower outcomes.  But to achieve lower
8    outcomes by measuring outcomes against evaluated amounts
9    and increase trial activity.
10   Q.  I'm sorry, where does it say increase trial
11   activity?  What page are you on?
12   A.  Page four.
13   Q.  Continue, please.
14   A.  On page five it says, it lists the segments, and
15   one of the segments is settle for X or less.  And then
16   that, there's a note down here:
17         It's anticipated that in most jurisdiction the
18   greatest percentage of cases will fall within the SFXOL
19   segment.  And of course that describes the Carrolls'
20   case.
21         And then number six says, it describes the
22   definitions of this segment, settle for X or less.
23   Default to trial.  Not default to negotiation or default
24   to explanation or default to responding to the insured's
25   questions, it says default to trial.  Primary reason,

138

1    plaintiff has not accepted Allstate's offer.
2          And then on page six -- excuse me, that's page
3    eight.  Allstate is measuring staff counsel and retained
4    counsel, like Mr. Ridley, and they're, they're measuring
5    economic results.  The average dollar deviation from
6    evaluated amount, and the percent of cases resolved at
7    or below evaluated amount.  And managing attorney
8    bonuses would be at risk, or job would be at risk, if
9    these results aren't achieved by the managing attorneys.
10   Q.  I'm sorry, where are you, what page are you on?
11   A.  That's page nine.  Page ten is a summary that
12   says:  To meet Allstate's goal after achieving the
13   evaluated amount.
14         Now, remember, Allstate's evaluated amount is not
15   a fair determination of jury value, jury verdict value,
16   it is a self-imposed, self-generated estimate of the
17   value between the handling adjuster and the evaluation
18   consultant.  So it's essentially an arbitrary amount
19   without an adequate exploration of what the verdict
20   value of a UIM case would be against the wrongdoer.  So
21   applying these practices will advance Allstate to be the
22   premiere claim organization in the country.
23         I hope that answers your question.
24   Q.  Where did you get this document from?
25   A.  The sources of the document are down at the

139

1    bottom.
2    Q.  Specifically, who gave this document to you?
3    A.  I hope I'm not misstating this, but I believe I
4    put this document together for a presentation one time.
5    Q.  Who gave this document to you?
6    A.  I hope I'm not misstating this, but I believe
7    that I put this document together for a presentation I
8    gave one time.
9    Q.  But who gave this document to you?  How did you
10   obtain it?
11   A.  I have no idea what your question is.  Don't
12   you -- didn't you listen to my answer?
13   Q.  I did, three times, but it was non-responsive.  I
14   just want to know who --
15   A.  This is a document I created for a presentation.
16   Q.  So this is your work?
17   A.  This is Allstate's documents put in a small
18   collection to explain the SFXOL statement.
19   Q.  So who gave you the documents on which you
20   base --
21   A.  Allstate.
22   Q.  -- Exhibit 64?
23   A.  Allstate.
24   Q.  In what case?
25   A.  I don't know.

140

1    Q.  Do you recall when?
2    A.  No, not particularly.
3    Q.  Do you recall what lawyers were involved?
4    A.  No.  You understand that I have many hundreds of
5    thousand pages of documents, and -- for instance, the
6    Allstate redesign is 150,000 pages.  The CCPR is a
7    150,000.
8    Q.  Right.  So --
9    A.  I didn't produce that.  Do you want that?
10   Allstate produced it.
11   Q.  My question was, I want to know where you got
12   these --
13   A.  Out of the Allstate --
14   Q.  -- Allstate documents from.
15   A.  Out of the Allstate production of documents,
16   either on its own website or wherever they produced
17   unprotected documents.  These are not protected
18   documents.
19   Q.  All right.  So these ten pages or so which
20   comprise of Exhibit 64 are part of --
21   A.  A presentation.
22   Q.  -- a much larger universe of documents.
23   A.  As is the entire production of 12,000 documents,
24   to protect you from having to copy 150,000 pages of
25   documents that your own client already has.

35 (Pages 137 to 140)

Bonanza Reporting            (775) 786-7655            1111 Forest Street

Carroll v. Allstate                    Gary Fye                    April 2, 2013

141

1      Q.  So Mr. Fye, did you call these ten pages, which
2   comprise Exhibit 64, out of a larger body of
3   approximately 150,000 pages?
4      A.  Not precisely.  These documents came from sources
5   in addition to that.
6      Q.  All right.  There is a lot more to the CCPR, at
7   least as it existed in 1995, than these ten pages, which
8   comprise Exhibit 64.
9      A.  True.
10     Q.  Did you ever talk to the author of these pages of
11  the CCPR, which comprise Exhibit 64?
12     A.  Well, no.
13     Q.  Thank you.  All right.  Now, I believe you were
14  going to refer to a third document which supports --
15     A.  Or if I did, I don't even know his name.
16     Q.  I believe you were going to refer to a third
17  document which supports your opinion about the variable
18  compensation system that we've been talking about.  Is
19  there another document that you, that you've relied on?
20     A.  You're probably referring to my reference to page
21  two of thirteen, September 28th, 2012, enclosure number
22  F.
23         THE VIDEOGRAPHER:  I'm sorry to interrupt.
24  I need to change media.
25         MR. RIDLEY:  Sure, go ahead.

142

1          THE VIDEOGRAPHER:  This is the end of video
2   disc number two in the video deposition of Gary T. Fye.
3   We are going off record.  The monitor time is
4   approximately 2:14 p.m.
5          (A short break was taken at this time.)
6          THE VIDEOGRAPHER:  We're back on record.
7   The monitor time is approximately 2:24 p.m.  This marks
8   the beginning of video disc number three in the video
9   deposition of Gary T. Fye in the matter of Richard
10  Carroll, et al., versus Allstate Fire and Casualty
11  Insurance Company.
12         This deposition is taking place at Bonanza
13  Reporting, 1111 Forest Street, Reno, Nevada.  My name is
14  David Corrao.  We're ready to proceed.
15  BY MR. RIDLEY:
16     Q.  Mr. Fye, we've been talking about the
17  variable-pay and performance-based compensation programs
18  that you opine on on page three of thirteen of your
19  September, 2012 report, and we have gone through
20  Exhibit 63 and Exhibit 64.
21     A.  Actually, we haven't been.
22     Q.  I didn't finish my question.
23     A.  But let me tell you that you're wrong about that.
24     Q.  Well, let me state my question.  We have
25  discussed Exhibit 63 and Exhibit 64 in connection with

143

1   the variable-pay and performance-based compensation
2   opinion, and my question is:  Do you have any other
3   document upon which you base your variable-pay and
4   performance-based compensation opinion in the Carroll
5   case?
6      A.  If you look at paragraph two under section A of
7   page three of thirteen in my September 28th, 2012
8   report, since this is generic information, not
9   necessarily applying to any party in this case, what we
10  have actually been discussing is the Claim Core Process
11  Redesign on page eight, page seven, and so forth.  And
12  specific references were made to Exhibit F in that, in
13  that explanation.
14         So what I was saying on page three, basically, is
15  that in the background of doing claim practices
16  analysis, it's important to remember that variable-pay
17  and performance compensation programs are important, as
18  insurers seek competitive advantage through those
19  programs.  And I gave some examples.  But what I was
20  talking about was more we got into the CCPR.
21     Q.  Well, let me just try to clarify.  Because I'm
22  just talking about the variable pay and
23  performance-based compensation, and the documents you've
24  shown me, as I understand it, related to that issue are
25  Exhibit 63 and Exhibit 64.

144

1      A.  And --
2      Q.  Thus far.
3      A.  And enclosure F of the report.
4      Q.  You mean the long index of documents?
5      A.  Yeah.  Well, not the long index, the long list,
6   the documents themselves.  There's an index as well, but
7   there are documents.
8      Q.  Okay.  The thousands of pages of documents that
9   comprise Exhibit F?
10     A.  Yes.
11     Q.  All right.  Now, what I'm --
12     A.  But, but you have to remember that on page three
13  when I talk about claims financial information in
14  general terms, I'm looking at the whole industry.  I'm
15  looking at behaviors that I see from a lot of different
16  defendants.
17     Q.  And all I'm interested in at this point is
18  documentary evidence which would support an opinion that
19  Jerry Palmer's compensation was related to how he
20  adjusted the Carrolls' claims.
21     A.  So in other words, you want to know how much of
22  the documentary evidence has inadvertently gotten out
23  and that other people have?
24     Q.  No.  I want to know -- well, let me step back.
25  As I understand your opinion, you think that Jerry

36 (Pages 141 to 144)

Carroll v. Allstate                              Gary Fye                              April 2, 2013

---

145

1   Palmer's compensation somehow influenced how he adjusted
2   the Carrolls' claims, true?
3       A.  I guess I don't understand.  Are you saying that
4   what I wrote here on page three is tantamount to me
5   saying Jerry Palmer was thinking about his paycheck when
6   he handled this claim, is that what you're asking me?
7       Q.  Well, I wasn't specifically, but go ahead and
8   answer that question.
9       A.  No, I didn't say that.
10      Q.  Okay.
11      A.  I'm simply saying that corporations measure
12  what's important, and employees give those measurements,
13  and that it takes a toll, in terms of real claim
14  practices involving real people, that's exhibited in
15  claim handling behaviors that are designed.  And so what
16  I was trying to do is open up the world of Allstate's
17  claim practices design so that the fact finder could
18  decide whether Mr. Palmer was motivated or not motivated
19  by incentive pay or performance recognition programs
20  that existed at Allstate.  I don't know what the
21  evidence is going to be at the time of trial or whether
22  you're going to be successful to keep suppressing
23  evidence.
24      Q.  All right.  Is it your opinion, sir, that Jerry
25  Palmer, in adjusting the Carrolls' claims, was motivated

---

146

1   by variable-pay and performance-based compensation
2   programs?
3       A.  Well, only in the sense that all claims handling
4   behaviors are carried out in the matrix of goal setting,
5   measurement and recognition.  I've shown you some
6   examples of goal setting, but I, I'm not privy to Mr.
7   Palmer's personnel file, personnel records, his
8   performance development summaries.  I'm not privileged
9   to occupy his mind.
10      I can tell you that the behaviors, looking,
11  looking at the behaviors and looking at the programs,
12  the behaviors are consistent with the programs in place,
13  in place at Allstate, and the motive for an employee
14  following those programs is to seek recognition,
15  continued employment, advancement and merit increase.
16      I, I don't have any evidence that bonuses are
17  given to people down where the rubber meets the road.
18  Bonuses at Allstate, as I understand it, are a
19  management phenomenon and employees help their managers
20  achieve those.  Whether the managers share those with
21  the employees, I don't know.
22      Q.  Do you know of any --
23      A.  I hope that, I hope that helps.
24      Q.  Do you know of any direct link between Mr.
25  Palmer's compensation and how he adjusted the Carrolls'

---

147

1   claim?
2       A.  In a, in a negative sense I do.  The, as I read
3   his testimony, and Mr. Miller's testimony, I saw where
4   Mr. Palmer has not received any criticism for the
5   Carroll case.  The absence of criticism is tacit
6   approval.
7       Q.  And now my question, though, went to compensation
8   and whether you knew of any direct link between
9   Mr. Palmer's compensation and how he adjusted the
10  Carrolls' claim.
11      A.  I just gave you that.
12      Q.  Okay.  Do you know of anything else, then?
13      A.  Say that again.
14      Q.  Is there anything else you, that you think
15  constitutes a direct link between Mr. Palmer's
16  compensation and how he adjusted the Carrolls' claim?
17      A.  Well, I'll think that through.  I don't have any
18  more for you right now other than approval and carrying
19  out the company's wishes, carrying out the goals of the
20  CCPR and the SFXOL, the segmentation, carrying that out,
21  even when it results in litigation.  If an insurance
22  company approves of that, then your compensation depends
23  on you doing that.
24      Q.  Do you know whether Mr. Palmer had any goals set
25  for him by his supervisors in 2011?

---

148

1       A.  Yes.
2       Q.  What were those goals?
3       A.  I don't know.  Every adjuster and supervisor has
4   goals.
5       Q.  Do you know of any direct link between those
6   goals and how Mr. Palmer adjusted the Carrolls' claims?
7       A.  No, other than what I've testified about already.
8       Q.  On the bottom of page three --
9       A.  If you adopt claim handling methods and you
10  expect them to be implemented, then you try to recognize
11  people who are effective in changing.  And I had a
12  document in front of me a minute ago that said that, but
13  I can't see it right now.
14      Q.  And I'm just interested in Mr. Palmer and the
15  Carrolls' claim, so --
16      A.  See, if I were Mr. Palmer, I would be really
17  upset about that.
18      Q.  All right.
19      A.  Because you're trying to make it personal to Mr.
20  Palmer and hide behind him.
21          MR. RIDLEY:  It's nonresponsive.
22          THE WITNESS:  Or put this all on him.
23          MR. RIDLEY:  Move to strike.
24          THE WITNESS:  That's a shameful way to
25  defend Allstate.

---

Bonanza Reporting                    (775) 786-7655                    1111 Forest Street

Carroll v. Allstate                                    **Gary Fye**                                    April 2, 2013

---

149

1          MR. RIDLEY:  Please mark the exhibit again,
2     Susan.  Thank you. /(
3     BY MR. RIDLEY:
4          Q.  Mr. Fye, do you know of any document that
5     discusses Mr. Palmer's compensation in connection with
6     the Carroll claim?
7          A.  Mr. Palmer, it's your attorney, not me, that's
8     doing this.  He's making it all about you.
9          What was the question again?
10         Q.  Do you know of any document that ties Mr.
11    Palmer's compensation to the Carrolls' claims?
12         A.  I guess that would be the performance development
13    summary, the CCPR, and Allstate's redesign documents and
14    however they're carrying out at the moment.  There may
15    be internal documents that I'm not seeing, but those
16    would be examples.  All of those would tie performance
17    with recognition.
18         Q.  You mentioned Egan on page four of thirteen.
19    What is Egan?
20         A.  The Egan standard is named after a California
21    case from, I think the '70s, where a guy named Michael
22    Egan sued Mutual of Omaha, and the court found that
23    insurance companies were responsible not for just
24    investigation facts supporting denial, but for facts
25    supporting coverage.  So the job of adjusting is not

---

150

1     just accumulating facts that undercut the insured in the
2     way that this case was handled, but to investigate and
3     secure facts that supported the insured's claims.
4          Q.  Is there a Colorado counterpart to that case,
5     Egan?
6          A.  Well, it would be improper of me, I believe, for
7     me to cite Colorado law.  I, I don't mean to duck your
8     question.  But I think the Goodson case, in a strange
9     way the Mount Rose Medical Center case, that makes all
10    of the coverages available when the report is made, all
11    support the Egan standard.  They put on the insurance
12    company the responsibility of preventing delay to
13    recognize the exposures, do the investigation, and do
14    whatever is necessary to assist the insured in
15    presenting a claim that softens the financial
16    consequences of the accident.  And that's all very
17    important claims handling technique that was not applied
18    to the Carrolls' case.
19         There are other cases probably that a trained
20    lawyer could give you in Colorado, but I hesitate to
21    even mention the law, because I want to assure the Court
22    that it's not my function here to talk about legal
23    principles and tell the jury what the law is.
24         Q.  Do you know whether any Colorado case has, a
25    reported decision has cited Egan with approval?

---

151

1          A.  I don't.
2          Q.  Do you agree that the insured has an obligation
3     to cooperate with the insurance adjuster?
4          A.  And by the way, on that last question, as I think
5     about my answer, again, I'm not a practicing lawyer, I
6     don't, I don't even come close to that, but I can
7     remember, I believe, a Colorado case citing Rawlings
8     versus Apodaca in Arizona.  And as I think of the Egan
9     criteria, criterion, it basically is cast by making it
10    improper for an insurance company to impair the
11    insured's rights to use the policy in the way that
12    Rawlings versus Apodaca suggested.  And I believe the
13    Colorado cases site that Arizona case, rather than Egan.
14    Maybe Mr. Kaudy could shed some light on this.
15         MR. KAUDY:  Yes, I can, but this isn't the
16    opportunity.
17         MR. RIDLEY:  Move to strike that last answer
18    as non-responsive.
19         THE WITNESS:  I tried to respond.  I'm
20    sorry.  That's the trouble when you ask an adjuster
21    about a legal matter.
22    BY MR. RIDLEY:
23         Q.  Mr. Fye, do you agree that an insured has an
24    obligation to cooperate with the adjuster in the
25    investigation of the claim?

---

152

1          A.  That who has to cooperate?
2          Q.  The insured.
3          A.  The insurance?
4          Q.  The insured.
5          A.  Insured.  Yes, but one can't take that too far.
6     I've seen that idea misused by attorneys sitting in your
7     chair.  And while it is the insured, insured's
8     obligation to cooperate, let me explain to the Court and
9     the jury that --
10         Q.  Well --
11         A.  -- people who --
12         Q.  -- I think you've answered the question.
13         A.  Let me, let me answer the question by saying
14    that --
15         MR. RIDLEY:  Object as non-responsive.
16         THE WITNESS:  -- people who suffer accidents
17    and losses are not at their best.  And so in claim
18    handling you hope that you'll get good cooperation, but
19    sometimes people are going through the process of denial
20    or anger, and so adjusters develop skills to handle the
21    anger and denial issues about people who suffer a loss.
22         So to make a long story short, it's more
23    incumbent for the adjuster to cooperate with the insured
24    rather than the reverse.
25         MR. RIDLEY:  Move to strike as

---

38 (Pages 149 to 152)

Carroll v. Allstate                    Gary Fye                    April 2, 2013

---

153

1    non-responsive.
2    BY MR. RIDLEY:
3        Q.  Do you agree that the insureds have an obligation
4    to communicate with the adjuster?
5        A.  In a, in a general sense, yes.  What are you --
6        Q.  Thank you.
7        A.  What are you specifically referring to?
8        Q.  Just a general, as a general proposition.
9        A.  As a general proposition, not as a legal
10   principle, sure.  It's a good idea to talk.  Wonder why
11   Mr. Palmer didn't.
12       Q.  Now -- and by the same token, the Carrolls never
13   responded to Mr. Palmer's offers to resolve their UIM
14   claims, correct?
15       A.  I don't know that I fully agree with that.  I, I
16   see that in a different context, probably, than your
17   question implies.
18       Q.  Have you ever seen a piece of correspondence from
19   either Mr. Carroll or Mrs. Carroll responding to Mr.
20   Palmer's offers to resolve their UIM claims?
21       A.  I have seen a response, yes.
22       Q.  By Mr. Carroll or Ms. Carroll?
23       A.  By Mr. Kaudy and Mr. Eddington.
24       Q.  I'm not, that wasn't the question.
25       A.  SFXOL is a default to sue us or else.  They got

---

154

1    sued.  That's a response.
2            MR. RIDLEY:  Move to strike as
3    non-responsive.
4            THE WITNESS:  It is -- well --
5    BY MR. RIDLEY:
6        Q.  The question is --
7        A.  What are you, what are you going to do?  If you
8    want to testify, go ahead.
9        Q.  The question is simple.  Have you seen a
10   letter --
11       A.  A response, yes.
12       Q.  -- from Mr. Carroll or Ms. Carroll, authored by
13   them, to Mr. Palmer related to his offer to resolve
14   their UIM claims?
15       A.  A letter?  No.  I don't --
16       Q.  An e-mail?
17       A.  -- I don't recall one.
18       Q.  An e-mail?  Any written communication by the
19   Carrolls, by Richard Carroll or Sharon Carroll, in
20   response to Mr. Palmer's offer to resolve the UIM
21   claims?
22       A.  If you'll give me the dates of the documents,
23   I'll look through the records and see if I can find
24   something, but I don't recall it offhand.
25       Q.  I don't know of any.  The, Mr. Palmer's letters

---

155

1    went out to the Carrolls in early May, 2011.
2        A.  So your question is just a -- I don't get to --
3        Q.  I want to know what you know.
4        A.  I don't get to say move to strike that question
5    as being provocative, do I?
6        Q.  Do you know --
7        A.  No.
8        Q.  -- of any e-mail by the Carrolls to Mr. Palmer in
9    response to his offers to resolve their UIM claims?
10       A.  I answered it.  Same answer.
11       Q.  What was your answer?
12       A.  Read the answer back, please.
13          (Whereupon the reporter read the record.)
14   BY MR. RIDLEY:
15       Q.  As you sit here, Mr. Fye, and without getting up
16   to look through five pages and thousands of pages of
17   documents, five boxes, thousands of pages of documents,
18   do you know of any written response, whether by letter
19   or e-mail, by the Carrolls, to Mr. Palmer's offers to
20   settle their UIM claims?
21       A.  I don't know how I could be clearer than that
22   answer.
23       Q.  Do you have anything to add to that?
24       A.  What?
25       Q.  So you don't know of any such written response by

---

156

1    Sharon Carroll or Richard Carroll to Mr. Palmer's offer
2    to settle and resolve their UIM claims?
3        A.  To settle and resolve.  That's an interesting way
4    of stating that.
5        Q.  Well, the question, I'm just asking if you know
6    of any written, written response whatsoever by Richard
7    Carroll or Sharon Carroll to Mr. Palmer's offer to
8    resolve their UIM claims.
9        A.  I, I told you that Mr. Eddington and Mr. Kaudy
10   wrote a complaint and filed it with the court of
11   jurisdiction, and that's a response.  I showed you --
12       Q.  The question was --
13       A.  I showed you SFXOL, which shows that the Allstate
14   method of handling this claim was to accept whatever we
15   said or sue us.  And I told you that I don't know of any
16   correspondence following that, as I sit here or offhand.
17   I don't know what else I can answer.
18       Q.  That's fine.
19       A.  You can ask it three or four more times.
20       Q.  You just said --
21       A.  What, what do you know?  What are you hiding?
22   What's the trick?
23       Q.  You don't know --
24       A.  Explain your trick now.
25       Q.  You don't --

---

39 (Pages 153 to 156)

Carroll v. Allstate                     Gary Fye                     April 2, 2013

157

1      A.  What is it?
2              MR. RIDLEY:  Move to strike.
3              THE WITNESS:  You're going to ask it again.
4              MR. RIDLEY:  Non-responsive.
5              THE WITNESS:  What, what in the hell is
6   wrong here?
7              MR. RIDLEY:  Please mark the transcript. /(
8              THE WITNESS:  Yes, mark the transcript. I
9   apologize, Your Honor, for being frustrated by this
10  fifth or sixth time of asking the same question.
11  BY MR. RIDLEY:
12     Q.  Mr. Fye, did Mr. Carroll or Mrs. Carroll ever
13  make a phone call to Mr. Palmer concerning his attempt
14  to resolve their UIM claims?
15     A.  And you're using resolve instead of settle now.
16             MR. RIDLEY:  Can you please read that
17  question back.
18         (Whereupon the reporter read the record.)
19             MR. KAUDY:  Object to the form and
20  foundation.
21             THE WITNESS:  Same answer.  I don't know of
22  any.  But I think you've mischaracterized Mr. --
23  BY MR. RIDLEY:
24     Q.  All right.  Thank you.
25     A.  I think --

158

1      Q.  That's all I needed.
2      A.  I think --
3      Q.  That's all I needed.
4      A.  You don't need to interrupt my answer.
5      Q.  Yes, I do, because --
6      A.  I think you --
7      Q.  -- it's non-responsive.
8      A.  I think you've mischaracterized Mr. Palmer's
9   correspondence.  When you're carrying out a plan to
10  either --
11     Q.  All right.
12     A.  -- ram a --
13             MR. RIDLEY:  Non-responsive.
14             THE WITNESS:  When you're caring out a
15  plan --
16  BY MR. RIDLEY:
17     Q.  It was a simple question.  You don't need to
18  pontificate on this, Mr. Fye.  You really don't.  You
19  can save that for another time.
20     A.  I took an oath to tell the whole truth, and I'm
21  not going to sit here and let the jury and the Court be
22  misled.
23     Q.  Well, I object to that.  I'm just asking you
24  whether you know if Mr. Carroll --
25     A.  Good.

159

1      Q.  -- or Mrs Carroll --
2      A.  Object all you want.
3      Q.  -- ever called Mr. Palmer --
4      A.  You don't need to give a speech.
5      Q.  -- after he --
6      A.  Just make your objection.
7      Q.  -- offered to resolve their claim.
8      A.  Just make your objection --
9      Q.  That's all.
10     A.  -- that will be fine.  But let me finish my
11  answer.  My answer is --
12     Q.  No.  I'm moving to, I'm moving to strike it.  It
13  was a simple yes or no question.  You know that,
14  Mr. Fye.  You've been around for a long time.  You're
15  just trying to waste time here.
16     A.  Are you done?
17     Q.  Yes, with that.  I'd like to move on to my next
18  question.  Are you done?
19     A.  No.  I'm finishing my answer.
20     Q.  I think you've finished your answer.
21     A.  When you're carrying out a program called settle
22  for X or less, or settle for X or else, and it's a
23  default to trial, then this was not really an attempt to
24  resolve, as characterized by Mr. Ridley.  It's a
25  mischaracterization of what was going on.

160

1      Q.  Did anybody ever tell Mr. Palmer SFXOL?
2      A.  Say that again.
3      Q.  Did anybody from Allstate ever tell Mr. Palmer to
4   SFXOL, settle for X or less, on the Carroll claim?
5      A.  Actually, the documents concerning segmentation
6   have not been provided me.  To me.
7      Q.  To your knowledge, did anybody from Allstate ever
8   tell Mr. Palmer to settle the Carrolls' claims for X or
9   less?
10     A.  I have not seen the segmentation documents, so I
11  have no way of answering that.  And as far as oral
12  communications, don't know.
13     Q.  So you don't know whether anybody from Allstate
14  ever told Mr. Palmer to settle the Carrolls' claims for
15  X or less.
16     A.  That's not quite true.  I have Mr. Miller's
17  testimony and Mr. Palmer's testimony about the
18  evaluation of the case.  And I have the documents of the
19  redesign methods at Allstate.  So I have some
20  information about the segmentation that would be
21  necessary to achieve the type of claim handling that we
22  see in the, in the Carroll case.  But you're playing an
23  interesting --
24             MR. RIDLEY:  I object to the form.
25             THE WITNESS:  You're playing an

40 (Pages 157 to 160)

Carroll v. Allstate                    Gary Fye                    April 2, 2013

161

1    interesting --
2              MR. RIDLEY:  Move to strike.
3              THE WITNESS:  You're playing --
4    BY MR. RIDLEY:
5         Q.  You're beginning to pontificate again, Mr. Fye,
6    and I move to strike that from the record.
7         A.  But you're playing an interesting game by using
8    that language.
9         Q.  I'm not playing a game, I'm just asking
10   questions, and you're not responding to any question
11   right now.
12        A.  You're playing an interesting game by using that
13   language that someone has to tell someone in Mr.
14   Palmer's position and with his experience that he has to
15   categorize this as an SFXOL.  I don't think, I don't
16   think, from what I know of the Allstate claim practices,
17   that there would have to be an oral expression of that.
18        Q.  What would it be, wink wink, nod nod?
19        A.  No.  There, there are documents that explain the
20   segmentation.
21             THE WITNESS:  Who is the attorney who
22   handled this case before Mr. Ridley?
23             MR. KAUDY:  Mr. Scott?
24             THE WITNESS:  Mr. Scott.
25             MR. KAUDY:  Andrew Scott.

162

1              THE WITNESS:  The referral to Mr. Scott will
2    have the segmentation information clearly displayed on
3    it.
4    BY MR. RIDLEY:
5         Q.  What do you mean, segmentation information?
6         A.  The category under which it's being defended.
7         Q.  Would this document have an amount for the,
8    representing the X in the SFXOL?
9              THE WITNESS:  Ladies and gentlemen and Your
10   Honor, these are the definitions of the segments.
11             MR. RIDLEY:  Object to the form as
12   non-responsive once again.
13   BY MR. RIDLEY:
14        Q.  The question was whether you think Mr. Scott
15   would have been provided with a document that sets forth
16   the X in the SFXOL.  That's the question.
17        A.  Are you ready for the answer or are you going to
18   keep talking?
19        Q.  Just so we're clear, I want to know if it's, if
20   it's your opinion that Mr. Scott was instructed to
21   settle for X or less.
22        A.  That's three different questions now.
23        Q.  Well, that's the question.
24        A.  Are you done?
25        Q.  Was Mr. Scott told to settle for X or less?

163

1         A.  The definitions of litigation segments are on
2    page SFXOL-6.  And of course, as I've said earlier, the
3    vast majority of the cases are SFXOL, which is the third
4    category.  And if you look at the categories, they are
5    trial defend on liability, and this case can't be
6    defended on liability, trial defend on damages where
7    there's a zero offer, which is really a low impact
8    category, that's not involved here, binding arbitration,
9    voluntary arbitration, that's not involved here.  So the
10   only category left for the Carroll case is settle for X
11   or less.
12             When the case is sent for handling by a
13   first-party claim handling attorney, like Mr. Scott, the
14   segmentation information is on the transferral sheet
15   that he gets with the claim documents.  And it will have
16   the information about the SFXOL, including the elements,
17   at the top of the form.  I've seen this many times.  It
18   has apparently been withheld in this case.
19        Q.  What's the date on that document you were just
20   holding up to the screen, Mr. Fye?
21        A.  There's no date on this document.
22        Q.  What's your understanding, on all your expertise,
23   as to when that document would have been created?
24        A.  Could you repeat that question?
25        Q.  Sure.  What's your best estimate as to when that

164

1    document would have been created, based on all your
2    expertise concerning Allstate?
3              MR. KAUDY:  You don't have to respond to
4    sarcasm.  Simply answer the question as best you can.
5              MR. RIDLEY:  And I'll object to that.  It
6    wasn't sarcasm.
7    BY MR. RIDLEY:
8         Q.  I'm trying to get to the date on that document
9    that you just held up.  When was that document created?
10   Is that from 1995?
11        A.  Or after.
12        Q.  All right.  Now, you have never seen any referral
13   document to Mr. Scott, correct?
14        A.  Yes.
15        Q.  How much was Mr. Carroll seeking under his
16   Allstate policies when he made his claim?
17        A.  A large amount, but I don't know exactly.
18        Q.  Was he seeking policy limits?
19        A.  No.  I think he was seeking policy limits for
20   part of the policies, but I'm not sure whether he knew
21   what that was.
22        Q.  Have you ever evaluated the Carrolls' claims in
23   terms of the, the monetary value of their UIM claims
24   made on Allstate?
25        A.  No.

Bonanza Reporting                (775) 786-7655                1111 Forest Street

Carroll v. Allstate                           Gary Fye                              April 2, 2013

---

165

1      Q.  Have you ever looked at the amount of medical
2   expenses that had been incurred by the Carrolls?
3      A.  Yes.  I've looked at a lot of medical records.
4      Q.  Do you know what the amount of Ms. Carrolls'
5   medical expenses were when Mr. Kaudy instituted
6   litigation against Allstate?
7      A.  No.
8          MR. KAUDY:  Object to the form and
9   foundation.
10  BY MR. RIDLEY:
11     Q.  Mr. Fye, I'm going to ask you to please take a
12  look at Deposition Exhibit 26.
13     A.  Okay.
14     Q.  Have you seen this document before?
15     A.  I think so.
16     Q.  Did you see it before you prepared your reports
17  from September and November of 2012?
18     A.  I don't know.
19     Q.  If you look at page 11, Mr. Kaudy has disclosed
20  in this federal case the medical bills for Sharon
21  Carroll, with a total of $23,471.32.  Do you see that on
22  page 11?
23     A.  Yes.
24     Q.  Do you have any reason to doubt the accuracy of
25  Mr. Kaudy's disclosure here?

---

166

1      A.  No.
2      Q.  Does a, do $23,000 in medical expenses typically
3   result in the payment of $250,000 additional dollars for
4   UIM benefits?
5      A.  Hard to say.  Typically not because it reflects
6   less care than a $250,000 case would warrant, but that,
7   you know, the value of the case isn't directly hinged on
8   the medical expense.
9      Q.  Do you agree that Mr. Palmer had an obligation to
10  investigate the Carrolls' claims?
11     A.  Yes.
12     Q.  Did he investigate the Carrolls' claims?
13     A.  Not really.
14     Q.  How did he not investigate the Carrolls' claims?
15     A.  He didn't communicate with the Carrolls and find
16  out the impact of the injuries on the Carrolls, and find
17  out what the value facts were.  That is, how the
18  injuries impacted them specifically.  He determined that
19  there were, there was clear liability, that there was an
20  underlying amount paid, and then he arbitrarily, with
21  Mr. Miller, set low values on the claim and instituted
22  the SFXOL type of handling with no communication, and
23  apparently expected the Carrolls either to accept
24  Allstate's offers or sue.
25     Q.  What's the factual basis for you saying that Mr.

---

167

1   Palmer set an arbitrarily low value on the claims?
2      A.  The depositions of the, of Palmer and Miller.
3      Q.  And those depositions speak for themselves,
4   right?
5      A.  They do.
6      Q.  Did Ms. Carroll have any claim for lost earnings?
7      A.  Not as a retired person, that I could see.
8      Q.  Can you tell me how medical expenses of
9   $23,471.32 would justify a policy limits payment of
10  $350,000?
11     A.  By creating, by representing the medical care
12  cost to an individual of injuries that would have
13  long-term consequences, or lifetime consequences, or
14  start a cascade of symptomatology that would impair that
15  person's quality of life over years rather than months.
16     Q.  Can you tell me --
17     A.  If, if the, if you think of it, the way injury
18  claims are valued is by the severity and duration, the
19  type of recovery, and the long-term consequences, and
20  the impact on that individual's life, not so much the
21  medical expense.
22     Q.  Do you know when, if ever, Mr. Palmer was
23  provided with evidence --
24     A.  Oh, there's another answer.
25     Q.  Well, let me finish -- concerning --

---

168

1      A.  Let me finish my answer.
2      Q.  I was in the middle of a question.
3      A.  Oh, yeah.  Well, forget the question.  I'll
4   finish the answer.  I'm in the middle --
5          MR. RIDLEY:  I object.
6          THE WITNESS:  I'm in the middle of an
7   answer.
8          MR. RIDLEY:  I object to that.
9          THE WITNESS:  The other would be fatal
10  accidents.
11  BY MR. RIDLEY:
12     Q.  All right.  We're not dealing with a fatal
13  accident.
14     A.  Well, you asked me for examples.
15     Q.  All right.  We're not dealing with a fatal
16  accident, the question, correct?
17     A.  You asked me for examples.  I'm giving you
18  another example.
19     Q.  Thank you.  My next question is we're not dealing
20  with a fatal accident here, correct?
21     A.  Correct.
22     Q.  All right.  Now, do you know when Mr. Palmer was
23  provided with evidence concerning the long-term economic
24  consequences of Ms. Carrolls' injury?
25     A.  Say that again.

42 (Pages 165 to 168)

---

**Bonanza Reporting**                    (775) 786-7655                    **1111 Forest Street**

Carroll v. Allstate                    Gary Fye                    April 2, 2013

---

169

1    Q.  Do you know when Mr. Palmer was provided with
2    evidence concerning the long-term consequences and
3    economic impact of her injuries?
4        A.  What a sad question that is.
5            MR. RIDLEY:  Please mark the transcript. /(
6            THE WITNESS:  The implication is that Mr.
7    Palmer has to be provided this information rather than
8    go out and ask the Carrolls for it.
9    BY MR. RIDLEY:
10       Q.  Can you just, can you just answer the question,
11   please?
12       A.  I'm answering the question.  You keep
13   interrupting me.
14       Q.  I didn't ask you for the implications.  I'm just
15   trying to put questions to you.
16       A.  I, I know --
17       Q.  So the question goes to when.
18       A.  I know that you're, you're not interrupting me at
19   all, and the record will show that, that we're not
20   over-talking each other.
21           What was the question again?
22           MR. RIDLEY:  Could you read it back, please.
23           THE WITNESS:  Oh, I remember it.  So here's
24   the answer.  The implication is that Mr. Palmer has to
25   be provided this information rather than going out and

---

170

1    getting it.  And of course the, the shift and burden of
2    finding information about the long-term consequences is
3    on Mr. Palmer.  He's got to go get this.  He's got to go
4    ask the insureds how this accident affected them and
5    what are the, what are the consequences, and give them
6    some peace of mind and assurance that's concomitant with
7    the contract of insurance they purchased.
8            So Mr., Mr. Palmer was not diligent in
9    deriving facts of the consequences of the injuries, and
10   as the litigation developed, the, and as an ongoing
11   process, the consequences of the injury, the cost of the
12   injury, and the extent of the injuries are still being
13   developed.
14   BY MR. RIDLEY:
15       Q.  Did there come a point in time, Mr. Fye, when
16   there was evidence of the long-term consequences of the
17   economic impact of Ms. Carrolls' injuries?
18       A.  Say that again.
19           MR. RIDLEY:  Could you read it back, please?
20       (Whereupon the reporter read the record.)
21           THE WITNESS:  I'm not sure that's ever been
22   made clear.
23   BY MR. RIDLEY:
24       Q.  Thank you.
25       A.  And I haven't read the material on that subject,

---

171

1    so I, I'm not prepared to answer that question.  The
2    economic impact of an injury to a retired person and a,
3    and a spouse is a subject of individual expertise, I
4    think.  And I think there are other witnesses whose
5    depositions I have, but have not reviewed, who are
6    addressing that.
7        Q.  In Exhibit 26, Mr. Carroll has listed his medical
8    expenses in this initial disclosure document filed in
9    this federal case on or about March 7, 2012, as $79,818.
10   First of all, Mr. Fye, do you have any reason to doubt
11   that those were the medical bills incurred by
12   Mr. Carroll as of March, 2012?
13       A.  No.  Should I?
14       Q.  In your experience, do medical bills of $79,818,
15   or thereabouts, with $25,000 in liability being paid,
16   warrant a $350,000 policy limits UIM payment?
17       A.  Medical bills alone?
18       Q.  Right.
19       A.  Yeah.  I'd say in a 60-plus-year-old working
20   person, medical expenses of that kind would reflect
21   surgical intervention, and they would reflect a, a
22   possibility of residual effects.  And you could be
23   talking about any, any scale of injury on a monetary
24   scale.
25       Q.  Do you know whether --

---

172

1        A.  You, you could be talking about a, policy limits
2    of underlying and umbrella coverage for that, that kind
3    of an injury, depending on the effect it had on the
4    person's life and what the outcome was from whatever
5    procedures amounted to that cost.
6        Q.  Do you know whether Mr. Carroll has had any
7    surgical interventions since the disclosure of these
8    medical bills in March of 2012?
9        A.  I don't recall.
10       Q.  Do you recall, or do you know what Mr. Carrolls'
11   lost earnings were as a result of the accident as of
12   May, 2011 when Mr. Palmer sent his offer to Mr. Carroll?
13       A.  I guess I didn't follow that.  Could you
14   rephrase?
15       Q.  Sure.  Well, do you know whether Mr. Carroll had
16   lost earnings from the accident as of May, 2011?
17       A.  Yes.
18       Q.  Do you know what those lost earnings were?
19       A.  No.
20       Q.  On page seven of your report you mention the
21   McKinsey program, correct?
22       A.  Yes.
23       Q.  And I'm talking about your September report.
24       A.  Yes.
25       Q.  Have you reviewed all of the McKinsey documents?

---

43 (Pages 169 to 172)

Carroll v. Allstate                    Gary Fye                    April 2, 2013

173

1    A.  No.  The -- it's interesting that you should
2    phrase it that way.
3    Q.  Okay.  I just asked if you reviewed them all.  Do
4    you have anything else?  Is that, is that your answer,
5    no?
6    A.  (No audible response.)
7    Q.  Do you know whether Mr. Palmer has ever seen any
8    McKinsey document?
9    A.  I don't.
10   Q.  Do you know whether Mr. Miller has ever seen any
11   McKinsey document?
12   A.  I don't.
13   Q.  Do you know whether Ms. Estrella Hernandez has
14   ever seen any McKinsey document?
15   A.  No.  Or you or Mr. Scott.
16        MR. RIDLEY:  Move to strike.
17   BY MR. RIDLEY:
18   Q.  Do you have any specific evidence that Jerry
19   Palmer had a plan to delay resolution of the Carrolls'
20   claims?
21        THE WITNESS:  Read that back, please.
22        (Whereupon the reporter read the record.)
23        THE WITNESS:  In addition to the actual
24   claim materials and the way the claim was handled, yes.
25   And I've given it to you.  Take what we offer or sue us.

174

1    BY MR. RIDLEY:
2    Q.  Are you saying that Mr. Palmer said take what we
3    offer or sue us?
4    A.  I'm not making this about Mr. Palmer, as you are.
5    Q.  He was --
6    A.  But Allstate did.
7    Q.  He was the adjuster on the claim, right?
8    A.  Allstate was the adjuster on the claim.
9    Q.  Mr. Palmer was the specific adjuster, the
10   specific claims representative on this claim, correct?
11        THE WITNESS:  Mr. Palmer, he's doing it, not
12   me.
13        MR. RIDLEY:  Move to strike.
14        THE WITNESS:  He's moving to strike, Mr.
15   Palmer.
16        MR. RIDLEY:  Move to strike again.
17        THE WITNESS:  Some lawyer you've chosen.
18        MR. RIDLEY:  Please mark the transcript. /(
19        THE WITNESS:  Mr. Palmer's carrying out his
20   job.  This is his job.
21   BY MR. RIDLEY:
22   Q.  Mr. Palmer was the claims adjuster on the
23   Carrolls' claims.  Correct?
24   A.  At times, yes.
25   Q.  Can you identify any other claims adjuster that

175

1    worked on the Carrolls' claims?
2    A.  Mr. Scott, Mr. Miller.  Is it Ms. Alexander?
3    Schwedel.  And there are probably others.
4    Q.  Do you know what Mr. Miller's title is?
5    A.  Evaluation consultant, I think.
6    Q.  It's not adjuster, is it?  It's not adjuster, is
7    it?
8    A.  No, and I doubt that Mr. Palmer's is either.  Is
9    that your response --
10   Q.  Mr. Miller --
11   A.  Is that your response that I'm telling you who
12   was involved in the adjusting effort?  I'm trying to --
13   Q.  That wasn't the question.
14   A.  -- answer your question, and you don't like the
15   language.
16   Q.  Well, I don't think you're answering the
17   question.  All right?
18   A.  Sure you don't.
19   Q.  Mr. Miller was evaluation --
20        MR. RIDLEY:  Okay, go ahead and mark the
21   transcript again. /(
22   BY MR. RIDLEY:
23   Q.  Is it your testimony that Mr. Miller adjusted
24   this claim?
25   A.  In part, yes.

176

1    Q.  Is it your testimony that Mr. Scott adjusted this
2    claim?
3    A.  In part, yes.
4    Q.  How did Mr. Scott adjust the claim?
5    A.  He's part of the first-party claims process.
6    His, these are all people trying to achieve the outcomes
7    that are part of Allstate's business plan.  It's just
8    like you sitting here, Mr. Ridley, trying to carry out
9    Allstate's business plan in the way you're conducting
10   this deposition.  You, you basically are another tool in
11   the panoply of devices that the Carrolls are going to
12   have to deal with when they deal with their Allstate
13   claim.
14        And I know you don't think of yourself as an
15   adjuster, but basically you're, you're sitting here
16   trying to attack the insured's proof and, and the
17   overall effect is that you're saying that the people
18   involved in the claims transaction, which are Mr. Scott,
19   Mr. Miller, Ms. Alexander and Mr. Palmer, can't be
20   categorized as claim handlers.  And you want to
21   specifically use the term that's on their business card
22   as adjusters.  They're the claim handlers.  And I can't
23   change that, you can't change that, so why quibble about
24   it?
25        MR. RIDLEY:  Move to strike.  Let's take a

44 (Pages 173 to 176)

Carroll v. Allstate    Gary Fye    April 2, 2013

**177**

```
1   break.
2         THE VIDEOGRAPHER:  We're going off record.
3   The monitor time is approximately 3:19 p.m.
4         (A short break was taken at this time.)
5         THE VIDEOGRAPHER:  We're back on record.
6   The monitor time is approximately 3:30 p.m.
7   BY MR. RIDLEY:
8         Q.  Mr. Fye, specifically what did Andrew Scott do,
9   in your mind, that constituted adjusting the case, the
10  claim?
11        A.  Carried out the final stage of the SFXOL program
12  with Mr. Palmer and Mr. Miller, and handled the claim
13  with Mr. Kaudy under the segment instructions.
14        Q.  Anything else?
15        A.  I, I know there are some other record entries,
16  but I, I can't articulate them at the moment.  I could
17  quickly review documents and tell you if there's
18  anything else.
19        Q.  Do you understand that Allstate hired Mr. Scott
20  after the Carrolls' hired Mr. Kaudy?
21        A.  I think so, but I, I'm not sure that that's
22  particularly relevant if he has an ongoing relationship
23  with the claim department.
24        Q.  Is there anything wrong with Allstate hiring an
25  outside attorney to deal with the Carrolls' retained
```

**178**

```
1   counsel?
2         A.  In, in the sense that they're carrying out the
3   performance management program for staff and outside
4   attorneys in terms of achieving evaluated amount, you
5   bet there's something wrong with it.  But in terms of
6   Allstate hiring lawyers, I don't have any problem with
7   that.  It's that, the claim effort that, the claim
8   effort should be unfailingly to carry out the purposes
9   of this coverage.  And the purposes of the coverage are
10  well-known to Mr. Scott, and that would be that in an
11  underinsured motorist case, the coverage grant is all
12  damages recoverable from the wrongdoing party.
13        So Mr. Scott would be responsible not just for
14  defending Allstate, but for assisting in carrying out
15  the purpose of the coverage and responding to the
16  insured's valid claims.  If Allstate is using Mr. Scott
17  to undercut the insured, to conform with the SFXOL
18  segment, or if they're using him to undercut the claims
19  of the Carrolls as expressed through Mr. Kaudy, then his
20  claim handling efforts are improper.
21        If, in a situation like this where the
22  business plan of the insurance company is to offer small
23  settlements in exchange for the extinguishment of the
24  coverages that they may need in the future, if their
25  goal is to provide prompt payment or fair payment but
```

**179**

```
1   not both, then Mr. Scott becomes a tool, or a factor in
2   carrying out the SFXOL segment, and as such is a claims
3   handler.
4         The record pretty much shows that, but I've given
5   you the specific information that I have.
6         Q.  Do you have any evidence that Mr. Scott was ever
7   told anything about SFXOL?
8         A.  Yes.  He would have to receive that segment
9   information when he obtained the referral from Allstate,
10  whether it's before or after Mr. Kaudy's presence.
11        Q.  But you haven't seen that.
12        A.  No, that's being withheld.
13        Q.  You agree that Allstate is entitled to an
14  attorney-client privilege --
15        A.  No.
16        Q.  -- like everybody else?
17        A.  No, not in this context.  In a UIM context such
18  as this program, where you make the attorney part of the
19  claim process, and part of the segment in carrying out
20  its purposes, there should not be any privilege attached
21  to that, neither work product or attorney-client.  It's,
22  it's a difficult subject, I know, but claims operation
23  should have more transparency and should not hide behind
24  privileges like that, like you're suggesting.
25        Q.  Let me direct your attention to your November
```

**180**

```
1   20th, 2012 report, beginning with your findings on page
2   five of seven.  All right.  At the bottom of page five
3   of seven, you have a heading called findings, and then
4   on the top of page six you begin a series of bullet
5   points.  And as I understand it the, the bold portion
6   of this is the new information under findings, as
7   compared to your September, 2012 report; is that right?
8         A.  Yes.
9         Q.  All right.  The first bullet on page six of seven
10  says:
11        Allstate's UIM coverage did not protect the
12  injured insureds from the economic and other
13  consequences of an accident caused by a driver with
14  inadequate insurance or means to pay their damages
15  claims.
16        You go on to say:  The claims handling by
17  Allstate adjusters and the attorneys enlisted to help
18  handle the claim, subverted fundamental purposes of the
19  coverage.
20        Now, first of all, when you talk about the
21  attorney enlisted to help handle the claim, who are you
22  referring to there?
23        A.  Mr. Scott.
24        Q.  What exactly did Mr. Scott do to subvert the
25  fundamental purposes of the coverage?
```

45 (Pages 177 to 180)

Carroll v. Allstate                    **Gary Fye**                    April 2, 2013

---

181

1   A. Carried out the SFXOL segment.
2   **Q. Anything else?**
3   A. Well, in general, yes. In general, failed to
4   direct the claim effort to fulfill the purposes of the
5   coverage. In other words, didn't proactively
6   investigate and evaluate the facts that supported paying
7   the claims, bring to bear the expertise and the medical
8   analysis necessary to support the insured's claims, and
9   instead sought evidence to undercut those claims and
10  sought an interpretation of the evidence to undercut the
11  claims.
12  **Q. What evidence did he seek to undercut?**
13  A. Say that again.
14  **Q. Yeah. You mentioned that Mr. Scott sought**
15  **evidence to undercut the Carrolls' claims. Explain**
16  **that. What do you mean by that?**
17  A. What I mean is that insurance claims handlers and
18  their claims attorneys like Mr. Scott frequently use the
19  expression we handle each claim on its merits, and then
20  when you look at the claim handling, that's really not
21  true. They handle the claims on demerits. And
22  basically the analysis that they follow is not to take
23  the facts supporting payment of the claim to third-party
24  hands and basically learn the verdict value of the claim
25  against the wrongdoer, which is what the coverage is.

---

182

1   The coverage isn't a repair contract, it isn't a
2   medical bill contract, it isn't a wage payment contract.
3   What it is is an interesting first-party bodily injury
4   coverage that says if someone doesn't have the means to
5   pay, we'll pay the claim that you have against that
6   wrongdoing party. If you have lifetime implications, if
7   you can satisfy our proof requirements, we will pay the
8   verdict value of that claim against that person with no
9   hassle and no litigation.
10  And it goes without saying that because the
11  policy lists these damages as a plural, if for instance
12  the insured has UM/UIM coverage, and they have elements
13  of damages that they could use during the pendency of
14  the claim, it's incumbent on a UM/UIM adjuster to pay
15  undisputed amounts representing damages as you go along.
16  In other words, there is no limit to the number of
17  claims an insured can make under this coverage as long
18  as they can provide adequate proof of a claim that's
19  payable.
20  So what happened here is that everyone got behind
21  the articulated plan at Allstate, which was to force the
22  Carrolls to extinguish the balance of their coverage in
23  exchange for a small payment, and the Carrolls were not
24  willing to do that. And Allstate's methodology is not
25  to default to discussing that, but basically to default

---

183

1   to trial. So the, the Carrolls are left with no
2   alternative but to file the litigation and resolve this
3   case in litigation. That's in SFXOL page six. It says
4   default to trial.
5   So to make a long story longer --
6   **Q. And I'll just, I'll just, I'd like to stop you,**
7   **because you're being unresponsive to the specific**
8   **question.**
9   A. Well --
10  **Q. And I'd like to remind you what the question was,**
11  **if you recall. Do you recall the question?**
12  A. I do, and I'm right in the middle of an answer.
13  And you've asked me to give complete answers, and --
14  **Q. I just want you to answer the question asked.**
15  **And the question, Mr. Fye, simply went to --**
16  A. It's not simply.
17  **Q. Well --**
18  A. I'm trying to give you an answer, and you've
19  interrupted me again.
20  **Q. What is the specific evidence that Mr. Scott**
21  **sought, to your mind, to undercut the Carrolls' claims?**
22  **Specific evidence.**
23  A. Did he pay the claim?
24  **Q. What specific evidence --**
25  A. Did he pay the claim?

---

184

1   **Q. What specific evidence did he seek --**
2   A. Did he pay the claim?
3   **Q. -- in your mind to undercut the Carrolls' claims?**
4   A. Did he pay the claim?
5   **Q. Are you going to answer my question? Let me, let**
6   **me try it again.**
7   A. There's no evidence that he paid or sought to pay
8   his claim. That's the specific evidence. I'm trying to
9   talk about specific evidence. There's no evidence that
10  he went to the claim department and said let's
11  re-evaluate this evidence that you have of the injury
12  and let's support this claim. Let's find out what the
13  merits for paying an amount is, even if it's not an
14  amount that will resolve this case and cause these
15  people to extinguish the rest of their coverage, what
16  kind of a payment can we justify under this coverage.
17  Mr. Scott failed in his obligation to lead the
18  claims adjusters into the undisputed claim payments that
19  would have softened the financial circumstances of the
20  accident to the Carrolls. Instead, he undercut their
21  claim by supporting the SFXOL methodology of forcing the
22  Carrolls to litigate the amount of their claim rather
23  than receive payments under the coverages that they
24  purchased.
25  So he, he specifically caused Allstate, helped

---

46 (Pages 181 to 184)

Carroll v. Allstate                    **Gary Fye**                    April 2, 2013

---

185

1    Allstate to breach their contract of insurance where
2    they promise to pay damages that the insured could
3    recover against the wrongdoing party.  That's, that's an
4    undercutting of the grant of coverage that was provided
5    to the Carrolls with their insurance contract.
6        **Q.  You don't know what Mr. Scott told Allstate, do**
7    **you?**
8        A.  Correct.
9        **Q.  Mr. Scott did not have authority to pay anything**
10   **on this claim, did he, as an outside lawyer?**
11       A.  Correct.
12       **Q.  Now, you go on and --**
13       A.  In fact, once the SFXOL segment is instituted, no
14   one has authority to pay anything except the evaluated
15   amount.  And so there's, the default is to trial.
16       **Q.  What do you mean, the default is to trial?**
17       A.  The document says default to trial.  If they
18   don't accept the amount, the low amount, you don't talk
19   to them, you don't offer them more, you don't have any
20   authority.  You take them to trial.
21       **Q.  You go on in your first bullet of your findings**
22   **and you say:**
23       **Allstate promised to pay the damages recoverable,**
24   **or the verdict value, of the claim against Mr. Guillen.**
25       A.  Guillen.

---

186

1        **Q.  What do you mean by the verdict value?**
2        A.  The damages recoverable.  What would a jury award
3    a bodily injury claim claimant under these
4    circumstances.  A clear liability case, somewhat
5    aggravated, where the Carrolls moved off to the right
6    side of the road and the oncoming car lost control, came
7    over the center line and hit them.  And there are broken
8    bones and bad injuries and lifetime consequences for an
9    older couple.
10       Sorry, sorry that, Mr. and Mrs. Carroll, I don't
11   mean to categorize you like I am, an older couple.  The
12   truth is the truth.
13       If, if you get hurt at that age, the chances are
14   you're going to have lifetime consequences.
15       **Q.  You --**
16       A.  So that --
17       **Q.  You're not a doctor, are you?  You're not a**
18   **doctor, correct?**
19       A.  So when you're looking at a claim like this with
20   an older couple with a severe collision, broken bones,
21   closed head injuries, all the other things that occurred
22   to them, most adjusters would understand, and most
23   attorneys in Mr. Scott's position would understand that
24   the lifetime consequences of an injury like this have to
25   be dealt with.

---

187

1        **Q.  You're not a doctor, correct?**
2        A.  I'm, I'm not.
3        **Q.  Have you received any medical training?**
4        A.  Of course.
5        **Q.  What type of medical training have you received?**
6        A.  I was a lifeguard at one time, I got CPR
7    training.  I've been trained in medical terminology and
8    I had adjuster training in what operations amounted to
9    and how surgeries are accomplished, and various things
10   like that.
11       **Q.  Have you taken any college level --**
12       A.  Claims training.
13       **Q.  Have you taken any college level courses related**
14   **to medicine or medical treatment?**
15       A.  No, I haven't.
16       **Q.  You go on in this first bullet and you say:**
17       **Allstate wouldn't pay the Carrolls' own coverage**
18   **without another kind of fight.  Allstate made the claim**
19   **adversarial.**
20       **Isn't it true, Mr. Fye, that it's Mr. Kaudy who**
21   **made this claim adversarial?**
22       A.  For purposes of the claims handling, Allstate
23   did.
24       **Q.  For purposes of litigation, though, Mr. Kaudy**
25   **did, right?**

---

188

1        A.  In a specific context, you're absolutely right.
2        **Q.  Thank you.**
3        A.  And the context is this:  A basketball player
4    goes into the game and commits an egregious foul, and
5    the player that was fouled didn't get the call, and so
6    he retaliates and he gets called for the foul.  If you
7    think that's fair, good for you.
8        **Q.  Did Mr. Kaudy ever respond with a number to Mr.**
9    **Palmer's offers to resolve the Carrolls' UIM claims?**
10       A.  Are you trying to bring settlement negotiations
11   into this as evidence, or --
12       **Q.  Just answer the question, please.**
13       A.  Well, I, I don't, I don't have any comment about
14   that.
15       **Q.  Do you have any knowledge?**
16       A.  Off the top of my head, I don't remember what
17   went on.  You're talking about Mr. Kaudy's suggestions
18   to who?
19       **Q.  Did Mr. Kaudy respond to Mr. Palmer's offer to**
20   **resolve the UIM claims of the Carrolls with a, with a**
21   **counter number?**
22       A.  Oh.  The response I know about is Exhibit 26.  Or
23   wait, not Exhibit 26.  What is the exhibit where he
24   filed suit?
25       **Q.  29?  So you're saying the complaint was the**

---

**Bonanza Reporting**          **(775) 786-7655**          **1111 Forest Street**

Carroll v. Allstate                     Gary Fye                     April 2, 2013

189

1   response?
2       A.  Well, that's a response.
3       Q.  Okay.
4       A.  I don't, I, I don't recall anything else.  That's
5   what the claim process is designed to produce.
6       Q.  Have you ever determined what the verdict value
7   of Ms. Carrolls' UIM claim is?
8       A.  I guess more correctly stated, that would be the,
9   that's what the business plan is designed to produce.
10      What was that question?
11      Q.  Okay.  Actually, I misstated.  Have you ever,
12  have you ever evaluated the verdict value of Ms.
13  Carroll's bodily injury claim?
14          MR. KAUDY:  Object to the form and
15  foundation.
16          THE WITNESS:  No.
17  BY MR. RIDLEY:
18      Q.  Have you ever evaluated the verdict value of
19  Mr. Carroll's bodily injury claim?
20      A.  No.  So I guess Mr. Palmer, Mr. Miller and I are
21  in the same boat.
22          MR. RIDLEY:  Move to strike as
23  non-responsive.
24  BY MR. RIDLEY:
25      Q.  All right.  Moving on to the second bullet of

190

1   your findings, you start off by saying Allstate tried to
2   pay too little, too late.  When, to your mind, Mr. Fye,
3   do you think Allstate should have first offered to
4   resolve this UIM claim of the Carrolls?
5       A.  At the, at the time of the report of accident,
6   there should have been a meeting or a conversation with
7   the insureds explaining how the coverage would be
8   available and how the purpose of the coverage is to
9   protect the Carrolls against the economic consequences
10  of this accident to the extent of these policies upon
11  adequate proof to support payments under this coverage.
12      So my, my inclination is that when Allstate
13  received a report of this accident, they knew that it
14  would exceed the underlying coverage, their obligation
15  was to investigate the extent of the injuries.  And once
16  they learned that there were injuries with permanency or
17  long-term consequences, they should have been offering
18  to sit down with the insured and either make payments of
19  discrete claims that were necessary to help them
20  financially, or to seek to apply the coverage in a more
21  universal sense.  But never should it have been
22  Allstate's plan to approach the insured with a take it
23  or leave it offer that required a release of the
24  coverages that they still had remaining.
25      Q.  Why do you say take it or leave it?  It wasn't a

191

1   take it or leave it offer, was it?  Take a look at
2   your --
3       A.  Allstate says it, not me.
4       Q.  Well, you're looking at a 1995 document.  Let me
5   show you something that actually relates to this case.
6   Take a look at Exhibit 12, if you would, in the book.
7   In this letter from Mr. Palmer to Mr. Carroll, he says:
8       I trust you are doing well.  Some time ago
9   Allstate made an offer of settlement of your
10  underinsured motorist claim.  We have had no response
11  from you.  Would you please call me so we might discuss
12  settlement of your UIM claim?
13      Now, Mr. Fye, does that sound like a take it or
14  leave it position being carved out by Mr. Palmer?
15      A.  No, it doesn't.
16      Q.  But do you know if your --
17      A.  But it, it sounds incorrect with me.  It sounds
18  like there's something wrong --
19      Q.  Did Mr. --
20      A.  It sounds like there's something wrong with it.
21  And, and this language, of course, it's inappropriate.
22      Q.  Well, I asked you simply is this, does this
23  strike you as a take it or leave it --
24      A.  Nothing about your question was simple.  I don't
25  think you should characterize your own demeanor as

192

1   simplicity, because that's not true.
2       Q.  That's the nicest thing you've said to me all day
3   long.
4       Mr. Fye, do you know why Mr. Carroll never
5   bothered to pay Mr. Palmer the courtesy of a response to
6   this letter?
7       A.  I, I think you should rephrase that question,
8   because it is so evocative, full of evocative language
9   and sarcasm that it doesn't warrant an answer.
10      Q.  Did Mr. Carroll bother to respond to this letter?
11      A.  It still is filled with sarcasm.  What do you
12  mean, bother?
13      Q.  Did he bother.  Did he take the time to pick up
14  the phone or send an e-mail or do anything to respond to
15  Mr. Palmer?
16      A.  So you can't just ask the question did he, do you
17  know if he responded?  No, I don't.  I saw that there
18  was no response when the testimony was taken.  But your
19  filling this with invective doesn't help.
20      Q.  It's not invective.  It's, the question was --
21      A.  It's sarcasm, I know.  I should recognize --
22      Q.  Do you --
23      A.  -- sarcasm and invective.
24      Q.  Do you know -- the fact is that Mr. Carroll did
25  not bother to respond to this letter from Mr. Palmer

Carroll v. Allstate                    Gary Fye                    April 2, 2013

---

193

1    dated June 16th --
2        A. Did not bother.
3        Q. Did not bother. Did not pick up the phone, did
4    not send an e-mail, did not write a letter, did not pay
5    him, Mr. Palmer, the courtesy of a response. Isn't that
6    true?
7        A. I wish you could hear yourself. The Carrolls are
8    suffering these injuries, suffering the uncertainty, not
9    having an adjuster picking up the phone and calling
10   them, and then you're sitting here characterizing their
11   behavior as not bothering to follow through with their
12   claim. These people are underneath a lot of
13   circumstances, and you're frivolously complaining about
14   their behavior. Shame on you.
15       MR. RIDLEY: Move to strike.
16   BY MR. RIDLEY:
17       Q. Do you know what Mr. Carroll did the day of the
18   accident, after the accident?
19       A. Not as I sit here.
20       Q. Do you know what he did the day after the
21   accident?
22       A. Isn't that the same question?
23       Q. The day -- no. I asked you the day of the
24   accident and then the day after the accident. Do you
25   know what he did the day of the accident?

---

194

1        A. I think he attended his wife in the hospital.
2        Q. And then do you know that he went back to the
3    scene of the accident to take photographs? Did you know
4    that?
5        A. Yes, I did. I saw that.
6        Q. And you know he went back on day two, the day
7    after the accident, to --
8        A. That I don't know.
9        Q. -- take more photographs?
10       A. So what's your point?
11       Q. I ask questions, Mr. Fye.
12       A. You don't explain your point or want any answer?
13       Q. I ask questions.
14       A. Is that your moral --
15       Q. Please take a look --
16       A. Is that your moral statement --
17       Q. Please take a look --
18       A. -- Mr. Ridley?
19       MR. RIDLEY: Move to strike the vindictive
20   and verbal ad hominems by Mr. Fye, here.
21   BY MR. RIDLEY:
22       Q. Please take a look at Deposition Exhibit 13, a
23   letter from Mr. Palmer to Ms. Carroll dated May 4th,
24   2011, where he offers $21,500 and notes that she has
25   already received $25,000 for the bodily injury

---

195

1    settlement. The last sentence says:
2        Please let me know your thoughts and response to
3    Allstate's offer of settlement.
4        Does that sentence strike you, Mr. Fye, as
5    someone who is proposing a take it or leave it offer?
6        THE WITNESS: Could you read that question
7    back, please?
8        (Whereupon the reporter read the record.)
9        THE WITNESS: The last sentence, is that the
10   scope of your question?
11   BY MR. RIDLEY:
12       Q. Does the --
13       A. Did you say sentence? Does that sentence?
14       Q. Yes. Does the sentence, please let me know your
15   thoughts and response to Allstate's offer of settlement,
16   does that strike you as a take it or leave it offer?
17       A. No, not so much.
18       Q. Thank you. Did you review any financial
19   information --
20       A. If you didn't know anything about SFXOL, this
21   would be a very, a very good statement to receive,
22   because it would imply that they're willing to discuss
23   things.
24       Q. Did you review any financial information of the
25   Carrolls prior to finishing your November, 2012 report?

---

196

1        A. I don't know what it would have been. I know
2    that there were some tax returns.
3        Q. Anything else that you can recall?
4        A. No. I may have seen some commentary in the --
5    did you say November?
6        Q. November, 2012, right.
7        A. Yeah. I would have read the examinations under
8    oath. That would have had financial information about
9    Mr. Carroll's earnings.
10       Q. Coming back to your second bullet point under
11   findings, you say:
12       Claiming that it needs indefinite periods of time
13   to seek out meritless fraudulent claims.
14       What is that phrase about?
15       A. What page are you on?
16       Q. Okay. I'm on page six of seven, your second
17   bullet point of your findings, where you mention
18   claiming that it needs indefinite periods of time to
19   seek out meritless fraudulent claims. My question is
20   what does meritless fraudulent claims have to do with
21   this case, if anything?
22       A. You should take that into context with the first
23   sentence.
24       Q. Okay. In this case, Mr. Fye, has there been any
25   allegation by Allstate that the Carrolls have made a

---

Bonanza Reporting                (775) 786-7655                1111 Forest Street

Carroll v. Allstate                        Gary Fye                        April 2, 2013

197

1    meritless or fraudulent claim?
2        A.  Yes.  Your examination recently was all about
3    that.  You brought, you introduced that into this case
4    in a major way by suggesting that Sharon Carroll was
5    lying about what happened in the emergency room and
6    reports to doctors.  You were just a regular --
7        Q.  Well, wait a second.
8        A.  -- a Dick Tracy in your examination of her.
9            MR. RIDLEY:  Move, move to strike.
10   BY MR. RIDLEY:
11       Q.  First of all, it mischaracterizes the deposition.
12   But more importantly, my deposition of Ms. Carroll
13   occurred after your November, 2012 report, correct?
14       A.  Correct.
15       Q.  So at the time you wrote this report, why are you
16   talking about meritless fraudulent claims?
17       A.  In the context of the Claim Core Process Redesign
18   is why I was talking about it then.  But that wasn't
19   your question.  You were asking me has it ever been in
20   this case.  I answered your question.
21       Q.  Well, I was asking you about your phrase in your
22   report dated November 20th, 2012.
23       A.  Well, this wasn't about you, if you're sensitive
24   about that.
25       Q.  Well, I appreciate that.

198

1        A.  If you hadn't introduced it by then, I don't want
2    to blame you for that then.  I'm just telling you that
3    you've introduced it now.
4        Q.  So when you wrote this report, when you mentioned
5    meritless fraudulent claims, you were referring to the
6    Claim Core Process Redesign?
7        A.  Yes.
8        Q.  In what respect?
9        A.  The, the deliberate slowdown and underpayment of
10   claims is predicated on a core process -- I can't
11   remember exactly what the manual says, but it's
12   predicated on an understanding that the about 80 percent
13   of the claims presented are not payable as presented.
14   And so some are just outright fraud, some are lesser
15   fraud, and some are just misunderstanding.  But
16   basically that's some of the rationale behind the rather
17   draconian claim handling methods that CCPR brought
18   about.  That comment was in the context of CCPR.
19       Q.  All right.
20       A.  You hadn't really --
21       Q.  Do you agree --
22       A.  You hadn't really taken their depositions and
23   gone into your --
24       Q.  Okay.
25       A.  -- Sam Spade type of investigation.

199

1            MR. RIDLEY:  All right.  Object and move to
2    strike.
3    BY MR. RIDLEY:
4        Q.  There's nothing wrong with an insurance company
5    being concerned about meritless claims, is there?
6        A.  No.
7        Q.  And there's nothing wrong with an insurance
8    company being concerned about fraud, is there?
9        A.  Well, there's something wrong about it, in that
10   fraud and meritless claims should be investigated and
11   punished by public authorities, not by insurance
12   companies.  And when Allstate reports to be the victim
13   investigator and accuser and judge and jury of
14   everyone's behavior but its own, there's something wrong
15   about that.
16       Q.  Insurance companies have to be concerned about
17   fraud, correct?
18       A.  Of course.  And --
19       Q.  Thank you.
20       A.  -- they should be concerned about avoidable harm
21   to the insuring public's interest, and they should be
22   also concerned about unavoidable harm to the public's
23   interest.  And minimize both of those.
24       Q.  In your second bullet under your findings on page
25   six, you use the phrase studied blundering.  Now, is it

200

1    your opinion that Jerry Palmer engaged in studied
2    blundering?
3        A.  Back to Jerry Palmer?
4        Q.  Yes.
5        A.  Are you his attorney?
6        Q.  Is that your opinion?
7            THE WITNESS:  If he's your attorney,
8    Jerry --
9            MR. RIDLEY:  Move to strike.
10           THE WITNESS:  Boy.  So you're making this
11   all about Jerry Palmer.  Now, where are you reading
12   this?
13   BY MR. RIDLEY:
14       Q.  It's your, the fifth line down on your second
15   bullet.  Studied blundering.  Allstate's delay and
16   studied blundering.
17       A.  Hang on one second.  What is your question?
18       Q.  Is it your opinion, sir, that Jerry Palmer
19   engaged in studied blundering?
20       A.  No, but it could be.
21       Q.  All right.
22       A.  I --
23       Q.  Is it your opinion --
24       A.  If you want me to, if you want me to pull his
25   deposition and go further into that --

50 (Pages 197 to 200)

Carroll v. Allstate                     Gary Fye                     April 2, 2013

---

201

1    Q. No.  No.
2    A. -- I will be glad to.
3    Q. I --
4    A. But this, of course, was not about Jerry Palmer.
5    Q. I appreciate --
6    A. You're bringing up Jerry Palmer, not me.
7    Q. Ask --
8    A. In this context.
9    Q. Allstate --
10   A. It's all on you, not me.
11   Q. Allstate, Allstate acts through its employees,
12   correct?
13   A. It does.
14   Q. All right.  So in terms of your accusation of
15   studied blundering, who from Allstate --
16   A. What accusation?
17   Q. Well, you say right here that a blank pass for
18   Allstate's delay and studied blundering.
19   A. That's correct.
20   Q. All right.  So my question is since a corporation
21   acts through its employees, who are you accusing from
22   Allstate in engaging in studied blundering?
23   A. No one.
24   Q. Okay.  What is studied blundering?
25   A. No individual -- it's simply saying that it was

---

202

1    attributable to error or to process and that it's not an
2    individual, it's a process.  And that in order to
3    accomplish these goals, we do make a few mistakes, and
4    withholding benefits and accusing people of crimes.  And
5    that's what I mean by the studied blundering that goes
6    on to accomplish the purposes of CCPR.  But you're,
7    you're taking this out of the context it's written in.
8    Q. I'm just asking questions.
9    A. No, you're not, you're taking it out of context.
10   Q. You say also in this second bullet that it has
11   the duty to investigate.  And by that, you're referring
12   to Allstate, right, has the duty to investigate?  True?
13   A. What's your question?
14   Q. That Allstate has the duty to investigate.
15   A. Of course.
16   Q. Okay.  And then when you say the time to do so is
17   not open-ended.  In a case such as the Carrolls' case,
18   what do you think the time period was by which the claim
19   had to be resolved?
20   A. It doesn't make any difference what the final
21   resolution is, but 60 days would have been a good time
22   for partial payments or handling discrete claims.  I
23   don't think the Carrolls should have been left without
24   UIM benefits for very long.  They should -- I don't
25   remember the date that the underlying coverages were

---

203

1    paid, but the UIM payments should follow that shortly.
2    Q. Have you ever spoken with Sharon Carroll?
3    A. No.
4    Q. Have you ever spoken with Richard Carroll?
5    A. No.
6    Q. Have you ever spoken with any Allstate person
7    working on the Carroll claim?
8    A. Not to my knowledge.
9    Q. You say that, claim handling that knowingly
10   causes anxiety and conflict.  Are you saying that
11   Allstate, in this Carroll claim, engaged knowingly in
12   conduct that caused anxiety and conflict?
13   A. Well, can't you read what I said?  Claim handling
14   that knowingly causes anxiety and conflict is abusive
15   and unreasonable.  Am I saying that Allstate handled the
16   Carroll claim, Carrolls' claim in an abusive and
17   unreasonable manner?  Of course I am.  That's what my
18   report says.
19       Allstate's conduct was unreasonable.  The
20   Carrolls still haven't been paid.  They were badly
21   injured in an accident, and Allstate hasn't responded
22   appropriately under the coverage that they sold to the
23   Carrolls and entered into a contract to provide.  They
24   breached their contract with the Carrolls.
25   Q. What provision of their policy did they breach?

---

204

1    A. The agreement to pay damages recoverable from the
2    wrongdoing party.  And it goes without saying that the
3    covenant of good faith and fair dealing, the unwritten
4    part of the policy, requires that it be promptly done,
5    as well as the Colorado Fair Claim Practices Act.
6        There's never been a liability question.  It's
7    always been known that the Carrolls were badly injured
8    and that the injuries continue and have cascaded into
9    other symptoms.  And instead of resolving their, or
10   trying to help them with their coverages, Allstate has
11   simply cast them as complainers and resisted them.
12       MR. RIDLEY:  Move to strike as
13   non-responsive.
14       THE WITNESS:  Well, wait a minute.  I
15   thought you were just here answering -- asking
16   questions, but now you're saying you're here to strike
17   answers also.  So you are a multi-functional guy.
18       MR. RIDLEY:  Mark the transcript, please. /(
19       MR. KAUDY:  Is it cold in here?
20       THE WITNESS:  How's our time?
21       MR. KAUDY:  I've got 4:12.
22       THE WITNESS:  Well in advance, let me tell
23   you that I'm quitting at 5:00, and you'll have to
24   discuss additional time.  If you want to whine and do
25   your stuff, do it, do it now or wait until later, but

51 (Pages 201 to 204)

Carroll v. Allstate                    Gary Fye                    April 2, 2013

205

1    I'm leaving at 5:00.  We can continue this another day.
2    Just let me know.  That will be seven hours.
3            And please don't go through the exercise of
4    telling me that I'm walking out of the deposition.  I
5    want to tell you well in advance that I don't work past
6    5:00.
7    BY MR. RIDLEY:
8        Q.  As I understand, one of your opinions is that you
9    believe Allstate has --
10       A.  You can take the word believe out of there, as I
11   asked you this morning.  Don't do that at this stage of
12   the deposition just to provoke me, please.  You've
13   already done that enough.
14       Q.  I'm sorry, I don't understand what you just said.
15       A.  Of course you don't.
16           MR. RIDLEY:  All right.  Please mark the
17   transcript. /(
18   BY MR. RIDLEY:
19       Q.  Mr. Fye, is it your opinion that the claims
20   handling standard in the State of Colorado is to pay
21   undisputed amounts of UIM benefits?
22       A.  That's it?
23       Q.  Yes.  As a beginning, yes.
24       A.  I would say yes, that's the standard.
25       Q.  So to put a finer point on it, in a case like

206

1    this -- you're laughing.  I'm trying to ask you some
2    follow-up questions.
3            MR. RIDLEY:  Please mark the transcript
4    again. /(
5    BY MR. RIDLEY:
6        Q.  In a case such as this, Mr. Fye, where there has
7    been a policy limits demand and there are bills coming
8    in on an ongoing basis, it's your opinion that in
9    Colorado such amounts need to be paid on an ongoing
10   basis?
11           MR. KAUDY:  Object to the form and
12   foundation.
13           THE WITNESS:  Possibly.  But that's a
14   different question.
15   BY MR. RIDLEY:
16       Q.  I know it is.
17       A.  The, the paying of bills on an ongoing basis is
18   not paying claims on an ongoing basis.  My testimony
19   would be that the insured should be invited to make
20   discrete claims under this coverage as financial need
21   arises.
22       Q.  Did the Carrolls make discrete claims in the
23   history of this case?
24       A.  Yes, I believe so.
25       Q.  Based on what?

207

1        A.  Well, I don't really want to testify about the
2    settlement history, but when they reported the accident
3    they made claims for the benefits of the policy.  That's
4    one.  Number two, Mr. Carroll asked for the benefits of
5    the policy to be paid, without specifying exactly what
6    policy and what benefits.  As the correspondence with
7    the insurance company transpired, the, Mr. Palmer cast
8    the, the claim as a, not as a first party claim in terms
9    of presentation of claim and acceptance or rejection,
10   but rather as a, in third-party terms of offer,
11   settlement and release and that sort of thing.  And all
12   of that is reframing the coverages into something that
13   they are not.
14       My testimony is that -- and this is an example of
15   a claim where Allstate redesigned its company, purposely
16   creating categories of harsh claims handling to increase
17   litigation where insureds don't accept low offers of,
18   quote, settlement, quote, of first-party benefits.
19       Q.  Did the Carrolls ever request Allstate to pay a
20   specific bill?
21       A.  Maybe they did under the, any medical coverages,
22   but I'm not really, I don't recall how that went.  There
23   wasn't, the real issue, as I'm sitting here, is not
24   whether they failed to pay a specific bill, it's that
25   Allstate didn't meet with the Carrolls and explain the

208

1    coverages in terms that would enable the Carrolls to
2    utilize the coverages to soften the economic
3    consequences of the accident, in every way that they
4    needed.
5        Instead, it was cast as set piece negotiation of
6    demand offer and extinguishment of the balance of the
7    coverage upon reaching a claim amount.  And that, that's
8    not called for under this coverage, under this type of
9    coverage.  So that, that whole type of handling is
10   simply subverting and frustrating the insureds' attempts
11   to use coverage that they bought.
12       Q.  At any point in time did the Carrolls request
13   that Allstate pay anything less than policy limits?
14       A.  Same answer, but added to that I would say I
15   don't recall that.
16       Q.  Thank you.  With respect to paying undisputed
17   amounts --
18       A.  Oh, and of course that's the Carrolls and not
19   their attorney.
20       Q.  Are you aware that Mr. Kaudy ever asked for
21   payment of anything less than policy limits?
22       A.  Mr., Mr. Kaudy asked for reasonable talks about
23   amounts payable as he wrote to the, wrote to Mr. Scott
24   and Mr. Palmer.  Or Mr. Palmer.  I don't know that he
25   wrote to Mr. Palmer directly.  I'm not sure about that.

52 (Pages 205 to 208)

209

1 **Q.  And what amount less than policy limits did**
2 **Mr. Kaudy request?**
3 A.  I don't remember a quantification of that.
4 **Q.  Do you know whether Mr. Kaudy ever did quantify**
5 **something less than policy limits for Allstate?**
6 A.  I don't, as I sit here.
7 **Q.  Do you consider yourself an expert on claims**
8 **practices and claims handling in Colorado?**
9 A.  Will you not interrupt me as I answer that?
10 **Q.  As long as you answer it and don't attack my**
11 **client.  I'm just asking you a simple question about**
12 **whether you consider yourself an expert on claims**
13 **practices and claims handling in the State of Colorado.**
14 A.  Is that yes, you're not going to interrupt?
15 **Q.  Well, if you answer my question, I won't**
16 **interrupt.**
17 A.  I hold myself out as a claim practices analyst,
18 and a student of claim practices and insurance.  Others,
19 like Judge Sylvester, have held me out as an expert in
20 various claim subjects in Colorado.  And with humility
21 and modesty, I can basically say that I'm very
22 experienced with Colorado in terms of the work that I've
23 done there.
24  My practice is national in scope, and in terms of
25 all of the rules, all of the federal rules governing

210

1 expert testimony, it's my belief that I qualify as an
2 expert in every sense, through experience and training,
3 education, and pursuit of current methodology and
4 subject matter, I'll call it mastery of subject, that
5 would enable a judge to accept my testimony as expert
6 testimony in Colorado.
7 **Q.  With respect to paying undisputed amounts, what**
8 **is the basis for saying that that is the standard in**
9 **Colorado?**
10 A.  It's, it's basically accepted nationally that to
11 not pay undisputed amounts imposes hardships on policy
12 holders, and that companies that don't pay undisputed
13 amounts can rightfully be accused of trying to starve
14 out the insured to obtain lowball results.  To avoid
15 that, company after company have left the old discipline
16 behind of trying to withhold insured benefits to further
17 oppress an insured that has had dire financial
18 consequences as a result of an accident.
19 **Q.  Is there any --**
20 A.  There's another reason, and that is that I have
21 claim lawyers, consumer lawyers, claim adjusters, claim
22 managers, attend my workshops and tell me that the
23 standard for their company and their operation and their
24 clients almost universally is to pay undisputed amounts.
25  There's another compelling reason that Colorado

211

1 has that standard, and that is that an insurance company
2 in Colorado has an obligation not to treat its policy
3 holders in Colorado worse than it treats policy holders
4 in other states, and in other states undisputed claim
5 payments are required, such as the state you're in right
6 now.  And if you're saying that Allstate is taking the
7 position that it gets to treat people in Colorado worse
8 than it gets to treat people in Nevada, I disagree with
9 you.
10 **Q.  What's the basis in Nevada for the pay undisputed**
11 **amounts?**
12 A.  Regulation.
13 **Q.  Is there a similar regulation in Colorado?**
14 A.  I don't think so.
15 **Q.  Is there a statute in Colorado that specifically**
16 **requires the payment of undisputed amounts?**
17 A.  Well, there, there almost never would be a
18 statute.
19 **Q.  Is there a case in Colorado that says that**
20 **there's an obligation on the insurer to pay undisputed**
21 **UIM amounts?**
22 A.  Yes.  In fact, I thought it was very interesting
23 and appropriate for this case.  When an insurance
24 company withholds payment of claims under the coverages
25 it writes, and it is unreasonable in doing that, I can't

212

1 remember the name of the case, but it basically imposed
2 kind of a double indemnity, or a double limit sanction
3 on the company for doing that, where its behavior is
4 unreasonable.  In this case, of course, the behavior is
5 quite unreasonable, and I would assume that that would
6 apply here.
7 **Q.  Are you familiar with the Rabin v. Fidelity**
8 **National Property case out of the United States District**
9 **Court of the District of Colorado?**
10 A.  Not by name.
11 **Q.  Are you familiar with the proposition recognized**
12 **in that case, that the insurer's good faith duty to**
13 **negotiate, settle or pay insured's claims was suspended**
14 **upon the insured's filing suit?**
15 A.  Yes, I am familiar with that.
16 **Q.  Does Allstate have the right to rely on that type**
17 **of court holding?**
18 A.  Well, not in my opinion, but I, I have to say
19 that there is a bit of conflict in, in that holding, in
20 that my understanding from years in the insurance
21 industry is that a fair-minded insurance company will
22 unceasingly, even when litigation is filed, attempt to
23 achieve the purposes of coverage to assist the insured.
24  Now, I realize that in saying that I'm answering
25 a specific question in a deposition.  It's not a written

Carroll v. Allstate                     **Gary Fye**                     April 2, 2013

---

**213**

1  opinion of mine, it's simply answering your question.
2  And I don't mean to imply to the court that I in any way
3  am going to delve into legal questions like that in
4  front of the jury.
5      THE VIDEOGRAPHER: I'm sorry to interrupt.
6  I need to change media.
7      MR. RIDLEY: Sure.
8      THE VIDEOGRAPHER: This is the end of video
9  disc number three in the video deposition of Gary T.
10 Fye. We are going off record, and the monitor time is
11 approximately 4:28 p.m.
12     (A short break was taken at this time.)
13     THE VIDEOGRAPHER: We're back on record.
14 The monitor time is approximately 4:36 p.m. This marks
15 the beginning of video disc number four in the video
16 deposition of Gary T. Fye in the matter of Richard
17 Carroll, et al., versus Allstate Fire and Casualty
18 Insurance Company.
19     This deposition is taking place at Bonanza
20 Reporting, 1111 Forest Street, Reno, Nevada. My name is
21 David Corrao. We're ready to proceed.
22 BY MR. RIDLEY:
23     Q. Okay. Mr. Fye, before the break we were talking
24 about the payment of undisputed amounts and the standard
25 in Colorado. You mentioned companies in Colorado that

**214**

1  pay undisputed amounts of UIM. What companies are
2  those?
3      A. Before the break we were talking about a Colorado
4  decision that basically terminated good faith and fair
5  dealing at the time litigation is filed, and I was
6  expressing my disagreement with that idea and that
7  insurance companies were acting properly if they
8  followed that rule.
9      But going back longer before we broke, I was
10 saying that people attending my seminars from
11 Progressive, State Farm, Seneca, Pacific Specialty,
12 Farmers, and others, have either testified or mentioned
13 that undisputed claim payments were being made. That's
14 not to mention anecdotal evidence I have from speaking
15 with other experts in the field at seminars and whatnot
16 who, in their discussions in front of peer review
17 groups, which is what I'll call my audiences, have
18 articulated the same thing.
19     Q. All right. Just so I'm clear, because you were
20 speaking fast, you mentioned Seneca?
21     A. Yes.
22     Q. And it was Pacific?
23     A. Pacific Specialty. State Farm, Farmers.
24     Q. All right. So those --
25     A. And Progressive. Didn't I say Progressive?

**215**

1      Q. Those -- well, I'm not sure. That's why I wanted
2  to make sure. So Progressive as well?
3      A. Yes.
4      Q. Have you spoken with anybody from Farmers on this
5  issue of paying undisputed amounts?
6      A. Ex-Farmers people, but not people with Farmers.
7      Q. How about State Farm, have you spoken with
8  anybody from State Farm about their current practice
9  when it comes to paying undisputed amounts?
10     A. Only in the review of deposition testimony and
11 that sort of thing.
12     Q. Whose deposition testimony?
13     A. I don't know.
14     Q. But you have reviewed it?
15     A. Yes.
16     Q. It was in the context of a case?
17     A. Yes.
18     Q. A Colorado case?
19     A. Well, I'm not sure about that, but I do know that
20 in Colorado State Farm is one of the companies that pays
21 undisputed claims.
22     Q. And are you sure that that is still the case?
23     A. Well, I don't know. Pope Benedict resigned, and
24 that caught me by surprise. Do you have some other
25 surprises in your bag of tricks?

**216**

1      MR. RIDLEY: Move to strike. Mark the
2  transcript, please. /(
3  BY MR. RIDLEY:
4      Q. What about Seneca? First of all, what is the
5  full name of Seneca? If you know.
6      A. I don't.
7      Q. But they, they sell UM/UIM insurance in the State
8  of Colorado?
9      A. Do they?
10     Q. Do they? Do you know that?
11     A. No, I don't know. I don't know what their
12 marketing plan is. It's my assumption.
13     Q. And Pacific Specialty, do you know --
14     A. So in other words, giving you names is not going
15 to help at all, is it?
16     Q. I'm sorry?
17     A. Giving you names is not going to help at all.
18 You're going to know less after I say those names than
19 you knew before, correct?
20     Q. I don't know what you're saying.
21     A. Yeah. Well, you should know what I'm saying.
22     Q. Well --
23     A. Go ahead. What are your questions?
24     MR. RIDLEY: Move to strike.
25

Carroll v. Allstate                           **Gary Fye**                           April 2, 2013

---

217

1   BY MR. RIDLEY:
2       **Q. Does Specific Specialty sell UIM in the State of**
3   **Colorado?**
4       A. That I don't know.
5       **Q. Have you spoken with anybody from Specific**
6   **Specialty about their UIM --**
7       A. No.
8       **Q. -- payments?**
9       A. Most of the --
10      **Q. You've got to let me finish.**
11      A. Oh, excuse me. I thought you were done.
12      **Q. No. Have you spoken to anybody from Specific**
13  **Specialty about --**
14      A. Specific Specialty?
15      **Q. I'm sorry. Pacific Specialty about how they pay**
16  **UIM claims in Colorado?**
17      A. No.
18      **Q. Okay. Have you spoken to anybody from**
19  **Progressive about how they pay UIM claims in Colorado?**
20      A. I don't, but I spoke to their lawyer at one time
21  about it.
22      **Q. Who was that?**
23      A. Rich Kaudy.
24      **Q. When was that conversation?**
25      A. I don't remember. Sometime back.

---

218

1       **Q. To your knowledge, does Mr. Kaudy still represent**
2   **Progressive?**
3       A. I, I don't know about that. I know that I was
4   assisting him with a Progressive case and we discussed
5   that.
6       **Q. You were, Mr. Kaudy was representing Progressive**
7   **at the time?**
8       A. Yes.
9       **Q. Was that litigation?**
10      A. Yes.
11      **Q. Do you know what court that was in?**
12      A. No.
13      **Q. Have you conducted any survey of Colorado**
14  **companies or insurance companies that sell UIM in**
15  **Colorado in terms of whether they pay undisputed UIM**
16  **amounts?**
17      A. I have not.
18      **Q. Have you seen any survey?**
19      A. No.
20      **Q. How long have you known Mr. Kaudy?**
21      A. I don't know, but probably ten years.
22      **Q. And do you understand him to be a reputable and**
23  **competent insurance attorney in the State of Colorado?**
24      A. Yes.
25      **Q. Based on what you've observed, do you think that**

---

219

1   he understands the UM/UIM laws in the State of Colorado?
2       A. Yes.
3       **Q. Do you think he understands how a UM/UIM claim is**
4   **adjusted in the State of Colorado?**
5       A. Yes.
6       **Q. Do you think he understands the type of**
7   **information that an insurance company needs to adjust a**
8   **UM or UIM claim in Colorado?**
9       A. Mostly, but he would be in a position of asking
10  for specific methods and information required of a
11  company that where he didn't fully understand the
12  process, like he did in this case.
13      **Q. In your career, Mr. Fye, have you ever seen an**
14  **insured not respond to an offer of a UIM settlement**
15  **offer?**
16      A. Yes.
17      **Q. Who? Who refused to respond?**
18      A. Don't know.
19      **Q. All right. As I understand it, you are leaving**
20  **in 15 minutes.**
21      A. I'm leaving at 5:00 o'clock. Is that 15 minutes?
22      **Q. By my watch, which --**
23      A. Okay.
24      **Q. -- may be a minute fast. What I want to do with**
25  **our remaining time -- I've got these boxes of documents.**

---

220

1       MR. RIDLEY: And Rich, they're not, the
2   documents are not Bates labeled. I'm not going to have
3   time to go through these documents. But I would at
4   least like Mr. Fye to confirm that these documents
5   contain what he just loaded on the cart, copies of what
6   he just loaded on the cart.
7   BY MR. RIDLEY:
8       **Q. And if you could take a look. I will note for**
9   **the record I've added a few tabs.**
10      A. There's no way we can do that. These are just
11  kind of, the folders aren't replicated. I can, I don't
12  know what kind of assurance I can give you, but they're
13  not in a form that I could do in 15 minutes. It would
14  take a couple of hours, probably, to do that.
15      MR. RIDLEY: All right. Rich, you and I
16  might be able to -- it's sort of a chain of custody. I
17  don't want an argument over chain of custody on these
18  documents. I haven't removed any. This is how I got
19  them from the copy service.
20      THE WITNESS: Wait. Let me see if I can
21  help you with this. Sierra Document Management has
22  been, in effect, in this production of documents, my
23  agent, even, even if they are a third-party
24  intermediary. I will certify that this is a copy, an
25  accurate copy of what I gave them to copy. I have never

---

**Bonanza Reporting**              **(775) 786-7655**              **1111 Forest Street**

Carroll v. Allstate                    Gary Fye                    April 2, 2013

221

1   known them to fall down on a copying job.
2           And so to the extent that I can, if no one
3   has removed any documents from these boxes, they're the
4   documents that I gave them to copy.  How's that grab
5   you?
6   BY MR. RIDLEY:
7       Q.  That's, that's a very good start, and I can
8   assure you, I haven't removed any documents --
9       A.  Okay.
10      Q.  -- from these boxes.
11      A.  And let me add that anytime you want an updated
12  version of that, or anything, you can, you can call
13  Sierra Document Management and have them contact me for
14  any additional copying you need.
15      Q.  All right, and I appreciate that.  All right.
16  Did you bring with you today any documents that, to your
17  knowledge, were not copied by Sierra on Friday?
18      A.  I did.  A couple of pages.  A few pages.
19      Q.  All right.  Can I take a look at those, please?
20      A.  Yes.
21          MR. KAUDY:  These were the medical
22  disclosures he's mentioned.
23          THE WITNESS:  Are we on the record?
24          MR. RIDLEY:  Yes.
25          THE WITNESS:  The documents are the claim

222

1   policy practices and procedure manual from Allstate,
2   which is, I think, a 2003 version.  This apparently was
3   said by Allstate to be a privileged or confidential
4   document, so I produced a copy.  And I marked section
5   three, page five, which is guiding principles relating
6   to automobile insurance claims.  And there's two pages,
7   by the way, of that.  And I also marked section one,
8   customer service policy, page one.
9   BY MR. RIDLEY:
10      Q.  And why did you mark that page?
11      A.  For the principles of Allstate's assumption of
12  the duties to provide claim service that's customer
13  focused and that exceeds expectations of customers and
14  that they will handle claims in a manner that best
15  serves the needs of our customers.
16          And the same thing is true of the first page.
17  It's a list of claim standards that Allstate purports to
18  meet.  And it breached its own internal standards in
19  this case.  Anyway, that document is one I brought with
20  me to illustrate those points.
21      Q.  Where did you get that document from?
22      A.  In discovery in other Allstate cases.
23      Q.  So you had it in your library?
24      A.  Yes.
25      Q.  Do you know what case you got it from --

223

1       A.  No.
2       Q.  -- specifically?
3       A.  No, I don't.  Not offhand.  It's simply an
4   unprotected document that I had in my library.
5           And then in my correspondence file there are
6   three or four pages here at the top that are an e-mail
7   chain and your letter and check.  I don't know whether
8   you want to make copies of them or -- oh, and here I was
9   served a subpoena and a --
10      Q.  And I'm sorry --
11      A.  I don't think Mr. Kaudy has ever seen that.
12          THE WITNESS:  You weren't aware that I was
13  served a subpoena?
14          MR. KAUDY:  No.
15  BY MR. RIDLEY:
16      Q.  What's the, what's the date on that subpoena, the
17  date served?
18      A.  Thursday.
19      Q.  Last Thursday?
20      A.  Yeah, I think it was last Thursday.
21      Q.  And is that the subpoena to appear --
22      A.  No.  Well, both.  It was the subpoena to put the,
23  send the documents to Snell & Wilmer, and also to appear
24  here.  So I was actually here under subpoena, but I
25  didn't need to be.  You never needed to do this.

224

1           And then the last document was a file of medical
2   disclosures to bring me up-to-date on plaintiff's
3   disclosures of medical information right at the last
4   here.  It doesn't affect my opinions.
5       Q.  I'm sorry?
6       A.  It doesn't affect my opinions.
7           MR. RIDLEY:  Rich, I would like to get a
8   copy of the first two folders.  I don't need the third
9   one, since it does not affect his opinions.  But the
10  Allstate manual and the --
11          THE WITNESS:  And the correspondence file?
12          MR. RIDLEY:  And the correspondence file.
13          THE WITNESS:  All right.
14          MR. RIDLEY:  And you can, obviously --
15          THE WITNESS:  You already have a copy of the
16  correspondence file, it's just that there are a few more
17  pages now.
18          MR. RIDLEY:  Right.
19          MR. KAUDY:  We will obtain that and
20  supplement our disclosures accordingly.
21  BY MR. RIDLEY:
22      Q.  All right.  Mr. Fye, in our few remaining
23  minutes --
24      A.  Yes.
25      Q.  Are you familiar with the Colorado Court of

56 (Pages 221 to 224)

Carroll v. Allstate                    Gary Fye                    April 2, 2013

225

1    Appeals in the Sanderson case, which talked in part
2    about the suspension of the duty to pay, negotiate,
3    settle UIM claims once a lawsuit is filed?
4        A.  Like I said a minute ago, familiar in at least
5    one context.  But what is it you want to know about?
6        Q.  Have you read that case?
7        A.  Probably.
8        Q.  Okay.  Are you aware of what it says about the
9    suspension of the duty to pay, settle, negotiate?
10       A.  I've already testified about that.
11       Q.  So you're aware that that case does address that
12   issue?
13       A.  I, I just think it's unconscionable to create a
14   situation where, to provide an incentive for insurers to
15   conduct a business plan where their insureds have to
16   litigate for benefits, and then in a, in a duty free
17   zone, as Mr. Kaudy would refer to it.  It's just, it's
18   just appalling to me as a claim practices analyst.
19       Q.  So you disagree with that decision.
20       A.  I don't go on record disagreeing with the Court
21   at all.  The principle behind that decision bothers me.
22       Q.  All right.  But do you recognize that Allstate
23   has the right to rely on reported decisions related to
24   UIM claims handling?
25       A.  See, I don't agree with that.  I think Allstate

226

1    has to do the right thing, and they have to take the
2    same position I'm taking, that the right thing is to
3    help the policy holder and carry out the fundamental
4    purpose of the policy and not conduct a business plan
5    that forces the insured to sue for benefits.  I think
6    that what Allstate is doing is wrong and unreasonable.
7    And if it is relying on that case, which I don't believe
8    it is, it's acting unreasonably in doing that.  How's
9    our time?
10           THE VIDEOGRAPHER:  I have 4:54.
11           THE WITNESS:  Okay.  Next question?
12   BY MR. RIDLEY:
13       Q.  Do you know what Jerry Palmer's claim adjusting
14   process was with respect to the Carrolls' claim?
15       A.  Not beyond what I've testified about.
16       Q.  Thank you.  You mention in your report Judge
17   Vigil's record in the Martinez case.  What court does
18   Judge Vigil sit on?
19       A.  The superior court bench in Santa Fe.  I'm not
20   sure what its precise name is.
21       Q.  All right.
22       A.  The document will probably speak for itself in
23   that regard.
24       Q.  And you've produced a copy of this, this Judge
25   Vigil --

227

1        A.  Yes.
2        Q.  -- record?
3        A.  I have a copy of it.  And I gave you the number.
4    Let me give it to you again.  It starts at page 2038 and
5    runs to 2046 of the Fye testimony exhibits.
6        Q.  That's Exhibit F?
7        A.  Or Allstate testimony exhibits.  Yes, Exhibit F
8    in the first report.
9        Q.  In the, the fourth bullet on the last page of
10   your November report, you talk about how Allstate's
11   claim handling doesn't reflect the adoption and
12   implementation of proper guidelines or systems to handle
13   first-party UIM claims as required in Colorado.  What's
14   the basis for that finding?
15       A.  I pretty much explain it here.  Subjecting
16   insureds to an SFXOL methodology, forcing the insured to
17   undergo the very financial consequences that they bought
18   insurance to avoid, and forcing the insureds to incur
19   financial and emotional distress by non-payment of
20   claims and by insistence on Allstate's methods that are
21   so foreign to carrying out the promises of the insurance
22   policy, is, is a clear example of unreasonable claim
23   handling behavior, improper claim handling behavior,
24   self-serving economic behavior to the detriment of its
25   insureds.

228

1            And all I can say is that I hope my reports, my
2    work in this case, my demeanor and comments here all
3    express my disapproval of how this was carried out in
4    the Carroll case.
5        Q.  Is there any other basis for the opinions set
6    forth in your, the fourth bullet point on page seven of
7    seven?
8        A.  Yes.  Allstate has not produced adequate UM/UIM
9    claim handling instructions that concern undisputed
10   claim payments, substitution of funds, philosophies of
11   recovery, nature of first-party coverages, or any of the
12   other vital elements of first-party claim handling that
13   have not been used, and apparently are misunderstood
14   institutionally by Allstate and which constitutes
15   studied blundering by Allstate by saying that it is
16   handling these cases fairly when it so clearly is not.
17       Q.  You use the phrase substitution of funds.  What
18   do you think should be in the Allstate claims handling
19   manuals related to substitution of funds?
20       A.  Well, basically when an insured goes to the
21   insurance company and says can I settle with the
22   underlying driver, the underlying driver has additional
23   assets beyond the insurance policy, and the insurance
24   company says no, you can't, they should substitute the
25   funds in order to preserve their subrogation rights.

Bonanza Reporting          (775) 786-7655          1111 Forest Street

**Carroll v. Allstate**                    **Gary Fye**                    **April 2, 2013**

---

229

1      And that needs to be spelled out.  There have to
2  be instructions in claim handling articles.  And
3  Allstate has not provided anything in this case that
4  shows that these coverages are even understood by the
5  company.  What I have seen instead is that Allstate has
6  published its CCPR implementation training manual and
7  shown how it has radically changed its approach to the
8  handling of claims and tried to act like it doesn't know
9  how to do the right thing.
10  **Q.  Have you --**
11      A.  That's another example of studied blundering.
12  **Q.  Have you seen any Colorado regulation, Colorado**
13  **statute or Colorado case that requires insurance**
14  **companies to engage in what you call substitution of**
15  **funds in the UIM context?**
16      A.  No.  It basically requires the insurance company
17  to be fair, to pay claims and liabilities reasonably
18  clear.  And when a, when a company decides not to do
19  that, it's not on the regulation, it's on the company.
20          THE WITNESS:  Are we 5:00 o'clock?
21          THE VIDEOGRAPHER:  We're 15 seconds after
22  the hour.
23          THE WITNESS:  Thank you.  Good-bye.
24          MR. KAUDY:  Off the record.
25          THE VIDEOGRAPHER:  This concludes today's

---

230

1  video deposition of Gary T. Fye.  One copy of the
2  original video disc delivered to the law office of
3  Wheeler Trigg O'Donnell, 370 Seventeenth Street, Suite
4  4500, Denver, Colorado.  Total number of video discs
5  used was four.  We're going off record.  The monitor
6  time is approximately 5:00 p.m.
7          (Deposition concluded at 5:00 p.m.)
8              -oOo-
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

231

1
2  GARY T. FYE
3
4
5
6
7
8
9  Subscribed and sworn to before me
   this      day of      2013.
10
11
12
13
14
15
       Notary Public
16
17
18
19
20
21
22
23
24
25

---

232

1  STATE OF NEVADA    )
                      ) ss.
2  COUNTY OF WASHOE   )
3          I, SUSAN E. BELINGHERI, a notary public in
4  and for the County of Washoe, State of Nevada, do hereby
5  certify;
6          That on Tuesday, the 2nd day of April, 2013,
7  at the hour of 9:00 a.m. of said day, at the offices of
8  Bonanza Reporting, 1111 Forest Street, Reno, Nevada,
9  personally appeared GARY T. FYE, who was duly sworn by
10  me to testify the truth, the whole truth, and nothing
11  but the truth, and thereupon was deposed in the matter
12  entitled herein;
13          That said deposition was taken in verbatim
14  stenotype notes by me, a Certified Court Reporter, and
15  thereafter transcribed into typewriting as herein
16  appears;
17          That the foregoing transcript, consisting of
18  pages 1 through 234, is a full, true and correct
19  transcript of my stenotype notes of said deposition to
20  the best of my knowledge, skill and ability.
21          DATED:  At Reno, Nevada, this 11th day of
22  April, 2013.
23
          SUSAN E. BELINGHERI, CCR #655
24
25

---

**Carroll v. Allstate**                    **Gary Fye**                    **April 2, 2013**

233

```
1              OFFICER'S ACTIONS RE SIGNING OF DEPOSITION
2            PURSUANT TO NEVADA RULES OF CIVIL PROCEDURE
3
4    DATE:
5
6    4/11/13       AT DIRECTION OF COUNSEL,
                   ORIGINAL WAS SENT TO MR. FYE
7
8                  WITNESS SIGNED DEPOSITION
9
                   ORIGINAL SENT TO MR. RIDLEY
10
11
12
                        OTHER ACTIONS
13
14
15
16
17
18
19
20
21
22
23
24
25
```

234

```
1    April 10, 2013
2
3    Gary T. Fye
     6815 Windy Hill Way
4    Reno, Nevada 89511
5
6
     Dear Mr. Fye,
7
8            Enclosed is the deposition given by you on
9    the 2nd day of April, 2013, in the matter of Carroll v.
10   Allstate.
11           You may change any answer, either by listing
12   your corrections on the provided correction page and
13   sending it back in the enclosed self-addressed stamped
14   envelope or by a signed letter to the address listed
15   below, and my approve the transcript by signing it, or
16   choose not to read and sign the transcript, in which
17   event after thirty (30) days from today's date the
18   deposition may be used by the parties for any lawful
19   purpose.
20
21
22           Bonanza Reporting
             1111 Forest Street
23           Reno, Nevada 89509
             (775) 786-7655
24
25
```

Carroll v. Allstate                    Gary Fye                    April 2, 2013

Page 1

## A

abiding 103:2
ability 232:20
able 8:5 13:21 27:25
  36:25 37:20 51:2 74:3
  89:6 220:16
absence 20:12 28:19
  147:5
absent 83:4
absolutely 18:10 104:16
  120:21 132:18 188:1
abundance 106:14
  132:1
abusive 203:14,16
accept 25:1 136:15
  156:14 166:23 185:18
  207:17 210:5
acceptance 84:13 207:9
accepted 138:1 210:10
accident 14:25 15:1,5,7
  30:15,18,20,23 66:8
  98:6 130:19 131:11
  150:16 168:13,16,20
  170:4 172:11,16
  180:13 184:20 190:5
  190:10,13 193:18,18
  193:21,24,24,25
  194:3,7 203:21 207:2
  208:3 210:18
accidents 31:11 99:11
  152:16 168:10
acclaim 3:11 110:25
  111:1 112:23 117:6
  117:10
accommodate 73:4
accomplish 202:3,6
accomplished 187:9
account 111:5
accumulating 36:12
  68:16 150:1
accuracy 165:24
accurate 7:10 51:23
  68:7 83:14 84:1 93:25
  220:25
accusation 201:14,16
accusations 94:6
accused 19:1 210:13
accuser 199:13
accusing 201:21 202:4
achieve 77:20 93:20
  110:20 111:11 112:10
  114:12 129:11 137:6
  137:7 146:20 160:21
  176:6 212:23
achieved 138:9
achieving 112:9 136:11
  138:12 178:4
acknowledge 41:21
act 204:5 229:8
acting 214:7 226:8

action 102:2
actions 233:1,12
active 97:14
activities 8:17 36:15
  136:8
activity 9:21 12:23
  13:24 14:11 81:9
  137:9,11
acts 201:11,21
actual 76:15 83:24
  110:15 173:23
ad 107:17 194:20
adamant 129:9
add 155:23 221:11
added 48:10,22 208:14
  220:9
adding 48:21
addition 20:18 141:5
  173:23
additional 21:22 23:15
  82:21 166:3 204:24
  221:14 228:22
additions 54:1,16,17
address 5:20 6:19,21,22
  6:24 24:22 60:19
  225:11 234:14
addressed 28:16
addresses 113:21
addressing 171:6
adequate 138:19 182:18
  190:11 228:8
adjust 176:4 219:7
adjusted 61:21 88:24
  89:1,5 120:17 122:1
  124:15 125:5 126:6
  126:15,25 128:8,15
  128:22 144:20 145:1
  146:25 147:9,16
  148:6 175:23 176:1
  219:4
adjuster 30:11 60:10
  89:4 138:17 148:3
  151:3,20,24 152:23
  153:4 174:7,8,9,22,25
  175:6,6 176:15
  182:14 187:8 193:9
adjusters 152:20
  176:22 180:17 184:18
  186:22 210:21
adjusting 8:14 89:10
  118:23 121:4 132:22
  135:22 145:25 149:25
  175:12 177:9 226:13
adjustment 89:23
admonished 102:8
admonition 78:3 84:14
  102:15
adopt 148:9
adoption 227:11
ads 57:1

advance 21:12 90:15
  138:21 204:22 205:5
advancement 146:15
advantage 28:13 43:18
adversarial 187:19,21
affect 224:4,6,9
afternoon 9:23
age 186:13
agent 220:23
aggravated 186:5
aggressive 10:25 60:15
  60:16,19,24 61:5,6,9
  98:19 106:18 107:20
aggressively 11:1
aggressor 11:2
ago 20:15,18 33:12 47:2
  61:1 148:12 191:8
  225:4
agree 42:13 68:17 127:9
  151:2,23 153:3,15
  166:9 179:13 198:21
  225:25
agreed 7:3
agreement 7:2 106:1
  204:1
agreements 107:4
ahead 33:10 55:15
  62:13 71:10 74:15
  118:15 124:24 141:25
  145:7 154:8 175:20
  216:23
al 67:10 73:22 101:11
  142:10 213:17
alaska 8:12
alerted 18:1
alexander 175:2 176:19
alive 131:4
allegation 196:25
allotted 26:3
allowing 123:11
allstate 1:9 5:12 6:4
  10:24 12:9 13:22
  18:20 29:5 41:7 43:11
  50:4,13 53:3,5 56:16
  57:23 58:22 60:10
  66:6,24 69:8,23 70:13
  72:5 73:22 75:15
  76:15,25 78:2,9 83:5
  84:13,15,17,20 85:1
  86:6 90:13 94:12 98:2
  99:3,8,12,12,23
  100:10,12,16 101:1,3
  101:5,7,24 102:4
  106:22 107:2,22
  109:8,19 110:17
  111:1,3,8,10 112:4,11
  113:13,15 117:10,14
  120:18,24,25 121:9
  121:14 122:8 123:20
  124:1,14 125:4 129:5

129:10,19,23 132:20
  133:19 136:22,25
  138:3,21 139:21,23
  140:6,10,13,14,15
  142:10 145:20 146:13
  146:18 148:25 156:13
  160:3,7,13,19 161:16
  164:2,16,24 165:6
  174:6,8 176:12
  177:19,24 178:6,14
  178:16 179:9,13
  180:17 182:21 184:25
  185:1,6,23 187:17,18
  187:22 190:1,3,12
  191:3,9 196:25
  199:12 201:9,11,11
  201:15,22 202:12,14
  203:6,11,15,21
  204:10 205:9 207:15
  207:19,25 208:13
  209:5 211:6 212:16
  213:17 222:1,3,17,22
  224:10 225:22,25
  226:6 227:7 228:8,14
  228:15,18 229:3,5
  234:10
allstates 53:4 82:11,18
  82:25 83:5 98:17,19
  101:12 108:20,21
  109:17 111:13 112:8
  117:21 128:17 129:8
  129:10,23 131:3
  136:13 138:1,12,14
  139:17 145:16 149:13
  166:24 176:7,9
  180:11 182:24 190:22
  195:3,15 200:15
  201:18 203:19 222:11
  227:10,20
alter 129:7
alternative 44:10 80:12
  183:2
amazed 69:1
amended 122:13
america 112:6
ammunition 102:14
amount 24:13 26:2
  34:20,21,22,23 37:24
  110:16,18,19,21,21
  112:1,2 136:11 138:6
  138:7,13,14,18 162:7
  164:17 165:1,4
  166:20 178:4 184:13
  184:14,22 185:15,18
  185:18 208:7 209:1
amounted 172:5 187:8
amounts 35:6 38:2
  137:8 182:15 205:21
  206:9 208:17,23
  210:7,11,13,24

211:11,16,21 213:16
  214:1 215:5,9 218:16
analysis 7:18,24 8:15
  77:18 89:15 143:16
  181:8,22
analyst 7:14 209:17
  225:18
analyzing 79:2
anchorage 8:12
andrew 161:25 177:8
anecdotal 53:12 214:14
anger 152:20,21
animosities 27:2
animosity 27:13
annual 111:22
annually 60:6
answer 13:8 14:21
  18:18,18 19:3,15,25
  22:21 23:1 24:2,4,5,8
  24:17,18,20 25:17,19
  25:24 26:18,19 34:25
  35:3,7 36:5 46:14
  55:8,8 72:2 74:4
  77:22 80:10,11,12,14
  81:13 87:4 88:3 96:3
  96:4,5 103:21,24
  105:21 107:8,11,21
  107:25 108:18 109:6
  109:10 110:9 113:11
  115:15 116:11 120:8
  120:10 122:7 124:12
  125:17,21 126:19
  127:7,22,24 128:10
  128:11,13,15,23
  130:12 139:12 145:8
  151:5,17 152:13
  155:10,11,12,22
  156:17 157:21 158:4
  159:11,11,19,20
  162:17 164:4 167:24
  168:1,4,7 169:10,24
  171:1 173:4 175:14
  183:12,14,18 184:5
  188:12 192:9 194:12
  208:14 209:9,10,15
  234:11
answered 35:10 124:18
  152:12 155:10 197:20
answering 36:6 87:3
  126:12 129:1 160:11
  169:12 175:16 204:15
  212:24 213:1
answers 27:11 138:23
  183:13 204:17
anticipated 137:17
anxiety 203:10,12,14
anybody 160:1,3,7,13
  215:4,8 217:5,12,18
anyones 77:13
anytime 221:11

**Carroll v. Allstate**          **Gary Fye**          April 2, 2013

anyway 42:15 105:7 128:24 222:19
anyways 25:15
apodaca 151:8,12
apologize 20:12 23:21 29:1,6 78:16 157:9
appalling 225:18
apparently 30:10,16 34:25 49:23 52:17 163:18 166:23 222:2 228:13
appeals 225:1
appear 34:14 42:13 43:9 53:3 223:21,23
appearance 41:13
appearances 2:1
appeared 5:5 18:13 232:9
appearing 6:3
appears 22:19 45:9 54:4 54:13,23 57:22 87:16 96:24 106:22 232:16
applied 131:10 150:17
apply 118:14 131:6 190:20 212:6
applying 138:21 143:9
appreciate 24:23 29:16 38:5 75:4 107:15,17 114:9 123:17 197:25 201:5 221:15
approach 98:19 106:16 129:7 137:5 190:22 229:7
appropriate 211:23
appropriately 203:22
approval 147:6,18 150:25
approve 234:15
approves 147:22
approximately 5:10 17:15,18 55:22,25 73:16,19 88:17,20 115:20,24 127:13,16 141:3 142:4,7 177:3,6 213:11,14 230:6
april 1:15 5:2,9 51:11 90:25 91:9,13 232:6 232:22 234:1,9
arbitrarily 166:20 167:1
arbitrary 138:18
arbitration 163:8,9
archives 57:13
area 64:13 68:2,11,20 69:11 77:10 96:22
arena 7:24
arent 87:6 138:9 220:11
argue 57:17
argument 22:24 220:17
arises 206:21

arising 61:2 66:5
arithmetic 137:3
arizona 151:8,13
arkansas 99:4
arranged 21:4
arrowhead 8:24
art 14:7
article 3:11 116:7 117:6 117:9,13
articles 57:1 229:2
articulate 177:16
articulated 182:21 214:18
aside 27:11
asked 10:8,19 16:7 18:22,22 19:7,25 22:4 22:16,16 24:12,15 26:7,17,20 28:15 31:24 35:9,13 37:7 44:2 46:23 47:2 48:3 50:8 70:18 74:11 79:5 79:6 86:4 106:16 124:18 168:14,17 173:3 183:13,14 191:22 193:23 205:11 207:4 208:20,22
asking 13:20 15:23 16:8 18:16 19:20 22:10 24:16 36:20 37:14,17 70:9 71:2,4,5 74:18 74:24 82:18 83:16 114:18 145:6 156:5 157:10 158:23 161:9 197:19,21 202:8 204:15 209:11 219:9
asks 25:24 26:8 92:4
assembled 9:21
assessment 94:1 102:4
assets 228:23
assignment 89:11
assist 99:9 150:14 212:23
assistance 84:13
assisting 92:1 178:14 218:4
associated 9:19 10:3
assorted 3:8
assume 212:5
assuming 52:8 100:2
assumption 23:11 95:6 133:17 216:12 222:11
assumptions 92:9
assurance 170:6 220:12
assure 150:21 221:8
astonishing 28:11
attached 46:24 179:20
attachments 20:17
attack 100:11,11,11 176:16 209:10
attacking 93:21,22

100:10
attempt 25:11 46:9 77:2 77:12 101:12 102:11 131:2 157:13 159:23 212:22
attempting 17:24
attempts 77:20 208:10
attend 91:24 210:22
attendance 95:22
attendants 91:18
attended 67:19 89:18 91:17 95:17,25 96:10 100:1 194:1
attendees 95:21
attending 214:10
attention 9:2 11:5 27:18 97:20 98:22 109:21 135:19 179:25
attorney 9:12 95:17 98:9,17 138:7 149:7 161:21 163:13 177:25 179:18 180:21 200:5 200:7 208:19 218:23
attorneyclient 179:14 179:21
attorneys 2:4,9 4:1 23:12 50:4 97:10 138:9 152:6 178:4 180:17 181:18 186:23
attributable 202:1
audible 12:1 29:20 173:6
audience 93:14 95:15
audiences 214:17
austin 8:1,4,13,15
authenticating 75:17
author 60:16 62:5,21 141:10
authored 154:12
authoritative 64:12 65:14,19 68:2,11,20 68:24 69:11,17
authorities 199:11
authority 68:9 185:9,14 185:20
authors 60:18 63:16 64:22 65:21
authorship 65:22
auto 98:6 99:10
automobile 222:6
avail 90:13
available 15:6 20:11 21:2 44:11 53:17 56:25 57:2 69:14 112:14 116:16 133:1 133:2,5 150:10 190:8
avenue 2:5
average 112:1 138:5
avoid 74:12 132:9 210:14 227:18

avoidable 199:20
award 186:2
aware 27:9 97:15 114:22 208:20 223:12 225:8,11

**B**

b 60:15 61:4
bachelor 9:9,14
bachelors 9:7
back 13:13 16:12 17:17 18:8,10 19:7 22:16 25:17 26:16 27:15 33:15 35:8 36:9 49:11 51:18,20 55:10,24 61:4 62:11,15 65:24 73:18 75:16,18 80:7 80:25 84:3 88:12,19 115:2,23 122:3 124:8 124:20,23 127:15 135:11,19 142:6 144:24 155:12 157:17 169:22 170:19 173:21 177:5 194:2,6 195:7 196:10 200:3 213:13 214:9 217:25 234:13
backed 122:8
background 19:22 57:19 58:19 88:23 143:15
backslash 86:17
bad 12:5 17:25 62:4,21 186:8
badly 203:20 204:7
bag 215:25
balance 30:8 182:22 208:6
ball 76:19 101:21
bar 92:3,4
barrons 66:15
base 139:20 143:3
based 24:17 25:9 31:18 49:23 84:8 164:1 206:25 218:25
basic 18:16 83:5
basically 8:16 10:11,14 12:4,12 25:16 31:9 33:16,19 59:7 92:5 93:23 111:20,24 114:10 129:14 143:14 151:9 176:10,15 181:22,24 182:25 198:16 209:21 210:10 212:1 214:4 228:20 229:16
basis 44:12 59:7 120:23 166:25 206:8,10,17 206:18 210:8 211:10 227:14 228:5
basketball 188:3

bates 115:5 220:2
bathroom 55:18
beach 106:23
bear 31:20 112:8 135:22 181:7
bearing 21:24
beginning 8:6 73:20 142:8 161:5 180:1 205:23 213:15
behalf 6:4 78:1,17 84:12,25 104:19
behavior 10:17 63:14 118:18 193:11,14 199:14 212:3,4 227:23,23,24
behaviors 112:9 121:1 131:2 136:17 144:15 145:15 146:4,10,11 146:12
belief 210:1
believe 11:22 28:25 38:1,6 39:23 66:25 67:15 87:23 91:7 99:16 139:3,6 141:13 141:16 150:6 151:7 151:12 205:9,10 206:24 226:7
believed 21:17
belingheri 1:25 5:4,18 232:3,23
bench 226:19
benedict 215:23
benefit 15:2 23:4
benefits 11:3 14:5,19 15:5 18:24 22:6 24:16 101:13 136:21 166:4 202:4,24 205:21 207:3,4,6,18 210:16 225:16 226:5
berardinelli 66:18,19 66:20,21 67:4 69:22 75:9,9 100:15
best 21:13 23:24 24:1 24:18 27:19,25 152:17 163:25 164:4 222:14 232:20
bests 59:25 60:2,5,13 61:12
bet 178:5
better 114:12 137:6,6
beyond 226:15 228:23
big 50:19,19
bigger 57:15
bill 33:20,21,24 37:8,8,8 51:10 182:2 207:20 207:24
billing 33:9,13 34:2 37:4,22 107:3
billings 33:4 37:5
bills 51:22 165:20

**Carroll v. Allstate**                **Gary Fye**                **April 2, 2013**

Page 3

171:11,14,17 172:8
206:7,17
**binding** 163:8
**bit** 11:21 54:5 56:3,4
69:5 73:8 77:16 103:6
212:19
**blame** 85:9 198:2
**blaming** 27:5
**blank** 201:17
**blue** 125:22 126:1,3,13
126:18 128:4,7,13,16
128:17,18 132:15
**blundering** 199:25
200:2,15,16,19
201:15,18,22,24
202:5 228:15 229:11
**boat** 70:20 189:21
**bodily** 14:8 182:3 186:3
189:13,19 194:25
**body** 49:10 141:2
**bold** 54:1,9 180:5
**bombarded** 111:10
**bonanza** 5:3,16,18
73:24 142:12 213:19
232:8 234:22
**bones** 186:8,20
**bonus** 117:21,24 118:1
118:3,7,10,13,16
135:2,3,4,6,8,14
**bonuses** 135:10 138:8
146:16,18
**book** 61:16 62:24,25
63:5,9,12 64:3,7,10
64:12,25 65:3,7,9,12
66:7 67:24 68:6 69:6
69:21 70:4,12 75:10
75:12,15,18,23 191:16
**books** 39:25,25 40:3,6,8
40:11,14,17 53:16
87:7
**boss** 118:16,16
**bother** 192:10,12,13,25
193:2,3
**bothered** 192:5
**bothering** 193:11
**bothers** 225:21
**bottom** 9:3 40:25 41:6
41:16 98:22 100:12
111:3 114:13 119:6
136:2 139:1 148:8
180:2
**bought** 208:11 227:17
**box** 18:13 22:15 37:1
49:12,17 52:22,22
**boxes** 9:19 16:8 18:13
19:4,24 20:1 21:19
33:17 36:17,25 49:3,7
49:14 52:20 58:12,14
59:14 79:19 80:1,13
80:15,16 81:8,25 82:1

82:4 83:11 84:6 115:6
155:17 219:25 221:3
221:10
**boxing** 66:18 69:10
**boy** 200:10
**breach** 185:1 203:25
**breached** 203:24
222:18
**breadth** 76:21
**break** 17:16 55:19,23
56:3 88:15,18 115:14
115:21 116:2 126:22
127:11,14 142:5
177:1,4 213:12,23
214:3
**brief** 23:5,14
**briefly** 10:9 30:12
**bring** 21:5 22:2 31:17
40:8 53:7 181:7
188:10 221:16 224:2
**bringing** 201:6
**broad** 71:5,5
**broader** 59:6
**broadly** 76:21
**broke** 214:9
**broken** 186:7,20
**brought** 9:24 21:9,19
27:17 31:16 32:3 33:1
39:6 48:14,18 132:11
197:3 198:17 222:19
**bullet** 180:4,9 185:21
187:16 189:25 196:10
196:17 199:24 200:15
202:10 227:9 228:6
**bunch** 19:9
**bundled** 136:8
**burden** 170:1
**bureau** 89:24
**business** 6:19 76:3
118:15 120:19 129:7
176:7,9,21 178:22
189:9 225:15 226:4
**bye** 29:18

_____
**C**

**c** 61:4,14 91:7
**calculated** 137:1,3
**calculates** 31:10
**california** 8:19,24
149:20
**call** 12:6 18:6 23:22
24:24 28:14 29:16
42:17 49:5 50:5,7
76:5 141:1 157:13
188:5 191:11 210:4
214:17 221:12 229:14
**called** 9:9,10 90:11
110:18 131:8 159:3
159:21 180:3 188:6
208:8

**calling** 17:22 123:19
193:9
**calls** 44:23 59:3 101:1
**calm** 75:7
**calmer** 75:4
**camera** 126:4
**campbell** 66:16 67:1
**candid** 123:8
**cant** 9:25 11:7 25:18
31:3,5 41:18 43:13
44:8 46:14 55:8 59:5
104:16,23 124:6
134:3 148:13 152:5
163:5 176:19,22,23
177:16 192:16 198:10
203:13 211:25 228:24
**capable** 68:25
**capacity** 31:11 43:5
**car** 186:6
**card** 176:21
**care** 166:6 167:11
**career** 219:13
**careful** 26:5 36:11
**carefully** 126:16,17,19
**caring** 158:14
**carriage** 30:16
**carried** 146:4 177:11
181:1 228:3
**carrier** 43:11
**carroll** 1:5,6 5:11,12
6:1 11:11 20:11 23:8
23:10,13 29:24,25
30:7,12,20 38:1 52:12
52:18 53:1 57:24 58:6
60:3,10,19 61:2,22
63:23 64:4 66:8,24
73:22 81:24 105:19
116:6 120:22 121:4
124:15 126:5 131:10
136:18 142:10 143:4
147:5 149:6 153:19
153:19,22,22 154:12
154:12,19,19 156:1,1
156:7,7 157:12,12
158:24 159:1 160:4
160:22 163:10 164:15
165:21 167:6 171:7
171:12 172:6,12,15
186:10 191:7 192:4
192:10,24 193:17
194:23 197:4,12
203:2,4,7,11,16 207:4
213:17 228:4 234:9
**carrolls** 14:1,4,18,24
15:19 17:23 18:24
22:6 24:16 30:24
32:23 33:7 35:6 36:1
38:2,11 54:22 56:10
56:15,21 57:4,7,9
63:6 66:5 80:21 82:10

82:14,19,20,22 83:3
84:12,14,15,25 88:8
100:24 104:19 106:4
118:23 120:17 121:2
121:22 122:1,20,23
124:2 125:5 126:6,15
126:25 127:19 128:8
128:14,22 130:19
132:22 133:13,20,24
134:7 135:23 137:19
144:20 145:2,25
146:25 147:10,16
148:6,15 149:11
150:18 153:12 154:19
155:1,8,19 160:8,14
164:22 165:2,4
166:10,12,14,15,16,23
168:24 169:8 170:17
172:10 173:19 174:23
175:1 176:11 177:20
177:25 178:19 181:15
182:22,23 183:1,21
184:3,20,22 185:5
186:5 187:17 188:9
188:20 189:7,13,19
190:4,9 193:7 195:25
196:9,25 202:17,23
203:16,20,23,24
204:7 206:22 207:19
207:25 208:1,12,18
226:14
**carry** 108:11 176:8
178:8 226:3
**carrying** 147:18,19,20
149:14 158:9 159:21
174:19 178:2,14
179:2,19 227:21
**cart** 220:5,6
**carved** 191:14
**cascade** 167:14
**cascaded** 204:8
**case** 1:8 5:13 9:20 10:3
13:6,10 15:12 19:11
19:15 20:11 23:5,7,8
23:10 28:5,8 32:11,19
33:4,14,15,20,22,25
34:2,16,17 36:2 37:4
37:6,24 38:1,1 40:15
45:10 46:17 52:12,18
52:24 53:1,9,19 57:17
57:18,24,24 58:2,6,8
58:16,16,18,18 67:23
67:10 68:22 69:5 78:4
81:10 85:1 87:24 90:7
90:10,11,13,13 97:12
98:2,5,7 99:4,23
100:6,9,19,21,23
101:9,11,14,15,15,18
101:19 102:1,20
106:7,9,23,24,25

107:2,6,23 108:11,13
108:16 109:3,8,19
120:22 121:9 125:23
136:18 137:20 138:20
139:24 143:5,9 147:5
149:21 150:2,4,8,9,18
150:24 151:7,13
160:18,22 161:22
163:5,10,12,18
165:20 166:6,7 171:9
177:9 178:11 183:3
184:14 186:4 191:5
196:21,24 197:3,20
202:17,17 205:25
206:6,23 211:19,23
212:1,4,8,12 215:16
215:18,22 218:4
219:12 222:19,25
225:1,6,11 226:7,17
228:2,4 229:3,13
**cases** 26:25 29:4 53:19
58:12 67:9 69:5,8,25
78:1 83:15 97:8,8,9
97:21,23 101:16
111:25 132:20 136:20
137:18 138:6 150:19
151:13 163:3 222:22
228:16
**cast** 85:9 99:12 151:9
204:11 207:7 208:5
**casualty** 1:9 5:13 6:4
73:22 142:10 213:17
**categories** 54:16 114:8
163:4 207:16
**categorize** 77:13 161:15
186:11
**categorized** 176:20
**category** 53:16 100:25
162:6 163:4,8,10
**caught** 215:24
**cause** 184:14
**caused** 27:7 180:13
184:25 203:12
**causes** 203:10,14
**causing** 27:14
**caustic** 27:3,7 28:21
**caution** 106:15 132:2
**ccpr** 3:12 119:11,14
122:13,19,22 123:1
124:15 125:4,7,8
128:3,5,20,21 132:11
132:16,22 133:7
136:5 140:6 141:6,11
143:20 147:20 149:13
198:17,18 202:6
229:6
**ccr** 1:25 232:23
**cd** 20:15
**center** 89:24 150:9
186:7

**Carroll v. Allstate**                    **Gary Fye**                    **April 2, 2013**

Page 4

centers 106:22 108:25
    109:8
certain 27:2 72:12
    75:10,11,24 95:6
    113:16
certainly 47:6 69:9 93:8
    124:18 132:23,25
certified 5:19 232:14
certify 220:24 232:5
cetera 24:1
chain 220:16,17 223:7
chair 152:7
chance 87:4
chances 186:13
change 120:23 141:24
    176:23,23 213:6
    234:11
changed 113:15 229:7
changes 114:19,20,22
changing 113:10 148:11
characterization
    128:12
characterize 114:8
    191:25
characterized 159:24
characterizing 193:10
charge 32:14 33:12,14
charged 32:19 33:7
    35:20
charges 34:14,23
charging 32:10
chart 93:14 95:15
check 24:7,14 39:1
    132:6 223:7
checked 48:23
checking 23:25 24:3,4,6
    24:10,15,19
choose 234:16
chop 65:16
chose 42:15 43:12
chosen 174:17
circular 84:16
circumstances 89:7
    99:11 184:19 186:4
    193:13
cite 89:6 150:7
cited 150:25
cities 8:7
citing 151:7
civil 233:2
claim 7:13,24 8:15 9:21
    12:12,13,20,21,22
    14:10,11 15:1,21
    18:11,21 31:25,25
    32:2,4 53:8 57:13
    60:10,20 61:2,22
    62:13 63:6 64:20
    65:22 66:5,24 68:7
    69:20 77:9,10,11,14
    79:2 81:9,24 82:17,23

82:24 84:17 86:6
    88:24 89:2,5 91:14
    92:1,2 93:11,15,18,20
    93:21,23,24 94:1
    97:11,18 101:12,13
    103:17 108:7 109:11
    109:16 110:15 112:8
    116:6 118:16,18,18
    119:21,22 120:17,20
    121:4,7,11,14 122:20
    122:23 123:20,25
    124:4,15 125:8
    126:25 128:8,14
    129:3,11 130:22
    131:2,4,6,7,10 132:9
    133:2,6,7,10,12,13
    135:23 136:4,7
    138:22 143:10,15
    145:6,13,15,17 147:1
    147:10,16 148:9,15
    149:6 150:15 151:25
    152:17 156:14 159:1
    160:4,21 161:16
    163:13,15 164:16
    166:21 167:6 173:24
    173:24 174:7,8,10
    175:24 176:2,4,13,20
    176:22 177:10,12,23
    178:7,7,20 179:19
    180:18,21 181:4,19
    181:20,23,24 182:5,8
    182:14,18 183:23,25
    184:2,4,8,10,12,18,21
    184:22 185:10,24
    186:3,19 187:18,21
    189:5,7,13,19 190:4
    191:10,12 193:12
    197:1,17 198:6,17
    202:18 203:7,9,11,13
    203:16,16 204:5
    207:8,8,9,15 208:7
    209:17,18,20 210:21
    210:21,21 211:4
    214:13 219:3,8
    221:25 222:12,17
    225:18 226:13,14
    227:11,22,23 228:9
    228:10,12 229:2
claimant 186:3
claimed 65:4
claiming 70:13 196:12
    196:18
claims 7:13,18 8:13
    14:12 53:13 60:9
    61:15,25 63:25 64:21
    65:2,11,20,25 66:14
    68:2,10,12,21 69:12
    76:21 84:14 89:7,9,11
    89:19,19 90:21,23
    91:11,14 92:2 96:21

100:25 102:3 108:17
    109:1,5 110:13,20
    112:7 113:12 114:12
    117:7 118:23 120:19
    122:1,19 124:2 125:5
    126:6,15 127:19
    128:14,22 129:6,8,23
    132:22 133:20,20,24
    134:7 136:14,15
    144:13,20 145:2,25
    146:3 148:6 149:11
    150:3,17 153:14,20
    154:14,21 155:9,20
    156:2,8 157:14 160:8
    160:14 164:22,23
    166:10,12,14 167:1
    167:18 173:20 174:10
    174:22,23,25 175:1
    176:5,18 178:16,18
    179:2,22 180:15,16
    181:7,8,9,11,15,17,18
    181:21 182:17 183:21
    184:3,18 187:12,22
    188:9,20 190:19
    196:13,19,20 197:16
    198:5,10,13 199:5,10
    202:22 205:19 206:18
    206:20,22 207:3,16
    209:7,8,12,13 211:24
    212:13 215:21 217:16
    217:19 222:6,14
    225:3,24 227:13,20
    228:18 229:8,17
clarified 85:5
clarify 15:10 85:6
    112:18 143:21
class 102:2
clear 24:7 25:13 28:20
    54:11 97:16 162:19
    166:19 170:22 186:4
    214:19 227:22 229:18
clearer 155:21
clearly 78:6 162:2
    228:16
client 140:25 209:11
clients 85:4 210:24
climbing 30:8
clinic 99:9
close 36:16 45:22
    101:22 107:5 151:6
closed 33:15,20 37:4,6
    186:21
coffee 55:17
cohen 110:25
coherence 91:11
cold 204:19
collection 48:11 53:5,6
    139:18
college 187:11,13
collision 186:20

color 51:12
colorado 1:2 5:15 6:2
    88:24 89:1,5,9,14,14
    89:17 90:1,16,20,22
    90:23 91:2,3 92:17,18
    93:7,15 94:21 101:18
    101:22 108:16,22,23
    109:1,4,8,11,16,19
    122:19,25 150:4,7,20
    150:24 151:7,13
    204:5 205:20 206:9
    209:8,13,20,22 210:6
    210:9,25 211:2,3,7,13
    211:15,19 212:9
    213:25,25 214:3
    215:18,20 216:8
    217:3,16,19 218:13
    218:15,23 219:1,4,8
    224:25 227:13 229:12
    229:12,13 230:4
colors 52:2
colossus 102:10,12,18
    102:18 104:9,12
    105:9,19 106:2,8,18
column 117:23
combination 99:17
come 27:15 43:8 51:2
    83:17 107:5 151:6
    170:15
comes 215:9
coming 196:10 206:7
comment 23:4 188:13
    198:18
commentary 59:10
    196:4
comments 31:19 59:8
    113:12 121:13 228:2
commits 188:4
communicate 153:4
    166:15
communicating 49:24
communication 78:21
    154:18 166:22
communications
    160:12
companies 27:1 77:9
    93:11 94:10 149:23
    199:12,16 210:12
    213:25 214:1,7
    215:20 218:14,14
    229:14
company 1:9 5:13 6:4
    7:14 10:11 11:4,6
    27:1 29:5 53:8,12
    69:14,20 73:23 77:11
    77:15 78:5,7 97:24
    110:14,18 121:18
    129:16,17,20 142:11
    147:22 150:12 151:10
    178:22 199:4,8 207:7

207:15 210:15,15,23
    211:1,24 212:3,21
    213:18 219:7,11
    228:21,24 229:5,16
    229:18,19
companys 58:22 111:3
    147:19
companywide 111:6
compared 110:15 180:7
compelling 210:25
compensation 109:24
    110:3 113:15,18
    116:5,23 118:22
    134:11,14,17,20,23
    141:18 142:17 143:1
    143:4,17,23 144:19
    145:1 146:1,25 147:7
    147:9,16,22 149:5,11
competent 218:23
competitive 143:18
complain 10:25
complainers 204:11
complaining 10:21
    193:13
complaint 85:3,21 86:5
    86:11,12,18,20 87:1
    87:14,17 88:5,9 105:3
    156:10 188:25
complete 20:16 21:24
    62:6 70:4 85:13 89:12
    136:9 183:13
completely 19:15 50:25
    69:17 129:5
completion 134:8
complex 19:11
complicated 110:9
complied 39:21
comprise 140:20 141:2
    141:8,11 144:9
comprised 47:5
compromised 72:19,21
computer 105:24
computerized 76:20
concern 12:2 228:9
concerned 103:5 199:5
    199:8,16,20,22
concerning 12:2 30:4
    102:12 115:15 116:22
    134:7 157:13 160:5
    164:2 167:25 168:23
    169:2
concluded 230:7
concludes 229:25
conclusion 12:9
concomitant 170:6
condition 29:23,24
conduct 17:4,5 203:12
    203:19 225:15 226:4
conducted 218:13
conducting 176:9

**Carroll v. Allstate**  **Gary Fye**  **April 2, 2013**

Page 5

conducts 120:19
conference 49:4,16
  96:12
confidential 70:14
  222:3
confidentiality 103:10
  107:4
confirm 220:4
confirmed 23:9
conflict 203:10,12,14
  212:19
conform 130:23 178:17
confusing 114:3
connection 67:7 89:7
  90:7 92:10,12 142:25
  149:5
consequences 15:7
  150:16 167:13,13,19
  168:24 169:2 170:2,5
  170:9,11,16 180:13
  186:8,14,24 190:9,17
  208:3 210:18 227:17
consider 44:12 53:14
  64:12 65:14 68:1,7,11
  68:19,23,24 69:10
  79:3 120:21 209:7,12
consideration 36:14
  110:13,22
considered 42:9 53:16
  54:18,22 56:6 121:3
  132:21 133:1,4
considering 104:18
consistent 146:12
consistently 136:10
  137:5
consisting 232:17
consists 135:20
constantly 43:10
constituted 177:9
constitutes 147:15
  228:14
consultant 70:1 96:21
  129:21 138:18 175:5
consulted 79:2
consulting 7:19 67:20
  76:3 92:12
consume 36:15
consumer 97:10 112:5
  210:21
consumers 92:13
contact 221:13
contain 70:4 88:2
  118:25 220:5
contained 49:13 81:8
containing 47:4
contains 69:17
content 83:12
contentious 20:2
contest 19:2
context 50:21 57:21

67:18,24 97:8 121:11
  153:16 179:17,17
  188:1,3 196:22
  197:17 198:18 201:8
  202:7,9 215:16 225:5
  229:15
continue 121:10 137:13
  204:8 205:1
continued 146:15
continuing 121:9 124:1
  132:20
contract 170:7 182:1,2
  182:2 185:1,5 203:23
  203:24
contributions 111:4
control 136:16 186:6
convenience 21:7 53:7
conversation 30:17
  64:23 190:6 217:24
cooperate 50:23 151:3
  151:24 152:1,8,23
cooperating 50:21
cooperation 152:18
cooperative 50:25
copied 11:18 48:14 49:9
  51:3,13,14 52:3,6,16
  132:4 221:17
copies 38:20 51:13
  132:7 220:5 223:8
copy 7:7 20:16 21:2
  39:24 40:2,6 43:10,10
  45:9,21,23 46:4 49:22
  50:18 51:9,12 74:9
  76:3,6 90:3,14 115:4
  115:11,12 131:13
  132:5 140:24 220:19
  220:24,25,25 221:4
  222:4 224:8,15
  226:24 227:3 230:1
copying 9:22 39:25 48:8
  48:24 50:14,17 51:25
  221:1,14
core 125:8 129:3 131:4
  143:10 197:17 198:6
  198:10
corporation 201:20
corporations 145:11
corrao 2:15,15 5:19,20
  74:1 142:14 213:21
correct 16:25 31:21
  41:4,9,25 42:10 45:25
  46:18 54:7,14,18,24
  56:7,10,13,16,18,23
  57:4,5 63:15 67:5
  74:14 75:21,24,25
  76:10 78:9 79:13,14
  84:21 91:8 106:10
  124:16 125:1 153:14
  164:13 168:16,20,21
  172:21 174:10,23

185:8,11 186:18
  187:1 197:13,14
  199:17 201:12,19
  216:19 232:18
correcting 98:24
correction 234:12
corrections 4:1 234:12
correctly 90:9 189:8
corresponded 67:21
correspondence 9:11
  9:20 39:4 49:17 56:7
  56:9 79:12,21 80:1,21
  80:23 81:5,7,12,23
  82:5,9 84:8 153:18
  156:16 158:9 207:6
  223:5 224:11,12,16
cost 94:1 129:19 136:16
  167:12 170:11 172:5
couldnt 32:1 41:24
  101:21
counsel 5:22,23 7:2
  22:9 23:9,10,22 26:23
  27:7,14 41:7 74:3
  78:25 86:19 97:2,3
  100:14 131:3 138:3,4
  178:1 233:6
count 52:1,22 57:11,11
counter 188:21
counterpart 150:4
country 97:14 108:21
  138:22
county 232:2,4
couple 32:4 49:15 93:10
  186:9,11,20 220:14
  221:18
course 9:11 13:21 23:12
  26:1 52:14 55:4 58:6
  67:17 69:4 70:6
  108:18,19,22 112:5
  137:7,19 163:2 170:1
  187:4 191:21 199:18
  201:4 202:15 203:17
  205:15 208:18 212:4
courses 89:16,19
  187:13
court 1:1 5:15,17,19 6:6
  17:19 18:1 19:8 20:4
  20:6 23:3,17 24:24
  25:2,21 26:22 27:15
  28:11,13,20,23,24
  29:13,17 31:20 55:3
  55:13 70:16,17 71:7
  71:20,23 72:4,22 73:8
  74:4,18,24 76:1 77:2
  85:18 87:25 88:1
  95:24 123:17 129:24
  130:8 149:22 150:21
  152:8 156:10 158:21
  212:9,17 213:2
  218:11 224:25 225:20

226:17,19 232:14
courtesy 123:11,13
  192:5 193:5
courts 50:21
covenant 204:3
cover 19:10 112:24
coverage 10:12 14:8
  22:6 149:25 172:2
  178:9,9,11,15 180:11
  180:19,25 181:5,25
  182:1,4,12,17,22
  184:15,16 185:4
  187:17 190:7,8,11,14
  190:20 203:22 206:20
  208:7,8,9,11 212:23
coverages 10:16 101:17
  108:11 150:10 178:24
  184:23 190:24 202:25
  204:10 207:12,21
  208:1,2 211:24
  228:11 229:4
cpr 187:6
create 15:11 69:20
  120:24 225:13
created 139:15 163:23
  164:1,9
creating 74:5 167:11
  207:16
crimes 202:4
criteria 151:9
criterion 151:9
criticism 18:19 147:4,5
crucial 120:22 136:3
culture 58:23 111:9
  129:23
current 121:9 210:3
  215:8
curriculum 7:8 94:8
custody 220:16,17
customer 222:8,12
customers 222:13,15
cv 3:8 7:1,9 8:5 9:3

**D**

d 3:1 62:4
damaged 99:12
damages 62:4,21 163:6
  178:12 180:14 182:11
  182:13,15 185:2,23
  186:2 204:1
data 53:15 54:18,21
  56:5 79:11
date 5:9 10:20 13:1
  31:17 45:15,19 66:2
  83:12,20,22,22,24,24
  87:1,11,12,17 94:22
  101:17 125:25 163:19
  163:21 164:8 202:25
  223:16,17 233:4
  234:17

dated 18:8,10 40:24
  46:17 51:10 56:5
  128:19 193:1 194:23
  197:22 232:21
dates 87:8,10,13 88:3
  154:22
david 2:15 5:19 74:1
  100:15 142:14 213:21
day 5:2,3 19:19 49:5
  192:2 193:17,20,23
  193:23,24,25 194:6,6
  205:1 231:9 232:6,7
  232:21 234:9
days 9:10 202:21
  234:17
deal 50:19,20 69:17
  176:12,12 177:25
dealing 10:10 36:21
  43:5 132:2 168:12,15
  168:19 204:3 214:5
deals 107:1
dealt 186:25
dear 234:6
deceive 71:7
deceived 131:4 135:7
deceiving 129:24 130:7
december 87:1,12,13,18
  91:1 92:25 106:21
decide 55:17 62:8
  145:18
decided 100:6
decides 229:18
decision 150:25 214:4
  225:19,21
decisions 225:23
deemed 104:13
defamation 99:17
default 137:23,23,23,24
  137:25 153:25 159:23
  182:25,25 183:4
  185:15,16,17
defend 66:17 68:19
  148:25 163:5,6
defendant 2:9 5:13 60:8
  107:2
defendants 1:10 144:16
defended 162:6 163:6
defending 90:12 178:14
defense 91:19 92:3,3,6
  92:8,9,10,15,17,20
  93:3,4,5,7 94:15 95:5
definitions 137:22
  162:10 163:1
deflect 11:5
degree 9:3,4,8 90:4
delay 66:17 68:19 73:7
  73:10 84:19 101:13
  150:12 173:19 200:15
  201:18
delaying 84:17,17

Carroll v. Allstate | Gary Fye | April 2, 2013

Page 6

**deliberate** 124:3 198:9
**deliberately** 70:8
123:10
**deliver** 74:14
**delivered** 51:15 52:17
230:2
**delve** 213:3
**demand** 14:6,9,9,13
15:11,20 206:7 208:6
**demanding** 14:1,4,19
15:3 18:24 74:8
**demeanor** 191:25 228:2
**demerits** 181:21
**denial** 149:24 152:19,21
**dense** 33:18 37:2
**denver** 2:11 39:25 40:1
89:20,25 94:21,24
230:4
**deny** 66:17 68:19
**department** 177:23
184:10
**depending** 34:15 37:24
172:3
**depends** 147:22
**deponent** 26:4
**deposed** 13:6 232:11
**deposit** 33:25
**deposition** 1:14 5:10,16
9:18,24 13:10 16:21
17:4,5,24 18:9,12,16
18:18 19:10,23 22:22
23:15 25:23 26:3,4,20
27:7,9,12,16,20 28:17
32:6,20 34:14 37:22
38:17 42:8,13 43:6,14
49:12 51:9 58:1,24
65:4 73:14,21,24 74:9
74:15 75:7 85:16
98:11,20,21 100:14
102:23 103:17 107:18
107:20,20,22 108:2
108:13,15 109:11,16
127:21 142:2,9,12
165:12 176:10 194:22
197:11,12 200:25
205:4,12 212:25
213:9,16,19 215:10
215:12 230:1,7
232:13,19 233:1,8
234:8,18
**depositions** 9:20 23:8
27:3 49:2 50:14 81:9
100:3 167:2,3 171:5
198:22
**deriving** 170:9
**described** 111:2
**describes** 123:20
137:19,21
**description** 3:7
**deserve** 123:13

**deserved** 107:19
**design** 145:17
**designed** 98:19 122:10
129:21 130:21 136:7
145:15 189:5,9
**destroy** 130:25
**determination** 38:10
138:15
**determine** 37:1
**determined** 166:18
189:6
**detriment** 227:24
**develop** 27:3 152:20
**developed** 170:10,13
**developing** 74:13
**development** 111:21
146:8 149:12
**deviation** 112:1,2 138:5
**devices** 176:11
**devoted** 65:21
**diary** 12:22 15:21
**dick** 197:8
**dictionary** 66:15
**didnt** 11:18 16:18 19:5
21:10,25 22:1 25:14
31:24 34:25 42:3,4,5
42:21,22 43:6,25 44:5
44:5 48:1,3 49:16
52:13 57:24 75:14
81:15 84:15 85:6,17
96:4 102:25 105:8
106:13,14 107:8
111:7 139:12 140:9
142:22 145:9 153:11
166:15 169:14 172:13
181:5 188:5 195:20
207:25 214:25 219:11
223:25
**diego** 11:2
**difference** 53:23 202:20
**different** 59:19 92:6
107:24 113:19 128:23
144:15 153:16 162:22
206:14
**differently** 56:3
**difficult** 33:19 69:18
179:22
**difficulties** 30:13,24
**difficulty** 10:10
**diligent** 131:2 170:8
**dire** 210:17
**direct** 97:20 108:23
117:20 118:20 121:20
146:24 147:8,15
148:5 179:25 181:4
**directing** 98:22,24,25
109:21 135:19
**direction** 16:20 233:6
**directly** 12:17 109:20
166:7 208:25

**disagree** 128:12 211:8
225:19
**disagreeing** 225:20
**disagreement** 214:6
**disapproval** 228:3
**disarray** 49:4
**disc** 47:4 73:14,20
142:2,8 213:9,15
230:2
**discipline** 210:15
**disclosed** 72:6 78:18
165:19
**disclosure** 46:10 53:4
56:15 165:25 171:8
172:7
**disclosures** 21:22 31:17
56:12 57:23 133:18
221:22 224:2,3,20
**discovery** 98:21 102:23
103:17 104:4,23
222:22
**discrete** 190:19 202:22
206:20,22
**discs** 230:4
**discuss** 16:24 17:3,4
95:22 102:8 103:4
106:25 191:11 195:22
204:24
**discussed** 10:17 25:9
28:19 29:23 30:4,12
39:24 94:10,12
100:15 117:5 142:25
218:4
**discusses** 69:18 149:5
**discussing** 95:16 103:5
143:10 182:25
**discussion** 30:22 73:17
**discussions** 214:16
**disingenuous** 55:2,13
58:7 62:12 70:8,11
71:3 86:1 98:15
**disingenuously** 57:17
79:16
**disloyal** 121:10
**dispense** 70:25
**displayed** 162:2
**dispute** 22:13 101:3
**disputes** 66:14 68:10
**disqualification** 78:25
**distress** 227:19
**district** 1:1,2 5:15,15
87:25 212:8,9
**disturbing** 12:13
**doctor** 186:17,18 187:1
**doctors** 11:17 197:16
**document** 21:5 25:4
34:19 35:2 37:14
41:14 49:8,18 50:3,5
51:1 52:1,6 57:11,20
59:2,5 74:7 82:2 88:2

90:14 110:10 111:18
112:20,23 120:11,25
121:12,15 129:2
136:24 138:24,25
139:2,4,5,7,9,15
141:14,17,19 143:3
148:12 149:4,10
162:7,15 163:19,21
163:23 164:1,8,9,13
165:14 171:8 173:8
173:11,14 185:17
191:4 220:21 221:13
222:4,19,21 223:4
224:1 226:22
**documentary** 116:3
144:18,22
**documentation** 36:4,11
82:3 84:18 126:1
**documents** 3:8 10:21
16:8,19 18:3,8,13
19:14,21,25 20:1
23:16,25 24:3,4,6,8
24:10,14,15,19,25
25:5,6,14,19,25 26:1
26:9 31:15 32:7,25
33:17 36:12,18,25
37:18 38:18 39:9,13
40:5 41:17,23,24 42:2
42:5,19 43:11,23,24
44:14 46:25 47:3,8
48:4,7,8,10,12,13,14
48:24,25 49:6,25 50:9
50:14,18 51:1,2,15,17
52:7,16,23,25 53:2,4
53:10 57:13,15,16,16
57:23 58:5,12,18,19
59:9,12 70:14 75:11
75:15,19,23 76:12,14
78:21 79:20 82:4
83:10,11,15 84:7
91:15 101:8 111:9,12
111:15,19 112:3,5,6
112:12,13,14,17
115:8,10 116:13,19
118:25 121:16 123:18
131:1,16 139:17,19
140:5,14,15,17,18,22
140:23,25 141:4
143:23 144:4,6,7,8
149:13,15 154:22
155:17,17 160:5,10
160:18 161:19 163:15
172:25 177:17 219:25
220:2,3,4,18,22 221:3
221:4,8,16,25 223:25
**dodson** 99:2,3,12,21
100:6
**doesnt** 24:18 33:11
50:22 53:8 74:21
78:18 112:13 125:19

182:4 191:15 192:9
192:19 202:20 224:4
224:6 227:11 229:8
**doing** 8:14 15:14 16:25
43:13,13,15 72:5
74:21 85:9 88:4
115:13 136:24 143:15
147:23 149:8 174:11
191:8 211:25 212:3
226:6,8
**dollar** 112:1 138:5
**dollars** 34:15 37:23
129:20 166:3
**domiciled** 89:13
**dont** 7:15 8:4 9:16 13:2
13:8,10 14:3,8,13,21
17:11 19:12,18 20:3
21:15 22:24 27:8
28:25 29:1,1 31:13,20
32:8 33:20,23,24 34:4
34:13,13,18 35:11
36:19,21 37:5 38:4,8
38:12 40:2,6 41:10
42:10,23 43:1,1,5
44:24 45:15 46:8,11
46:11,19,21 48:16,20
48:22 50:24 51:20
52:19 55:6 57:10
58:15 61:1 62:1 63:3
64:18 66:2,7 67:14
68:8,17,18 70:3,3,17
70:22,24 71:9,15,20
71:22,25 72:1,8,8,19
74:13,17 75:13 76:13
77:8 78:3,16 80:14
83:3,11,14,18,25 85:2
86:8 88:4 89:21 90:18
91:13 92:3,23 93:8,9
93:11 94:11,13,14,17
94:19,25 95:21 97:4,6
100:19 101:16,20,20
101:20 102:20,21,22
103:3,3,9 104:2,3,19
105:3,10,14,16 106:1
106:25 107:4 112:12
112:13,25 114:20
115:2,5,7,11 117:16
118:7,11 119:7,7,18
120:1,3 121:12,22
122:17,21,24 123:1
123:13,17 124:14
127:3,21 131:3 132:7
132:25 133:14,22
134:1,10,10,25 135:5
135:7,18 139:11,25
141:15 145:3,20
146:16,21 147:17
148:3 150:7 151:1,6,6
153:15 154:15,17,24
154:25 155:2,4,21,25

Carroll v. Allstate                          Gary Fye                          April 2, 2013

Page 7

156:15,17,23,25
157:21 158:4,17,18
159:4 160:12,13
161:15,15 164:3,17
165:18 172:9 173:9
173:12 175:14,16,18
176:14 178:6 185:6
185:18,18,19,19
186:10 188:13,13,16
189:4,4 191:24
192:17 194:8,12
196:1 198:1 202:23
202:24 205:3,5,11,14
205:15 207:1,17,22
208:15,24 209:3,6,10
210:12 211:14 213:2
215:13,23 216:6,11
216:11,20 217:4,20
217:25 218:3,21
219:18 220:11,17
223:3,7,11 224:8
225:20,25 226:7
**doover** 51:19
**double** 212:2,2
**doubt** 51:14 52:5,16
68:18 118:7 165:24
171:10 175:8
**dozen** 97:9
**dr** 68:24 99:12
**draconian** 198:17
**draw** 15:10 95:16
**drive** 101:21
**driver** 180:13 228:22,22
**duces** 41:21,22 47:20
**duck** 150:7
**duly** 6:10 232:9
**duplicating** 3:10 51:8
**duration** 167:18
**duties** 222:12
**duty** 202:11,12,14
212:12 225:2,9,16
**dynamic** 48:21

**E**

**e** 1:25 3:1 5:4 97:21
232:3,23
**ea** 110:15
**earlier** 50:9,11,12 98:10
163:2
**early** 50:1 63:4 155:1
**earning** 31:11
**earnings** 167:6 172:11
172:16,18 196:9
**easel** 95:15
**easy** 50:18 72:11 107:11
**eating** 121:6
**economic** 135:5 168:23
169:3 170:17 171:2
180:12 190:9 208:2
227:24

**economist** 31:9
**eddington** 23:6,9 85:24
86:18,19 153:23
156:9
**edit** 104:17 105:5
**editing** 104:23
**edition** 64:1 65:12,18
65:19,25 66:4
**editions** 68:13
**education** 210:3
**educational** 89:24
**effect** 31:10 40:7 41:20
69:14 116:5 121:25
122:18,23 126:5,9,11
126:13,14,20 128:1,2
128:7,13,21 132:17
172:3 176:17 220:22
**effective** 148:11
**effects** 171:22
**efficient** 36:23 58:11
**efficiently** 27:12,25
**effort** 175:12 178:7,8
181:4
**efforts** 178:20
**egan** 149:18,19,20,22
150:5,11,25 151:8,13
**egregious** 188:24
**eight** 98:23 99:20
101:23 138:3 143:11
**either** 12:14 20:25
29:24 71:22 92:2
94:19 104:4 140:16
153:19 158:10 166:23
175:8 190:18 214:12
234:11
**electronic** 44:24 47:3,7
47:13 86:16
**electronically** 44:4,15
**element** 117:19
**elements** 163:16 182:12
228:12
**elicit** 84:13 102:11
103:8 104:8 105:20
105:24
**eliciting** 102:6
**eligible** 117:21,24 118:2
118:5,7,10,14
**eloquently** 129:12
**email** 25:3 38:24 39:3
40:25 41:3 48:1 79:13
154:16,18 155:8,19
192:14 193:4 223:6
**emails** 3:9 40:23 44:17
44:18 47:6 134:6,10
**emergency** 197:5
**emotional** 22:20 227:19
**emphasize** 121:17
**employed** 89:4
**employee** 111:4 137:4
146:13

**employees** 111:3,5,22
114:5,11 117:15,24
118:2 119:22 145:12
146:19,21 201:11,21
**employment** 111:8
146:15
**enable** 208:1 210:5
**enclose** 41:17
**enclosed** 53:4 234:8,13
**enclosure** 117:1 141:21
144:3
**encompass** 79:3
**encompasses** 11:8
82:13
**encountered** 18:7
**encourage** 27:10 28:1
**endlessly** 10:15
**engage** 22:23 82:22
83:16 84:15 229:14
**engaged** 59:10 78:4
82:17 83:18 200:1,19
203:11
**engagements** 97:6,13
**engaging** 19:2 62:7
201:22
**englewood** 2:6
**enjoyed** 97:17
**enlisted** 180:17,21
**entered** 203:23
**entire** 20:20 21:2,10,19
42:13 57:8 69:19
107:18 140:23
**entitled** 112:23 113:4
179:13 232:12
**entries** 177:15
**entry** 10:8 11:25 12:4,6
12:11,13,14,19 13:1
13:12,24 14:2,5,20
15:21 18:20,25 99:2
101:24
**envelope** 234:14
**environment** 63:25
65:2,11,20,23,25
66:13 67:25 68:4
136:9
**envision** 134:3
**episode** 105:2
**error** 202:1
**esq** 2:5,10
**essentially** 93:25 138:18
**establish** 25:22
**established** 59:5 89:24
99:8
**estimate** 32:18 138:16
163:25
**estrella** 18:20 173:13
**et** 24:1 67:9 73:22
101:11 142:10 213:17
**ethic** 68:18
**evading** 44:7

**evaluate** 181:6
**evaluated** 110:16,18
111:25 112:2 136:11
137:8 138:6,7,13,14
164:22 178:4 185:14
189:12,18
**evaluating** 89:12 112:7
**evaluation** 110:17
138:17 160:18 175:5
175:19
**evaluations** 82:19
111:22
**evasive** 83:1
**event** 234:17
**eventually** 27:14
**everett** 8:9
**everybody** 179:16
**everyones** 199:14
**evidence** 93:22 102:11
144:18,22 145:21,23
146:16 167:23 168:23
169:2 170:16 173:18
179:6 181:9,10,12,15
183:20,22,24 184:1,7
184:8,9,9,11 188:11
214:14
**evidentiary** 103:19
**evocative** 192:8,8
**evolution** 58:22
**exactly** 10:22 28:18
35:20 72:18 86:24
164:17 180:24 198:11
207:5
**examination** 3:3 6:13
197:2,8
**examinations** 196:7
**examined** 6:11
**example** 32:12 54:13
57:22 131:7 168:18
207:14 227:22 229:11
**examples** 57:2 143:19
146:6 149:16 168:14
168:17
**exceed** 190:14
**exceeds** 222:13
**exceptionally** 51:23
**exchange** 22:8,18
178:23 182:23
**exchanges** 25:3 27:16
**excluding** 32:19
**excuse** 30:7 62:17 71:12
76:7 90:18 138:2
217:11
**exercise** 10:15 205:3
**exfarmers** 215:6
**exhibit** 3:8,8,9,9,10,10
3:11,12 7:2,3,4,7
38:14,17 40:19,22
41:16 42:19,25 43:23
45:2,3,5,8,17 46:24

46:25,25 47:5,8 48:7
48:12,19 49:13 51:6,9
54:3 79:10 85:16,16
91:7 97:21 109:22
111:10 114:24 115:14
116:23,24 117:5,17
117:22 119:1,3,6,9
120:7,16 121:4,25
129:4 131:12 135:19
135:20,21 139:22
140:20 141:2,8,11
142:20,20,25,25
143:12,15,25 144:9
149:1 165:12 171:17
188:22,23,23 191:6
194:22 227:6,7
**exhibited** 145:14
**exhibits** 3:7 53:5,6
95:16 115:22 227:5,7
**exist** 125:13 130:18
**existed** 141:7 145:20
**exists** 123:21
**expanded** 54:5
**expect** 148:10
**expectations** 222:13
**expected** 166:23
**expedite** 47:22 48:4
**expense** 20:20 40:1
166:8 167:21
**expenses** 165:2,5 166:2
167:8 171:8,20
**experience** 112:7
161:14 171:14 210:2
**experienced** 30:20
209:22
**expert** 3:9,10 7:19
17:25 26:24 27:24
29:4 31:10 70:1 209:7
209:12,19 210:1,2,5
**expertise** 163:22 164:2
171:3 181:7
**experts** 79:1 105:21
214:15
**explain** 21:18 33:9
58:22 72:9 129:13
131:1 136:4 139:18
152:8 156:24 161:19
181:15 194:12 207:25
227:15
**explained** 129:12
**explaining** 82:21 190:7
**explains** 121:1 129:5,14
136:4
**explanation** 72:25 73:2
120:23 131:5 137:24
143:13
**exploration** 138:19
**expositor** 68:25
**exposure** 97:9
**exposures** 150:13

Carroll v. Allstate                                    Gary Fye                                    April 2, 2013

Page 8

express 228:3
expressed 18:19 30:21
  104:11 178:19
expressing 214:6
expression 82:19
  161:17 181:19
extension 9:4,15
extent 23:20 25:23
  170:12 190:10,15
  221:2
extinguish 182:22
  184:15
extinguishment 178:23
  208:6
extort 101:13
extra 49:15
extremities 30:14
extremity 30:19

_____

**F**

f 46:25 47:5,8 48:7,12
  48:19 49:13 111:10
  117:1 141:22 143:12
  144:3,9 227:6,7
facsimiles 75:19,22,23
fact 20:24 22:5 23:14
  37:10 41:24 58:17
  92:8 118:21 145:17
  185:13 192:24 211:22
factor 179:1
facts 149:24,24 150:1,3
  166:17 170:9 181:6
  181:23
factual 41:17 42:1
  44:11 88:7 166:25
factually 42:9,10
failed 181:3 184:17
  207:24
fair 77:20 138:15
  178:25 188:7 204:3,5
  214:4 229:17
fairly 123:24,24 228:16
fairminded 212:21
fairness 96:2
faith 12:5 17:25 60:15
  60:17,19,24 61:5,6,9
  62:4,22 204:3 212:12
  214:4
fall 137:18 221:1
familiar 90:1 212:7,11
  212:15 224:25 225:4
familiarity 90:4
far 17:4 32:19 34:10
  103:4 116:12,21
  144:2 152:5 160:11
farm 66:16 67:2 96:23
  214:11,23 215:7,8,20
farmers 214:12,23
  215:4,6
fashion 52:17

fast 22:3 214:20 219:24
fatal 168:9,12,15,20
fault 106:15
fax 46:2,3
fe 67:10 100:13,21
  101:22 226:19
february 13:3 15:20
  18:21
federal 165:20 171:9
  209:25
federation 112:5
fee 23:15 28:15
feel 23:20 35:10 106:25
feet 22:15
feinman 66:17 67:11,11
  67:14 68:19,24
felt 29:9
fidelity 212:7
field 65:15 214:15
fifth 157:10 200:14
fifty 58:12
fight 187:18
figure 16:21 34:3 43:13
file 12:6,8,12,13 18:21
  20:20 21:2,5,10,13,24
  33:15 36:12 39:4
  42:14 48:21 49:3,10
  49:17 53:3 57:8 59:7
  86:18 90:9,14 133:6,7
  133:10 146:7 183:2
  223:5 224:1,11,12,16
filed 5:14 85:24 87:22
  88:1 105:3 156:10
  171:8 188:24 212:22
  214:5 225:3
files 36:16 46:21 47:7
  47:13 49:13,15 81:9
filing 85:3 87:20 88:8
  212:14
filled 192:11
filling 192:19
final 177:11 202:20
financial 15:7 60:7
  129:15 136:21 144:13
  150:15 184:19 195:18
  195:24 196:8 206:20
  210:17 227:17,19
financially 82:25
  190:20
find 22:14 71:17 72:12
  72:18 81:19,22 115:6
  154:23 166:15,16
  184:12
finder 58:18 145:17
finding 170:2 227:14
findings 180:1,3,6
  185:21 190:1 196:11
  196:17 199:24
fine 27:22,23 102:22
  103:23 106:13 108:14

109:15 116:17 156:18
  159:10
finer 205:25
fingers 35:21
finish 117:3 123:6,11
  142:22 159:10 167:25
  168:1,4 217:10
finished 159:20
finishing 159:19 195:25
fire 1:9 5:12 6:4 73:22
  142:10 213:17
firemans 8:10
firm 2:4 5:23 6:5 11:1
  28:5 48:5 98:18
firms 91:11,17,19,19
  92:15,17 93:3,4,7,15
first 5:24 7:1 19:22 28:4
  38:22 40:22 45:11
  49:19 59:20,21,22,24
  64:1 65:18 66:4 92:7
  92:19 98:1 111:18
  112:19 113:8 119:3
  120:5,15 124:11
  128:19 133:12 171:10
  180:9,20 185:21
  187:16 190:3 196:22
  197:11 207:8 216:4
  222:16 224:8 227:8
firsthand 114:16
firstparty 14:8 121:11
  163:13 176:5 182:3
  207:18 227:13 228:11
  228:12
five 16:8 18:13 19:4,7
  21:19 22:15 25:16
  39:16 52:20 54:23
  57:10,12 70:2 79:19
  82:4 83:11 84:6
  137:14 155:16,17
  180:2,2 222:5
flags 32:5
flip 95:15
florida 106:23 109:3
flourished 126:4
focus 27:11
focused 222:13
folders 115:8 125:22
  126:1,3,13,18 128:4,7
  128:13,17,17,18
  132:15 220:11 224:8
folks 96:10
follow 8:5 136:23
  172:13 181:22 193:11
  203:1
followed 214:8
following 146:14
  156:16
follows 6:11 23:25
followup 206:2
force 114:15 182:21

forced 107:7
forces 226:5
forcing 184:21 227:16
  227:18
foregoing 232:17
foreign 227:21
forest 5:3,17 73:25
  142:13 213:20 232:8
  234:22
forget 10:22 168:3
forgotten 76:7
form 12:10 13:16 15:24
  33:9 35:9 36:13 52:17
  84:22 121:20 124:17
  130:18 135:8 157:19
  160:24 162:11 163:17
  165:8 189:14 206:11
  220:13
formerly 96:22
forming 25:7 40:15
  82:16
forms 130:20
forth 54:6 82:7,19
  117:25 143:11 162:15
  228:6
forty 58:12
forward 22:3 25:23
  53:7
forwarded 48:1
forwarding 47:19
foul 188:4,6
fouled 188:5
found 12:12 46:20
  49:15 149:22
foundation 40:18 84:23
  124:18 157:20 165:9
  189:15 206:12
foundational 57:12
  131:1
four 22:9 34:15,22
  37:23 39:16 52:21
  54:23 56:25 58:14
  59:14,23,25 70:2
  100:23 101:16 115:6
  137:12 149:18 156:19
  213:15 223:6 230:5
fourreel 29:10
fourth 227:9 228:6
frame 128:9
framed 23:25
fraud 94:6 99:12 198:14
  198:15 199:8,10,17
fraudulent 102:3
  196:13,19,20 197:1
  197:16 198:5
frcp 46:7
free 35:10 106:25
  225:16
frequent 29:4
frequently 34:2 74:20

104:22 181:18
fresno 8:8,19
friday 9:22 11:19 20:25
  21:4 38:23 39:3 48:9
  49:5 221:17
frivolously 193:13
front 16:25 28:7 95:15
  128:4 148:12 213:4
  214:16
frustrated 157:9
frustrating 43:14
  208:10
frustration 82:20
fulfill 181:4
full 6:16 74:8,14 75:21
  192:8 216:5 232:18
fullsize 76:3
fulltime 7:23
fully 39:21 97:15
  153:15 219:11
function 150:22
fund 8:10 111:2
fundamental 110:11
  123:19 180:18,25
  226:3
funds 114:4 228:10,17
  228:19,25 229:15
furnish 32:2
furnished 10:6 41:23
  81:7 82:3
furnishing 50:2
further 15:16 24:21
  73:7 129:13 200:25
  210:16
fuss 90:15
future 75:2 178:24
fye 1:14 3:8,9,10 5:5,11
  6:9,15,18,18 7:3,6,14
  9:17 16:16 17:25
  18:13,19,22 19:1,12
  19:24 20:3,17,21,21
  21:5,9,16,22 22:1,4,6
  22:13,21 25:1,5,13
  26:16,19 28:4,6,12,15
  28:16,19,23,25 29:2,4
  29:22 30:5,6 35:14
  38:13,16,17 40:21,22
  41:16 43:22 45:5
  47:19,20 48:7 51:8
  54:4 56:2 59:24 72:10
  73:14,21 74:23 75:8
  76:11 77:25 79:1,6,9
  80:20 81:19 84:6
  88:22 102:25 106:13
  106:21 109:21,22
  113:8 116:2 124:14
  127:18 130:15 131:23
  132:15 135:20 141:1
  142:2,9,16 149:4
  151:23 155:15 157:12

158:18 159:14 161:5
163:20 165:11 170:15
171:10 177:8 183:15
187:20 190:2 191:13
192:4 194:11,20
195:4 196:24 205:19
206:6 213:10,16,23
219:13 220:4 224:22
227:5 230:1 231:1
232:9 233:6 234:3,6
**fyes** 21:2

_____

**G**

**g** 65:2,11
**gabs** 89:18
**gait** 30:15
**game** 123:16 129:6
161:7,9,12 188:4
**gardono** 90:11
**gary** 1:14 5:5,11 6:9,17
6:17 7:14 17:25 73:14
73:21 142:2,9 213:9
213:16 230:1 231:1
232:9 234:3
**general** 30:23 41:12
57:1,19 58:3,8 61:19
64:22 89:23 94:3 98:5
116:8 131:5 136:14
144:14 153:5,8,8,9
181:3,3
**generally** 7:17 37:21
40:16 52:20 53:14,17
53:18,23 56:25 57:20
58:2 75:25 93:18,21
98:2 99:4,7 100:16
106:24 128:8
**generation** 119:22
**generic** 113:12 143:8
**gentlemen** 162:9
**gerald** 110:2 133:24
**getchey** 98:10,11,12
**getcheys** 11:1 98:16
**getting** 22:21 25:15
32:25 49:6 116:18
155:15 170:1
**give** 32:18 51:18 55:8
57:2 75:18,20 82:22
83:12 84:1 85:12
90:23 92:3 94:22
95:23,24 96:13 101:9
110:9 119:1 127:22
145:12 150:20 154:22
159:4 170:5 183:13
183:18 220:12 227:4
**given** 24:11 41:13 53:19
67:19 74:6,8 90:22
92:16 110:22 146:17
173:25 179:4 234:8
**giving** 19:2 83:1 87:4
168:17 216:14,17

**glad** 201:2
**gloves** 66:18 69:10
**go** 8:21,23 10:25 11:4
17:6,12 19:18 20:1
22:14 33:10,15 39:12
51:18 55:15 58:15
61:4 62:13 71:10 72:3
72:17 73:3,7 74:15
80:15 83:9 124:8,24
127:5 141:25 145:7
154:8 169:8 170:3,3
175:20 180:16 182:15
185:12,21 187:16
200:25 205:3 216:23
220:3 225:20
**goal** 111:22 138:12
146:4,6 178:25
**goals** 111:11,14 113:4
147:19,24 148:2,4,6
202:3
**goes** 10:15 36:4 40:25
97:22 169:17 182:10
188:4 202:5 204:2
228:20
**going** 16:16,17,19,22,23
17:14,17 19:19,24
20:10 29:9 35:20
50:24 55:16,21 56:2
71:13,17 72:13,18
73:15,18 77:2 79:19
88:16 94:24 102:18
103:5,8 104:8 105:11
105:20,22 106:8
108:19 111:17 114:13
115:19 121:19 124:11
127:12 141:14,16
142:3 145:21,22
152:19 154:7 157:3
158:21 159:25 162:17
165:11 169:25 176:11
177:2 184:5 186:14
209:14 213:3,10
214:9 216:14,17,18
220:2 230:5
**golf** 101:21
**good** 5:25 6:15 17:19,21
20:25 21:4 35:23,23
49:5 51:23 60:15,16
60:19,24 61:5,6,9
66:17 68:16 69:10
70:20 83:17 98:8
115:17 125:20 152:18
153:10 158:25 188:7
195:21 202:21 204:3
212:12 214:4 221:7
**goodbye** 229:23
**goodson** 150:8
**gotten** 18:9 75:16
144:22
**governing** 209:25

**grab** 221:4
**grade** 51:12
**graduate** 8:25
**grandstanding** 130:15
**grant** 178:11 185:4
**great** 69:17
**greater** 129:15
**greatest** 137:18
**greg** 31:1
**group** 31:16 49:19
**groups** 214:17
**grow** 8:19
**guess** 7:15 15:9 21:13
65:16 78:19 85:2 92:8
105:9 111:7 145:3
149:12 172:13 189:8
189:20
**guessing** 83:21
**guidance** 20:4 29:11
**guide** 59:25 60:2,5,13
61:12
**guidelines** 227:12
**guiding** 222:5
**guillen** 185:24,25
**guise** 75:17
**guy** 149:21 204:17

_____

**H**

**h** 65:23 99:3
**hadnt** 114:19 198:1,20
198:22
**half** 10:3 58:14 97:9
**hall** 94:25
**hampden** 2:5
**hand** 10:11,12 115:2
121:20 125:13
**handed** 38:16 40:21
51:9 85:19 112:22
**handle** 23:24 152:20
180:18,21 181:19,21
222:14 227:12
**handled** 120:20 145:6
150:2 161:22 173:24
177:12 203:15
**handler** 179:3
**handlers** 176:20,22
181:17
**handling** 61:15,25
65:22 89:19 101:12
109:1 121:7 131:2
136:7 138:17 145:15
146:3 148:9 150:17
152:18 156:14 160:21
163:12,13 166:22
178:20 180:16 181:20
187:22 198:17 202:22
203:9,13 205:20
207:16 209:9 209:8
209:13 225:24 227:11
227:23,23 228:9,12

228:16,18 229:2,8
**hands** 66:17 69:10
181:24
**handwritten** 133:23
134:1
**hang** 39:10 200:17
**happen** 16:22 74:21
**happened** 18:5 27:8
182:20 197:5
**happens** 10:17
**hard** 166:5
**hardships** 210:11
**harm** 199:20,22
**harsh** 207:16
**hasnt** 203:21
**hassle** 182:9
**hat** 92:7
**havent** 33:7 34:18 35:13
48:22 74:3 128:20
131:17,20 132:7,8
142:21 170:25 179:11
187:15 203:20 220:18
221:8
**head** 134:3 186:21
188:16
**heading** 180:3
**heads** 23:17
**hear** 124:6 128:15
135:15 193:7
**heard** 96:2 135:13
**hearing** 20:9,13 23:5,13
23:19 28:9
**heart** 15:12
**heavily** 12:4
**held** 5:16 73:17 126:14
132:16 164:9 209:19
**hell** 105:21 157:5
**help** 8:5 48:4 49:8 82:25
92:5 146:19 180:17
180:21 190:19 192:19
204:10 216:15,17
220:21 226:3
**helped** 184:25
**helpful** 21:17 22:23
74:5
**helps** 53:20 74:14
146:23
**heres** 18:14 169:23
**hernandez** 10:9 11:23
12:3 13:4,12,23 14:2
14:19 15:21 18:20,25
61:8,11 134:23 135:1
173:13
**hes** 30:10 44:7,15 47:15
67:19,20 71:21 78:3
85:19 92:8 97:14
98:17 105:17 106:14
125:8,9 149:8 170:3,3
174:11,14 176:5
200:7 221:22

**hesitate** 31:9 150:20
**hide** 148:20 179:23
**hiding** 156:21
**high** 8:21,23
**highlighting** 36:13 52:2
**hill** 6:25 234:3
**hinged** 166:7
**hired** 177:19,20
**hiring** 177:24 178:6
**historical** 53:7
**history** 12:20,21 20:2
26:23 27:10,11 28:12
53:8,10,12 85:3
133:13,20 206:23
207:2
**hit** 186:7
**hold** 13:2 106:16 209:17
**holder** 226:3
**holders** 92:17 97:11
109:9 210:12 211:3,3
**holding** 163:20 212:17
212:19
**home** 6:21,22 8:3
**hominems** 107:18
194:20
**honor** 17:25 19:9 20:12
22:25 23:2 24:23
26:11 28:7 29:9,15
125:6 130:11 157:9
162:10
**hooky** 121:21
**hoopes** 65:11
**hope** 90:8 138:23 139:3
139:6 146:23,23
152:18 228:1
**hoping** 19:17
**horrendous** 40:1
**hospital** 194:1
**hour** 5:2 10:3 32:15
33:20 229:22 232:7
**hourly** 32:16 37:4,5
**hours** 33:21 36:16
205:2 220:14
**hows** 204:20 221:4
226:8
**human** 61:14,24
**humility** 209:20
**hundreds** 52:6 140:4
**hunter** 76:22
**hurt** 100:8 186:13

_____

**I**

**id** 7:1 38:5 79:9 93:9
107:17 115:6,14
128:15 159:17 171:19
183:6,10
**idea** 15:17 18:14 20:13
28:10 30:13 50:8
76:15 98:16 139:11
152:6 153:10 214:6

ideas 92:12,13
identified 52:2
identify 79:20 80:20
   81:23 83:7 84:7,11
   92:14 174:25
identity 93:12
ignore 42:15
ignored 20:24
ill 23:1 29:10,10,11 34:2
   44:12 52:19 56:3 73:4
   78:20 83:9 96:13
   103:15,24 110:9
   111:16 116:10,12
   124:22 127:7 128:23
   129:1 136:2 147:17
   154:23 164:5 168:3
   183:6,6 210:4 214:17
illconceived 80:17
illustrate 68:23 222:20
im 6:5,21 7:13 14:22
   15:9,23 16:8,16,17,17
   16:19,23 17:24 18:15
   19:17,19,20,21 22:24
   26:12 27:5 28:18,25
   29:8,9 30:6,7,13 31:4
   35:14,22 36:25 37:13
   37:17 43:8 45:23
   47:12 50:25 52:8
   54:11 55:16 56:2
   59:15,19 62:11 69:9
   70:7,9 71:2,2,16,16
   74:2,6,7 75:20 76:7
   81:19 86:19 87:5 88:3
   88:4 90:8,12,19 92:17
   95:1,6,16 96:7 97:15
   99:24 100:2 102:15
   103:2,4,5 105:4,20
   106:11,14 107:7,14
   108:6,13,15 111:17
   113:13,16,22 119:2
   121:19 123:22 124:5
   124:11 126:11 134:8
   136:1 137:10 138:10
   139:3,6 141:23
   143:21 144:11,14,14
   144:17 145:11 146:6
   146:8 148:14 149:15
   151:5,19 153:24
   156:5 158:20,23
   159:12,12,19 161:9,9
   164:8,20 165:11
   168:4,6,17 169:12,14
   170:21 171:1 172:23
   174:4 175:11,12
   177:21 183:12,18
   184:8 187:2,2 196:16
   198:2 202:8 204:23
   205:1,4,14 206:1
   207:22,23 208:25
   209:11,21 212:24

213:5 214:19 215:1
   215:19 216:16,21
   217:15 219:21 220:2
   223:10 224:5 226:2
   226:19
immediately 83:22
impact 99:10 120:16,18
   163:7 166:16 167:20
   169:3 170:17 171:2
impacted 166:18
impacting 136:11
impair 151:10 167:14
impaired 103:10
implementation 3:12
   119:11,14 129:3
   227:12 229:6
implemented 129:19,22
   130:20 148:10
implementing 130:24
implements 129:11
implication 75:6 121:19
   169:6,24
implications 71:6
   169:14 182:6
implied 83:24
implies 153:17
imply 195:22 213:2
implying 28:23
important 121:17
   130:22 143:16,17
   145:12 150:17
importantly 197:12
imposed 212:1
imposes 210:11
imprecise 36:21
improper 12:11,11
   15:14 150:6 151:10
   178:20 227:23
improve 114:12 129:6
improved 77:12
inaccuracy 83:19
inadequate 180:14
inadmissible 102:10
inadvertent 78:22,24
inadvertently 78:17
   144:22
inappropriate 72:7
   191:21
incentive 110:23,24
   111:5 114:5 115:15
   118:3,17 135:8
   145:19 225:14
incentives 118:2,14
inclination 190:12
included 54:12,15 75:23
   120:19 163:16
inclusion 75:12
income 110:12
incomplete 21:20

incorporate 111:23
incorrect 29:6 42:9 55:1
   75:13,20 125:2
   191:17
increase 136:17 137:9
   137:10 146:15 207:16
increased 111:4
increases 110:22
increments 33:16
incumbent 152:23
   182:14
incur 227:18
incurred 34:24 165:2
   171:11
indefinite 196:12,18
indemnity 212:2
independent 8:11
independently 101:6
index 74:8 144:4,5,6
indicate 122:11
indirect 108:12 117:19
indirectly 12:16
individual 36:22 120:12
   167:12 171:3 201:25
   202:2
individuals 167:20
industry 77:19 144:14
   212:21
influenced 145:1
information 7:9 10:7
   11:9,10,13 22:14
   54:18,21 56:6 57:14
   58:3,21,25 60:7 69:18
   79:11 83:1 88:7 100:7
   118:11 143:8 144:13
   160:20 162:2,5
   163:14,16 169:7,25
   170:2 179:5,9 180:6
   195:19,24 196:8
   219:7,10 224:3
initial 171:8
injured 108:10 180:12
   203:21 204:7
injuries 11:14,15 30:23
   82:12 98:6 99:10
   166:16,18 167:12
   169:3 170:7,12,17
   186:8,21 190:15,16
   193:8 204:8
injury 14:8 76:21
   167:17 168:24 170:11
   170:12 171:2,23
   172:3 182:3 184:11
   186:3,24 189:13,19
   194:25
innuendo 105:24
insiders 76:19
insightful 97:18
insinuation 105:23
insisted 25:15

insistence 227:20
instance 8:7 33:17 37:6
   53:15 59:12 69:16
   83:20 92:7 140:5
   182:11
instances 26:14
instituted 165:5 166:21
   185:13
institutional 21:16
institutionally 69:20
   228:14
instructed 40:2 162:20
instruction 19:17
instructions 177:13
   228:9 229:2
insurance 1:9 5:13 6:4
   10:11,12 11:3,4 12:5
   26:25 27:1 29:5 53:18
   58:19 61:15,25 62:12
   63:15 64:13,16,18,19
   65:15,23 66:13,14,15
   68:1,2,4,9,10,12,15,20
   68:25 69:11,19 73:23
   77:9,11,14,15,21 78:5
   78:6 91:25 93:11
   94:10 96:21 97:3,24
   142:11 147:21 149:23
   150:11 151:3,10
   152:3 170:7 178:22
   180:14 181:17 185:1
   185:5 199:4,7,11,16
   207:7 209:18 211:1
   211:23 212:20,21
   213:18 214:7 216:7
   218:14,23 219:7
   222:6 227:18,21
   228:21,23,23 229:13
   229:16
insured 129:16 150:1
   150:14 151:2,23
   152:2,4,5,7,23 178:17
   182:12,17 185:2
   190:18,22 206:19
   210:14,16,17 212:23
   219:14 226:5 227:16
   228:20
insureds 78:1 93:22,22
   100:23 102:2 121:11
   136:15 137:24 150:3
   151:11 152:7 153:3
   170:4 176:16 178:16
   180:12 181:8 190:7
   207:17 208:10 212:13
   212:14 225:15 227:16
   227:18,25
insurer 211:20
insurers 15:4 76:20
   143:18 212:12 225:14
insuring 69:15 129:16
   199:21

intend 103:17 105:16
intended 75:1,2 136:13
   136:20
intent 68:14 103:16
   105:1,4 136:23
intentional 114:10
interest 199:21,23
interested 40:10 69:4,6
   95:21 144:17 148:14
interesting 13:22 69:21
   110:23 123:5 156:3
   160:23 161:1,7,12
   173:1 182:3 211:22
interference 99:17
interim 34:2
intermediary 220:24
internal 149:15 222:18
interpretation 181:10
interrupt 71:9 128:24
   128:25 141:23 158:4
   209:9,14,16 213:5
interrupted 127:22,23
   127:24 129:10 183:19
interrupting 169:13,18
intervention 171:21
interventions 172:7
introduce 5:22
introduced 197:3 198:1
   198:3
invective 192:19,20,23
invented 62:12
invest 7:22
investigate 15:5 150:2
   166:10,12,14 181:6
   190:15 202:11,12,14
investigated 199:10
investigating 89:11
investigation 89:15
   149:24 150:13 151:25
   198:25
investigator 199:13
invitation 20:24
invited 206:19
invoice 3:11 32:22 33:1
   34:5,7 52:9 53:22
involve 20:11 84:16
   101:18 107:6,11
   108:16 109:1,4,11
involved 11:1 23:21
   57:25 108:11,12,22
   108:23 109:16 140:3
   163:8,9 175:12
   176:18
involvement 29:2
involves 109:19
involving 26:25 145:14
irrelevant 102:10
irresponsible 119:21
   120:10
isnt 10:13 35:4 45:21

Carroll v. Allstate                                    Gary Fye                                    April 2, 2013

Page 11

98:8 122:11 151:15
166:7 182:1,1,2
187:20 193:5,22
**issue** 10:10 18:2,2,3,15
19:11,18 22:7,8 23:14
23:23 25:4,4,8,8
28:16 30:4 59:2 98:5
113:23 143:24 207:23
215:5 225:12
**issues** 19:9,10 23:16,16
30:2,15,16,19 31:11
152:21
**item** 56:6,10,12,16,18
56:21,25 58:21 59:15
59:16,21,22,23,24
60:15 61:4,4,14 62:4
63:14,25 65:2,11,23
76:19 79:21 80:23
117:2
**items** 39:22 47:4 54:23
57:3,6 66:12,22
**ive** 8:7 19:9,24 22:22
26:14 28:25 29:2
33:21 34:4 36:17
38:16,19 40:21 50:14
50:20 51:9 53:2,4
57:14 58:4 59:10
67:19,20,21 76:7 82:3
89:12,18 90:22 93:10
97:8 102:7 103:18
106:15 111:8 112:3
112:15 118:24 122:7
131:21 146:5 148:7
152:6 163:2,17 165:3
173:25 179:4 187:7
204:21 209:22 219:25
220:9 225:10 226:15

**J**

**january** 87:11,19,22
**jd** 9:11
**jeff** 31:6,8,12
**jerry** 63:8 144:19,25
145:5,24 173:18
200:1,3,8,11,18 201:4
201:6 226:13
**job** 68:16 138:8 149:25
174:20,20 221:1
**jon** 99:2
**judge** 17:20,21 20:8
28:2 47:12 62:8
101:11 199:13 209:19
210:5 226:16,18,24
**judging** 43:4
**judgment** 27:8 58:17
59:3 112:7
**judgmental** 43:8
**july** 119:12 126:2 129:4
130:21
**jumped** 128:10

**june** 193:1
**jurisdiction** 137:17
156:11
**jury** 70:18 71:7 75:25
77:3 85:19 99:18
120:22 123:17 125:7
129:24 130:8 138:15
138:15 150:23 152:9
158:21 186:2 199:13
213:4
**justify** 167:9 184:16

**K**

**kaudy** 2:4,5 5:25 6:1
9:23 10:2 15:24 17:23
20:7,8 23:4 25:3,9
26:16 28:2,3,21 29:8
29:23 30:19 31:15,19
32:23 33:7 35:6,9
36:1 38:2 40:18 41:4
42:22,25 43:22 44:3
44:14 47:3,7,9,18,25
49:24 50:2 55:18
71:16,18,22 72:7
78:24 82:21 83:7,13
84:8,20,22,25 85:9,22
86:13,17 88:8,11,14
92:7,10,14 96:15
102:9,14,22,24 104:3
104:8,18 105:7,13,15
105:20 106:4,10,13
124:17 126:22 127:5
127:9,11 131:13
132:1,6,12 151:14,15
153:23 156:9 157:19
161:23,25 164:3
165:5,8,19 177:13,20
178:19 187:20,24
188:8,19 189:14
204:19,21 206:11
208:20,22 209:2,4
217:23 218:1,6,20
221:21 223:11,14
224:19 225:17 229:24
**kaudys** 78:17 82:10
83:4 85:4 86:22 87:16
165:25 179:10 188:17
**keep** 17:8,12 35:5,19,25
36:11,19,22 48:21
145:22 162:18 169:12
**keeping** 33:13 36:24
**keeps** 48:21
**kept** 110:16
**kerfuffle** 21:13
**key** 59:25 60:2,5,13
61:12
**kietzke** 2:16 5:20
**kind** 10:14 12:5 22:24
27:6 43:19 53:12 86:5
97:11 101:7 116:18

171:20 172:2 184:16
187:18 212:2 220:11
220:12
**knew** 24:11 49:17 50:8
85:17 86:3 147:8
164:20 190:13 216:19
**know** 9:16 12:5 13:23
14:1,4,7,18,21 15:19
15:23 17:1,1 18:23
19:16 22:5 24:1,5,15
24:19 25:4 26:25
27:21,21,24 31:1,2,4
31:6 33:1 34:9,12,17
35:1 38:7,8,12 41:10
42:23,24 43:1,1,16
44:15,21 45:15 46:8
46:11,22 47:6,9 48:20
48:22 49:25 50:20,23
50:24 55:2,12 57:11
60:9,12 61:1,5,8,11
61:18,24 62:2,24 63:2
63:5,8,11,17,19 64:6
64:9,21,22 65:8,24
66:2 67:13,14 69:1,5
69:22 71:15,20,25
72:8,8 73:5 75:9
76:11 77:25 78:3,10
78:23 79:1 85:2 87:23
88:4,7 92:19,24 93:8
93:9,10 94:5,12,13,14
94:17,19 95:1 97:5,6
97:13,13 98:11,12,14
101:20,21 105:2
106:6,14 107:7 108:6
110:2 112:25 113:8
113:14 114:14,20
115:5 117:9,16 118:5
118:9,12 119:8,16,23
120:4,15 121:24
122:17,18,22,24
123:1 124:14 126:4,7
126:8,10,11 130:16
130:24 131:10,24
132:7,19,21,25 133:4
133:14,15,19 134:1
134:10,11,14,17,20,22
134:22,23 135:1
139:14,25 140:11
141:15 144:21,24
145:20 146:21,22,24
147:12,24 148:3,5
149:4,10 150:24
153:15 154:25 155:3
155:3,6,18,21,25
156:5,15,17,21,23
157:21 158:24 159:13
160:12,13 161:16
162:19 164:17 165:4
165:18 166:7 167:22
168:22 169:1,16,18

171:25 172:6,10,15
172:18 173:7,10,13
175:4 176:14 177:15
179:22 185:6 188:22
191:16 192:4,17,21
192:24 193:17,20,25
194:2,3,6,8 195:2,14
195:20 196:1,1 205:2
206:16 208:24 209:4
215:13,19,23 216:5
216:10,11,11,13,18,20
216:21 217:4 218:3,3
218:11,21 219:18
220:12 222:25 223:7
225:5 226:13 229:8
**knowing** 21:18 70:12
104:4 135:18
**knowingly** 203:9,11,14
**knowledge** 13:5,7,11,19
22:5,8,11,12,12 24:13
28:4,6 31:13 46:19
58:3 117:14 119:18
120:12,13 135:9
160:7 188:15 203:8
218:1 221:17 232:20
**knowledgeable** 24:8
**known** 124:3 204:7
218:20 221:1
**knows** 24:25 25:2

**L**

**label** 115:5
**labeled** 111:19 220:2
**ladders** 30:9
**ladies** 162:9
**lake** 8:24
**lane** 2:16 5:20
**language** 41:20 129:2
161:8,13 175:15
191:21 192:8
**large** 164:17
**largely** 89:14
**larger** 140:22 141:2
**lasalle** 9:4,15
**lastly** 111:15
**late** 63:3 190:2
**laughing** 206:1
**law** 2:4,4,9 6:5 9:7 28:5
40:17 64:13,16,18
68:15 89:5,17 90:17
90:18,19 91:11,16
101:7,19 150:7,21,23
230:2
**lawful** 234:18
**laws** 9:9,14 219:1
**lawsuit** 85:4,4,25 99:14
100:16 136:18 225:3
**lawyer** 90:19 92:8,9
129:10 150:20 151:5
174:17 185:10 217:20

**lawyers** 9:10 10:24
27:23 85:9 86:4 92:6
92:20 94:15 95:4,5
140:3 178:6 210:21
210:21
**lead** 184:17
**learn** 181:24
**learned** 111:8 132:24
190:16
**leave** 190:23,25 191:1
191:14,23 195:5,16
**leaving** 205:1 219:19,21
**lecturing** 126:21 127:3
128:11
**led** 136:17
**left** 163:10 183:1 202:23
210:15
**legal** 3:10 51:8 65:23
66:13 67:25 68:4
150:22 151:21 153:9
213:3
**lesser** 94:7 198:14
**letter** 39:2 79:13 83:21
154:10,15 155:18
191:7 192:6,10,25
193:4 194:23 223:7
234:14
**letters** 82:10,10,11,11
82:14,15,17,21 83:3,4
83:5,7 84:12 154:25
**letting** 105:5
**level** 93:23 187:11,13
**liabilities** 229:17
**liability** 163:5,6 166:19
171:15 186:4 204:6
**liar** 50:24
**libel** 99:14
**library** 57:13 222:23
223:4
**licensed** 89:13
**life** 167:15,20 172:4
**lifeguard** 187:6
**lifetime** 167:13 182:6
186:8,14,24
**light** 112:14 151:14
**limit** 52:13 182:16
212:2
**limited** 26:2 30:9
117:24
**limiting** 135:5
**limits** 14:2 164:18,19
167:9 171:16 172:1
206:7 208:13,21
209:1,5
**line** 3:15,15 4:3 41:15
46:2,3 56:2 73:9
86:14 109:23 111:3
114:13 186:7 200:14
**link** 121:12 146:24
147:8,15 148:5

**Carroll v. Allstate**                          **Gary Fye**                          April 2, 2013

Page 12

**list** 39:18,22 41:22 42:5
  42:19,20,21,22 43:23
  43:24 44:2 46:25 47:8
  80:22 87:7 91:3,18
  97:20,22 98:9 144:5
  222:17
**listed** 8:6 39:22 40:11
  47:4 48:7,12,19 56:10
  56:16,21 60:18 67:24
  91:2 92:24,25 98:16
  100:3,14 133:18
  171:7 234:14
**listen** 34:25 126:16,17
  126:19 127:1 139:12
**listing** 79:12 98:1
  234:11
**lists** 56:25 137:14
  182:11
**literature** 53:18 56:25
**litigate** 184:22 225:16
**litigation** 66:16 77:17
  91:12 92:2 124:1
  147:21 163:1 165:6
  170:10 182:9 183:2,3
  187:24 207:17 212:22
  214:5 218:9
**little** 11:21 22:18 28:18
  56:3,4 99:3,25 103:5
  126:22 190:2
**live** 103:14
**llb** 9:10
**llp** 2:9
**loaded** 9:23 220:5,6
**located** 116:3
**location** 95:1
**locations** 8:17
**log** 13:24
**logs** 12:23 81:9
**long** 10:2 20:2 38:9,9,12
  115:13 144:4,5,5
  152:22 159:14 182:17
  183:5 192:3 202:24
  209:10 218:20
**longer** 37:2 183:5 214:9
**longterm** 167:13,19
  168:23 169:2 170:2
  170:16 190:17
**look** 16:7,18 25:14
  32:25 37:1,18 42:12
  42:18 46:24 53:21
  54:2 74:10 76:20 87:2
  97:6 112:19 115:6
  117:22 119:20 130:22
  131:21 143:6 154:23
  155:16 163:4 165:12
  165:19 181:20 191:1
  191:6 194:15,17,22
  220:8 221:19
**looked** 112:17,19
  121:15 131:17,20

165:1,3
**looking** 46:20 52:21
  81:25 82:1,4 83:10,11
  84:6 91:6 96:7 106:12
  144:14,15 146:10,11
  146:11 186:19 191:4
**looks** 45:12
**lorimer** 65:24 66:14
  68:1
**loss** 30:10 136:12 137:6
  152:21
**losses** 152:17
**lost** 167:6 172:11,16,18
  186:6
**lot** 13:19 19:10 25:5,12
  141:6 144:15 165:3
  193:12
**lots** 107:3
**low** 76:19 99:10 163:7
  166:21 167:1 185:18
  207:17
**lowball** 210:14
**lower** 30:14,19 69:20
  93:20 111:11 112:9
  112:10 118:16,17
  129:11 136:15 137:7
  137:7
**lunch** 88:18
**lying** 197:5

**M**

**m** 2:5,10 5:2,10 16:10
  17:15,18 55:22,25
  73:16,19 86:17 88:17
  88:20 115:20,24
  127:13,16 142:4,7
  177:3,6 213:11,14
  230:6,7 232:7
**madam** 71:23
**magazine** 111:1
**magistrate** 16:20,24
  17:13,20
**main** 49:10
**maintain** 8:1
**maintaining** 136:16
**major** 197:4
**majority** 163:3
**making** 12:6 13:12
  14:10,11 15:1 50:22
  59:3 82:17,24 92:9
  93:23 106:15 149:8
  151:9 174:4 200:10
**manage** 118:8
**managed** 112:4 117:21
**management** 49:8,19
  50:4,5 51:1 52:6 57:1
  89:19 90:14 111:13
  114:14 117:24 119:21
  120:11 137:5 146:19
  178:3 220:21 221:13

**manager** 96:23 118:1,3
**managers** 93:11 146:19
  146:20 210:22
**managing** 138:7,9
**manipulate** 76:20
**manner** 74:13,17 75:1,4
  75:7 203:17 222:14
**manual** 3:12 31:25 32:1
  32:2,4 119:11,14
  121:16 122:19 125:7,9
  125:9,12,15 129:4,5
  130:18 198:11 222:1
  224:10 229:6
**manuals** 228:19
**march** 24:25 41:4 50:1
  50:9,10,12 91:1 99:2
  99:24 171:9,12 172:8
**margin** 72:16
**mark** 7:1,3 43:17 45:1
  51:4 62:9 71:10,12
  72:15,24 73:1 74:6,10
  74:19,24 75:2 77:6,23
  79:17 80:18 81:17
  85:11 86:2,9 87:9
  105:6 107:9 113:24
  114:23 115:4,12,14
  123:14 130:5 131:12
  131:13 149:1 157:7,8
  169:5 174:18 175:20
  204:18 205:16 206:3
  216:1 222:10
**marked** 3:14 7:4 38:14
  38:16 40:19,22 45:3
  45:17 51:6 62:14
  71:14 72:14 74:11
  85:15 115:22 222:4,7
**market** 136:11,14,14
**marketing** 216:12
**markham** 64:1,21
**marking** 71:24 72:11
**marks** 73:20 142:7
  213:14
**martinez** 67:9 100:12
  101:11,15 226:17
**mastery** 210:4
**material** 11:18 33:18
  36:14 37:2,2 58:23
  59:4 68:16 80:12,16
  170:25
**materials** 9:19,21,22,24
  10:6 21:19 22:15
  33:16 34:16 36:17,24
  37:25 49:14 90:4 95:8
  173:24
**matrix** 146:4
**matter** 5:11 20:10 34:10
  37:19 42:14 73:21
  79:7 82:20 84:20
  99:21 105:19 107:12
  142:9 151:21 210:4

213:16 232:11 234:9
**matters** 64:19 82:18
**maundy** 20:25
**mccarthy** 62:5,5,21
**mckinsey** 69:14 70:4,13
  75:11,15,19,22,24
  76:11,13 129:20,21
  133:10 172:21,25
  173:8,11,14
**mcminnville** 8:12
**mean** 24:24 25:21 26:22
  33:5 41:19 46:1,8
  48:17 102:17 104:19
  132:25 137:7 144:4
  150:7 162:5 181:16
  181:17 185:16 186:1
  186:11 192:12 202:5
  213:2
**meaning** 38:24
**means** 27:5 55:20 101:1
  125:8 180:14 182:4
**meant** 52:9
**measure** 110:15 145:11
**measurement** 146:5
**measurements** 110:14
  145:12
**measures** 111:23,24
**measuring** 137:8 138:3
  138:4
**media** 141:24 213:6
**medical** 10:7 11:9,10,12
  29:23 30:4 31:16,20
  106:22 107:2,3
  108:10,25 109:4,8
  150:9 165:1,3,5,20
  166:2,8 167:8,11,21
  171:7,11,14,17,20
  172:8 181:7 182:2
  187:3,5,7,14 207:21
  221:21 224:1,3
**medicine** 187:14
**medium** 51:12
**meet** 10:2 138:12
  207:25 222:18
**meeting** 190:6
**meets** 146:17
**members** 125:6
**memory** 15:22,25 16:3
  16:5 19:2 22:7,11,11
  22:12 26:18 83:16,17
  83:25 134:5
**mention** 12:14,17 60:2
  64:3 69:8 150:21
  172:20 196:17 214:14
  226:16
**mentioned** 10:20 11:9
  23:7 34:6 44:14 47:7
  47:12 98:10,18
  101:13 149:18 181:14
  198:4 213:25 214:12

214:20 221:22
**mentions** 102:17
**mere** 74:23
**merit** 110:22 146:15
**meritless** 196:13,19,20
  197:1,16 198:5 199:5
  199:10
**merits** 181:19 184:13
**met** 9:22 28:25 92:7
**method** 37:14,15 47:21
  48:25 49:1 65:17 72:6
  101:12,12 130:24
  131:9 133:2 136:20
  156:14
**methodology** 49:21
  182:24 184:21 210:3
  227:16
**methods** 112:8 121:14
  123:20 132:24 133:1
  133:4 148:9 160:19
  198:17 219:10 227:20
**mexico** 100:13,23 101:6
**michael** 149:21
**microphone** 131:23
**middle** 55:7 128:11
  168:2,4,6 183:12
**miller** 166:21 167:2
  173:10 175:2,10,19
  175:23 176:19 177:12
  189:20
**millers** 147:3 160:16
  175:4
**million** 57:10,12 99:18
**millions** 129:19
**mind** 13:21 65:19 104:2
  114:23 146:9 170:6
  177:9 183:21 184:3
  190:2
**mindset** 136:6
**mine** 115:9 129:8 213:1
**minimize** 199:23
**miniscule** 51:11
**minute** 10:7 36:6 47:2
  51:18 94:20 100:20
  117:3 148:12 204:14
  219:24 225:4
**minutes** 19:7 25:16 87:7
  219:20,21 220:13
  224:23
**mischaracterization**
  159:25
**mischaracterized**
  157:22 158:8
**mischaracterizes**
  197:11
**mischaracterizing**
  128:16
**mislead** 70:17,22,24
  77:2
**misled** 70:16 158:22

Carroll v. Allstate                          Gary Fye                          April 2, 2013

Page 13

missed 113:20
missing 37:13
misstated 189:11
misstating 139:3,6
mistakes 202:3
misunderstanding 198:15
misunderstood 228:13
misused 152:6
mix 17:20,21
moderate 99:10
modesty 209:21
modified 111:23
moment 14:3 23:1 111:16 149:14 177:16
monetary 164:23 171:23
moneys 93:25
monitor 5:9 17:15,18 55:22,25 73:15,19 88:17,20 115:20,24 127:13,16 142:3,7 177:3,6 213:10,14 230:5
months 20:15 21:3 111:24 167:15
moral 194:14,16
morning 5:25 6:15 9:25 17:19,21 22:4 25:8 28:14 83:20 98:18 205:11
morphs 10:13
motivated 118:21 145:18,18,25
motivation 13:12,20
motive 146:13
motorist 178:11 191:10
mount 150:9
mountain 91:16
move 29:11 55:14 70:9 77:4,6,22 79:10 87:5 107:14,19 124:11 125:14 130:1,5 148:23 151:17 152:25 154:2 155:4 157:2 159:17 161:2,6 173:16 174:13,16 176:25 189:22 193:15 194:19 197:9,9 199:1 200:9 204:12 216:1 216:24
moved 8:8,8,9,12,16 186:5
movie 29:10
moving 106:21 159:12 159:12 174:14 189:25
multifunctional 204:17
multiples 76:18
mutual 149:22
mylar 76:3,3,6

## N

n 3:1
name 5:19,23 6:16,18 31:2 73:25 76:7 87:16 95:1 96:5,16 98:14,16 141:15 142:13 212:1 212:10 213:20 216:5 226:20
named 10:8 149:20,21
names 93:9 95:23,24 96:5,7,13 216:14,17 216:18
national 91:11 108:20 109:17,18 209:24 212:8
nationally 120:19 129:22 210:10
naturally 109:18
nature 10:18 12:2 23:19 27:17 80:16 114:18 119:20 228:11
near 110:21
necessarily 34:4 143:9
necessary 136:16 150:14 160:21 181:8 190:19
neck 121:13
necklace 121:12
need 14:8 15:9 16:25 17:1 19:6 24:7,21 27:4 33:9 42:14 44:3 49:18 55:6 58:21 71:15 77:12 92:11 104:5,6 105:3,8 120:3 121:19 127:5 141:24 158:4,17 159:4 178:24 206:9,20 213:6 221:14 223:25 224:8
needed 21:1 58:4 60:7 158:1,3 208:4 223:25
needs 58:18,18 196:12 196:18 219:7 222:15 229:1
negative 147:2
neglected 21:21
negotiate 101:2 212:13 225:2,9
negotiating 123:24
negotiation 82:23 137:23 208:5
negotiations 84:16 188:10
neither 46:23 86:22 102:10 179:21
nevada 1:16 5:4,17,21 6:25 73:25 142:13 211:8,10 213:20 232:1,4,8,21 233:2 234:4,23

never 22:22 28:6 79:6 79:14 83:24 89:13,13 89:13 122:8,8 153:12 164:12 190:21 192:4 204:6 211:17 220:25 223:25
new 25:8 100:13,23 101:6 109:14 120:24 137:4 180:6
newly 136:7
nicest 192:2
nine 138:11
nod 161:18,18
nonissue 28:17
nonpayment 227:19
nonresponse 83:6
nonresponsive 85:23 130:12 139:13 148:21 151:18 152:15 153:1 154:3 157:4 158:7,13 162:12 189:23 204:13
normal 110:21
normally 34:13 95:13 95:14
notary 5:5 231:15 232:3
note 16:9 137:16 220:8
noted 53:2
notes 4:1 14:11 36:22 133:23 194:24 232:14 232:19
notice 5:1 9:22 42:8,12 103:21
noticed 99:23
notified 95:25
november 45:14,20 46:4,18 53:24 54:3,5 54:11,19 79:10,23 80:24 100:20 104:12 133:16,16,18,21,25 134:8,9 165:17 179:25 195:25 196:5 196:6 197:13,22 227:10
number 5:13 6:2 19:11 36:16 50:3 52:16 53:16 59:12 73:14,20 79:11 87:20 95:3 101:10 110:18 117:1 119:6 136:3,3,10 137:21 141:21 142:2 142:8 182:16 188:8 188:21 207:4 213:9 213:15 227:3 230:4
numbers 46:8 136:1
nv 2:16

## O

o 57:3 76:19
oath 158:20 196:8
object 15:24 35:9 40:18

55:14 72:1,21 75:6 84:22 86:6 123:24 125:11 152:15 157:19 158:23 159:2 160:24 162:11 164:5 165:8 168:5,8 189:14 199:1 206:11
objected 22:22
objection 21:14 47:13 85:20 96:1 124:17 130:1,3,9 159:6,8
objectives 137:4
obligated 85:10
obligation 15:4 151:2 151:24 152:8 153:3 166:9 184:17 190:14 211:2,20
obliterate 131:1
observed 218:25
obtain 9:14 20:20 139:10 210:14 224:19
obtained 9:4 179:9
obvious 70:6,6
obviously 44:4 224:14
occasionally 27:6
occupation 30:10
occupational 31:10
occupy 146:9
occur 50:7 94:18
occurred 62:13 121:1 130:19 186:21 197:13
oclock 9:25 219:21 229:20
odonnell 2:9 6:5 28:6 230:3
offer 12:7,8 14:9 15:11 138:1 154:13,20 156:1,7 163:7 172:12 173:25 174:3 178:22 185:19 188:19 190:23 191:1,9 195:3,5,15,16 207:10 208:6 219:14 219:15
offered 159:7 190:3
offering 190:17
offers 127:19 153:13,20 155:9,19 166:24 188:9 194:24 207:17
offhand 154:24 156:16 223:3
office 8:1,11 20:19,20 20:23 21:1 39:25 40:1 42:24 43:2,15 47:19 67:20 122:19 230:2
officers 233:1
offices 5:3 18:6 21:7 232:7
oh 50:11,13 58:7 62:17 113:16 125:20 167:24 168:3 169:23 188:22

208:18 217:11 223:8
okay 6:24 8:18 9:17 11:21 13:1,11 14:14 16:16 17:10,13 29:18 29:19,22 35:16,23 39:17 40:21 42:6 43:3 46:1,13 54:17 59:23 64:21 65:6,17 66:9 70:21 71:10 75:8 88:22 89:1 91:16 92:17 96:9,11,13,14 99:1 102:16,24 104:1 104:11 106:19 113:2 113:5,17,20 114:2 115:1,11,13 116:10 116:12,17 118:9 119:2 120:2 125:25 144:8 145:10 147:12 165:13 173:3 175:20 189:3,11 196:16,24 198:24 201:24 202:16 213:23 217:18 219:3 221:9 225:8 226:11
old 210:15
older 186:9,11,20
omaha 149:22
once 162:12 185:13 190:15 225:3
oncoming 186:6
ongoing 30:13 170:10 177:22 206:8,9,17,18
ooo 1:3 5:6 230:8
open 145:16
openended 24:12 202:17
operated 101:6
operates 109:19 111:6
operating 23:11
operation 37:7 179:22 210:23
operations 124:4 187:8
opine 142:18
opinion 21:17,25 100:6 116:4,14,22 141:17 143:2,4 144:18,25 145:24 162:20 200:1 200:6,18,23 205:19 206:8 212:18 213:1
opinions 25:7 31:21 40:15 54:5,6 82:6,16 84:9 104:11 105:18 205:8 224:4,6,9 228:5
opp 31:6,8,12
opportunity 151:16
opposed 87:25 108:9
oppress 210:17
oral 111:11 160:11 161:17
order 8:7 16:20 19:15 24:8 27:12 32:1 49:8

Carroll v. Allstate | Gary Fye | April 2, 2013

Page 14

107:14,15 112:12
132:5 202:2 228:25
**orders** 103:10
**oregon** 8:12
**organization** 138:22
**organizational** 63:14
**original** 49:16 56:4
230:2 233:6,9
**originally** 87:25
**originals** 38:19,21
**outcome** 121:8 172:4
**outcomes** 69:20 93:21
110:14 111:12 112:4
112:9,10 118:17,18
129:12 137:7,8,8
176:6
**outline** 69:13 95:11
**outlining** 82:12
**outright** 198:14
**outside** 177:25 178:3
185:10
**overall** 176:17
**overhead** 76:4
**overlay** 76:6
**overtalking** 36:7 169:20
**owe** 36:1
**owed** 35:6 38:2,10

_____
**P**
**p** 88:20 115:20,24
127:13,16 142:4,7
177:3,6 213:11,14
230:6,7
**pacific** 214:11,22,23
216:13 217:15
**package** 89:12
**page** 3:3,7,15,15 4:3
38:23,24 39:11,18
40:22 41:1,16 42:19
54:19 56:5 57:11 74:8
76:4 79:23 80:23 87:2
87:16,17,21 98:23
99:20 100:20 101:10
101:10,23 109:22
111:9 112:24 113:4
117:1,22 119:3,5,6,15
119:17,20 120:5,15
120:21 121:4,24
125:16,16 129:4,12
129:14 136:2,3,4,10
137:11,12,14 138:2,2
138:10,11,11 141:20
142:18 143:7,11,11
143:14 144:12 145:4
148:8 149:18 163:2
165:19,22 172:20
180:1,2,4,9 183:3
196:15,16 199:24
222:5,8,10,16 227:4,9
228:6 234:12

**pages** 18:7 19:14 32:4
39:16 51:11,12,13,15
52:21 57:10,12 58:15
59:13 76:14 97:23
129:13 131:19,21
135:20,21,25 140:5,6
140:19,24 141:1,3,7
141:10 144:8 155:16
155:16,17 221:18,18
222:6 223:6 224:17
232:18
**paid** 28:17 129:20 135:8
166:20 171:15 184:7
203:1,20 206:9 207:5
**palm** 106:23
**palmer** 60:11,12 61:5
61:21,24 63:8,19 64:6
110:2 113:8,13
116:16 117:20 118:5
118:20 119:16,23
120:16,20 121:3,25
124:15 125:5 126:5
126:14,25 127:18
128:22 132:21 133:24
134:7 135:6,9,14
145:5,18,25 147:4,24
148:6,14,16,20 149:7
153:11 154:13 155:8
157:13 159:3 160:1,3
160:8,14 166:9 167:1
167:2,22 168:22
169:1,7,24 170:3,8
172:12 173:7,19
174:2,4,9,11,15,22
176:19 177:12 189:20
191:7,14 192:5,15,25
193:5 194:23 200:1,3
200:11,18 201:4,6
207:7 208:24,24,25
**palmers** 65:9 110:12
118:9 120:4 121:13
134:11,14,17 144:19
145:1 146:7,25 147:9
147:15 149:5,11
153:13,20 154:20,25
155:19 156:1,7 158:8
160:17 161:14 174:19
175:8 188:9,19
226:13
**panoply** 176:11
**paper** 36:13 44:24
**paragraph** 109:23
117:23 143:6
**paragraphs** 46:10
**paranoid** 77:16
**pardon** 92:9
**pared** 58:10
**park** 94:25
**part** 18:9,18,18 32:5
86:7 94:7 102:19

104:22 114:5 133:17
137:3 140:20 164:20
175:25 176:3,5,7
179:18,19 204:4
225:1
**partial** 202:22
**particular** 26:24 79:13
105:18
**particularly** 140:2
177:22
**parties** 56:12 78:6,8
234:18
**party** 102:11 143:9
178:12 182:6 185:3
204:2 207:8
**pass** 27:8 201:17
**patients** 30:22 99:9
**patrick** 79:7
**paula** 79:7
**pay** 113:9 114:13
115:15,18 123:11
135:8 136:13 143:22
145:19 180:14 182:5
182:5,7,14 183:23,25
184:2,4,7 185:2,9,14
185:23 187:17 190:2
192:5 193:4 204:1
205:20 207:19,24
208:13 210:11,12,24
211:10,20 212:13
214:1 217:15,19
218:15 225:2,9
229:17
**payable** 182:19 198:13
208:23
**paycheck** 145:5
**paying** 181:6 184:13
206:17,18 208:16
210:7 215:5,9
**payment** 14:5 84:14,17
84:19 166:3 167:9
171:16 178:25,25
181:23 182:2,23
184:16 208:21 211:16
211:24 213:24
**payments** 15:20 82:24
82:25 136:15 184:18
184:23 190:11,18
202:22 203:1 211:5
214:13 217:8 228:10
**payout** 136:12 137:6
**pays** 215:20
**pds** 111:20
**peace** 170:6
**peer** 214:16
**peevishness** 28:14
**pendency** 34:1 182:13
**pending** 90:11
**people** 10:25 11:2 77:5
77:8,8,19 95:25

108:10 110:20 113:12
117:20,21,21 118:8
120:11 144:23 145:14
146:17 148:11 152:11
152:16,19,21 176:6
176:17 184:15 193:12
202:4 211:7,8 214:10
215:6,6
**perceive** 74:23
**percent** 111:25 138:6
198:12
**percentage** 112:1
137:18
**perfect** 131:7
**performance** 111:21
112:17 113:9 116:15
137:5 143:17 145:19
146:8 149:12,16
178:3
**performancebased**
109:24 110:3 116:5
116:23 118:22 142:17
143:1,4,23 146:1
**performed** 33:6
**period** 202:18
**periods** 196:12,18
**permanency** 190:16
**perplexed** 28:18
**persisted** 19:3,7
**person** 167:7 171:2,20
182:8 203:6
**personal** 148:19
**personally** 5:5 232:9
**personnel** 146:7,7
**persons** 167:15 172:4
**phase** 37:22
**phenomenon** 146:19
**philosophies** 228:10
**philosophy** 53:13
**phone** 16:23,24 17:13
23:6,12 157:13
192:14 193:3,9
**photocopied** 21:6
**photographs** 194:3,9
**phrase** 173:2 196:14
197:21 199:25 228:17
**physician** 99:8
**physicians** 82:11
**pick** 49:9 192:13 193:3
**picked** 50:6
**picking** 193:9
**piece** 153:18 208:5
**pieces** 36:13 81:5,23
82:5,9
**pin** 104:6
**pinned** 104:7
**place** 62:18 73:24 107:4
114:21 119:7 122:11
129:18 130:21 131:11
137:1 142:12 146:12

146:13 213:19
**plain** 86:7
**plaintiff** 2:4 5:24 138:1
**plaintiffs** 1:7 5:12 17:25
23:10 91:19 97:2
100:14 109:7 224:2
**plan** 15:16 114:5,7,11
158:9,15 173:19
176:7,9 178:22
182:21 189:9 190:22
216:12 225:15 226:4
**played** 121:21
**player** 188:3,5
**playing** 123:16,24
160:22,25 161:3,7,9
161:12
**pleading** 56:20
**pleadings** 9:21 56:18
**pleasant** 27:21
**please** 5:24 6:7,15 7:21
16:9,12 27:19 43:17
51:5 71:10,17 77:6,23
79:17 80:6,18 81:1,17
84:3,11 85:11 86:2,9
87:9 88:12 101:23
105:6 106:16 107:9
113:24 123:6,9,14
124:8,23 126:23
131:3 135:7 137:13
149:1 155:12 157:7
157:16 165:11 169:5
169:11,22 170:19
173:21 174:18 188:12
191:11 194:15,17,22
195:2,7,14 204:18
205:3,12,16 206:3
216:2 221:19
**pleases** 118:15
**pleasure** 97:19
**plural** 182:11
**plus** 131:21
**point** 14:3 15:2 18:22
19:1,21 25:22,25
37:13 43:3 62:6 86:24
102:19 144:17 170:15
194:10,12 196:10,17
205:25 208:12 228:6
**points** 180:5 222:20
**policies** 164:16,20
190:10
**policy** 10:16 14:2 15:2,6
92:1 97:10 109:8
151:11 164:18,19
167:9 171:16 172:1
182:11 203:25 204:4
206:7 207:3,5,6
208:13,21 209:1,5
210:11 211:2,3 222:1
222:8 226:3,4 227:22
228:23

**Carroll v. Allstate**                    **Gary Fye**                    **April 2, 2013**

Page 15

pontificate 158:18
161:5
pope 215:23
pork 65:16
portion 59:11 75:11
180:5
portions 3:14 68:6
72:12 74:10 75:11
portland 8:10
pose 13:22
posed 46:15
position 21:18 24:2 59:3
110:12 161:14 186:23
191:14 211:7 219:9
226:2
possession 42:2,3
possibility 171:22
possible 20:5 27:13
41:25 49:22 137:2
possibly 206:13
postured 12:8
posturing 12:12
potential 23:16 132:9
powerpoint 95:11
practical 69:18
practice 7:13 86:7
91:11 93:21 99:13
107:2 123:25 209:24
215:8
practices 7:13,18,24
8:15 53:8 57:13 58:23
64:20,21 68:3,7,12,21
69:12 77:9,10,11,14
77:14,21 78:7 86:7
90:21,24 91:14 92:1
93:15,18,20 96:22
97:11 101:3 108:8,17
108:20,21,23 109:5
109:12,16,17,19
130:22 133:3 136:4
138:21 143:15 145:14
145:17 161:16 204:5
209:8,13,17,18 222:1
225:18
practicing 92:18 151:5
practitioner 69:15
practitioners 68:15
precious 104:4
precise 35:22,23 37:14
37:15 66:2 226:20
precisely 67:14 141:4
precision 36:20
predated 66:23
predicated 198:10,12
prejudice 132:9
premiere 138:22
preparation 106:1
prepare 9:18 49:11
prepared 49:12 165:16
171:1

preparing 32:11
presence 8:4 179:10
present 28:9 90:18 92:4
93:7 94:15 95:8
presentation 91:14 92:2
92:21 94:25 139:4,7
139:15 140:21 207:9
presentations 92:5
96:25
presented 67:8,8 90:16
90:20 92:15 93:2,19
106:8 116:13,21
128:18 198:13,13
presenting 97:17
105:18 150:15
preserve 228:25
president 117:7
presumably 128:20
presume 38:5 48:20
presumption 47:25
85:2 91:25 132:8
presumptions 68:17
pretty 11:7 43:14 74:22
82:12 90:3 101:22
129:14 179:4 227:15
prevent 24:9
preventing 150:12
previously 21:12 85:15
primary 137:25
principle 153:10 225:21
principles 68:23 122:9
131:5 150:23 222:5
222:11
prior 50:17 61:2 63:6
66:5 88:8 107:22
133:21,24 134:7
195:25
privately 92:4
privilege 179:14,20
privileged 70:14 146:8
222:3
privileges 179:24
privy 146:6
proactively 181:5
probably 10:17 11:21
45:21,22 50:24 54:15
54:15 57:9,12 59:13
63:7 70:2 76:18 83:17
90:7 92:16 94:13
107:12,25 108:4
109:20 141:20 150:19
153:16 175:3 218:21
220:14 225:7 226:22
problem 57:19 97:11
178:6
procedural 82:18
procedure 20:19 222:1
233:2
procedures 172:5
proceed 74:1,15 127:21

142:14 213:21
proceeding 28:7
proceedings 81:10
process 27:21 50:15
77:2 84:16 98:20
110:17 124:1 125:8
129:3 131:4 143:10
152:19 170:11 176:5
179:19 189:5 197:17
198:6,10 202:1,2
219:12 226:14
produce 3:9 21:15 25:6
39:9,13 40:23 42:25
52:24 58:5 59:11
112:13 118:17 123:18
140:9 189:5,9
produced 10:22 18:3
21:15 48:8 57:23
58:24 59:5,9,12 75:16
78:22 79:4 112:15
116:19 125:22 131:14
131:16,16,19,25
132:7,13 140:10,16
222:4 226:24 228:8
produces 112:12
product 179:21
production 21:6,10,13
21:21 41:14 48:4
58:11 59:2 121:16
123:7 140:15,23
220:22
productive 20:5 26:13
26:21 27:4 105:13
professional 7:12 27:20
27:23
professionally 7:16
professionals 27:22
professor 67:11
profit 111:2 114:3
117:8
program 11:2 105:25
110:23,24 111:6
114:4,20 117:8 118:4
118:6 123:20 129:11
129:22,22 130:23
136:13,25 159:21
172:21 177:11 178:3
179:18
programs 109:25 116:5
116:23 130:25 142:17
143:17,19 145:19
146:2,11,12,14
progress 19:20
progressive 214:11,25
214:25 215:2 217:19
218:2,4,6
projector 76:4
projects 50:17
promise 128:24,25
185:2

promised 185:23
promises 227:21
promotional 110:13,22
prompt 178:25
promptly 204:4
pronounced 96:19
proof 93:22 100:10
118:20 121:3,5,6,7,8
121:11,20 176:16
182:7,18 190:11
proper 227:12
properly 214:7
property 30:10 212:8
proposing 195:5
proposition 153:8,9
212:11
protect 130:25 140:24
180:11 190:9
protected 140:17
protective 32:1 107:13
107:15 112:12
provide 10:15 21:11
22:23 24:5,8 132:6
178:25 182:18 203:23
222:12 225:14
provided 20:15,19 21:6
21:22,23 42:18 88:8
160:6 162:15 167:23
168:23 169:1,7,25
185:4 229:3 234:12
providing 129:15
provision 203:25
provocations 22:24
provocative 155:5
provoke 205:12
prudent 112:11
public 5:5 69:16 104:22
129:16 199:11 231:15
232:3
publication 62:5 63:20
63:22 76:22 111:2
117:10
publics 77:20 199:21,22
published 11:2 60:6,24
61:18,21 63:2,6,17
66:1,5,8 76:15 117:14
229:6
pudding 121:6
pull 200:24
punished 199:11
purchased 170:7
184:24
purports 222:17
purpose 15:6 69:6 70:6
73:10 77:17,17 93:24
94:7 178:15 190:8
226:4 234:19
purposely 207:15
purposes 53:7 67:21
178:8,9 179:20

180:18,25 181:4
187:22,24 202:6
212:23
pursuant 5:1 18:3 46:7
233:2
pursue 10:14 105:8,10
105:16
pursued 8:17
pursuing 111:13
pursuit 210:3
put 24:2 27:10 32:5
33:16 43:7 49:7,16
52:15 54:9 59:2 75:15
76:4 96:24 100:5,25
115:8 129:18 130:21
133:9 136:25 139:4,7
139:17 148:22 150:11
169:15 205:25 223:22
puts 10:11
putting 12:5 36:25
puzzling 22:19

--- Q ---

qualifications 54:12
qualify 118:2 210:1
quality 167:15
quantification 209:3
quantify 209:4
quantity 51:11
quarter 112:23
question 7:15 11:23
13:16,22 14:15,18,23
16:2,4,8,11 18:16,23
19:6,8,16,25 22:5,11
22:16,17 23:24 24:12
24:14 25:18,24 26:7
26:15,16,17,19,19
33:11 35:13,18,19
36:4,5,9 37:12,13
40:25 44:10 46:14,23
48:16 51:19,25 52:9
55:8,9 56:22 62:15,20
65:3 70:10,12,18 72:2
73:3 80:2,7,10,11,13
83:21 84:2 85:5,25
86:4 87:8 88:11 91:13
96:3,4 105:1,22 107:7
107:21,24,25 108:21
109:14 111:17 113:10
114:2 121:5 122:21
123:6,8,12,13,19
124:9 125:17,21
126:12,17 127:1,2,4,7
127:23,25 128:6,23
129:6 130:13 132:23
135:20 138:23 139:11
140:11 142:22,24
143:2 145:8 147:7
149:9 150:8 151:4
152:12,13 153:17,24

Page 16

154:6,9 155:2,4 156:5
156:12 157:10,17
158:17 159:13,18
161:10 162:14,16,23
163:24 164:4 168:2,3
168:16,19 169:4,10
169:12,17,21 171:1
175:13,14,17 183:8
183:10,11,14,15
184:5 188:12 189:10
191:24 192:7,16,20
193:22 195:6,10
196:19 197:19,20
200:17 201:20 202:13
204:6 206:14 209:11
209:15 212:25 213:1
226:11
**questioning** 56:3 59:18
73:9
**questions** 16:18 19:22
19:24 21:18 23:1
25:12 27:11 39:12
71:2,5,5,8 80:17 83:2
87:3 88:2,22 101:18
102:6 103:9,24 109:1
109:4 114:18 137:25
161:10 162:22 169:15
194:11,13 202:8
204:16 206:2 213:3
216:23
**quibble** 176:23
**quickly** 177:17
**quiet** 29:12
**quite** 23:14 69:5 160:16
212:5
**quitting** 204:23
**quote** 207:18,18

**R**

**rabin** 212:7
**radically** 129:7 229:7
**raise** 96:1
**raised** 20:14
**raising** 117:18
**ram** 158:12
**range** 38:3
**rapid** 33:18 37:1
**rare** 37:11
**rate** 16:22 32:16
**rating** 59:25 60:2,5,13
61:12
**rationale** 84:18 198:16
**rawlings** 151:7,12
**reaching** 208:7
**react** 30:23
**reaction** 22:20
**read** 9:19 13:13,14,21
15:18 16:12,13 35:7
36:8,10 51:20,21
55:11 61:6,8,11,24

62:15,16 63:8,12,19
64:6,10,25 65:3,7,9
65:12 66:12 69:2 74:7
75:10 76:22 80:7,8,25
81:2,13,14 84:2,4
88:11,13 90:4,6 100:8
112:3 119:9 122:3,4,6
124:10,20,23,25
135:11,12 147:2
155:12,13 157:16,18
169:22 170:19,20,25
173:21,22 195:6,8
196:7 203:13 225:6
234:16
**reading** 49:2 74:9
200:11
**ready** 18:17 19:23 74:1
142:14 162:17 213:21
**real** 97:19 145:13,14
207:23
**realize** 57:9 212:24
**realizing** 36:23
**really** 7:22 15:3 77:16
87:6 97:13,17 148:16
158:18 159:23 163:7
166:13 181:20 198:20
198:22 207:1,22
**reappeared** 117:10
**reason** 51:14 52:15
72:22 96:1 102:7
129:9 137:25 165:24
171:10 210:20,25
**reasonable** 24:13
208:22
**reasonably** 229:17
**reasons** 70:7 105:9
**recall** 11:12,15,17 13:1
31:14 32:8 38:22 42:7
50:11 78:16 89:21
94:9 95:17 98:2
108:24 133:22 134:10
140:1,3 154:17,24
172:9,10 183:11,11
189:4 196:3 207:22
208:15
**recalled** 96:5
**recapturing** 93:25
**recast** 14:23
**recasts** 10:12
**receipt** 41:21
**receive** 39:1 47:4 135:6
135:9,14 179:8
184:23 195:21
**received** 51:10 110:2
113:9 135:1 147:4
187:3,5 190:13
194:25
**receives** 110:12
**receiving** 89:11
**recitations** 68:7

**recognition** 145:19
146:5,14 149:17
**recognize** 45:5 148:10
150:13 192:21 225:22
**recognized** 22:7 212:11
**recollection** 22:7 24:11
24:18 75:14 82:13
98:4,8
**recommend** 68:8
**reconstruct** 36:16 37:3
43:5
**record** 5:8 6:16 13:14
16:6,9,13 17:7,9,12
17:14,18 22:10,19
24:7 29:19 35:14,16
36:10,25 51:21 55:11
55:21,24 62:6,9,16
72:3,17 73:3,8,15,17
73:19 80:8 81:2,14
84:4 85:11 86:19
88:13,16,19 97:16
103:9,16 104:22
105:8 107:1 112:18
115:19,23 121:22
122:4,6 124:10,25
127:6,12,15 135:12
142:3,6 155:13
157:18 161:6 169:19
170:20 173:22 177:2
177:5,15 179:4 195:8
213:10,13 220:9
221:23 225:20 226:17
227:2 229:24 230:5
**recorded** 101:4
**records** 21:17 31:20
33:13 36:19,23 52:7
100:6 108:11 110:16
146:7 154:23 165:3
**recover** 30:23 185:3
**recoverable** 178:12
185:23 186:2 204:1
**recovery** 62:4,21
167:19 228:11
**redding** 8:8
**redefined** 129:6
**redesign** 69:14,19 93:20
109:18 111:12 122:9
122:11 125:9 129:3
129:11,18 130:23
131:4 136:9,19 140:6
143:11 149:13 160:19
197:17 198:6
**redesigned** 207:15
**redesigning** 121:17
**reduce** 136:12
**reel** 29:9
**reevaluate** 184:11
**refer** 52:19 53:15 134:4
136:3 141:14,16
225:17

**reference** 21:20 63:22
75:2 141:20
**referenced** 20:17,22
47:3 81:8
**references** 143:12
**referral** 162:1 164:12
179:9
**referred** 47:18 116:20
**referring** 29:7 44:15
47:8,9,14,17 59:15
79:21 80:22 81:5,11
83:8 87:20 91:10
136:1 141:20 153:7
180:22 198:5 202:11
**refers** 53:17 87:24
111:20
**reflect** 16:6 22:10
111:12 171:20,21
227:11
**reflects** 51:13 53:11
133:6 166:5
**reflexive** 98:15
**reframe** 79:16
**reframing** 59:1 77:1
207:12
**refresh** 16:5 24:10
134:4
**refuse** 96:3,4 107:21
**refused** 22:21 25:1
107:25 219:17
**refusing** 95:23
**refutation** 124:3
**regard** 52:9 226:23
**regarding** 104:9 117:20
**regional** 95:4
**registration** 6:2
**regular** 197:6
**regularly** 76:24
**regulation** 211:12,13
229:12,19
**regulatory** 101:19
**rehab** 106:22 107:1,23
108:25 109:3,8
**rejection** 207:9
**relate** 11:10 29:24 30:2
33:12 53:1,9 57:3,7
57:24 108:1
**related** 11:13 19:23
23:5,14 30:2,15,18,20
52:17 53:11,14 54:22
56:10,20 57:16 58:1,6
58:20 80:21 81:23
95:12 104:12 116:4
133:13,20,24 143:24
144:19 154:13 187:13
225:23 228:19
**relates** 53:18 57:8 191:5
**relating** 23:15,16 222:5
**relations** 61:14,25
**relationship** 58:16 59:4

177:22
**relatively** 36:20 37:11
**release** 190:23 207:11
**released** 70:15
**relentless** 111:13
**relevant** 15:4 177:22
**relied** 20:21 21:16 25:7
40:14,16 115:15
141:19
**rely** 212:16 225:23
**relying** 82:15 226:7
**remaining** 190:24
219:25 224:22
**remains** 113:11
**remember** 11:8 22:17
30:17 31:5 35:3 46:19
50:2 70:3 92:23 94:24
96:8,13,16 101:16
120:14 138:14 143:16
144:12 151:7 169:23
188:16 198:11 202:25
209:3 212:1 217:25
**remembering** 90:8
**remind** 183:10
**remiss** 111:7
**removed** 87:24 123:4
220:18 221:3,8
**rendered** 99:18
**reno** 1:16 2:16 5:4,17
5:20 6:25 8:16 10:7
20:8 21:7 73:25
142:13 213:20 232:8
232:21 234:4,23
**repair** 182:1
**reparation** 101:5,6
**repeat** 19:8 122:2
163:24
**repeatedly** 22:4
**rephrase** 52:14 84:1
108:17,19 109:6,10
172:14 192:7
**rephrased** 85:8
**replicated** 220:11
**reply** 12:10
**report** 3:9,10 12:20,21
15:1,12,18 20:18,22
40:12 45:9,11,14,19
46:4 48:19 53:17,24
53:25 54:3,5,7,12,14
54:19 56:5 59:16,17
59:20,21,22,24 70:5
78:15 79:6,10,25
80:24 91:7 97:22
101:5 102:17 106:7
109:22 116:25 133:13
133:16,18,20,21,25
134:9 142:19 143:8
144:3 150:10 172:20
172:23 180:1,7 190:5
190:13 195:25 197:13

Carroll v. Allstate                            Gary Fye                              April 2, 2013

Page 17

197:15,22 198:4
203:18 226:16 227:8
227:10
**reported** 1:25 14:25
150:25 207:2 225:23
**reporter** 5:18 6:6 13:14
16:13 19:8 36:10
51:21 55:11 62:16
71:20,23 72:4,22 73:8
74:4,19,24 80:8 81:2
81:14 84:4 88:13
122:4,6 124:10,25
135:12 155:13 157:18
170:20 173:22 195:8
232:14
**reporting** 5:3,17,18
59:10 72:6 73:25
142:13 213:20 232:8
234:22
**reports** 12:15 31:16
32:11 36:14 45:10
46:6,16,17,21 53:21
82:7 104:12,17,21,24
105:5 134:1 165:16
197:6 199:12 228:1
**represent** 5:23 103:15
105:4 218:1
**representative** 60:9
174:10
**represented** 28:11 74:2
**representing** 6:1 69:15
92:13 97:10 162:8
167:11 182:15 218:6
**represents** 17:23 34:3
118:19
**reputable** 218:22
**reputation** 99:13
**request** 24:25 106:17
207:19 208:12 209:2
**requested** 23:18 49:25
**requesting** 74:7
**required** 190:23 211:5
219:10 227:13
**requirements** 182:7
**requires** 37:12 204:4
211:16 229:13,16
**residual** 171:22
**resigned** 215:23
**resisted** 204:11
**resolution** 136:21
173:19 202:21
**resolutions** 110:20
**resolve** 22:13 124:2
127:19 153:13,20
154:13,20 155:9
156:2,3,8 157:14,15
159:7,24 183:2
184:14 188:9,20
190:4
**resolved** 111:25 138:6

202:19
**resolving** 89:12 204:9
**respect** 23:6,13,23
24:11 26:24 29:22
33:3 34:5 38:21 39:5
39:8 41:8 52:23 54:21
61:14 66:11,12,22
67:25 75:22 82:14
91:9 93:13 98:1 119:1
125:22 126:3 132:15
198:8 208:16 210:7
226:14
**respond** 24:14 26:8
101:2 151:19 164:3
188:8,19 192:10,14
192:25 219:14,17
**responded** 153:13
192:17 203:21
**responding** 83:2 121:21
137:24 153:19 161:10
178:15
**response** 12:1 26:15,17
28:22 29:20 58:24
82:23 83:21 153:21
154:1,11,20 155:9,18
155:25 156:6,11
173:6 175:9,11
188:22 189:1,2
191:10 192:5,18
193:5 195:2,15
**responses** 82:18 83:1
**responsibilities** 124:4
**responsibility** 124:2
150:12
**responsible** 149:23
178:13
**responsive** 14:12
**rest** 184:15
**result** 99:10 136:21
166:3 172:11 210:18
**results** 110:15 111:4
114:12 137:6,6 138:5
138:9 147:21 210:14
**resume** 7:7 55:17
**retain** 79:1
**retained** 36:17 78:1,6,8
78:13 97:2,24 138:3
177:25
**retainer** 34:1,6
**retaliates** 188:6
**retired** 8:13 167:7
171:2
**retirement** 111:5 114:4
114:10,20 117:8
**retracted** 104:15
122:10
**retraction** 122:8
**retrieved** 52:3
**returned** 40:5 49:19
**returns** 196:2

**reveal** 91:15 93:12
**revenue** 93:24
**reverse** 152:24
**review** 25:24 26:1,25
33:18,19 37:1,3,8
133:19,23 134:6
177:17 195:18,24
214:16 215:10
**reviewed** 20:21 21:16
22:15 60:12 133:12
171:5 172:25 173:3
215:14
**reviewing** 25:19 26:8
36:24
**rewards** 112:10
**rhetorical** 26:15
**rich** 28:3 41:4 47:16
78:22 96:15 105:16
131:24 217:23 220:1
220:15 224:7
**richard** 1:5 2:5 5:11 6:1
6:1 11:11 17:23 60:2
63:23 64:3 73:21
86:13,17 142:9
154:19 156:1,6 203:4
213:16
**ridley** 2:10 3:4,14 6:3,3
6:14 7:5 13:17 16:1,6
16:12,15 17:8,11,21
17:22 20:10,16 21:8
21:10,20,25 22:4,11
22:20 23:6,7 24:22,23
26:11 27:17 28:10
29:14,15,18,21 35:12
36:8 37:16 38:13,15
40:20 43:17,21 44:13
45:1,4,18 47:16,24
48:6 51:4,7,20 52:11
55:14,20 56:1 62:9,14
62:19 71:10,15 72:1
72:10,15,20,24 73:1,4
73:7,12 74:16 76:8,9
76:9 77:4,6,19,22,24
78:20 79:8,17,18 80:6
80:9,18,19 81:4,17,18
84:2,5,24 85:11,14,20
85:23 86:2,9,10 87:9
87:15 88:15,21
102:13,16,23 103:1,7
103:12,15,23 104:1,5
104:10,25 105:6,12
105:14,16 106:3,5,11
106:19,20 107:9,10
112:25 113:3,6,7,24
114:1 116:1 122:12
123:14,22 124:5,8,11
124:13,21,24 125:3
125:11,14,18 126:24
127:9,17 129:24
130:1,3,4,5,7,9,11,15

131:3,12,14,18,24
132:14 135:16 138:4
141:25 142:15 148:21
148:23 149:1,3
151:17,22 152:15,25
153:2 154:2,5 155:14
157:2,4,7,11,16,23
158:13,16 159:24
160:24 161:2,4,22
162:4,11,13 164:5,7
165:10 168:5,8,11
169:5,9,22 170:14,19
170:23 173:16,17
174:1,13,16,18,21
175:20,22 176:8,25
177:7 189:17,22,24
193:15,16 194:18,19
194:21 195:11 197:9
197:10 199:11,3 200:9
200:13 204:12,18
205:7,16,18 206:3,5
206:15 213:7,22
216:1,3,24 217:1
220:1,7,15 221:6,24
222:9 223:15 224:7
224:12,14,18,21
226:12 233:9
**ridleys** 20:19,23 21:1
28:13,14
**right** 7:1,6,9,23 9:2,8
11:22 12:24 15:8
16:18,20 20:6 23:3
24:21 26:10,11,22
29:13,17 34:5 39:5,8
39:15,19,21 40:4,8
41:3,11,15 42:11,16
44:2 45:5,6,14,19
46:3,24 47:2,15,24
48:12 52:23 53:22
54:2,17,21 55:1 57:6
59:19,24 62:14 63:17
64:1 65:8,14 66:22
67:1 70:23 79:9 80:4
80:6 82:6 85:1 86:16
87:2,23 88:15 91:6,9
93:2 95:2 96:20 100:2
102:13,16,16 103:7
106:3,11 107:12
108:14,16 109:21
112:16,22 113:3,6,14
114:23 116:17,21
117:2,4,6,9 119:5,9
119:16 123:9 127:7
128:6 130:12 135:13
135:15,25 140:8,19
141:6,13 144:11
145:24 147:18 148:13
148:18 157:24 158:11
161:11 164:12 167:4
168:12,15,22 171:18

174:7 175:17 180:2,7
180:9 183:12 186:5
187:25 188:1 189:25
196:6 198:19 199:1
200:21 201:14,17,20
202:12 205:16 211:5
212:16 214:19,24
219:19 220:15 221:15
221:15,19 224:3,13
224:18,22 225:22,23
226:1,2,21 229:9
**rightfully** 210:13
**righthand** 117:23
**rights** 151:11 228:25
**risk** 137:1 138:8,8
**risks** 136:24 137:2
**road** 50:25 66:16
146:17 186:6
**rock** 99:3,25
**rokes** 60:16,16,25 61:15
61:25
**roles** 136:7
**romano** 76:21,24 77:25
78:4,8 112:6
**romanos** 77:13
**ron** 11:1
**ronald** 98:10
**roofs** 30:9
**room** 197:5
**rose** 150:9
**rubber** 146:17
**rubin** 66:15
**rule** 46:10,11 78:17
79:3 214:8
**rules** 26:6 209:25,25
233:2
**ruling** 23:17 101:10
**rummage** 19:13 25:15
**rummaging** 19:5
**run** 37:23 51:25
**runs** 227:5
**rutgers** 67:12,12

**S**

**s** 86:17 87:24
**sad** 169:4
**safe** 92:11
**salary** 110:23
**sam** 198:25
**san** 11:1
**sanction** 212:2
**sanderson** 225:1
**santa** 67:10 100:13,21
101:22 226:19
**sarcasm** 164:4,6 192:9
192:11,21,23
**satisfactory** 74:4
**satisfy** 73:3 182:7
**save** 158:19
**saw** 38:21,22,25 115:10

Carroll v. Allstate | Gary Fye | April 2, 2013

Page 18

119:16,25 120:5
121:15 147:3 192:17
194:5
**saying** 12:4,6 14:17
50:4 65:18 71:20
101:11 124:7 131:9
131:14,15,16 143:14
145:3,5,11 152:13
166:25 174:2 176:17
182:10 188:25 190:1
201:25 203:10,15
204:2,16 210:8 211:6
212:24 214:10 216:20
216:21 228:15
**says** 10:11 56:6,12,18
59:7,25 60:15,16
61:14 62:4 65:2,11
78:18 85:21 86:17,23
86:23,24,24 87:22
94:21 106:7 117:23
119:10 133:8 136:2,5
136:10,19 137:14,21
137:25 138:12 180:10
182:4 183:3 185:17
191:3,7 195:1 198:11
203:18 211:19 225:8
228:21,24
**scale** 97:7 171:23,24
**scene** 194:3
**scholarship** 68:18
**school** 8:21,23 40:17
**schwedel** 175:3
**scope** 69:2 91:18 109:17
109:18 136:5 195:10
209:24
**scott** 20:16 161:23,24
161:25 162:1,14,20
162:25 163:13 164:13
173:15 175:2 176:1,4
176:18 177:8,19
178:10,13,16 179:1,6
180:23,24 181:14,18
183:20 184:17 185:6
185:9 208:23
**scotts** 186:23
**screen** 163:20
**se** 62:22
**seattle** 8:10 96:22
**second** 8:3 37:21 39:11
39:18,18 41:15 45:19
65:12,19,25 66:4
109:23,23 110:10
112:23 113:2,4
117:22,23 119:2,5,6
189:25 196:10,16
197:7 199:24 200:14
200:17 202:10
**secondary** 30:14
**secondhand** 114:16,17
**seconds** 229:21

**secret** 96:2
**section** 143:6 222:4,7
**secure** 150:3
**see** 7:23 8:18 11:19
41:15 47:20 74:10
77:18 78:20 80:16
91:2,16 93:2 96:1
98:9 100:14,19 103:3
105:8 109:25 120:22
144:15 148:13,16
153:16 154:23 160:22
165:16,21 167:7
220:20 225:25
**seeing** 120:13,13,14
149:15
**seek** 143:18 146:14
181:12 184:1 190:20
196:13,19
**seeking** 22:6 41:8
164:15,18,19
**seen** 38:17,19 41:23
60:13 76:13 88:5
120:14 122:8,10,13
128:20 152:6 153:18
153:21 154:9 160:10
163:17 164:12 165:14
173:7,10,14 179:11
196:4 218:18 219:13
223:11 229:5,12
**segment** 100:25 131:8
137:19,22 177:13
178:18 179:2,8,19
181:1 185:13
**segmentation** 121:8
147:20 160:5,10,20
161:20 162:2,5
163:14
**segmenting** 136:20
**segments** 137:14,15
162:10 163:1
**seldom** 92:4
**selected** 48:24 75:10
**selfaddressed** 234:13
**selfgenerated** 138:16
**selfimposed** 138:16
**selfserving** 227:24
**sell** 216:7 217:2 218:14
**seminar** 90:23 92:3,19
93:13 94:9,16,18 95:9
95:12,18
**seminars** 89:16 90:16
90:19,20,22 93:5
95:25 214:10,15
**send** 33:21 34:2 37:3,5
44:11 192:14 193:4
223:23
**sending** 234:13
**seneca** 214:11,20 216:4
216:5

**sense** 25:13 30:24 49:23
53:11 89:10 108:4,23
132:18 146:3 147:2
153:5 178:2 190:21
210:2
**sensitive** 197:23
**sent** 32:22 33:2 39:3
41:3 42:24 43:7 44:4
44:5,15 47:14,23
49:10,18 163:12
172:12 233:6,9
**sentence** 195:1,4,9,13
195:13,14 196:23
**separate** 74:6 103:3
**separately** 52:3
**september** 46:17 53:25
54:6,13 56:5 91:7
97:21 100:13 104:12
109:22 116:25 141:21
142:19 143:7 165:17
172:23 180:7
**sequences** 8:16
**series** 99:11 180:4
**serve** 21:11
**served** 223:9,13,17
**serves** 222:15
**service** 39:24 40:2 41:9
43:10 47:22 49:22
51:9,24 72:4 220:19
222:8,12
**services** 36:1
**session** 82:23
**set** 54:6 82:6 101:5
147:24 166:21 167:1
208:5 228:5
**sets** 162:15
**setting** 111:22 146:4,6
**settle** 101:1 131:8,9
137:15,22 155:20
156:2,3 157:15
159:21,22 160:4,8,14
162:21,25 163:10
212:13 225:3,9
228:21
**settlement** 14:9 188:10
191:9,12 195:1,3,15
207:2,11,18 219:14
**settlements** 178:23
**seven** 34:15 37:23 53:16
58:21 59:13,15,16,21
59:22 101:23 143:11
172:20 180:2,3,9
196:16 205:2 228:6,7
**seventeenth** 2:10 230:3
**severe** 186:20
**severity** 167:18
**sfxol** 101:1 111:15,19
137:18 139:18 147:20
153:25 156:13 160:1
160:4 161:15 162:8

162:16 163:3,16
166:22 177:11 178:17
179:2,7 181:1 183:3
184:21 185:13 195:20
227:16
**sfxol1** 136:2
**sfxol11** 111:20
**sfxol3** 136:19
**sfxol6** 163:2
**shame** 193:14
**shameful** 148:24
**share** 120:11 146:20
**sharing** 111:2 114:3
117:8
**sharon** 1:6 5:12 6:1
11:11 60:3 63:23 64:4
154:19 156:1,7
165:20 197:4 203:2
**shed** 112:13 151:14
**sheet** 92:24 163:14
**shes** 30:13
**shift** 136:6 170:1
**short** 9:22 17:16 55:23
115:14,21 127:14
142:5 152:22 177:4
213:12
**shortcircuit** 66:11
**shortcut** 47:21
**shortened** 125:8
**shortly** 203:1
**shouldnt** 119:19
**show** 31:15,23,24 32:3
32:7 34:19 85:15
111:10 119:21 133:3
169:19 191:5
**showed** 32:4 156:11,13
**showing** 35:2 37:15
**shown** 143:24 146:5
229:7
**shows** 51:11 156:13
179:4 229:4
**shut** 130:11
**side** 30:14 72:16 94:24
186:6
**sierra** 3:10 21:5 49:8,18
50:3,5 51:1,8,14 52:6
52:16,24 90:14
220:21 221:13,17
**sign** 41:13,18,24,25
42:10 74:7 234:16
**signature** 86:12,14,16
86:21
**signed** 41:8 42:2 46:7
46:16 86:11,13 233:8
234:14
**significant** 95:3 114:19
120:18 136:6,21
**signing** 74:9 133:21,25
233:1 234:15
**similar** 211:13

**simple** 18:23 19:6,16
26:15,17 43:5 50:15
70:10,18 71:2,4,8
72:15,24 73:1 127:2,4
154:9 158:17 159:13
191:24 209:11
**simplicity** 192:1
**simply** 21:24 22:1,13,22
33:21 43:3 47:21
50:23 53:6 56:6 62:20
71:4 72:11 75:20
81:19,21,22 114:11
114:18,22 145:11
164:4 183:15,16
191:22 201:25 204:11
208:10 213:1 223:3
**sincere** 105:4
**singling** 113:13
**sir** 86:11 87:5 145:24
200:18
**sit** 31:2 80:20 93:9
155:15 156:16 158:21
190:18 193:19 209:6
226:18
**site** 151:13
**sitting** 25:19 49:3 152:6
176:8,15 193:10
207:23
**situation** 14:9 37:10
178:21 225:14
**situational** 90:5
**six** 137:21 138:2 180:4
180:9 183:3 196:16
199:25
**sixth** 157:10
**skill** 232:20
**skills** 152:20
**slander** 99:14
**slash** 86:17
**slide** 76:2,5,5
**slides** 75:24
**sloppy** 86:7
**slowdown** 198:9
**small** 136:1 139:17
178:22 182:23
**smaller** 58:5 114:8
**smart** 11:3
**snell** 18:7 21:7 223:23
**socalled** 107:20
**soften** 15:6 208:2
**softened** 184:19
**softens** 150:15
**software** 102:3,5,7,20
105:25
**sold** 203:22
**sole** 68:8
**solely** 8:14 93:4
**somewhat** 64:14 186:4
**soon** 49:22
**sorry** 6:22 7:13 29:8

**Carroll v. Allstate**                    **Gary Fye**                    April 2, 2013

Page 19

30:7 31:4 43:8,19
45:23 47:13 59:15
71:16 76:7 86:19 95:1
99:24 102:15 104:24
119:2 123:22 124:5
134:8 137:10 138:10
141:23 151:20 186:10
186:10 205:14 213:5
216:16 217:15 223:10
224:5
**sort** 64:23 89:9 94:25
118:22 207:11 215:11
220:16
**sought** 84:18 181:9,10
181:14 183:21 184:7
**sound** 191:13
**sounds** 191:17,17,20
**source** 68:9 119:11
**sources** 57:2 138:25
141:4
**space** 41:22
**spade** 198:25
**speak** 167:3 226:22
**speaking** 7:17 31:19
51:8 53:23 57:20
72:21 93:18 129:1
214:14,20
**speaks** 133:8
**specialty** 214:11,23
216:13 217:2,6,13,14
217:15
**specific** 13:11,19 15:19
18:15 29:22 35:13
37:6,7,8,9 53:9 56:9
56:15,20 57:15,16,18
57:20,21 58:4,8,16,25
59:1,4,9 61:20 63:22
78:7 79:12 80:21
81:23 82:5,15 83:7,12
83:13,23 84:7 94:2,5
101:8,17 116:7
118:11 119:18 120:12
135:21 143:12 173:18
174:9,10 179:5 183:7
183:20,22,24 184:1,8
184:9 188:1 207:20
207:24 212:25 217:2
217:5,12,14 219:10
**specifically** 11:12 25:6
25:7 26:7 35:19 40:14
52:25 53:2,11,19
54:22 56:9 57:3,7,8
57:25 58:1,6,20 60:22
64:3 79:20 89:18
102:7 121:14 135:22
139:2 145:7 153:7
166:18 176:21 177:8
184:25 211:15 223:2
**specifying** 207:5
**speculate** 119:19

**speculating** 83:22
**speech** 159:4
**speed** 26:12
**spelled** 229:1
**spend** 32:10 36:15
**spending** 32:9
**spent** 32:11 33:21 34:9
34:23 36:12 37:19
87:7
**spoke** 18:1 217:20
**spoken** 13:4 31:12
67:16,20,21 203:2,4,6
215:4,7 217:5,12,18
**spouse** 171:3
**ss** 232:1
**stacked** 49:7
**staff** 138:3 178:3
**stage** 177:11 205:11
**stages** 49:20
**stamped** 234:13
**stand** 95:15
**standard** 79:15 149:20
150:11 205:20,24
210:8,23 211:1
213:24
**standards** 90:21 222:17
222:18
**standing** 19:13 68:8
**stands** 110:16 111:21
**stanton** 20:9 78:12,13
78:15,21 79:2,6,7,7
90:10
**start** 18:12,16 36:5,6
55:7 124:9 167:14
190:1 221:7
**started** 8:8,11,14 19:5
63:3 128:10,11
**starting** 9:25
**starts** 227:4
**starve** 210:13
**state** 6:15 66:16 67:2
88:1 96:23 108:22
142:24 205:20 209:13
211:5 214:11,23
215:7,8,20 216:7
217:2 218:23 219:1,4
232:1,4
**stated** 189:8
**statement** 114:14
139:18 194:16 195:21
**statements** 83:13,23
121:24
**states** 1:1 5:14 91:16
119:12 211:4,4 212:8
**stating** 156:4
**status** 121:9
**statute** 90:2,6 211:15,18
229:13
**steele** 92:20,21
**stempel** 66:17

**stenotype** 232:14,19
**step** 65:24 144:24
**steve** 96:18,21 97:8,12
97:17
**stip** 102:17
**stipulation** 102:9,21
103:3,18,20 105:7,23
**stipulations** 103:11
107:3
**stop** 71:1,1 107:16,17
126:21 127:3 183:6
**stopped** 33:12
**story** 65:5 66:16 152:22
183:5
**straight** 51:25
**strange** 150:8
**stream** 93:24
**street** 2:10 5:4,17 73:25
142:13 213:20 230:3
232:8 234:22
**stretching** 113:4
**strike** 55:15 70:9 77:4,6
77:22 124:12 125:14
130:1,5 148:23
151:17 152:25 154:2
155:4 157:2 159:12
161:2,6 173:16
174:13,14,16 176:25
189:22 191:23 193:15
194:19 195:4,16
197:9 199:2 200:9
204:12,16 216:1,24
**strzelec** 96:18,19,19
**student** 209:18
**studied** 199:25 200:1,15
200:16,19 201:15,18
201:22,24 202:5
228:15 229:11
**studies** 68:23 69:5
**stuff** 43:12 49:22 86:5
128:19 204:25
**styled** 99:15
**sub** 59:25
**subcategories** 46:12
**subject** 28:7 69:19
77:10 103:22 112:14
113:19 170:25 171:3
179:22 210:4,4
**subjected** 100:24
**subjecting** 227:15
**subjects** 69:1 209:20
**submitted** 78:15
**submitting** 133:25
**subparagraphs** 46:12
**subpoena** 3:9 18:4
21:11 25:1 39:8,13
40:23 41:21 42:4,8,14
42:15,25 47:19,20,22
58:24 59:6 223:9,13
223:16,21,22,24

**subpoenas** 41:9
**subrogation** 228:25
**subscribed** 231:8
**subsequently** 70:16
**subset** 48:13,17
**substance** 12:11
**substantive** 44:7 114:19
**substantively** 44:8
**substitute** 228:24
**substitution** 228:10,17
228:19 229:14
**subvert** 180:24
**subverted** 180:18
**subverting** 208:10
**successful** 145:22
**suddenly** 21:1
**sue** 84:20,25 153:25
156:15 166:24 173:25
174:3 226:5
**sued** 11:3 69:23 85:1
99:13 137:1 149:22
154:1
**suffer** 152:16,21
**suffering** 99:9 193:8,8
**suffice** 76:18 96:6
**suggest** 55:6 77:11
79:15 104:19
**suggested** 29:3,6 101:8
151:12
**suggesting** 46:9 71:7
76:9 129:25 130:8,17
179:24 197:4
**suggestion** 105:24
125:10 135:7
**suggestions** 188:17
**suggests** 86:13
**suing** 78:6,8
**suit** 188:24 212:14
**suite** 2:6,11 230:3
**summaries** 146:8
**summarizing** 68:14
**summary** 111:21
138:11 149:13
**superior** 226:19
**supervisor** 10:8 18:19
134:6 148:3
**supervisors** 62:2 63:11
64:9 65:9 118:10,21
120:5,20 147:25
**supplement** 35:10,11
45:13 124:19 224:20
**support** 82:6 116:3,8,14
116:22 129:15 136:8
144:18 150:11 181:8
184:12 190:11
**supported** 150:3 181:6
**supporting** 149:24,25
181:23 184:21
**supports** 52:22 141:14
141:17

**suppose** 44:10 101:21
**suppressing** 145:22
**sure** 7:16 14:22,24
15:13 30:14 33:10
35:17,25 62:11 69:9
70:7 83:9 90:12 93:6
94:13 102:19 106:15
109:3,7 115:3 117:13
119:15 132:10,13
141:25 153:10 163:25
164:20 170:21 172:15
175:18 177:21 208:25
213:7 215:1,2,19,22
226:20
**surgeries** 187:9
**surgical** 171:21 172:7
**surprise** 43:6 215:24
**surprised** 113:22
**surprises** 215:25
**survey** 218:13,18
**susan** 1:25 5:4,18
123:22 124:5 149:2
232:3,23
**susanville** 8:9
**suspended** 212:13
**suspension** 225:2,9
**swear** 6:7
**switched** 9:10
**sworn** 6:10 231:8 232:9
**syllable** 104:9
**sylvester** 209:19
**symptomatology**
167:14
**symptoms** 204:9
**system** 101:5,7 111:23
112:10 113:15,18
141:18
**systems** 76:21 227:12

---

**T**

**t** 1:14 5:5,11 6:9 7:14
73:14,21 142:2,9
213:9,16 230:1 231:1
232:9 234:3
**table** 49:4,4,16
**tables** 98:19
**tabs** 36:13 220:9
**tacit** 147:5
**tact** 124:3
**tactic** 10:23
**tactics** 11:3
**tailchasing** 10:14
**tailored** 136:8
**take** 17:24 24:13 26:1
36:21 38:10 54:2
55:18 62:10 82:22
88:15 106:6,16 112:3
112:19 115:14 126:22
127:11 132:3 152:5
165:11 173:25 174:2

Carroll v. Allstate                                Gary Fye                                April 2, 2013

Page 20

176:25 181:22 185:20
190:22,25 191:1,1,6
191:13,23 192:13
194:3,9,15,17,22
195:5,16 196:22
205:10 220:8,14
221:19 226:1
**taken** 17:16 49:1 55:23
57:15 88:18 89:16
115:21 127:14 142:5
177:4 187:11,13
192:18 198:22 213:12
232:13
**taker** 26:4
**takes** 37:2 145:13
**talk** 10:5,11 39:24
89:10 102:18 141:10
144:13 150:22 153:10
180:20 184:9 185:18
227:10
**talked** 10:9,9,19 98:18
225:1
**talking** 15:17 36:6
44:23 55:7 56:4 58:13
71:1,21 72:9 75:8
92:17 108:13,15
112:16 116:2 141:18
142:16 143:20,22
162:18 171:23 172:1
172:23 188:17 197:16
197:18 213:23 214:3
**talks** 109:23 208:22
**tantamount** 145:4
**tapes** 57:1
**target** 48:2
**targeted** 99:8
**tax** 196:2
**taylor** 31:1
**teach** 67:13
**teacher** 68:25
**teaching** 10:24
**technically** 76:5
**technique** 150:17
**tecum** 41:21,22 47:20
**telephone** 44:23 50:3
64:23
**tell** 7:21 9:17 17:11
21:21 27:9 33:17
35:24 37:18 38:9 40:2
43:4 44:25 72:10
78:20 80:15 85:18
88:23 97:7 99:4
100:15 106:23 113:17
124:22 125:25 127:3
142:23 146:10 150:23
158:20 160:1,3,8
161:13 167:8,16
177:17 204:22 205:5
210:22
**telling** 30:19 50:2 74:5

114:11 175:11 198:2
205:4
**ten** 138:11 140:19 141:1
141:7 218:21
**terence** 2:10 6:3 17:22
44:7 76:8
**term** 14:7 59:1 176:21
**terminated** 214:4
**terminology** 187:7
**terms** 27:22,24 53:9,13
54:4 61:19 66:15
83:12 106:7 108:7
112:4 122:18 144:14
145:13 164:23 178:4
178:5 201:14 207:8
207:10 208:1 209:22
209:24 218:15
**test** 15:22,25 16:3 26:18
83:16
**testified** 6:11 67:1,4
100:1,4,22 101:4
132:18 148:7 214:12
225:10 226:15
**testifies** 76:25
**testify** 77:8 78:1,5 83:15
154:8 207:1 232:10
**testimony** 12:20 14:14
22:23 52:25 53:5,6
64:18 66:23 72:12
74:14 75:21 84:1
85:13 100:4 102:11
103:13,19 107:22
147:3,3 160:17,17
175:23 176:1 192:18
206:18 207:14 210:1
210:5,6 215:10,12
227:5,7
**texas** 8:1,13
**text** 40:17 53:16 68:2,11
68:20,22 69:11
**thank** 5:25 8:18 11:21
20:6,8 23:3 28:2
29:13,15,17 62:15
66:9 73:6 75:4 86:25
88:14 112:22 117:18
127:9 130:6 141:13
149:2 153:6 157:24
168:19 170:24 188:2
195:18 199:19 208:16
226:16 229:23
**thats** 13:15,21 15:12,14
22:18 24:1,19 26:3,9
28:17 29:6 30:16
33:19,19 35:22 37:10
37:11 41:12,22 44:23
46:23 48:20 50:23
54:9,9 58:7,20,20
63:15,25 65:4 68:14
69:14 71:4,6 72:5,7
72:16 75:25 79:15

80:16 83:14 85:2,5,5
86:5,24 87:23 95:2
96:16 99:17,20,24
102:14,22,24 103:16
103:22,23 104:25,25
105:7 106:10,11,13
107:24 108:14 109:15
111:21 112:24 113:18
113:18,19 114:3,3
116:17,18 118:3
123:23,23 125:1
128:19,23 129:20
133:2 138:2,11
145:14 148:24 149:7
150:16 151:20 154:1
156:3,11,18 158:1,3
159:9 160:16 162:16
162:22,23 163:8,9
170:6,21 176:21
177:21 179:12 181:20
182:18 183:3 184:8
185:3,3 188:7 189:2,4
189:9 192:1,2 198:16
201:19 202:5 203:17
205:22,24 206:13
207:3 208:7,18
214:13 215:1 221:7,7
222:12 227:6 229:11
**thereabouts** 171:15
**theres** 26:2 28:13,21
35:1 37:6 40:23 42:14
46:21 56:22 62:25
66:7 72:22 74:17,18
86:12 99:2 103:18
115:5 116:8 117:19
137:16 144:6 163:7
163:21 167:24 177:17
178:5 184:7,9 185:15
191:18,20 199:4,7,9
199:14 204:6 210:20
210:25 211:20 220:10
222:6
**theyre** 15:3 33:18 51:23
51:23 57:18 71:8 72:5
72:9 80:17 91:21 92:1
95:25 104:22 107:19
116:19 121:14 132:5
138:4,4 149:14
176:22 178:2,18
195:22 220:1,12
221:3
**theyve** 132:13
**thing** 25:22 26:12 39:23
52:19 192:2 207:11
214:18 215:11 222:16
226:1,2 229:9
**things** 10:18,18 42:10
47:5 83:18 87:5 97:14
99:15 114:8 186:21
187:9 195:23

**think** 7:2 9:1,16,25 11:7
13:2 17:1 23:23 24:1
24:9 25:12,13,21,21
26:20 27:6 28:3 29:1
29:2,11 30:22 38:23
38:25 39:2 46:20
65:22 66:2,7 74:13,17
75:13 76:6 80:13 82:6
82:12,15 83:3,4,14
88:6 90:3 92:11 93:9
93:12 95:21 99:18
101:20 105:10 106:2
118:8 127:23 135:22
136:7 144:25 147:14
147:17 149:21 150:8
151:4,8 152:12
157:22,25 158:2,6,8
159:20 161:15,16
162:14 164:19 165:15
167:17 171:4,4 175:5
175:16 176:14 177:21
188:7 190:3 191:25
192:7 194:1 202:18
202:23 211:14 218:25
219:3,6 222:2 223:11
223:20 225:13,25
226:5 228:18
**thinking** 108:5,6,7
145:5
**third** 29:9 87:12 117:2
141:14,16 163:3
224:8
**thirdly** 52:5
**thirdparty** 181:23
207:10 220:23
**thirteen** 117:1 141:21
142:18 143:7 149:18
**thirty** 234:17
**thoroughly** 129:14
**thought** 34:18 62:17
204:15 211:22 217:11
**thoughtful** 97:18
**thoughts** 38:4 195:2,15
**thousand** 34:15 37:23
52:21 140:5
**thousands** 52:7 144:8
155:16,17
**threaten** 71:19 75:1
**threatening** 74:13,17,25
74:25
**three** 22:9 39:16 52:21
56:18,21 57:10,12
87:13 109:23 129:4
139:13 142:8,18
143:7,14 144:12
145:4 148:8 156:19
162:22 213:9 222:5
223:6
**thrown** 76:1
**thursday** 20:25 223:18

223:19,20
**tie** 149:16
**ties** 121:1 149:10
**tight** 136:16
**time** 5:9 7:4 9:25 14:2,5
14:19 16:9,10 17:15
17:16,18 18:24 19:12
22:5 23:7 24:12,14,17
26:1,2,5 27:2,14,15
27:16 28:4 32:9,10,11
32:14 33:3,8,16,24
34:10,13,23 35:2,5
36:12,15,19,21,22,22
36:24 37:2,3,8,9,19
37:21,22 38:14 40:19
44:3,6 45:3,17 50:6
51:6 55:22,23,25 62:7
70:12 73:15,17,19
88:17,18,20 90:6
92:16 104:3,4 105:15
115:20,21,22,24
116:6 122:5,19,23
124:15 125:4 127:13
127:14,16 128:7,9,14
128:19,21,24 130:18
130:20 131:11 133:12
139:4,8 142:3,5,7
145:21 157:10 158:19
159:14,15 170:15
177:3,4,6 187:6 190:5
191:8 192:13 196:12
196:18 197:15 202:16
202:18,21 204:20,24
208:12 213:10,12,14
214:5 217:20 218:7
219:25 220:3 226:9
230:6
**times** 22:9 68:13 69:22
69:25 70:2 76:2 98:16
139:13 156:19 163:17
174:24
**tiny** 103:6
**tiptoe** 105:23
**tipton** 6:17,17
**title** 175:4
**today** 11:19 16:21 18:12
20:5 21:9 23:8,23
27:9 29:11 32:3,6,10
34:22,24 38:11 39:6
40:9 48:15,19 74:3
96:3 120:25 221:16
**todays** 9:18 32:19
229:25 234:17
**token** 153:12
**told** 10:23 19:5 40:10
47:12 49:11 102:9
106:1 156:9,15
160:14 162:25 179:7
185:6
**toll** 145:13

**Carroll v. Allstate**                    **Gary Fye**                    April 2, 2013

Page 21

tool 176:10 179:1
tools 136:8
top 38:23 46:2 87:20
   98:9 99:20 101:23
   134:3 163:17 180:4
   188:16 223:6
topic 93:15
tormenting 50:13
tort 119:12
total 51:24 52:1 97:7
   106:22 107:1,22
   108:25 109:3,7
   165:21 230:4
totally 125:1,2
touched 89:20
track 35:5,20,25
tracy 197:8
trained 150:19 187:7
training 3:12 119:11,14
   125:7,9 129:3 187:3,5
   187:7,8,12 210:2
   229:6
transaction 176:18
transactions 97:18
transcribed 232:15
transcript 43:18 51:4
   71:11 72:11,12,21
   74:6,11,19,24 75:2
   77:7,23 79:17 80:18
   81:17 86:9 87:9 105:6
   107:9 113:24 123:15
   130:6 157:7,8 169:5
   174:18 175:21 204:18
   205:17 206:3 216:2
   232:17,19 234:15,16
transcripts 71:13,24
   72:19
transferral 163:14
transparency 179:23
transpired 207:7
traveling 49:2
treat 88:4 211:2,7,8
treatment 30:25 100:24
   187:14
treats 211:3
trends 93:16,19 94:3,4
   94:6
trial 10:19 78:25 99:16
   99:21,24 100:1,3,18
   100:22 102:17 103:19
   103:19 105:18 106:8
   137:9,10,23,25
   145:21 159:23 163:5
   163:6 183:1,4 185:15
   185:16,17,20
trials 136:17
trick 156:22,24
tricks 215:25
tried 26:14 58:4 85:8
   100:21 151:19 190:1

229:8
trigg 2:9 6:5 28:5 230:3
trouble 151:20
troubling 22:25
true 50:23 71:4 73:12
   75:10 141:9 145:2
   160:16 181:21 187:20
   192:1 193:6 202:12
   222:16 232:18
truisms 68:8
truong 101:24,25,25
   108:16
trust 58:9 123:5,7 191:8
truth 158:20 186:12,12
   232:10,10,11
truthfully 105:22
try 11:4 15:10 16:19,23
   27:10 56:2,3 74:12
   91:18 105:24 108:17
   108:19 110:9 143:21
   148:10 184:6
trying 15:9,11 16:17
   18:15 26:12 35:14,16
   35:22,23 41:10 47:21
   55:2,12 58:9 59:2
   62:11,18 70:7 71:3,19
   75:20 79:15,16 81:19
   81:22 85:12 87:5,6
   88:3,3 98:15 107:13
   114:7 125:10 130:25
   145:16 148:19 159:15
   164:8 169:15 175:12
   176:6,8,16 183:18
   184:8 188:10 204:10
   206:1 210:13,16
tuesday 1:15 5:1,9
   232:6
turn 98:19,20 101:23
turned 83:23
turning 9:2 82:20
twice 120:3
two 21:23 27:22 39:16
   41:13 46:6,16,20
   49:20 53:21 54:23
   56:5,12,16 67:9 73:20
   82:7 86:4 87:8,10
   99:20 103:16 110:11
   111:9 112:17 116:13
   117:1 136:10,10
   141:21 142:2 143:6
   194:6 207:4 222:6
   224:8
twopage 112:23 113:17
type 9:7 37:24 89:5
   99:14 114:10 123:25
   136:17 160:21 166:22
   167:19 187:5 198:25
   208:8,9 212:16 219:6
typewriting 232:15
typically 97:2 166:2,5

**U**

u 87:24
uim 14:5,19 18:24
   24:16 88:24 89:1,17
   90:1,17,21 98:7 100:9
   101:15 107:6,11,23
   108:1,12 127:19
   138:20 153:13,20
   154:14,20 155:9,20
   156:2,8 157:14
   164:23 166:4 171:16
   179:17 180:11 182:12
   182:14 188:9,20
   189:7 190:4 191:12
   202:24 203:1 205:21
   211:21 214:1 216:7
   217:2,6,16,19 218:14
   218:15 219:1,3,8,14
   225:3,24 227:13
   228:8 229:15
um 90:1,17 98:7 100:9
   101:15 107:6,11,23
   108:1,12 127:19
   182:12,14 216:7
   219:1,3,8 228:8
umbrella 172:2
unanswerable 13:15
   80:3 121:5 132:23
unavoidable 199:22
unaware 20:10 29:10
   48:2
unceasingly 212:22
uncertainty 193:8
unconscionable 225:13
undercut 150:1 178:17
   178:18 181:9,10,12
   181:15 183:21 184:3
   184:20
undercutting 185:4
undergo 227:17
undergoing 30:25
underinsured 178:11
   191:10
underlying 166:20
   172:2 190:14 202:25
   228:22,22
undermine 93:23
   121:10
undermining 102:2
underneath 193:12
underpay 76:21
underpayment 198:9
understand 7:6,15 9:3
   12:19 14:14,17 22:1
   22:25 26:23 27:2 29:8
   31:18 33:11 44:9
   48:16 58:10 66:23
   76:24 81:16 82:2
   91:13 93:14 103:1
   104:5 106:5 116:13

118:1 122:21 127:18
   132:12 140:4 143:24
   144:25 145:3 146:18
   177:19 180:5 186:22
   186:23 205:8,14
   218:22 219:11,19
understanding 14:10
   23:22 41:12 43:22,24
   44:25 105:25 110:8
   119:13 163:22 198:12
   212:20
understands 219:1,3,6
understood 41:7 113:11
   229:4
underwent 120:24
undisputed 82:24
   182:15 184:18 205:21
   208:16 210:7,11,12
   210:24 211:4,10,16
   211:20 213:24 214:1
   214:13 215:5,9,21
   218:15 228:9
undoubtedly 89:6,8
   108:10
unfailingly 178:8
unfamiliar 74:22 91:25
unfortunately 27:6
unilaterally 19:4
united 1:1 5:14 212:8
universal 190:21
universally 210:24
universe 57:14,15 58:3
   58:5 140:22
university 9:5,15
unnecessary 27:13,14
unprotected 32:3
   140:17 223:4
unreasonable 203:15
   203:17,19 211:25
   212:4,5 226:6 227:22
unreasonably 226:8
unrelated 19:15 58:2
unresponsive 183:7
unsigned 40:24
unusual 74:20
unwritten 204:3
updated 48:10 62:25
   221:11
upset 148:17
uptodate 224:2
urgency 20:25 49:6,23
use 36:24 38:5 42:14
   43:10 65:16 76:1
   95:14 102:3 112:7
   151:11 176:21 181:18
   182:13 199:25 208:11
   228:17
uses 69:5
usually 21:14 37:5
utilize 208:2

**V**

v 66:16 67:1 98:1 99:3
   100:12 101:24 106:22
   107:22 212:7 234:9
valid 178:16
value 136:11 138:15,15
   138:17,20 164:23
   166:7,17 167:1
   181:24 182:8 185:24
   186:1 189:6,12,18
valued 167:18
values 166:21
variable 115:16 141:17
   143:22
variablepay 109:24
   110:3 112:16 113:9
   114:7 116:4,14,22
   118:22 142:17 143:1
   143:3,16 146:1
variety 47:5 105:9
various 130:20 187:9
   209:20
vast 163:3
verbal 107:17 111:11
   194:20
verbatim 232:13
verdict 99:18 138:15,19
   181:24 182:8 185:24
   186:1 189:6,12,18
version 63:2,5 122:22
   122:24 128:21 132:16
   221:12 222:2
versions 63:1 122:13
versus 5:12 73:22
   142:10 151:8,12
   213:17
vice 117:7
victim 199:12
video 1:14 2:15 5:10,20
   18:2 23:15 28:15
   73:13,14,20,21 142:1
   142:2,8,8 213:8,9,15
   213:15 230:1,2,4
videographer 2:15 5:8
   5:19 6:6 17:6,10,14
   17:17 29:20 55:21,24
   73:11,13,18 88:16,19
   113:2,5 115:19,23
   127:12,15 131:23
   141:23 142:1,6 177:2
   177:5 213:5,8,13
   226:10 229:21,25
view 102:21
viewed 103:19
vigil 101:11 226:18,25
vigils 226:17
villain 11:5
vindictive 194:19
violate 107:13
violated 78:17

**Carroll v. Allstate**                     **Gary Fye**                     April 2, 2013

**violating** 107:5,14
**violation** 79:4 102:21 103:18
**visited** 67:20
**vitae** 7:8
**vital** 228:12
**void** 83:4
**volume** 76:16
**volumes** 125:7 133:8
**voluminous** 76:11 80:2
**voluntary** 21:9 114:4 163:9
**volunteer** 106:18
**volunteered** 21:11 22:1
**vs** 1:8

_____

**W**

**w** 2:5
**wage** 182:2
**wait** 51:18 64:16 188:23 197:7 204:14,25 220:20
**waiver** 41:8,17,20 47:2
**waivers** 41:13 44:12
**walked** 19:4 22:14
**walking** 205:4
**want** 15:10 17:6,8 20:3 20:4 25:14 27:8,9 35:1,7,10,24 36:7 40:6 58:15 70:17,22 70:24 71:9 72:19 74:2 82:22 83:18,25 84:15 93:12 102:25 103:9 104:3 105:17 107:4 115:4,7 118:14 127:21 132:9,12 139:14 140:9,11 144:21,24 150:21 154:8 155:3 159:2 162:19 176:20 183:14 194:12 198:1 200:24 200:24 204:24 205:5 207:1 219:24 220:17 221:11 223:8 225:5
**wanted** 22:21 48:4 82:24 92:13 215:1
**wants** 43:12 95:24
**warrant** 166:6 171:16 192:9
**washington** 8:9
**washoe** 232:2,4
**wasnt** 28:9,23 42:1 49:1 145:7 153:24 164:6 175:13 190:25 197:18 197:23 207:23
**waste** 44:3 62:7 104:3 159:15
**wasted** 27:16
**wasting** 27:13 44:6
**watch** 219:22

**way** 6:25 10:21 13:22 23:24 24:1 25:12 26:8 30:21 33:12 36:21 43:7 46:14 49:7 52:15 53:12 64:23 71:6,24 71:24 83:14 85:8 86:1 97:16 100:5 103:22 108:12 110:13 117:18 120:18 131:9 133:9 135:18 136:6 148:24 150:2,9 151:4,11 156:3 160:11 167:17 173:2,24 176:9 197:4 208:3 213:2 220:10 222:7 234:3
**ways** 110:11
**wearing** 92:6
**website** 70:15 140:16
**week** 20:24
**weeks** 20:18 21:23
**weight** 114:21
**welcome** 20:23 66:10
**welcoming** 77:20
**wellknown** 178:10
**went** 18:6 24:25 25:16 43:19 99:16 121:21 128:6 147:7 155:1 183:15 184:10 188:17 194:2,6 207:22
**west** 94:24
**weve** 7:2 83:15 117:5 141:18 142:16
**whatnot** 214:15
**whats** 12:21 18:14 27:8 32:16 35:18 38:16 40:21 48:19 53:23 59:21 71:13,17 72:18 85:15 110:7 119:5 145:12 156:22 163:19 163:22,25 166:25 194:10 202:13 211:10 223:16,16 227:13
**whatsoever** 156:6
**wheeler** 2:9 6:5 28:5 230:3
**whine** 204:24
**white** 63:15 92:19,21
**whos** 31:8 43:9 86:14
**wife** 194:1
**willing** 23:1 43:9 182:24 195:22
**wilmer** 18:7 21:7 223:23
**windt** 66:14 68:10,15
**windy** 6:25 234:3
**wink** 161:18,18
**winters** 98:1
**wisdom** 30:8
**wisely** 26:5
**wish** 105:10 193:7

**wishes** 147:19
**withdrawn** 104:14,15 104:20 106:2
**withheld** 163:18 179:12
**withhold** 48:3 210:16
**withholding** 123:18 202:4
**withholds** 211:24
**witness** 6:7 13:13,15 15:25 16:7,11,14 22:9 24:2,3,5,7,10,13,17 25:25 26:8,9,24 27:5 29:4 35:7,11 36:11 43:9,19 44:9 51:22 55:9,12,16 59:3 62:10 62:17 67:8 71:12,16 71:19,23 72:3,8,13,17 72:23,25 73:2,6,9 74:2 77:5,8 80:25 81:3,13,15 85:12,18 85:21,24 86:3 87:10 103:2,8,13,21,24 104:2,7,21 105:2,17 122:2,5,7 123:16,23 124:6,20 125:1,6,12 125:15 127:7 130:2,4 130:7,10,14,17 131:15 132:4,11 135:11,13 148:22,24 151:19 152:16 154:4 157:3,5,8,21 158:14 160:25 161:3,21,24 162:1,9 168:6,9 169:6 169:23 170:21 173:21 173:23 174:11,14,17 174:19 189:16 195:6 195:9 200:7,10 204:14,20,22 206:13 220:20 221:23,25 223:12 224:11,13,15 226:11 229:20,23 233:8
**witnesses** 171:4
**wonder** 153:10
**wont** 72:9 123:18 129:1 209:15
**word** 14:6 21:13 38:6 74:8,10 76:1 80:22 106:6 205:10
**words** 7:17 33:6 42:9 48:18 109:11 129:8 136:25 144:21 181:5 182:16 216:14
**work** 7:12,19,23 8:7 33:6,13 34:4 51:12 68:18 77:13,13 78:7 89:7,9,14,15 92:10,12 97:7 104:16 110:7 118:13 132:20 139:16 179:21 205:5 209:22

228:2
**worked** 8:10 69:25 97:12 175:1
**working** 49:10 97:19 113:12 171:19 203:7
**works** 58:19
**workshops** 67:19 91:24 210:22
**world** 15:11 71:21 145:16
**worry** 10:23 40:2
**worse** 211:3,7
**worth** 34:10
**wouldnt** 38:5 43:6 89:6 100:7 101:2,2 187:17
**wow** 124:5
**write** 33:23 36:22 193:4
**writer** 68:25
**writes** 211:25
**written** 10:16 15:20 33:3,5,23 34:19 35:1 35:1 68:13 70:13 95:8 111:11 154:18 155:18 155:25 156:6,6 202:7 212:25
**wrong** 74:18 142:23 157:6 177:24 178:5 191:18,20 199:4,7,9 199:14 226:6
**wrongdoer** 138:20 181:25
**wrongdoing** 137:2 178:12 182:6 185:3 204:2
**wrote** 75:18 82:21 84:12 145:4 156:10 197:15 198:4 208:23 208:23,25

_____

**X**

**x** 3:1 101:1 131:8,9 137:15,22 159:22,22 160:4,8,15 162:8,16 162:21,25 163:10

_____

**Y**

**yeah** 35:13 50:13 52:14 62:10 91:18 100:20 115:3 144:5 168:3 171:19 181:14 196:7 216:21 223:20
**year** 8:25 9:14 60:5,24 61:20 90:8
**years** 18:10 33:12 52:8 60:7 61:1 89:23 99:16 122:16 134:24 167:15 212:20 218:21
**yesterday** 9:23 18:1,6 20:9,13 23:5,13,20 25:10 28:10 29:3,23

31:15,23 39:2 46:20 51:10 78:22 115:10 131:19
**youd** 11:19 48:3 49:18 107:15,17
**youll** 13:7 27:25 33:11 42:12 117:22 152:18 154:22 204:23
**youre** 8:5 14:17,21 15:1 15:11,17 16:25 22:10 32:9 35:16,23 36:6,19 37:13,14 43:13 44:23 50:22,23,24 52:20 55:2,12 58:7,9 62:7 62:11 66:10 70:7 71:4 71:5 74:5,21 79:14,15 81:11 83:8,16 85:23 87:3,6,20 88:3 90:12 98:14 103:8 107:13 108:4,7,18 113:10,10 114:7 123:10,16,17 123:19 124:6 128:16 131:16 141:20 142:23 145:6,22 148:19 157:3,15 158:9,14 159:14,21 160:22,25 161:3,5,7,10,12 169:18,18 175:16 176:9,15,15,17 179:24 183:7 186:14 186:17,17,19 187:1 188:1,17,25 191:4 193:10,13 197:23 200:10 201:6 202:6,7 202:9,9,11 204:16,16 206:1 209:14 211:5,6 216:18,20 225:11
**youve** 28:3 30:21 33:6 34:23,23 35:21 37:19 48:8 50:19 67:4 74:11 87:6 92:15 96:24 104:7 112:17,17,18 112:22 116:3,7,13 128:18 132:16 141:19 143:23 152:12 157:22 158:8 159:14,20 174:17 183:13,18 192:2 198:3 205:12 217:10 218:25 226:24

_____

**Z**

**zero** 163:7
**zone** 225:17

_____

**0**

**00** 5:2,10 9:25 204:23 205:1,6 219:21 229:20 230:6,7 232:7
**000** 18:7 19:13,14 38:3 38:3 51:13,15,24

_____

**Carroll v. Allstate**                    **Gary Fye**                    April 2, 2013

**Page 23**

76:14,17 131:19,21
140:6,7,23,24 141:3
166:2,3,6 167:10
171:15,16 194:25
**01** 73:16
**05** 73:19

---
**1**
---

**1** 58:15 115:20,24
127:13,16 232:18
**10** 55:22,25 234:1
**104609** 90:2
**105** 3:22
**107** 3:16
**11** 3:10,18,21 51:11
52:1 73:16,19 78:17
88:17 165:19,22
233:6
**1111** 5:3,17 73:25
142:13 213:20 232:8
234:22
**113** 3:17
**115** 3:11,12
**11th** 232:21
**12** 3:9,10 18:7 19:13
51:13,15,24 88:20
111:24 131:19,21
135:20 140:23 191:6
204:21
**123** 3:17
**12345** 6:2
**12cv00007wjmklm** 1:8
**12cv0007wjmklm** 5:14
**12cv07** 17:22
**12th** 134:8
**13** 19:14 194:22 233:6
**130** 3:18
**14** 142:4
**149** 3:18
**15** 3:17 18:10 219:20,21
220:13 229:21
**150** 76:14,17 140:6,7,24
141:3
**157** 3:19
**16** 18:10 93:13 94:9,23
95:18
**169** 3:19
**16th** 90:25 91:4 193:1
**17** 3:19,20,21 16:10
115:20
**174** 3:20
**175** 3:20 32:17
**17th** 90:25
**18** 3:16,20,20,21 111:24
**18th** 90:25 91:1
**19** 13:3 87:11 177:3
**1959** 9:1
**1962** 89:8
**1970s** 50:21
**1973** 9:16

**1995** 3:12 18:8 119:12
119:14 122:14 126:2
128:7,20 129:4
130:21 132:22 141:7
164:10 191:4
**1998** 3:11 8:14 89:8
110:25 112:24 113:14
117:5,11,14
**1999** 7:12,17
**19th** 91:1 92:25
**1a** 119:7 136:4
**1st** 51:11

---
**2**
---

**2** 1:15 3:18,22 32:21
34:1,3,6,9 46:7 142:4
142:7
**20** 3:10 45:20 46:4 50:1
53:24 54:3,5,11 79:10
79:23
**200** 58:15
**2000** 8:15
**2003** 91:1 93:1,3 222:2
**2005** 66:3 91:1
**2009** 90:25 91:9,13 99:2
99:25 100:13,21
134:12,24 135:2,10
135:14
**2010** 114:15 118:6,10
134:15
**2011** 13:3 18:21 87:2,12
87:18 106:21 118:6
118:10 127:20 128:9
132:17 134:18 147:25
155:1 172:12,16
194:24
**2012** 45:20 46:4,17,18
50:1 53:24,25 54:3,6
54:11,13,19 56:5
79:10,25 80:24 87:11
87:13,19,22 90:25
93:13 94:9,23 95:18
97:21 116:25 133:16
133:21,25 134:9,20
134:24 135:2,10,14
141:21 142:19 143:7
165:17 171:9,12
172:8 180:1,7 195:25
196:6 197:13,22
**2013** 1:15 5:2,9 41:4
51:11 231:9 232:6,22
234:1,9
**2038** 101:10 227:4
**204** 3:21
**2046** 101:10 227:5
**205** 3:21
**206** 3:22
**20th** 25:1 46:18 50:9,10
50:12 54:19 80:24
180:1 197:22

**21** 3:20 17:15 41:4
99:18 106:21 194:24
**216** 3:22
**21st** 87:13
**22** 3:17
**23** 3:19 99:2 100:13
165:21 166:2 167:9
**234** 232:18
**24** 3:17 142:7
**25** 17:18 171:15 194:25
**250** 166:3,6
**25th** 13:3
**26** 46:7,10,11 79:3
115:24 165:12 171:7
188:22,23
**27** 99:24
**28** 3:9 55:22 88:20
97:21 109:22 213:11
**28th** 46:17 53:25 54:6
54:13 56:5 116:25
141:21 143:7
**29** 85:16,16 188:25
**2nd** 5:1,9 100:20 232:6
234:9

---
**3**
---

**3** 177:3,6
**30** 87:7 88:17 177:6
234:17
**32** 165:21 167:9
**333** 2:5
**350** 167:10 171:16
**36** 213:14
**37** 55:25
**370** 2:10 230:3
**38** 3:8
**3rd** 87:11,19,22 100:21

---
**4**
---

**4** 3:22 38:3 204:21
213:11,14 226:10
233:6
**40** 3:9
**43** 3:16
**44** 127:13
**45** 3:9,10
**4500** 2:11 230:4
**471** 165:21 167:9
**4th** 194:23

---
**5**
---

**5** 3:17,19 204:23 205:1
205:6 219:21 229:20
230:6,7
**50** 127:16
**500** 18:2 25:3 28:15
32:21 34:1,3,6,9
194:24
**51** 3:11,17
**5375** 2:16 5:20

**54** 226:10
**55** 3:17
**57** 3:8 7:3,4,7
**58** 3:8 38:13,13,14,17
**59** 3:9 40:19,22 41:16

---
**6**
---

**6** 3:4,18,22
**60** 3:9 45:2,3,5,8 46:24
109:22 202:21
**60plusyearold** 171:19
**61** 3:10 45:17 54:3
79:10
**62** 3:10,18 51:6,9
**63** 3:11 115:22 116:24
117:5 142:20,25
143:25
**634** 51:12 52:3
**64** 3:12 115:22 116:24
117:17 119:1,3,6,9
120:7,16 121:4,25
129:4 135:19,20
139:22 140:20 141:2
141:8,11 142:20,25
143:25
**655** 1:25 232:23
**6815** 6:25 234:3

---
**7**
---

**7** 3:8,19 38:3 171:9
**70s** 63:3 149:21
**71** 3:18
**725** 51:11 52:1
**77** 3:19
**775** 234:23
**7867655** 234:23
**79** 3:19 171:9,14

---
**8**
---

**8** 87:1
**80** 3:20 198:12
**80110** 2:6
**80202** 2:11
**80s** 63:4
**81** 3:20
**818** 171:9,14
**85** 3:21
**850** 2:6
**86** 3:21
**87** 3:22
**89509** 234:23
**89511** 6:25 234:4
**8th** 87:12,18

---
**9**
---

**9** 3:9,16,18,21,22 5:2,10
9:25 16:10 17:15,18
232:7

---